UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

11 CIV 6198

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

              Plaintiff,

      -against-

GOLDMAN, SACHS & CO., GS
MORTGAGE SECURITIES CORP.,
GOLDMAN SACHS MORTGAGE
COMPANY, THE GOLDMAN SACHS
GROUP, INC., GOLDMAN SACHS REAL
ESTATE FUNDING CORP., PETER C.
ABERG, HOWARD S. ALTARESCU,
ROBERT J. CHRISTIE, KEVIN GASVODA,
MICHELLE GILL, DAVID J. ROSENBLUM,
JONATHAN S. SOBEL, DANIEL L.
SPARKS, AND MARK WEISS,

            Defendants.

___ CIV. ___ (___)

**COMPLAINT**

**JURY TRIAL DEMANDED**

JUDGE BATTS



# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ...................................................................................................1

PARTIES ......................................................................................................................9

    *The Plaintiff and the GSEs*...................................................................................9

    *The Defendants* .................................................................................................10

JURISDICTION AND VENUE ..................................................................................13

FACTUAL ALLEGATIONS ......................................................................................14

I.    The Securitizations.............................................................................................14

    A.    Residential Mortgage-Backed Securitizations in General ....................14

    B.    The Securitizations at Issue in This Case .............................................16

    C.    The Securitization Process ....................................................................19

        1.    Goldman Sachs Mortgage Company Pools Mortgage Loans in Special Purpose Trusts ...........................................................19

        2.    The Trusts Issue Securities Backed by the Loans.....................21

II.    The Defendants' Participation in the Securitization Process ............................25

    A.    The Role of Each Defendant .................................................................25

        1.    Goldman, Sachs & Co............................................................25

        2.    GS Mortgage Securities Corp. .................................................26

        3.    Goldman Sachs Mortgage Company .......................................27

        4.    The Goldman Sachs Group, Inc...............................................28

        5.    Goldman Sachs Real Estate Funding Corp..............................29

        6.    The Individual Defendants........................................................29

    B.    Defendants Failed To Conduct Proper Due Diligence .........................32

III.    The Registration Statements and the Prospectus Supplements.........................37

    A.    Compliance with Underwriting Guidelines .........................................37

i

B.      Statements Regarding Occupancy Status of Borrower .........................................40

C.      Statements Regarding Loan-to-Value Ratios.........................................................43

D.      Statements Regarding Credit Ratings ....................................................................45

IV.   Falsity of Statements in the Registration Statements and Prospectus Supplements ..........47

A.      A Review of Loan-Level Data Indicates That the Statistical Data Provided
        in the Registration Statements and Prospectus Supplements Concerning
        Owner Occupancy and LTV Ratios Was Materially False.....................................47

        1.      Owner-Occupancy Data Was Materially False...........................................48

        2.      LTV Data Was Materially False ..................................................................50

B.      The Originators of the Underlying Mortgage Loans Systematically
        Disregarded Their Underwriting Guidelines .........................................................54

        1.      Government Investigations Have Confirmed That the Originators
                of the Loans in the Securitizations Systematically Failed to Adhere
                to Their Underwriting Guidelines ...............................................................55

        2.      The Collapse of the GSE Certificates' Credit Ratings Further
                Indicates that the Mortgage Loans Were not Originated in
                Adherence to the Stated Underwriting Guidelines ....................................64

        3.      The Surge in Mortgage Delinquencies and Defaults Further
                Demonstrates that the Mortgage Loans Were Not Originated in
                Adherence to the Stated Underwriting Guidelines ....................................66

V.    Goldman Sachs Knew Its Representations Were False ....................................................68

A.      Evidence Regarding Goldman's Due Diligence ....................................................69

        1.      Goldman's Due Diligence Benefitted From a Direct Window Into
                the Originators' Practices...........................................................................69

        2.      Goldman Had Actual Knowledge, on a Daily Basis, of the Number
                of Non-Performing Loans ...........................................................................72

B.      Other Evidence Of Goldman's Willingness to Capitalize on Its Unique
        Knowledge at the Expense Of Investors ...............................................................75

        1.      Goldman Began Shorting Its Own Offerings Beginning in 2006 ..............76

        2.      Goldman's Targeted Campaign to "Put Back" Defective Loans to
                Originators Demonstrates That It Knew the Targeted Originators'
                Loans Breached Underwriting Guidelines ..................................................79

      C.      Numerous Government Investigations Have Confirmed Goldman Acted With Scienter ........................................................................................................82

      D.      Further Evidence that Goldman Knew the Appraisals Were Inflated ..................84

VI.    The GSEs Justifiably Relied on Goldman Sachs's Representations .................................85

VII.   Fannie Mae's and Freddie Mac's Purchases of the GSE Certificates and the Resulting Damages ........................................................................................................87

FIRST CAUSE OF ACTION ........................................................................................................89

SECOND CAUSE OF ACTION ...................................................................................................93

THIRD CAUSE OF ACTION .......................................................................................................98

FOURTH CAUSE OF ACTION ..................................................................................................103

FIFTH CAUSE OF ACTION ......................................................................................................107

SIXTH CAUSE OF ACTION ......................................................................................................112

SEVENTH CAUSE OF ACTION ...............................................................................................116

EIGHTH CAUSE OF ACTION ..................................................................................................122

NINTH CAUSE OF ACTION .....................................................................................................125

TENTH CAUSE OF ACTION .....................................................................................................128

PRAYER FOR RELIEF ..............................................................................................................131

JURY TRIAL DEMANDED .......................................................................................................131

Plaintiff, The Federal Housing Finance Agency ("FHFA"), as conservator for The

Federal National Mortgage Association ("Fannie Mae") and The Federal Home Loan Mortgage

Corporation ("Freddie Mac"), by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for its

Complaint herein against Goldman, Sachs & Co., GS Mortgage Securities Corp., Goldman Sachs

Mortgage Company, The Goldman Sachs Group, Inc., Goldman Sachs Real Estate Funding

Corp. (collectively, "Goldman Sachs" or "Goldman"), Peter C. Aberg, Howard S. Altarescu,

Robert J. Christie, Kevin Gasvoda, Michelle Gill, David J. Rosenblum, Jonathan S. Sobel,

Daniel L. Sparks, and Mark Weiss (collectively, the "Individual Defendants," and together with

Goldman Sachs, the "Defendants") alleges as follows:

## NATURE OF ACTION

1.       This action arises out of Defendants' actionable conduct in connection with the

offer and sale of certain residential mortgage-backed securities ("RMBS") to Fannie Mae and

Freddie Mac (collectively, the "Government Sponsored Enterprises" or the "GSEs").  These

securities were sold pursuant to registration statements, including prospectuses and prospectus

supplements that formed part of those registration statements, which contained materially false

or misleading statements and omissions.  Defendants falsely stated that the underlying mortgage

loans and properties complied with certain underwriting guidelines and standards.  These false

statements and misleading omissions significantly overstated the ability of the borrowers to

repay their mortgage loans and the value of the collateralized property.  These statements were

material to the GSEs, as reasonable investors, and their falsity violates Sections 11, 12(a)(2), and

15 of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*, Sections 13.1-522(A)(ii) and 13.1-

522(C) of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of

Columbia Code, and constitutes negligent misrepresentation, common law fraud, and aiding and

abetting fraud.

2.      Between September 7, 2005 and October 29, 2007, Fannie Mae and Freddie Mac purchased from Goldman Sachs over $11.1 billion in residential mortgage-backed securities (the "GSE Certificates") issued in connection with 40 securitizations for which Goldman served as sponsor, depositor, and/or lead underwriter.[1]  The GSE Certificates purchased by Freddie Mac, along with date and amount of the purchases, are listed below in Table 10.  The GSE Certificates purchased by Fannie Mae, along with date and amount of the purchases, are listed below in Table 11.  The 40 securitizations at issue (collectively, the "Securitizations") are:

i.            Accredited Mortgage Loan Trust 2005-4, Asset-Backed Notes, Series 2005-4 ("ACCR 2005-4");

ii.           American Home Mortgage Assets Trust, Mortgage-Backed Pass-Through Certificates, Series 2006-1 ("AHMA 2006-1");

iii.          FFMLT Trust 2005-FF11, Mortgage Pass-Through Certificates, Series 2005-FF11 ("FFML 2005-FF11");

iv.          FFMLT Trust 2005-FF8, Mortgage Pass-Through Certificates, Series 2005-FF8 ("FFML 2005-FF8");

v.           FFMLT Trust 2006-FF13, Mortgage Pass-Through Certificates, Series 2006-FF13 ("FFML 2006-FF13");

vi.          Fremont Home Loan Trust 2006-E, Mortgage-Backed Certificates, Series 2006-E ("FHLT 2006-E");

---

[1]  For purposes of this Complaint, the securities issued under the Registration Statements (as defined in paragraph 4 below) are referred to as "Certificates," while the particular Certificates that Fannie Mae and Freddie Mac purchased are referred to as the "GSE Certificates."  Holders of Certificates are referred to as "Certificateholders."

vii.         GSAA Home Equity Trust 2005-11, Asset-Backed Certificates, Series 2005-11 ("GSAA 2005-11");

viii.        GSAA Home Equity Trust 2005-14, Asset-Backed Certificates, Series 2005-14 ("GSAA 2005-14");

ix.          GSAA Home Equity Trust 2005-15, Asset-Backed Certificates, Series 2005-15 ("GSAA 2005-15");

x.           GSAA Home Equity Trust 2006-11, Asset-Backed Certificates, Series 2006-11 ("GSAA 2006-11");

xi.          GSAA Home Equity Trust 2006-2, Asset-Backed Certificates, Series 2006-2 ("GSAA 2006-2");

xii.         GSAA Home Equity Trust 2006-4, Asset-Backed Certificates, Series 2006-4 ("(GSAA 2006-4");

xiii.        GSAA Home Equity Trust 2006-5, Asset-Backed Certificates, Series 2006-5 ("GSAA 2006-5");

xiv.         GSAA Home Equity Trust 2006-8, Asset-Backed Certificates, Series 2006-8 ("GSAA 2006-8");

xv.          GSAA Home Equity Trust 2007-6, Asset-Backed Certificates, Series 2007-6 ("GSAA 2007-6");

xvi.         GSAMP Trust 2005-AHL2, Mortgage Pass-Through Certificates, Series 2005-AHL2 ("GSAMP 2005-AHL2");

xvii.        GSAMP Trust HE5, Mortgage Pass-Through Certificates, Series 2005-HE5 ("GSAMP 2005-HE5");

xviii.          GSAMP Trust 2005-HE6, Mortgage Pass-Through Certificates, Series 2005-HE6 ("GSAMP 2005-HE6");

xix.          GSAMP Trust 2005-WMC2, Mortgage Pass-Through Certificates, Series 2005-WMC2 ("GSAMP 2005-WMC2");

xx.          GSAMP Trust 2005-WMC3, Mortgage Pass-Through Certificates, Series 2005-WMC3 ("GSAMP 2005-WMC3");

xxi.          GSAMP Trust 2006-FM1, Mortgage Pass-Through Certificates, Series 2006-FM1 ("GSAMP 2006-FM1");

xxii.          GSAMP Trust 2006-FM2, Mortgage Pass-Through Certificates, Series 2006-FM2 ("GSAMP 2006-FM2");

xxiii.          GSAMP Trust 2006-FM3, Mortgage Pass-Through Certificates, Series 2006-FM3 ("GSAMP 2006-FM3");

xxiv.          GSAMP Trust 2006-HE3, Mortgage Pass-Through Certificates, Series 2006-HE3 ("GSAMP 2006-HE3");

xxv.          GSAMP Trust 2006-HE4, Mortgage Pass-Through Certificates, Series 2006-HE4 ("GSAMP 2006-HE4");

xxvi.          GSAMP Trust 2006-HE5, Mortgage Pass-Through Certificates, Series 2006-HE5 ("GSAMP 2006-HE5");

xxvii.          GSAMP Trust 2006-HE7, Mortgage Pass-Through Certificates, Series 2006-HE7 ("GSAMP 2006-HE7");

xxviii.          GSAMP Trust 2006-HE8, Mortgage Pass-Through Certificates, Series 2006-HE8 ("GSAMP 2006-HE8");

xxix.	GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series 2006-NC2 ("GSAMP 2006-NC2");

xxx.	GSAMP Trust 2007-FM1, Mortgage Pass-Through Certificates, Series 2007-FM1 ("GSAMP 2007-FM1");

xxxi.	GSAMP Trust 2007-FM2, Mortgage Pass-Through Certificates, Series 2007-FM2 ("GSAMP 2007-FM2");

xxxii.	GSAMP Trust 2007-HE1, Mortgage Pass-Through Certificates, Series 2007-HE1 ("GSAMP 2007-HE1");

xxxiii.	GSAMP Trust 2007-HE2, Mortgage Pass-Through Certificates, Series 2007-HE2 ("GSAMP 2007-HE2");

xxxiv.	GSAMP Trust 2007-NC1, Mortgage Pass-Through Certificates, Series 2007-NC1 ("GSAMP 2007-NC1");

xxxv.	GSR Mortgage Loan Trust 2006-OA1, Mortgage Pass-Through Certificates, Series 2006-OA1 ("GSR 2006-OA1");

xxxvi.	GSR Mortgage Loan Trust 2007-AR2, Mortgage Pass-Through Certificates, Series 2007-AR2 ("GSR 2007-AR2");

xxxvii.	GSR Mortgage Loan Trust 2007-OA1, Mortgage Pass-Through Certificates, Series 2007-OA1 ("GSR 2007-OA1");

xxxviii.	GSR Mortgage Loan Trust 2007-OA2,  Mortgage Pass-Through Certificates, Series 2007-OA2 ("GSR 2007-OA2");

xxxix.	IndyMac INDX Mortgage Loan Trust 2005-AR18, Mortgage Pass-Through Certificates, Series 2005-AR18  ("INDX 2005-AR18"); and

xl.          IndyMac INDX Mortgage Loan Trust 2005-AR27, Mortgage Pass-Through Certificates, Series 2005-AR27 ("INDX 2005-AR27").

3.          Each Certificate was offered for sale pursuant to one of eight shelf registration statements (the "Shelf Registration Statements") filed with the Securities and Exchange Commission (the "SEC").  Defendant GS Mortgage Securities Corp. filed four of the Shelf Registration Statements (the "GS Mortgage Shelf Registration Statements," including any amendments thereto), which pertained to 35 of the Securitizations.  The Individual Defendants signed one or more of the GS Mortgage Shelf Registration Statements and the amendments thereto.  Accredited Mortgage Loan REIT Trust, American Home Mortgage Assets LLC, Fremont Mortgage Securities Corp., and IndyMac MBS, Inc., respectively, filed the remaining four Shelf Registration Statements.  Goldman, Sachs & Co. was the lead underwriter and the underwriter who sold the GSE Certificates to Fannie Mae and Freddie Mac with respect to all the Securitizations.

4.          For each Securitization, a prospectus ("Prospectus") and prospectus supplement ("Prospectus Supplement") were filed with the SEC as part of the Registration Statement for that Securitization.[2]  The GSE Certificates were marketed and sold to Fannie Mae and Freddie Mac pursuant to the Registration Statements, including the Shelf Registration Statements and the corresponding Prospectuses and Prospectus Supplements.

5.          The Registration Statements contained statements about the characteristics and credit quality of the mortgage loans underlying the Securitizations and the origination and underwriting practices used to make and approve the loans.  Such statements were material to a

---

[2]   The term "Registration Statement," as used herein, incorporates the Shelf Registration Statement, the Prospectus and the Prospectus Supplement for each referenced Securitization, except where otherwise indicated.

reasonable investor's decision to invest in mortgage-backed securities by purchasing the

Certificates.  Unbeknownst to Fannie Mae and Freddie Mac, these statements were materially

false, as significant percentages of the underlying mortgage loans were not originated in

accordance with the represented underwriting standards and origination practices, and had

materially poorer credit quality than was represented in the Registration Statements.

6.     The Registration Statements also contained statistical summaries of the collateral

groups and the entire group of mortgage loans in each Securitization, such as the percentage of

loans secured by owner-occupied properties and the percentage of the loan group's aggregate

principal balance with loan-to-value ratios within specified ranges.  This information was

material to reasonable investors.  However, a loan-level analysis of a sample of loans for each

Securitization—a review that encompassed thousands of mortgages across all of the

Securitizations—has revealed that these statistics were false and omitted material facts due to

inflated property values and misrepresentations of other key characteristics of the mortgage

loans.

7.     The percentage of second homes or investment properties is a material risk factor

to purchasers of Certificates, such as Fannie Mae and Freddie Mac, since a borrower who lives in

a mortgaged property is generally less likely to stop paying his or her mortgage and more likely

to take better care of the property.  The loan-level review reveals that the true percentage of

owner-occupied properties for the loans supporting the GSE Certificates was materially lower

than was stated in the Prospectus Supplements.  Likewise, the Prospectus Supplements

misrepresented other material factors, including the true value of the mortgaged properties

relative to the amount of the underlying loans.

8.      Defendants Goldman, Sachs & Co. (which lead underwrote and then sold the GSE Certificates to the GSEs), GS Mortgage Securities Corp. (which acted as the depositor in 35 of the Securitizations), and the Individual Defendants (who signed the Registration Statements with respect to 35 of the Securitizations) are directly responsible for the misstatements and omissions of material fact contained in the Registration Statements because they prepared, signed, filed and/or used these documents to market and sell the Certificates to Fannie Mae and Freddie Mac.

9.      Defendants Goldman Sachs Mortgage Company, The Goldman Sachs Group, Inc. and Goldman Sachs Real Estate Funding Corp. are likewise responsible for the misstatements and omissions of material fact contained in the Registration Statements by virtue of their direction and control over Defendants GS Mortgage Securities Corp. and Goldman, Sachs & Co.

10.     GS Mortgage Securities Corp. was a wholly owned subsidiary of Goldman Sachs Mortgage Company and Goldman Sachs Real Estate Funding Corp., both of which were wholly owned by The Goldman Sachs Group, Inc.  Goldman, Sachs & Co. was likewise a wholly owned subsidiary of The Goldman Sachs Group, Inc.

11.     Goldman Sachs Mortgage Company, The Goldman Sachs Group, Inc. and Goldman Sachs Real Estate Funding Corp. directly participated in and exercised dominion and control over the business operations of Defendant GS Mortgage Securities Corp.  The Goldman Sachs Group, Inc. directly participated in and exercised dominion and control over the business operations of Defendant Goldman, Sachs & Co.

12.     Fannie Mae and Freddie Mac purchased over $11.1 billion of the Certificates pursuant to the Registration Statements filed with the SEC.  The Registration Statements contained misstatements and omissions of material facts concerning the quality of the underlying mortgage loans and the practices used to originate and underwrite such loans.  As a result of

8

Defendants' misstatements and omissions of material fact, Fannie Mae and Freddie Mac have suffered substantial losses as the value of their holdings has significantly deteriorated.

13.     FHFA, as Conservator of Fannie Mae and Freddie Mac, brings this action against the Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2), 77o, Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, and for negligent misrepresentation, common law fraud, and aiding and abetting fraud.

## PARTIES

### *The Plaintiff and the GSEs*

14.     The Federal Housing Finance Agency is a federal agency that has its principal executive offices at 1700 G Street, N.W. in Washington, D.C.  FHFA was created on July 30, 2008 pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. § 4617), to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  On September 6, 2008, under HERA, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorship and appointed FHFA as conservator. In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs, including but not limited to, the authority to bring suits on behalf of and/or for the benefit of Fannie Mae and Freddie Mac.  12 U.S.C. § 4617(b)(2).

15.     Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress with a mission to provide liquidity, stability and affordability to the United States housing and mortgage markets.  As part of this mission, Fannie Mae and Freddie Mac invested in residential mortgage-backed securities.  Fannie Mae has its principal executive offices at 3900 Wisconsin Avenue, N.W. in Washington, D.C.  Freddie Mac has its principal executive offices at 8200 Jones Branch Drive in McLean, Virginia.

### The Defendants

16.     Defendant Goldman, Sachs & Co. is incorporated in New York and has its principal executive offices at 200 West Street in New York, New York.  Goldman, Sachs & Co. was the lead underwriter for each Securitization.  Fannie Mae and Freddie Mac purchased all of the GSE Certificates from Goldman, Sachs & Co. in its capacity as underwriter of the Securitizations.  Goldman, Sachs & Co. is a wholly owned subsidiary of The Goldman Sachs Group, Inc. and is its principal U.S. broker-dealer.

17.     Defendant GS Mortgage Securities Corp. is incorporated in Delaware and has its principal executive offices at 200 West Street in New York, New York.  As described below, GS Mortgage Securities Corp. served as the depositor for 35 of the Securitizations.  GS Mortgage Securities Corp. is a wholly owned subsidiary of The Goldman Sachs Group, Inc. and an affiliate of Defendants Goldman, Sachs & Co. and Goldman Sachs Mortgage Company.  In addition, GS Mortgage Securities Corp., as the depositor, is the issuer of the GSE Certificates within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a) of the Securities Act.

18.     Defendant Goldman Sachs Mortgage Company is a New York limited partnership and has its principal executive offices at 200 West Street in New York, New York.  Goldman Sachs Mortgage Company is (i) the sponsor of 36 of the Securitizations, (ii) the parent company of GS Mortgage Securities Corp. (the depositor in 35 of the Securitizations), and (iii) an affiliate of Goldman, Sachs & Co. (the lead underwriter in all 40 of the Securitizations) through ultimate parent ownership by The Goldman Sachs Group, Inc.  By the end of 2006, Goldman Sachs Mortgage Company had sponsored the securitization of approximately $162 billion of residential mortgage loans, including prime, subprime, Alt-A, FHA/VA/RHS, second lien, and home equity lines of credit.  *See* GSAMP 2007-NC1 Prospectus Supplement (filed Feb. 21, 2007).

10

19.     Defendant The Goldman Sachs Group, Inc. is incorporated in Delaware with its principal executive offices at 200 West Street in New York, New York.  The Goldman Sachs Group, Inc. is a bank holding company regulated by the Board of Governors of the Federal Reserve System and is the ultimate parent company of Goldman, Sachs & Co. (the selling and lead underwriter in all 40 Securitizations), Goldman Sachs Mortgage Company (the sponsor in 36 of the Securitizations), and GS Mortgage Securities Corp. (the depositor in 35 of the Securitizations).  Last year, The Goldman Sachs Group, Inc. generated net revenues of $39.2 billion and net profits of $8.4 billion.  *See* The Goldman Sachs Group, Inc., Form 10-K (filed Mar. 1, 2011).

20.     Defendant Goldman Sachs Real Estate Funding Corp. is incorporated in the State of New York and has its principal executive offices at 200 West Street in New York, New York.  Goldman Sachs Real Estate Funding Corp. is a wholly owned subsidiary of Goldman Sachs Bank USA and is the general partner of Goldman Sachs Mortgage Company, the sponsor of 36 of the Securitizations.

21.     Defendant Peter C. Aberg served at the time of the Securitizations as a Director of Defendant GS Mortgage Securities Corp. and worked in New York, New York.  Mr. Aberg signed one or more GS Mortgage Registration Statements, and did so in New York.

22.     Defendant Howard S. Altarescu served at the time of the Securitizations as Vice President, Chief Financial Officer, and Chief Accounting Officer of Defendant GS Mortgage Securities Corp. and worked in New York, New York.  Mr. Altarescu signed one or more GS Mortgage Registration Statements, and did so in New York.

23.     Defendant Robert J. Christie served at the time of the Securitizations as a Director of Defendant GS Mortgage Securities Corp. and worked in New York, New York.  Mr. Christie signed one or more GS Mortgage Registration Statements, and did so in New York.

24.     Defendant Kevin Gasvoda served at the time of the Securitizations as a Director of Defendant GS Mortgage Securities Corp., in addition to serving as Managing Director for Goldman's Fixed Income, Currency, and Commodities business line and head of Residential Whole Loan Trading at Goldman Sachs, and worked in New York, New York.  Mr. Gasvoda signed one or more GS Mortgage Registration Statements, and did so in New York.

25.     Defendant Michelle Gill served at the time of the Securitizations as Vice President and principal financial officer and principal accounting officer of Defendant GS Mortgage Securities Corp. and worked in New York, New York.  Ms. Gill signed one or more GS Mortgage Registration Statements, and did so in New York.

26.     Defendant David J. Rosenblum served at the time of the Securitizations as Vice President and a Director of Defendant GS Mortgage Securities Corp., in addition to serving as the head of Goldman's Collateralized Loan Obligation activities, and worked in New York, New York.  Mr. Rosenblum signed one or more GS Mortgage Registration Statements, and did so in New York.

27.     Defendant Jonathan S. Sobel served at the time of the Securitizations as a Director of Defendant GS Mortgage Securities Corp., in addition to having served as the head of Goldman's mortgage department, and worked in New York, New York.  Mr. Sobel signed one or more GS Mortgage Registration Statements, and did so in New York.

28.     Defendant Daniel L. Sparks served at the time of the Securitizations as Chief Executive Officer, Vice President and a Director of Defendant GS Mortgage Securities Corp., in

addition to serving as the head of Goldman's mortgage department, and worked in New York, New York.  Mr. Sparks signed one or more GS Mortgage Registration Statements, and did so in New York.

29.     Defendant Mark Weiss served at the time of the Securitizations as Vice President and principal financial officer and principal accounting officer of Defendant GS Mortgage Securities Corp. and worked in New York, New York.  Mr. Weiss signed one or more GS Mortgage Registration Statements, and did so in New York.

*The Non-Party Originators*

30.     The loans underlying the Certificates were acquired by the sponsor for each Securitization from non-party mortgage originators.[3]  The originators principally responsible for the loans underlying the Certificates were Accredited Home Lenders, Inc., American Home Mortgage Investment Corp., Argent Mortgage Company, L.L.C., Countrywide Home Loans, Inc., First Franklin Financial Corporation, Fremont Investment & Loan, GreenPoint Mortgage Funding, Inc., IndyMac Bank, F.S.B., Meritage Mortgage Corporation, NC Capital Corporation., New Century Mortgage Corporation, SouthStar Funding, LLC, and WMC Mortgage Company, Inc.

## JURISDICTION AND VENUE

31.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1345, which gives federal courts original jurisdiction over claims brought by FHFA in its capacity as conservator for Fannie Mae and Freddie Mac.

---

[3]  Defendant Goldman Sachs Mortgage Company was the sponsor for 36 of the 40 Securitizations.  The remaining four Securitizations were sponsored by non-parties.  Specifically, Accredited Home Lenders, Inc., Fremont Investment & Loan, and IndyMac Bank, F.S.B. each sponsored one or more of those four Securitizations.

32.    Jurisdiction of this Court is also founded upon 28 U.S.C. § 1331 because the Securities Act claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77*l*(a)(2), 77o.  This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

33.    This Court has jurisdiction over the statutory claims of violations of Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code and Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).  This Court likewise has jurisdiction over the common law claims of negligent misrepresentation, fraud, and aiding and abetting fraud, pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

34.    Venue is proper in this district pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation, dissemination and signing of the Registration Statements, occurred in substantial part in the State of New York.  Additionally, the GSE Certificates were actively marketed and sold from this State and several of the Defendants can be found and transact business in this District.  Defendants are also subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### I.    The Securitizations

#### A.    Residential Mortgage-Backed Securitizations in General

35.    Asset-backed securitization distributes risk by pooling cash-producing financial assets and issuing securities backed by those collateral groups.  In residential mortgage-backed securitizations, the cash-producing financial assets are residential mortgage loans.

36.    The most common form of securitization of mortgage loans involves a sponsor—the entity that acquires or originates the mortgage loans and initiates the securitization—and the

14

creation of a trust, to which the sponsor directly or indirectly transfers a portfolio of mortgage loans.  The trust is generally established pursuant to a Pooling and Servicing Agreement entered into by, among others, the "depositor" for that securitization.  In many instances, the transfer of assets to a trust "is a two-step process:  the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor … and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions."  Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No.  34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

37.     Residential mortgage-backed securities are backed by the underlying mortgage loans.  Some residential mortgage-backed securitizations are created from more than one pool of loans called collateral groups, in which case the trust issues securities backed by different groups.  For example, a securitization may involve two groups of mortgages, with some securities backed primarily by the first group, and others primarily by the second group.  Purchasers of the securities acquire an ownership interest in the assets of the trust, which in turn owns the loans.  Within this framework, the purchasers of the securities acquire rights to the cash-flows from the designated collateral group, such as homeowners' payments of principal and interest on the mortgage loans held by the related trust.

38.     Residential mortgage-backed securities are issued pursuant to registration statements filed with the SEC.  These registration statements include prospectuses, which explain the general structure of the investment, and prospectus supplements, which contain detailed descriptions of the collateral groups underlying the certificates.  Certificates are issued by the trust pursuant to the registration statement and the prospectus and prospectus supplement.  Underwriters sell the certificates to investors.

39.     A mortgage servicer is necessary to manage the collection of proceeds from the mortgage loans.  The servicer is responsible for collecting homeowners' mortgage loan payments, which the servicer remits to the trustee after deducting a monthly servicing fee.  The servicer's duties include making collection efforts on delinquent loans, initiating foreclosure proceedings, and determining when to charge off a loan by writing down its balance.  The servicer is required to report key information about the loans to the trustee.  The trustee (or trust administrator) administers the trust's funds and delivers payments due each month on the certificates to the investors.

### B.     The Securitizations at Issue in This Case

40.     This case involves the 40 Securitizations listed in Table 1 below.  Goldman Sachs served as the lead underwriter and sold the GSE Certificates to the GSEs for all 40 of the Securitizations.  In 36 of the Securitizations, Goldman also served as the sponsor, and in 35 of the Securitizations, Goldman was also the depositor and therefore the issuer and offeror of the Certificates.  For each GSE Certificate, Table 1 identifies:  (1) the sponsor; (2) the depositor; (3) the lead underwriter; (4) the principal amount issued for the tranches purchased by the GSEs; (5) the date of issuance; and (6) the loan group backing the GSE Certificates for that Securitization (referred to as the "Supporting Loan Group").

**Table 1**

| Transaction | Tranche[4] | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| ACCR 2005-4 | A1 | Accredited Home Lenders, Inc. | Accredited Mortgage Loan REIT Trust | Goldman, Sachs & Co. | $354,752,000 | November 23, 2005 | Group 1 |

---

[4]   A tranche is one of a series of certificates or interests created and issued as part of the same transaction.

| Transaction | Tranche[4] | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| AHMA 2006-1 | 1A1 | Goldman Sachs Mortgage Company | American Home Mortgage Assets LLC | Goldman, Sachs & Co. | $165,000,000 | May 25, 2006 | Group 1 |
| AHMA 2006-1 | 1A2 | Goldman Sachs Mortgage Company | American Home Mortgage Assets LLC | Goldman, Sachs & Co. | $101,477,000 | May 25, 2006 | Group 1 |
| FFML 2005-FF11 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $240,920,000 | November 22, 2005 | Group 1 |
| FFML 2005-FF8 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $304,713,000 | September 29, 2005 | Group 1 |
| FFML 2006-FF13 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $244,303,000 | September 28, 2006 | Group 1 |
| FHLT 2006-E | 1A1 | Fremont Investment & Loan | Fremont Mortgage Securities Corp. | Goldman, Sachs & Co. | $468,289,000 | December 6, 2006 | Group 1 |
| GSAA 2005-11 | 1A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $103,804,000 | September 29, 2005 | Group 1 |
| GSAA 2005-14 | 1A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $168,059,000 | November 22, 2005 | Group 1 |
| GSAA 2005-14 | 1A2 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $18,674,000 | November 22, 2005 | Group 1 |
| GSAA 2005-15 | 1A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $243,018,000 | December 29, 2005 | Group 1 |
| GSAA 2006-11 | 1A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $242,367,000 | June 30, 2006 | Group 1 |
| GSAA 2006-2 | 1A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $148,975,000 | February 6, 2006 | Group 1 |
| GSAA 2006-4 | 1A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $223,080,000 | March 6, 2006 | Group 1 |
| GSAA 2006-5 | 1A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $186,376,000 | March 30, 2006 | Group 1 |
| GSAA 2006-8 | 1A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $199,053,000 | April 28, 2006 | Group 1 |
| GSAA 2007-6 | 3A1A | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $78,936,000 | May 30, 2007 | Group 3 |

17

| Transaction | Tranche[4] | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| GSAMP 2005-AHL2 | A1A | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $108,759,000 | December 28, 2005 | Group 1 |
| GSAMP 2005-HE5 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $405,814,000 | November 22, 2005 | Group 1 |
| GSAMP 2005-HE6 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $341,242,000 | December 29, 2005 | Group 1 |
| GSAMP 2005-WMC2 | A1A | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $266,290,000 | November 23, 2005 | Group 1 |
| GSAMP 2005-WMC3 | A1A | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $238,899,000 | December 28, 2005 | Group 1 |
| GSAMP 2006-FM1 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $241,822,000 | April 27, 2006 | Group 1 |
| GSAMP 2006-FM2 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $351,611,000 | September 29, 2006 | Group 1 |
| GSAMP 2006-FM3 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $257,050,000 | December 21, 2006 | Group 1 |
| GSAMP 2006-HE3 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $304,472,000 | May 26, 2006 | Group 1 |
| GSAMP 2006-HE4 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $352,415,000 | June 29, 2006 | Group 1 |
| GSAMP 2006-HE5 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $241,582,000 | August 25, 2006 | Group 1 |
| GSAMP 2006-HE7 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $333,098,000 | October 31, 2006 | Group 1 |
| GSAMP 2006-HE8 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $353,741,000 | December 27, 2006 | Group 1 |
| GSAMP 2006-NC2 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $239,618,000 | June 29, 2006 | Group 1 |
| GSAMP 2007-FM1 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $315,873,000 | January 30, 2007 | Group 1 |
| GSAMP 2007-FM2 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $351,823,000 | January 30, 2007 | Group 1 |

| Transaction | Tranche[4] | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| GSAMP 2007-HE1 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $205,454,000 | February 23, 2007 | Group 1 |
| GSAMP 2007-HE2 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $370,801,000 | April 20, 2007 | Group 1 |
| GSAMP 2007-NC1 | A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $479,787,000 | February 20, 2007 | Group 1 |
| GSR 2006-OA1 | 1A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $744,970,000 | August 24, 2006 | Group 1 |
| GSR 2007-AR2 | 6A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $89,703,000 | May 24, 2007 | Group 6 |
| GSR 2007-OA1 | 1A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $374,616,000 | May 8, 2007 | Group 1 |
| GSR 2007-OA2 | 1A1 | Goldman Sachs Mortgage Company | GS Mortgage Securities Corp. | Goldman, Sachs & Co. | $186,326,000 | October 1, 2007 | Group 1 |
| INDX 2005-AR18 | 1A1 | IndyMac Bank, F.S.B. | IndyMac MBS, Inc. | Goldman, Sachs & Co. | $629,654,000 | September 7, 2005 | Group 1 |
| INDX 2005-AR27 | 2A1 | IndyMac Bank, F.S.B. | IndyMac MBS, Inc. | Goldman, Sachs & Co. | $136,304,000 | October 28, 2005 | Group 2 |

### C.   The Securitization Process

#### 1.   Goldman Sachs Mortgage Company Pools Mortgage Loans in Special Purpose Trusts

41.   As the sponsor for 36 of the 40 Securitizations, Defendant Goldman Sachs Mortgage Company purchased mortgage loans underlying the Certificates for those 36 Securitizations after the loans were originated, either directly from the originators or through affiliates of the originators.  Goldman Sachs Mortgage Company then sold or otherwise transferred the mortgage loans for the 36 Securitizations it sponsored to the depositor, which was an affiliated entity—Defendant GS Mortgage Securities Corp.—in 35 of the Securitizations. With respect to the remaining four Securitizations, non-party sponsors sold the mortgage loans to

non-party depositors, as reflected in Table 1 above.  Defendant Goldman, Sachs & Co. was the lead and selling underwriter for all 40 Securitizations.

42.     Both Goldman Sachs Mortgage Company (the sponsor) and GS Mortgage Securities Corp. (the depositor) were controlled by their ultimate parent, The Goldman Sachs Group, Inc.  The sole purpose of the depositor, and the common law trusts created through this process, was to act as a conduit through which loans acquired by the sponsor could be securitized and sold to investors.

43.     The transfer of the mortgage loans to the trust was generally effected by means of either a Master Servicing and Trust Agreement or a Pooling and Servicing Agreement (either referred to herein as a "PSA") executed among the depositor and the parties responsible for monitoring and servicing the mortgage loans in that Securitization.  The trust, administered by the trustee, held the mortgage loans pursuant to the related PSA and issued certificates, including the GSE Certificates, backed by such loans.  The GSEs purchased the GSE Certificates, through which they obtained an ownership interest in the assets of the trust, including the mortgage loans.

44.     The process by which loans were acquired by Goldman Sachs Mortgage Company differed somewhat among Securitizations.  For example, in a number of the Securitizations, the loans were acquired through Goldman Sachs Mortgage Company's "conduit program."  Under the conduit program, Goldman Sachs Mortgage Company acquired mortgage loans from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators, and purchasers of mortgage loans in the secondary market.  According to the Registration Statements, mortgage loans acquired by Goldman Sachs through its conduit program were acquired in accordance with the underwriting criteria specified in the Registration Statements.  Where the mortgage loans were acquired by the sponsor pursuant to Goldman

Sachs' conduit program, the Registration Statement stated that the mortgage loans met certain criteria, including specified maximum loan-to-value ratios for each loan documentation program based upon borrower FICO scores.

45.     In addition, Goldman Sachs Mortgage Company acquired other mortgage loans by bulk purchases in the secondary market from numerous originators and intermediate purchasers of loans.  The Registration Statements described the underwriting guidelines applicable to many of these originators and intermediate purchasers.  Such guidelines typically included maximum loan-to-value ratios, the degree of verification of borrower information required, the means by which the originator assessed borrower creditworthiness and likelihood of default on the mortgage loan, the adequacy of the mortgaged property as collateral, and whether a primary mortgage guarantee policy was required.

### 2.     The Trusts Issue Securities Backed by the Loans

46.     Once the mortgage loans were transferred to the trusts in accordance with the PSAs, each trust issued Certificates backed by the underlying mortgage loans.  The Certificates were then sold to investors like Fannie Mae and Freddie Mac, which thereby acquired an ownership interest in the assets of the corresponding trust.  Each Certificate entitles its holder to a specified portion of the cashflows from the underlying mortgages in the Supporting Loan Group.  The level of risk inherent in the Certificates is a function of the capital structure of the related transaction and the credit quality of the underlying mortgages.

47.     Each Certificate was issued pursuant to one of eight Shelf Registration Statements filed with the SEC on Form S-3.  The Shelf Registration Statements were amended by one or more Forms S-3/A filed with the SEC.  Each Individual Defendant signed one or more of the four GS Mortgage Shelf Registration Statements, including any amendments thereto, which were filed by GS Mortgage Securities Corp.  The SEC filing number, registrants, signatories and filing

dates for the eight Shelf Registration Statements and amendments thereto, as well as the

Certificates covered by each Shelf Registration Statement, are reflected in Table 2 below.

**Table 2**

| SEC File No. | Date Registration Statement Filed | Date(s) Amended Registration Statement Filed | Registrants | Covered Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-124435 | 4/28/2005 | 6/10/2005 | Accredited Home Lenders, Inc. Accredited Mortgage Loan REIT Trust | ACCR 2005-4 | James H. Berglund, John S. Buchanan, Gary M. Erickson, Bowers W. Espy, Jody A. Gunderson, Joseph J. Lydon, Ray W. McKewon, Richard T. Pratt, James A. Konrath | James H. Berglund, John S. Buchanan, Gary M. Erickson, Bowers W. Espy, Jody A. Gunderson, Joseph J. Lydon, Ray W. McKewon, Richard T. Pratt, James A. Konrath |
| 333-131641 | 2/7/2006 | **1.** 3/23/2006, **2.** 4/6/2006, **3.** 4/18/2006, **4.** 4/21/2006 | American Home Mortgage Assets LLC | AHMA 2006-1 | Michael Strauss, Stephen Hozie, Thomas McDonagh, Alan Horn | **1.** Michael Strauss, Stephen Hozie, Thomas McDonagh, Alan Horn; **2.** Michael Strauss, Stephen Hozie, Thomas McDonagh, Alan Horn; **3.** Michael Strauss, Thomas McDonagh, Alan Horn; **4.** Michael Strauss, Stephen Hozie, Thomas McDonagh, Alan Horn |
| 333-132540 | 3/17/2006 | **1.** 5/16/2006, **2.** 6/23/2006 | Fremont Mortgage Securities Corporation | FHLT 2006-E | Murray L. Zoota; Louis J. Rampino; Wayne R. Bailey; Thomas W. Hayes; Donald Puglisi; Kyle R. Walker; Ronald Nicolas, Jr., | **1.** Murray L. Zoota, Louis J. Rampino, Wayne R. Bailey, Thomas W. Hayes, Donald Puglisi, Patrick E. Lamb. **2.** Kyle W. Walker, Murray L. Zoota, Louis J. Rampino, Wayne R. Bailey, Thomas W. Hayes, Donald Puglisi, Ronald S. Nicolas. |
| 333-127620 | 8/17/2005 | Not applicable | GS Mortgage Securities Corp. | FFML 2005-FF11; FFML 2005-FF8; GSAA 2006-4; GSAA 2006-5; GSAMP 2005-AHL2; GSAMP 2005-HE5; GSAMP 2005-HE6; GSAMP 2005-WMC2; GSAMP 2005-WMC3 | Daniel L. Sparks, Mark Weiss, Jonathan S. Sobel | Not applicable |
| 333-132809 | 3/29/2006 | Not applicable | GS Mortgage Securities Corp. | FFML 2006-FF13; GSAA 2006-11; GSAA 2006-8; GSAMP 2006-FM1; GSAMP 2006-FM2; GSAMP 2006-FM3; GSAMP 2006-HE3; GSAMP 2006-HE4; GSAMP 2006-HE5; GSAMP 2006-HE7; GSAMP 2006-HE8; GSAMP 2006-NC2; GSAMP 2007-FM1; GSAMP 2007-NC1; GSR 2006-OA1; GSR 2007-AR2 | Daniel L. Sparks, Mark Weiss, David J. Rosenblum, Jonathan S. Sobel | Not applicable |

| SEC File No. | Date Registration Statement Filed | Date(s) Amended Registration Statement Filed | Registrants | Covered Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-120274 | 11/5/2004 | 11/24/2004 | GS Mortgage Securities Corp. | GSAA 2005-11; GSAA 2005-14; GSAA 2005-15; GSAA 2006-2 | Daniel L. Sparks, Howard S. Altarescu, Peter C. Aberg, Robert J. Christie, Jonathan S. Sobel | Daniel L. Sparks, Howard S. Altarescu, Peter C. Aberg, Robert J. Christie, Jonathan S. Sobel |
| 333-139817 | 1/5/2007 | 1/31/2007 | GS Mortgage Securities Corp. | GSAA 2007-6; GSAMP 2007-FM2; GSAMP 2007-HE1; GSAMP 2007-HE2; GSR 2007-OA1; GSR 2007-OA2 | Daniel L. Sparks, Michelle Gill, Kevin Gasvoda | Daniel L. Sparks, Michelle Gill, Kevin Gasvoda |
| 333-127556 | 8/15/2005 | Not applicable | IndyMac MBS, Inc. | INDX 2005-AR18, INDX 2005-AR27 | John Olinski; S. Blair Abernathy; Lynnette Antosh; Samir Grover | Not applicable |

48.     The Prospectus Supplement for each Securitization describes the underwriting guidelines that purportedly were used in connection with the origination of the underlying mortgage loans.  In addition, the Prospectus Supplements purport to provide accurate statistics regarding the mortgage loans in each group, including the ranges of and weighted average FICO credit scores of the borrowers, the ranges of and weighted average loan-to-value ratios of the loans, the ranges of and weighted average outstanding principal balances of the loans, the debt-to-income ratios, geographic distribution of the loans, and the extent to which the loans were for purchase or refinance purposes; information concerning whether the loans were secured by a property to be used as a primary residence, second home, or investment property; and information concerning whether the loans were delinquent.

44.     The Prospectus Supplements associated with each Securitization were filed with the SEC as part of the Registration Statements.  The Form 8-Ks attaching the PSAs for each Securitization were also filed with the SEC.  The date on which the Prospectus Supplement and Form 8-K containing the PSAs were filed for each Securitization, as well as the filing number of the Shelf Registration Statement related to each, are set forth in Table 3 below.

Table 3

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA Filed[5] | Filing No. of Related Registration Statement |
|---|---|---|---|
| ACCR 2005-4 | 11/21/2005 | 12/2/2005 | 333-124435 |
| AHMA 2006-1 | 5/26/2006 | 7/25/2006 | 333-131641 |
| FFML 2005-FF11 | 11/21/2005 | 12/7/2005 | 333-127620 |
| FFML 2005-FF8 | 9/29/2005 | 10/14/2005 | 333-127620 |
| FFML 2006-FF13 | 9/29/2006 | 10/13/2006 | 333-132809 |
| FHLT 2006-E | 12/7/2006 | 12/20/2006 | 333-132540 |
| GSAA 2005-11 | 9/29/2005 | 10/28/2005(*) | 333-120274 |
| GSAA 2005-14 | 11/23/2005 | 12/12/2005(*) | 333-120274 |
| GSAA 2005-15 | 12/8/2005 | 1/17/2006(*) | 333-120274 |
| GSAA 2006-11 | 7/3/2006 | 7/13/2006(*) | 333-132809 |
| GSAA 2006-2 | 1/25/2006 | 2/21/2006(*) | 333-120274 |
| GSAA 2006-4 | 3/6/2006 | 3/17/2006(*) | 333-127620 |
| GSAA 2006-5 | 3/31/2006 | 4/14/2006(*) | 333-127620 |
| GSAA 2006-8 | 5/1/2006 | 6/9/2006(*) | 333-132809 |
| GSAA 2007-6 | 5/30/2007 | 6/14/2007(*) | 333-139817 |
| GSAMP 2005-AHL2 | 12/23/2005 | 1/12/2006 | 333-127620 |
| GSAMP 2005-HE5 | 11/23/2005 | 12/7/2005 | 333-127620 |
| GSAMP 2005-HE6 | 12/27/2005 | 1/13/2006 | 333-127620 |
| GSAMP 2005-WMC2 | 11/21/2005 | 12/8/2005 | 333-127620 |
| GSAMP 2005-WMC3 | 12/23/2005 | 1/12/2006 | 333-127620 |
| GSAMP 2006-FM1 | 4/27/2006 | 5/18/2006 | 333-132809 |
| GSAMP 2006-FM2 | 10/22/2006 | 9/29/2006 | 333-132809 |
| GSAMP 2006-FM3 | 12/22/2006 | 1/8/2007 | 333-132809 |
| GSAMP 2006-HE3 | 5/25/2006 | 6/30/2006 | 333-132809 |
| GSAMP 2006-HE4 | 6/30/2006 | 7/19/2006 | 333-132809 |
| GSAMP 2006-HE5 | 8/25/2006 | 9/14/2006 | 333-132809 |
| GSAMP 2006-HE7 | 10/31/2006 | 11/15/2006 | 333-132809 |
| GSAMP 2006-HE8 | 12/27/2006 | 1/24/2007 | 333-132809 |
| GSAMP 2006-NC2 | 6/29/2006 | 3/12/2007 | 333-132809 |
| GSAMP 2007-FM1 | 2/1/2007 | 2/16/2007 | 333-132809 |
| GSAMP 2007-FM2 | 2/21/2007 | 3/28/2007 | 333-139817 |
| GSAMP 2007-HE1 | 2/26/2007 | 3/21/2007 | 333-139817 |
| GSAMP 2007-HE2 | 4/19/2007 | 5/24/2007 | 333-139817 |
| GSAMP 2007-NC1 | 2/21/2007 | 3/22/2007 | 333-132809 |
| GSR 2006-OA1 | 8/25/2006 | 9/11/2006(*) | 333-139817 |
| GSR 2007-AR2 | 5/29/2007 | 6/8/2007(*) | 333-139817 |
| GSR 2007-OA1 | 5/10/2007 | 5/29/2007(*) | 333-139817 |
| GSR 2007-OA2 | 11/1/2007 | 11/13/2007(*) | 333-139817 |
| INDX 2005-AR18 | 9/8/2005 | 1/24/2006 | 333-127556 |
| INDX 2005-AR27 | 10/31/2005 | 1/24/2006 | 333-127556 |

45.     The Certificates were issued pursuant to the PSAs, and Defendants Goldman,

Sachs & Co. and GS Mortgage Securities Corp. together offered, marketed, and sold the GSE

Certificates to Fannie Mae and Freddie Mac in the primary market pursuant to the Registration

Statements, which, as noted previously, included the Prospectuses and Prospectus Supplements.

---

[5]   An asterisk indicates that the relevant agreement was a Master Servicing and Trust Agreement, rather than a Pooling and Servicing Agreement.

## II.     The Defendants' Participation in the Securitization Process

### A.     The Role of Each Defendant

49.     Each Defendant, including the Individual Defendants, had a role in the securitization process and marketing of the Certificates, which included purchasing the mortgage loans from the originators, arranging the Securitizations, selling the mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, structuring and issuing the Certificates, and marketing and selling the Certificates to investors including Fannie Mae and Freddie Mac.

50.     Depositors, underwriters, and Individual Defendants who signed the Registration Statements, as well as Defendants who exercise control over their activities, are liable, jointly and severally, as participants in the registration, issuance and offering of Certificates, including issuing, causing, or making materially misleading statements in the Registration Statement, and omitting material facts required to be stated therein or necessary to make the statements contained therein not misleading.

### 1.     Goldman, Sachs & Co.

51.     Defendant Goldman, Sachs & Co. was the lead underwriter in each of the Securitizations.  Fannie Mae and Freddie Mac purchased all of the GSE Certificates from Goldman, Sachs & Co. in the primary market.  Goldman, Sachs & Co. is a wholly owned subsidiary of The Goldman Sachs Group, Inc. and is its principal U.S. broker-dealer.

52.     As the lead underwriter for the Securitizations, Goldman, Sachs & Co. was responsible for underwriting and managing the offer and sale of the Certificates to Fannie Mae and Freddie Mac and other investors.  Goldman, Sachs & Co. was also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material

misstatements or omissions, including as to the manner in which the underlying mortgage loans were originated, transferred and underwritten.

### 2. GS Mortgage Securities Corp.

53.     Defendant GS Mortgage Securities Corp. served as the depositor for 35 of the Securitizations.  GS Mortgage Securities Corp. is a wholly owned subsidiary of The Goldman Sachs Group, Inc. and an affiliate of Goldman, Sachs & Co. (the underwriter) and Goldman Sachs Mortgage Company (the sponsor).

54.     GS Mortgage Securities Corp. is a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming RMBS trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

55.     In its capacity as depositor, GS Mortgage Securities Corp. purchased mortgage loans from Goldman Sachs Mortgage Company and then sold, transferred, or otherwise conveyed the mortgage loans to be securitized to the trusts.  GS Mortgage Securities Corp., together with the Individual Defendants, Goldman Sachs Mortgage Company, and Goldman, Sachs & Co., was also responsible for preparing and filing the Registration Statements pursuant to which the Certificates issued by GS Mortgage Securities Corp. were offered for sale.  GS Mortgage Securities Corp., as the depositor, is the issuer of the GSE Certificates within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a), of the Securities Act.  GS Securities Mortgage Corp. was controlled by the Individual Defendants, who served as directors and/or officers of GS Securities Mortgage Corp.

### 3.    Goldman Sachs Mortgage Company

56.    Defendant Goldman Sachs Mortgage Corp. is the sponsor for 36 of the Securitizations and is the parent company of GS Mortgage Securities Corp. (the depositor) and is an affiliate of Goldman, Sachs & Co. (the underwriter) through common ownership by their ultimate parent, The Goldman Sachs Group, Inc.  As stated in the Prospectus Supplement for GSAMP 2007-NC1, by the end of 2006, Goldman Sachs Mortgage Company had sponsored the securitization of approximately $162 billion of residential mortgage loans, including prime, subprime, Alt-A, FHA/VA/RHS, second lien, and home equity lines of credit.  *See* GSAMP 2007-NC1 Prospectus Supplement (filed Feb. 21, 2007).

57.    As the sponsor for 36 of the Securitizations, Goldman Sachs Mortgage Company determined the structure of each of those Securitizations, initiated the Securitization, purchased the mortgage loans to be securitized, determined the distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the GSE Certificates.  Goldman Sachs Mortgage Company also selected, in 35 of the Securitizations, GS Mortgage Securities Corp. as the special purpose vehicle that would be used to transfer the mortgage loans from Goldman Sachs Mortgage Company to the trusts, and selected Goldman, Sachs & Co. as the lead underwriter for all the Securitizations.

58.    Pursuant to certain mortgage loan purchase and warranties agreements, the original loan sellers sold mortgage loans to Goldman Sachs Mortgage Company, which loans were subsequently conveyed to the depositor and then to the trust.  Pursuant to assignment, assumption, and recognition agreements, Goldman Sachs Mortgage Company also conveyed certain of its rights with respect to the underlying mortgage loans to the depositor, which subsequently transferred these rights to the trust pursuant to the applicable PSA.

27

4.    **The Goldman Sachs Group, Inc.**

59.    Defendant The Goldman Sachs Group, Inc. is a bank holding company regulated by the Board of Governors of the Federal Reserve System and is the ultimate parent company of its wholly owned subsidiaries Goldman, Sachs & Co., GS Mortgage Securities Corp, and Goldman Sachs Mortgage Company.

60.    The Goldman Sachs Group, Inc. employed its wholly owned or controlled underwriter, sponsor and depositor (each a defendant in this action) in key steps of the securitization process.  Unlike typical arms' length securitizations, the Securitizations here involved various Goldman Sachs subsidiaries and affiliates at virtually each step in the chain—the sponsor and depositor were nearly always Goldman Sachs Mortgage Company and GS Mortgage Securities Corp., and the lead underwriter was always Goldman, Sachs & Co.

61.    As the ultimate corporate parent of (i) Goldman Sachs Mortgage Company, (ii) GS Mortgage Securities Corp., (iii) and Goldman, Sachs & Co., The Goldman Sachs Group, Inc. had the practical ability to direct and control the actions of the sponsor, depositor and underwriter in those Securitizations, and in fact exercised such direction and control by coordinating the activities of its subsidiaries related to the issuance and sale of the Certificates.

62.    As detailed above, 35 of the Securitizations involved Goldman Sachs entities, including the aforementioned subsidiaries of The Goldman Sachs Group, Inc., at virtually each step in the process.  The Goldman Sachs Group, Inc. profited substantially from this vertically integrated approach to mortgage-backed securitization.  Furthermore, The Goldman Sachs Group, Inc. shared overlapping management with other Defendant entities.  For example, Defendant Kevin Gasvoda was a Director of GS Mortgage Securities Corp., in addition to serving as Managing Director for Goldman's Fixed Income, Currency, and Commodities business and Managing Director and head of Residential Whole Loan Trading.  In addition,

28

Defendant David J. Rosenblum, who was Vice President and a Director of GS Mortgage Securities Corp., also served as head of Goldman's Collateralized Loan Obligation activities. Similarly, Defendant Jonathan S. Sobel, who was a Director of Defendant GS Mortgage Securities Corp., also headed Goldman's mortgage department.  Likewise, Defendant Daniel L. Sparks, who was Chief Executive Officer, Vice President and a Director of GS Mortgage Securities, also headed Goldman's mortgage department.  As the above clearly shows, there was significant overlap between the management of The Goldman Sachs Group, Inc., and the directors and officers of Defendant GS Mortgage Securities Corp.

### 5. Goldman Sachs Real Estate Funding Corp.

63.     Defendant Goldman Sachs Real Estate Funding Corp. is a wholly owned subsidiary of Goldman Sachs Bank USA and is the general partner of Goldman Sachs Mortgage Company, the sponsor of the Securitizations.  The parent company of Goldman Sachs Real Estate Funding Corp.—Goldman Sachs Bank USA—is itself a subsidiary of The Goldman Sachs Group, Inc.  Goldman Sachs Real Estate Funding Corp. provided a vehicle for the ultimate controlling entity—The Goldman Sachs Group, Inc.—further to direct the activities of the sponsor of the Securitizations, Goldman Sachs Mortgage Company.

### 6. The Individual Defendants

64.     Defendant Peter C. Aberg served at the time of the Securitizations as a Director of Defendant GS Mortgage Securities Corp.  Mr. Aberg signed the GS Mortgage Shelf Registration Statement under file number 333-120274 filed with the SEC on November 5, 2004 and, through a power of attorney, the related pre-effective amendment on Form S-3/A filed with the SEC on November 24, 2004.

65.     Defendant Howard S. Altarescu served at the time of the Securitizations as Vice President, Chief Financial Officer, and Chief Accounting Officer of Defendant GS Mortgage

Securities Corp.  Mr. Altarescu signed the GS Mortgage Shelf Registration Statement under file number 333-120274 filed with the SEC on November, 5 2004 and the related pre-effective amendments on Form S-3/A filed with the SEC on November 24, 2004.

66.     Defendant Robert J. Christie served at the time of the Securitizations as a Director of Defendant GS Mortgage Securities Corp.  Mr. Christie signed the GS Mortgage Shelf Registration Statement under file number 333-120274 filed with the SEC on November 5, 2004 and, through a power of attorney, the related pre-effective amendment on Form S-3/A filed with the SEC on November 24, 2004.

67.     Defendant Kevin Gasvoda served at the time of the Securitizations as a Director of Defendant GS Mortgage Securities Corp. and Managing Director for Goldman's Fixed Income, Currency, and Commodities business and head of Residential Whole Loan Trading.  Mr. Gasvoda signed the GS Mortgage Shelf Registration Statement under file number 333-139817 filed with the SEC on January 5, 2007 and the related pre-effective amendment on Form S-3/A filed with the SEC on January 31, 2007.

68.     Defendant Michelle Gill served at the time of the Securitizations as Vice President and principal financial officer and principal accounting officer of Defendant GS Mortgage Securities Corp.  Ms. Gill signed the GS Mortgage Shelf Registration Statement under file number 333-139817 filed with the SEC on January 5, 2007, and signed the related pre-effective amendment on Form S-3/A filed with the SEC on January 31, 2007 in both her individual capacity and with a power of attorney on behalf of Defendant Daniel L. Sparks and Defendant Kevin Gasvoda.

69.     Defendant David J. Rosenblum served at the time of the Securitizations as Vice President and a Director of Defendant GS Mortgage Securities Corp., in addition to serving as

head of Goldman's Collateralized Loan Obligation activities.  Mr. Rosenblum signed the GS Mortgage Shelf Registration Statement under file number 333-120274 filed with the SEC on November 5, 2004 and, through a power of attorney, the related pre-effective amendment on Form S-3/A filed with the SEC on November 24, 2004.  Mr. Rosenblum further signed the GS Mortgage Shelf Registration Statement under file number 333-132809 filed with the SEC on March 29, 2006.

70.     Defendant Jonathan S. Sobel served at the time of the Securitizations as a Director of Defendant GS Mortgage Securities Corp. and headed Goldman's mortgage department.  Mr. Sobel signed the GS Mortgage Shelf Registration Statement under file number 333-127620 filed with the SEC on August 17, 2005.  Mr. Sobel further signed the GS Mortgage Shelf Registration Statement under file number 333-132809 filed with the SEC on March 29, 2006.  Mr. Sobel also signed the GS Mortgage Shelf Registration Statement under file number 333-120274 filed with the SEC on November 5, 2004 and the related pre-effective amendment on Form S 3/A filed with the SEC on November 24, 2004.

71.     Defendant Daniel L. Sparks served at the time of the Securitizations as Chief Executive Officer, Vice President, and a Director of Defendant GS Mortgage Securities Corp., in addition to heading Goldman's mortgage department.  Mr. Sparks signed the GS Mortgage Shelf Registration Statement under file number 333-120274 filed with the SEC on November 5, 2004 and signed through a power of attorney the related pre-effective amendment on Form S-3/A filed with the SEC on November 24, 2004.  Mr. Sparks further signed the GS Mortgage Shelf Registration Statement under file number 333-127620 filed with the SEC on August 17, 2005.  Mr. Sparks also signed the GS Mortgage Shelf Registration Statement under file number 333-132809 filed with the SEC on March 29, 2006.  Mr. Sparks further signed the GS Mortgage

Shelf Registration Statement under file number 333-139817 filed with the SEC on January 5, 2007 and signed the related pre-effective amendment on Form S-3/A filed with the SEC on January 31, 2007.

72.     Defendant Mark Weiss served at the time of the Securitizations as Vice President and principal financial officer and principal accounting officer of Defendant GS Mortgage Securities Corp.  Mr. Weiss signed the GS Mortgage Shelf Registration Statement under file number 333-127620 filed with the SEC on August 17, 2005.  Mr. Weiss further signed the GS Mortgage Shelf Registration Statement under file number 333-132809 filed with the SEC on March 29, 2006.

### B.     Defendants Failed To Conduct Proper Due Diligence

73.     The Defendants failed to conduct adequate and sufficient due diligence to ensure that the mortgage loans underlying the Securitizations complied with the statements in the Registration Statements.

74.     During the time period in which the Certificates were issued—approximately 2005 through 2007—Goldman's involvement in mortgage-backed securitization increased dramatically as compared to prior years.  For example, by the end of 2006, Goldman Sachs Mortgage Company had sponsored the securitization of approximately $162 billion of residential mortgage loans, including prime, subprime, Alt-A, FHA/VA/RHS, second lien, and home equity lines of credit.  *See* GSAMP 2007-NC1 Prospectus Supplement (filed Feb. 21, 2007).  In specific categories, such as subprime RMBS securitizations, Goldman's deal volume increased from $2.1 billion in 2003, to $9.7 billion in 2004, to $14.5 billion in 2005, to $15.0 billion in 2006.  *Id.* Similarly, in ALT-A RMBS securitizations, Goldman's deal volume increased from $3.8 billion in 2004, to $10.4 billion in 2005, to a staggering $20.5 billion in 2006.  *See* GSAA 2007-6 Prospectus Supplement (filed May 30, 2007).

75.     Defendants had enormous financial incentives to complete as many offerings as quickly as possible without regard to ensuring the accuracy or completeness of the Registration Statements, or conducting adequate and reasonable due diligence.  For example, the depositor in virtually all the Securitizations, GS Mortgage Securities Corp., was paid a percentage of the total dollar amount of the offering on completion of the Securitizations.  Similarly, Goldman, Sachs & Co., as the underwriter, was paid a commission based on the amount it received from the sale of the Certificates to the public.

76.     As revealed by the U.S. Senate Permanent Subcommittee on Investigations, a March 9, 2007 e-mail from Defendant Daniel L. Sparks, who was both an officer and director of Defendant GS Mortgage Securities Corp., as well as the head of Goldman's mortgage department, demonstrates that Goldman put the highest priority on packaging and selling Goldman's warehoused mortgages, if for no other reason than to quickly get them off Goldman's books:  "Our current largest needs are to execute and sell our new issues—CDO's and RMBS— and to sell our other cash trading positions…. I can't overstate the importance to the business of selling these positions and new issues."  U.S. Senate Permanent Subcommittee on Investigations, *Hearing on Wall Street and the Financial Crisis:  The Role of Investment Banks*, Ex. 76 (Apr. 27, 2010).

77.     The push to securitize large volumes of mortgage loans contributed to the absence of controls needed to prevent the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.  In particular, Defendants failed to conduct adequate diligence or otherwise to ensure the accuracy of the statements in the Registration Statements pertaining to the Securitizations.

33

78.     For instance, Goldman retained third-party due diligence providers such as Clayton Holdings, Inc. ("Clayton") and The Bohan Group, Inc. ("Bohan") to analyze the loans it was considering placing in its securitizations, but waived a significant number of loans into the Securitizations that these firms had recommended for exclusion, and did so without taking adequate steps to ensure that these loans had in fact been underwritten in accordance with applicable guidelines or had compensating factors that excused the loans' non-compliance with those guidelines.  On January 27, 2008, Clayton revealed that it had entered into an agreement with the New York Attorney General (the "NYAG") to provide documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients. According to The New York Times, as reported on January 27, 2008, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

79.     Goldman Sachs was negligent in allowing into the Securitizations a substantial number of mortgage loans that, as reported to Goldman by third-party due diligence firms, did not conform to the underwriting standards stated in the Registration Statements, including the Prospectuses and Prospectus Supplements.  Even upon learning from its third-party due diligence firms that there were high percentages of defective or at least questionable loans in the sample of loans reviewed by the third-party due diligence firms, Goldman failed to take any additional steps to verify that the population of loans in the Securitizations did not include a similar percentage of defective and/or questionable loans.

80.     The Financial Crisis Inquiry Commission (the "FCIC")[6] found that in the period from the first quarter of 2006 to the second quarter of 2007, 23 percent of the mortgage loans Goldman submitted to Clayton to review in RMBS loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage loans that Clayton found defective, 29 percent of the loans were subsequently waived in by Goldman without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here.  *See The Financial Crisis Inquiry Report*, at 167, Jan. 2011, *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf.

81.     As disclosed in a report as part of the NYAG's ongoing investigation of investment banking misconduct in underwriting mortgage-backed securities, Clayton routinely provided investment banks with detailed reports of loans that were not compliant with underwriting guidelines, but the investment banks, including Goldman Sachs, routinely overrode the exclusion of a significant percentage of rejected loans from purchase and securitization.

82.     Goldman has been the subject of numerous regulatory actions and investigations for matters similar to those raised in this Complaint.  In May 2009, the Massachusetts Attorney General announced a settlement agreement with Goldman arising out of an investigation into the role of Goldman and other banks in:  (i) facilitating the origination of illegal or otherwise improper mortgages; (ii) failing to ascertain whether loans purchased from originators complied with stated underwriting guidelines; (iii) failing to prevent problem loans from being put into securitization collateral groups; (iv) failing to correct inaccurate information in securitization

---

[6]   The Financial Crisis Inquiry Commission was created by the Fraud Enforcement and Recovery Act of 2009, and was established to examine the causes, domestic and global, of the current financial and economic crisis in the United States.

trustee reports concerning repurchases of bad loans; and (v) failing to disclose to investors the problems with loans placed into securitization collateral groups.  The Massachusetts Attorney General, in announcing the settlement, specifically stated that Goldman did not take "sufficient steps to avoid placing problem loans in securitization pools."  As part of its settlement with the Massachusetts Attorney General, Goldman agreed to provide approximately $50 million in relief to homeowners and an additional $10 million to the Commonwealth of Massachusetts.  *See Attorney General Martha Coakley and Goldman Sachs Reach Settlement Regarding Subprime Lending Issues* (May 11, 2009), *available at* http://www.mass.gov/Cago/docs/press/2009_05_07_goldman_settlement.pdf.

83.     In addition, Goldman has been the subject of investigations by both the Securities and Exchange Commission and the New York Attorney General.  On July 15, 2010, the SEC announced that Goldman had agreed to pay $550 million to settle SEC charges that Goldman misled investors in a subprime mortgage product just as the U.S. housing market was starting to collapse.  In agreeing to the SEC's largest-ever penalty paid by a Wall Street firm, Goldman also acknowledged that its marketing materials for the subprime product contained incomplete information.  *See Goldman Sachs to Pay Record $550 Million to Settle SEC Charges Related to Subprime Mortgage CDO*, SEC Litig. Release No. 21592 (July 15, 2010), *available at* http://www.sec.gov/litigation/litreleases/2010/lr21592.htm.

84.     More recently, in May 2011, the New York Attorney General began investigating Goldman's mortgage securities operations, including the pooling of mortgage loans.  *See* Gretchen Morgenson, *New York Investigates Banks' Role in Financial Crisis*, N.Y. Times, May 16, 2011, *available at* http://www.nytimes.com/2011/05/17/business/17bank.html.  In June 2011,

the Manhattan District Attorney's Office issued a subpoena to Goldman in connection with its investigation of Goldman's mortgage-backed securities. Both investigations are ongoing.

### III. The Registration Statements and the Prospectus Supplements

#### A. Compliance with Underwriting Guidelines

85. The Prospectus Supplement for each Securitization describes the mortgage loan underwriting guidelines pursuant to which mortgage loans underlying the related Securitizations were supposed to have been originated. These guidelines were intended to assess the creditworthiness of the borrower, the ability of the borrower to repay the loan, and the adequacy of the mortgaged property as security for the loan.

86. The statements made in the Prospectus Supplements, which, as discussed, formed part of the Registration Statement for each Securitization, were material to a reasonable investor's decision to purchase and invest in the Certificates because the failure to originate a mortgage loan in accordance with the applicable guidelines creates a higher risk of delinquency and default by the borrower, as well as a risk that losses upon liquidation will be higher, thus resulting in a greater economic risk to an investor.

87. The Prospectus Supplements for the Securitizations contained several key statements with respect to the underwriting standards of the entities that originated the loans in the Securitizations. For example, the Prospectus Supplement for GSAMP 2006-HE7 stated that: "The mortgage loans were originated or acquired generally in accordance with the underwriting guidelines of the original loan sellers."[7]  In that Securitization, Goldman Sachs Mortgage

---

[7]  In GSAMP 2006-HE7, the mortgage loans were primarily originated by, or sold through, the Goldman Sachs Mortgage Conduit Program, SouthStar Funding, LLC, Aames Capital Corporation, and NovaStar Mortgage, Inc.  The securitization was sponsored by Goldman Sachs Mortgage Company, underwritten and sold to Fannie Mae by Goldman, Sachs & Co., and the depositor was GS Mortgage Securities Corp.

Company and GS Mortgage Securities Corp. acquired approximately 30.87 percent of the

mortgage loans in the Securitization from SouthStar Funding, LLC.  The Defendants represented

in the Prospectus Supplement for this securitization that "SouthStar's guidelines are intended to

evaluate the borrower's ability to repay the mortgage loan, evaluate the borrower's credit and

evaluate the value and adequacy of the collateral.  SouthStar does not approve mortgage loans

based solely on the value of the collateral."  In the Prospectus Supplement, Defendants further

(a) described the level of documentation SouthStar required under its various documentation

programs, and represented that "the borrowers must show the ability to repay the mortgage loan,

have acceptable credit, and acceptable collateral"; (b) described the criteria for acceptable

collateral; and (c) described the borrower eligibility criteria, including maximum debt-to-income

ratios, minimum FICO scores, and valid credit scores, which "must be met."  SouthStar also

stated that it "realize[d] the soundness of a portfolio depends to a significant extent on the quality

and accuracy of the real estate appraisal," and explained that its policy was to, among other

things, comply with federal and state rules and use automated valuation models in the review

process.

      88.    According to the Prospectus Supplements, many of the underlying mortgage loans

in the Securitizations were also acquired by Goldman Sachs Mortgage Company through its

"conduit program"—whereby the loans were originated by third parties and sold or otherwise

transferred to the sponsor.  In those cases, although Goldman Sachs did not originate the loans, it

generally made representations in the deal documents as to the creditworthiness of the borrower

and the quality of the loans.

      89.    For example, the Prospectus Supplement for GSAMP 2006-HE4 stated that

"[p]ursuant to the mortgage conduit program, the sponsor purchases mortgage loans originated

by the original loan sellers if the mortgage loans generally satisfy the sponsor's underwriting guidelines."  Further, that Prospectus Supplement stated that Goldman Sachs Mortgage Company would, "[p]rior to acquiring any residential mortgage loans … conduct a review of the related mortgage loan seller" and that "[a]ll of the mortgage loans that [Goldman Sachs Mortgage Company's] may acquire through its conduit program will be acquired generally in accordance with the underwriting criteria described in this section."  The Prospectus Supplement further stated that the sponsor's "review process consists of reviewing select financial information for credit and risk assessment and underwriting guideline review, senior level management discussion and background checks.  The scope of the mortgage loan due diligence will depend on the credit quality of the mortgage loans."

90.     The Prospectus and Prospectus Supplement for each of the Securitizations had similar statements to those quoted above.  The relevant statements in the Prospectus and Prospectus Supplement pertaining to underwriting standards for each Securitization are reflected in Appendix A to this Complaint.  As discussed in Section IV.B. below, in fact, the originators of the mortgage loans in the Supporting Loan Groups for the Securitizations did not adhere to their stated underwriting guidelines, thus rendering the description of those guidelines in the Prospectuses and Prospectus Supplements false and misleading.

91.     Further, the Prospectuses and Prospectus Supplements included additional representations by the sponsor regarding the purported quality of the mortgage loans that collateralized the Certificates.  These representations and warranties were part of the PSA—the document that effected the transfer of the mortgage loans to the respective trusts—but were repeated in the Prospectuses and Prospectus Supplements prepared by the depositor, underwriter and others.  In many cases, the Prospectuses and Prospectus Supplements stated that the

applicable representations and warranties were "brought down" as of the close of the

Securitization, meaning that the representations and warranties were true as of the time the GSE

Certificates were issued.  *See, e.g.*, GSR 2006-OA1 Prospectus Supplement (filed Aug. 26, 2006)

("GSMC [Goldman Sachs Mortgage Company] will bring down all loan level representations

and warranties through the Closing Date.").

92.     These representations, which are described in greater detail for each

Securitization in Appendix A, included the following:

- "Underwriting Guidelines.  The Mortgage Loan was underwritten in accordance with the Seller's underwriting guidelines in effect at the time of origination with exceptions thereto exercised in a reasonable manner"; and

- "No Defaults.  Except with respect to delinquencies identified on the Mortgage Loan schedule… there is no default, breach, violation or event of acceleration existing under any mortgage or mortgage note and no event that, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration …."  *Id.*

93.     The inclusion of these representations in the Prospectuses and Prospectus

Supplements had the purpose and effect of providing additional assurances to investors regarding

the quality of the mortgage collateral underlying the Securitizations and its compliance with the

underwriting guidelines described in the Prospectuses and Prospectus Supplements.  These

representations were material to a reasonable investor's decision to purchase the Certificates.

## B.     Statements Regarding Occupancy Status of Borrower

94.     The Prospectus Supplements contained collateral group-level information about

the occupancy status of the borrowers of the loans in the Securitizations.  Occupancy status

refers to whether the property securing a mortgage is to be the primary residence of the

borrower, a second home, or an investment property.  The Prospectus Supplements for each of

the Securitizations presented this information in tabular form, usually in a table entitled

"Occupancy" or "Occupancy Status."  This table divided all the loans in the collateral group by

occupancy status, generally into the following categories:  (i) "Owner Occupied"; (ii) "Second

Home"; and (iii) "Investor."  For each category, the table stated the number of loans in that

category.  Occupancy statistics for the Supporting Loan Groups for each Securitization were

reported in the Prospectus Supplements as follows:[8]

   Table 4

| Transaction | Supporting Loan Group | Owner Occupied (%) | Second Home (%) | Investor (%) |
|---|---|---|---|---|
| ACCR 2005-4 | Group 1 | 94.21 | 0.97 | 4.83 |
| AHMA 2006-1 | Group 1 | 57.90 | 7.41 | 34.69 |
| FFML 2005-FF11 | Group 1 | 94.06 | 0.67 | 5.27 |
| FFML 2005-FF8 | Group 1 | 95.99 | 0.00 | 4.01 |
| FFML 2006-FF13 | Group 1 | 100.00 | 0.00 | 0.00 |
| FHLT 2006-E | Group 1 | 86.23 | 1.37 | 12.40 |
| GSAA 2005-11 | Group 1 | 55.48 | 3.44 | 41.08 |
| GSAA 2005-14 | Group 1 | 44.48 | 12.20 | 43.32 |
| GSAA 2005-15 | Group 1 | 68.42 | 8.54 | 23.03 |
| GSAA 2006-11 | Group 1 | 74.48 | 7.11 | 18.41 |
| GSAA 2006-2 | Group 1 | 97.51 | 2.49 | 0.00 |
| GSAA 2006-4 | Group 1 | 78.06 | 9.22 | 12.72 |
| GSAA 2006-5 | Group 1 | 67.10 | 5.65 | 27.25 |
| GSAA 2006-8 | Group 1 | 52.80 | 11.09 | 36.11 |
| GSAA 2007-6 | Group 3 | 57.94 | 5.15 | 36.91 |
| GSAMP 2005-AHL2 | Group 1 | 90.70 | 0.61 | 8.69 |
| GSAMP 2005-HE5 | Group 1 | 88.94 | 3.30 | 7.77 |
| GSAMP 2005-HE6 | Group 1 | 91.70 | 1.76 | 6.54 |
| GSAMP 2005-WMC2 | Group 1 | 95.91 | 2.76 | 1.32 |
| GSAMP 2005-WMC3 | Group 1 | 95.32 | 2.99 | 1.69 |
| GSAMP 2006-FM1 | Group 1 | 94.38 | 0.83 | 4.79 |
| GSAMP 2006-FM2 | Group 1 | 88.84 | 1.26 | 9.90 |
| GSAMP 2006-FM3 | Group 1 | 89.25 | 0.89 | 9.87 |
| GSAMP 2006-HE3 | Group 1 | 89.27 | 2.66 | 8.07 |
| GSAMP 2006-HE4 | Group 1 | 86.04 | 2.54 | 11.42 |
| GSAMP 2006-HE5 | Group 1 | 94.48 | 1.15 | 4.37 |
| GSAMP 2006-HE7 | Group 1 | 91.04 | 1.40 | 7.55 |
| GSAMP 2006-HE8 | Group 1 | 87.74 | 1.68 | 10.58 |
| GSAMP 2006-NC2[9] | Group 1 | 92.16 | 0.81 | 6.23 |
| GSAMP 2007-FM1 | Group 1 | 88.31 | 1.19 | 10.50 |
| GSAMP 2007-FM2 | Group 1 | 89.84 | 1.40 | 8.76 |
| GSAMP 2007-HE1 | Group 1 | 89.48 | 1.32 | 9.21 |

---

   [8]   Each Prospectus Supplement provides the total number of loans and the number of
loans in the following categories:  owner occupied, second home, and investor.  These numbers
have been converted to percentages as set forth in Table 4.

   [9]   As described more fully in note 16, *infra*, the GSAMP 2006-NC2 Prospectus
Supplement misstates *all* relevant characteristics for the Supporting Loan Group, by reporting
the statistical and tabular information for the Securitization as a whole in place of the statistical
and tabular information for Loan Group 1.  Tables 4–7, *infra*, in the interest of avoiding further
confusion, utilize the data in the GSAMP 2006-NC2 Prospectus Supplement that appears to have
been intended to correspond to Loan Group 1, notwithstanding that this information is reported
in a section of the Prospectus Supplement titled, "All Collateral."

| Transaction | Supporting Loan Group | Owner Occupied (%) | Second Home (%) | Investor (%) |
|---|---|---|---|---|
| GSAMP 2007-HE2 | Group 1 | 88.04 | 2.74 | 9.22 |
| GSAMP 2007-NC1 | Group 1 | 91.80 | 1.08 | 7.11 |
| GSR 2006-OA1 | Group 1 | 79.40 | 3.91 | 16.69 |
| GSR 2007-AR2 | Group 6 | 83.85 | 11.20 | 4.95 |
| GSR 2007-OA1 | Group 1 | 70.61 | 6.04 | 23.34 |
| GSR 2007-OA2 | Group 1 | 66.22 | 6.09 | 27.69 |
| INDX 2005-AR18 | Group 1 | 90.69 | 2.48 | 6.83 |
| INDX 2005-AR27 | Group 2 | 83.19 | 4.79 | 12.02 |

95.     As Table 4 makes clear, the Prospectus Supplements for each Securitization reported that an overwhelming majority of the mortgage loans in the Supporting Loan Groups were owner occupied, while a small percentage were reported to be non-owner occupied (i.e., a second home or investment property).

96.     The statements about occupancy status were material to a reasonable investor's decision to invest in the Certificates.  Information about occupancy status is an important factor in determining the credit risk associated with a mortgage loan and, therefore, the securities that it collateralizes.  Because borrowers who reside in mortgaged properties are less likely to default than borrowers who purchase homes as second homes or investments and live elsewhere, and are more likely to care for their primary residence, the percentage of loans in the collateral group of a securitization that are secured by mortgage loans on owner-occupied residences is an important measure of the risk of the certificates sold in that securitization.

97.     All other things being equal, the higher the percentage of loans not secured by owner-occupied residences, the greater the risk of loss to the certificateholders.  Even small differences in the percentages of owner-occupied, second home, and investment properties in the collateral group of a securitization can have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.  As discussed in Section IV.A.1. below, the Registration Statement for each Securitization materially *overstated* the percentage of loans in the Supporting Loan

Groups that were owner occupied, thereby misrepresenting and *understating* the degree of risk of the GSE Certificates.

C.       **Statements Regarding Loan-to-Value Ratios**

98.     The loan-to-value ratio of a mortgage loan, or LTV ratio, is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan is made.

99.     The denominator in the LTV ratio is the value of the mortgaged property, and is generally the lower of the purchase price or the appraised value of the property.  In a refinancing or home-equity loan, there is no purchase price to use as the denominator, so the denominator is often equal to the appraised value at the time of the origination of the refinanced or home-equity loan.  Accordingly, an accurate appraisal is essential to an accurate LTV ratio.  In particular, an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan.

100.    The Prospectus Supplements for each Securitization also contained group-level information about the LTV ratio for the underlying group of loans as a whole.  The percentage of loans by aggregate principal balance with an LTV ratio at or less than 80 percent and the percentage of loans with an LTV ratio greater than 100 percent as reported in the Prospectus Supplements for the Supporting Loan Groups are reflected in Table 5 below.[10]

**Table 5**

| Transaction | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|
| ACCR 2005-4 | Group 1 | 79.52 | 0.00 |
| AHMA 2006-1 | Group 1 | 84.90 | 0.00 |

---

[10]   As used in this Complaint, "LTV" refers to the original loan-to-value ratio for first lien mortgages and for properties with second liens that are subordinate to the lien that was included in the securitization (i.e., only the securitized lien is included in the numerator of the LTV calculation).  However, for second lien mortgages, where the securitized lien is junior to another loan, the more senior lien has been added to the securitized one to determine the numerator in the LTV calculation (this latter calculation is sometimes referred to as the combined-loan-to-value ratio, or "CLTV").

| Transaction | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|
| FFML 2005-FF11 | Group 1 | 91.49 | 0.00 |
| FFML 2005-FF8 | Group 1 | 56.61 | 0.00 |
| FFML 2006-FF13 | Group 1 | 68.93 | 0.00 |
| FHLT 2006-E | Group 1 | 54.11 | 0.01 |
| GSAA 2005-11 | Group 1 | 88.20 | 0.00 |
| GSAA 2005-14 | Group 1 | 93.87 | 0.00 |
| GSAA 2005-15 | Group 1 | 89.93 | 0.00 |
| GSAA 2006-11 | Group 1 | 91.47 | 0.00 |
| GSAA 2006-2 | Group 1 | 60.24 | 0.00 |
| GSAA 2006-4 | Group 1 | 94.93 | 0.00 |
| GSAA 2006-5 | Group 1 | 94.71 | 0.00 |
| GSAA 2006-8 | Group 1 | 79.43 | 0.00 |
| GSAA 2007-6 | Group 3 | 96.98 | 0.00 |
| GSAMP 2005-AHL2 | Group 1 | 57.58 | 0.00 |
| GSAMP 2005-HE5 | Group 1 | 68.15 | 0.00 |
| GSAMP 2005-HE6 | Group 1 | 51.58 | 0.00 |
| GSAMP 2005-WMC2 | Group 1 | 70.77 | 0.00 |
| GSAMP 2005-WMC3 | Group 1 | 70.06 | 0.00 |
| GSAMP 2006-FM1 | Group 1 | 60.16 | 0.00 |
| GSAMP 2006-FM2 | Group 1 | 66.94 | 0.00 |
| GSAMP 2006-FM3 | Group 1 | 60.86 | 0.00 |
| GSAMP 2006-HE3 | Group 1 | 67.69 | 0.00 |
| GSAMP 2006-HE4 | Group 1 | 57.61 | 0.00 |
| GSAMP 2006-HE5 | Group 1 | 67.62 | 0.00 |
| GSAMP 2006-HE7 | Group 1 | 61.99 | 0.00 |
| GSAMP 2006-HE8 | Group 1 | 61.21 | 0.00 |
| GSAMP 2006-NC2[11] | Group 1 | 56.07 | 0.00 |
| GSAMP 2007-FM1 | Group 1 | 56.47 | 0.00 |
| GSAMP 2007-FM2 | Group 1 | 57.71 | 0.00 |
| GSAMP 2007-HE1 | Group 1 | 39.37 | 0.00 |
| GSAMP 2007-HE2 | Group 1 | 46.03 | 0.00 |
| GSAMP 2007-NC1 | Group 1 | 58.37 | 0.00 |
| GSR 2006-OA1 | Group 1 | 93.41 | 0.00 |
| GSR 2007-AR2 | Group 6 | 84.03 | 0.00 |
| GSR 2007-OA1 | Group 1 | 82.23 | 0.00 |
| GSR 2007-OA2 | Group 1 | 83.17 | 0.00 |
| INDX 2005-AR18 | Group 1 | 96.84 | 0.00 |
| INDX 2005-AR27 | Group 2 | 93.95 | 0.00 |

101.    As Table 5 makes clear, the Prospectus Supplement for each Securitization reported that many or most of the mortgage loans in the Supporting Loan Groups had an LTV ratio of 80 percent or less, and all but one of the Securitizations reported that zero mortgage loans in the Supporting Loan Group had an LTV ratio over 100 percent.[12]

---

[11]    *See supra* note 9.

[12]    The only Securitization reporting any mortgage loans with an LTV ratio over 100 percent was FHLT 2006-E, and in that case, only 0.01 percent of its mortgage loans were reported to have an LTV ratio in excess of 100 percent.

102.     The LTV ratio is among the most important measures of the risk of a mortgage loan, and thus, it is one of the most important indicators of the default risk of the mortgage loans underlying the Certificates.  The lower the ratio, the less likely that a decline in the value of the property will wipe out an owner's equity, and thereby give an owner an incentive to stop making mortgage payments and abandon the property.  This ratio also predicts the severity of loss in the event of default.  The lower the LTV ratio, the greater the "equity cushion," so the greater the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

103.     Thus, LTV ratio is a material consideration to a reasonable investor in deciding whether to purchase a certificate in a securitization of mortgage loans.  Even small differences in the LTV ratios of the mortgage loans in the collateral group of a securitization have a significant effect on the likelihood that the collateral groups will generate sufficient funds to pay certificateholders in that securitization, and thus are material to the decision of a reasonable investor whether to purchase any such certificate.  As discussed in Section IV.A.2. below, the Registration Statements for the Securitizations materially *overstated* the percentage of loans in the Supporting Loan Groups with an LTV ratio at or less than 80 percent, and materially *understated* the percentage of loans in the Supporting Loan Groups with an LTV ratio over 100 percent, thereby misrepresenting and understating the degree of risk of the GSE Certificates.

### D.     Statements Regarding Credit Ratings

104.     Credit ratings are assigned to the tranches of mortgage-backed securitizations by the credit rating agencies, including Moody's Investors Service, Standard & Poor's, and Fitch Ratings.  Each credit rating agency uses its own scale with letter designations to describe various levels of risk.  In general, AAA or its equivalent ratings are at the top of the credit rating scale and are intended to designate the safest investments.  C and D ratings or their equivalents are at the bottom of the scale and refer to investments that are currently in default and exhibit little or

no prospect for recovery.  At the time the GSEs purchased the GSE Certificates, investments with AAA or its equivalent ratings historically experienced loss rates of less than 0.05 percent. Investments with a BBB rating, or its equivalent, historically experienced loss rates of under one percent.  As a result, securities with credit ratings between AAA through BBB- or their equivalents were generally referred to as "investment grade."

105.    Rating agencies determine the credit rating for each tranche of a mortgage-backed securitization by comparing the likelihood of contractual principal and interest repayment to the "credit enhancements" available to protect investors.  Rating agencies determine the likelihood of repayment by estimating cashflows based on the quality of the underlying mortgages by using sponsor provided loan-level data.  Credit enhancements, such as subordination, represent the amount of "cushion" or protection from loss incorporated into a given securitization.[13]  This cushion is intended to improve the likelihood that holders of highly rated certificates receive the interest and principal to which they are contractually entitled.  The level of credit enhancement offered is based on the make-up of the loans in the underlying collateral group and entire securitization.  Riskier loans underlying the securitization necessitate higher levels of credit enhancement to insure payment to senior certificate holders.  If the collateral within the deal is of a higher quality, then rating agencies require less credit enhancement for AAA or its equivalent rating.

106.    Credit ratings have been an important tool to gauge risk when making investment decisions.  For almost a hundred years, investors like pension funds, municipalities, insurance

---

[13]  "Subordination" refers to the fact that the certificates for a mortgage-backed securitization are issued in a hierarchical structure, from senior to junior.  The junior certificates are "subordinate" to the senior certificates in that, should the underlying mortgage loans become delinquent or default, the junior certificates suffer losses first.  These subordinate certificates thus provide a degree of protection to the senior certificates from losses on the underlying loans.

companies, and university endowments have relied heavily on credit ratings to assist them in distinguishing between safe and risky investments.  Fannie Mae and Freddie Mac's respective internal policies limited their purchases of private label residential mortgage-backed securities to those rated AAA (or its equivalent), and in very limited instances, AA or A bonds (or their equivalent).

107.    Each tranche of the Securitizations received a credit rating upon issuance, which purported to describe the riskiness of that tranche.  The Defendants reported the credit ratings for each tranche in the Prospectus Supplements.  The credit rating provided for each of the GSE Certificates was "investment grade," always "AAA" or its equivalent.  The accuracy of these ratings was material to a reasonable investor's decision to purchase the Certificates.  As set forth in Table 8 below, the ratings for the Securitizations were inflated as a result of Defendants' provision of incorrect data concerning the attributes of the underlying mortgage collateral to the ratings agencies, and, as a result, Defendants marketed and sold the GSE Certificates as AAA (or its equivalent) when, in fact, they were not.

### IV.    Falsity of Statements in the Registration Statements and Prospectus Supplements

#### A.    A Review of Loan-Level Data Indicates That the Statistical Data Provided in the Registration Statements and Prospectus Supplements Concerning Owner Occupancy and LTV Ratios Was Materially False

108.    A review of loan-level data was conducted in order to assess whether the statistical information provided in the Prospectus Supplements was true and accurate.  For each Securitization, the sample consisted of 1,000 randomly selected loans per Supporting Loan Group, or all of the loans in the group if there were fewer than 1,000 loans in the Supporting Loan Group.  The sample data confirms, on a statistically significant basis, material misrepresentations of underwriting standards and of certain key characteristics of the mortgage

loans across the Securitizations.  The review demonstrates that the data concerning owner occupancy and LTV ratios was materially false and misleading.

### 1.    Owner-Occupancy Data Was Materially False

109.    The data review has revealed that the owner-occupancy statistics reported in the Prospectus Supplements were materially false and inflated.  In fact, far fewer underlying properties were occupied by their owners than disclosed in the Prospectus Supplements, and more correspondingly were held as second homes or investment properties.

110.    To determine whether a given borrower actually occupied the property as claimed, a number of tests were conducted, including, *inter alia*, whether, months after the loan closed, the borrower's tax bill was being mailed to the property or to a different address; whether the borrower had claimed a tax exemption on the property; and whether the mailing address of the property was reflected in the borrower's credit reports, tax records, or lien records.  Failing two or more of these tests is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property, both of which make it much less likely the borrower will repay the loan.

111.    A significant number of the loans failed two or more of these tests, indicating that the owner-occupancy statistics provided to Fannie Mae and Freddie Mac were materially false and misleading.  For example, in GSAA 2006-4, for which Goldman Sachs Mortgage Company was the sponsor and Goldman, Sachs & Co. was the underwriter, the Prospectus Supplement stated that 21.94 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied, and therefore 78.06 percent were owner-occupied.  The data review revealed that 17.07 percent of the properties represented as owner-occupied in the sample showed strong indications that their owners lived elsewhere. Therefore, recalculating that an additional 17.07 percent of the 78.06 percent of loans represented as owner occupied in the

Supporting Loan Group were in fact not owner occupied, indicates that the true percentage of non-owner-occupied properties was 35.27 percent, nearly double the percentage reported in the Prospectus Supplement.[14]

112.     The data review revealed that for each Securitization, the Prospectus Supplement misrepresented the percentage of non-owner-occupied properties, as determined by the data review.  The true percentage of non-owner-occupied properties versus the percentage stated in the Prospectus Supplement for each Securitization is reflected in Table 6 below.  Table 6 demonstrates that the Prospectus Supplements for each Securitization understated the percentage of non-owner-occupied properties by at least 5.96 percent, and for many Securitizations by 10 percent or more.

Table 6

| Transaction | Supporting Loan Group | Reported Percentage of Non-Owner-Occupied Properties | Percentage of Properties Reported as Owner-Occupied With Strong Indication of Non-Owner Occupancy[15] | Actual Percentage of Non-Owner-Occupied Properties | Prospectus Percentage Understatement of Non-Owner-Occupied Properties |
|---|---|---|---|---|---|
| ACCR 2005-4 | Group 1 | 5.79 | 11.10 | 16.25 | 10.46 |
| AHMA 2006-1 | Group 1 | 42.10 | 19.96 | 53.66 | 11.56 |
| FFML 2005-FF11 | Group 1 | 5.94 | 8.25 | 13.70 | 7.76 |
| FFML 2005-FF8 | Group 1 | 4.01 | 10.96 | 14.53 | 10.52 |
| FFML 2006-FF13 | Group 1 | 0.00 | 10.56 | 10.56 | 10.56 |
| FHLT 2006-E | Group 1 | 13.77 | 12.09 | 24.20 | 10.42 |
| GSAA 2005-11 | Group 1 | 44.52 | 16.67 | 53.76 | 9.24 |
| GSAA 2005-14 | Group 1 | 55.52 | 13.39 | 61.48 | 5.96 |
| GSAA 2005-15 | Group 1 | 31.58 | 14.48 | 41.48 | 9.91 |
| GSAA 2006-11 | Group 1 | 25.52 | 16.23 | 37.62 | 12.10 |
| GSAA 2006-2 | Group 1 | 2.49 | 12.00 | 14.20 | 11.71 |
| GSAA 2006-4 | Group 1 | 21.94 | 17.07 | 35.27 | 13.32 |
| GSAA 2006-5 | Group 1 | 32.90 | 13.17 | 41.74 | 8.84 |
| GSAA 2006-8 | Group 1 | 47.20 | 12.38 | 53.74 | 6.54 |

---

[14]   This conclusion is arrived at by summing (a) the stated non-owner-occupied percentage in the Prospectus Supplement (here, 21.94 percent) and (b) the product of (i) the stated owner-occupied percentage (here, 78.06 percent) and (ii) the percentage of the properties represented as owner-occupied in the sample that showed strong indications that their owners in fact lived elsewhere (here, 17.07 percent).

[15]   As described more fully in paragraph 110, failing two or more tests of owner occupancy is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property.

| Transaction | Supporting Loan Group | Reported Percentage of Non-Owner-Occupied Properties | Percentage of Properties Reported as Owner-Occupied With Strong Indication of Non-Owner Occupancy[18] | Actual Percentage of Non-Owner-Occupied Properties | Prospectus Percentage Understatement of Non-Owner-Occupied Properties |
|---|---|---|---|---|---|
| GSAA 2007-6 | Group 3 | 42.06 | 11.76 | 48.88 | 6.82 |
| GSAMP 2005-AHL2 | Group 1 | 9.30 | 12.16 | 20.33 | 11.03 |
| GSAMP 2005-HE5 | Group 1 | 11.06 | 9.98 | 19.94 | 8.88 |
| GSAMP 2005-HE6 | Group 1 | 8.30 | 13.25 | 20.44 | 12.14 |
| GSAMP 2005-WMC2 | Group 1 | 4.09 | 11.38 | 15.00 | 10.91 |
| GSAMP 2005-WMC3 | Group 1 | 4.68 | 11.73 | 15.86 | 11.18 |
| GSAMP 2006-FM1 | Group 1 | 5.62 | 13.75 | 18.59 | 12.97 |
| GSAMP 2006-FM2 | Group 1 | 11.16 | 12.86 | 22.58 | 11.42 |
| GSAMP 2006-FM3 | Group 1 | 10.75 | 10.88 | 20.46 | 9.71 |
| GSAMP 2006-HE3 | Group 1 | 10.73 | 8.84 | 18.62 | 7.89 |
| GSAMP 2006-HE4 | Group 1 | 13.96 | 12.50 | 24.71 | 10.75 |
| GSAMP 2006-HE5 | Group 1 | 5.52 | 12.96 | 17.77 | 12.25 |
| GSAMP 2006-HE7 | Group 1 | 8.96 | 9.27 | 17.39 | 8.43 |
| GSAMP 2006-HE8 | Group 1 | 12.26 | 11.55 | 22.39 | 10.13 |
| GSAMP 2006-NC2[16] | Group 1 | 7.04 | 10.68 | 16.97 | 9.93 |
| GSAMP 2007-FM1 | Group 1 | 11.69 | 11.81 | 22.12 | 10.43 |
| GSAMP 2007-FM2 | Group 1 | 10.16 | 11.47 | 20.47 | 10.31 |
| GSAMP 2007-HE1 | Group 1 | 10.52 | 10.22 | 19.66 | 9.14 |
| GSAMP 2007-HE2 | Group 1 | 11.96 | 8.86 | 19.76 | 7.80 |
| GSAMP 2007-NC1 | Group 1 | 8.20 | 9.76 | 17.15 | 8.95 |
| GSR 2006-OA1 | Group 1 | 20.60 | 15.21 | 32.68 | 12.08 |
| GSR 2007-AR2 | Group 6 | 16.15 | 20.19 | 33.08 | 16.93 |
| GSR 2007-OA1 | Group 1 | 29.39 | 15.15 | 40.09 | 10.70 |
| GSR 2007-OA2 | Group 1 | 33.78 | 16.01 | 44.38 | 10.60 |
| INDX 2005-AR18 | Group 1 | 9.31 | 14.69 | 22.63 | 13.32 |
| INDX 2005-AR27 | Group 2 | 16.81 | 15.61 | 29.79 | 12.99 |

## 2.    LTV Data Was Materially False

113.    The data review has further revealed that the LTV ratios disclosed in the

Prospectus Supplements were materially false and understated as more specifically set out

---

[16]    As described in note 9, *supra*, the GSAMP 2006-NC2 Prospectus Supplement misstates *all* relevant characteristics associated with the Supporting Loan Group.  Specifically, the section of the GSAMP 2006-NC2 Prospectus Supplement that purports to provide statistical information about Loan Group 1 (which collateralized the GSE Certificates that Fannie Mae purchased) in fact describes, not the applicable Supporting Loan Group, but the *entire* Securitization.  As a consequence, the Prospectus Supplement misstates information about, among other things, the number of loans in the group, the distributions by LTV and CLTV, the distribution by owner occupancy, the distribution by current principal balance, the distribution by current principal rate, the distribution by FICO credit score, the distribution by lien, the distribution by documentation, the distribution by purpose of the loan, the distribution by property type, the distribution by state, the distribution by zip code, and numerous other relevant factors.  Such gross misstatements of the relevant characteristics of the Securitization's collateral provide further evidence of Defendants' lack of care and due diligence.

below.  For each of the sampled loans, an industry standard automated valuation model

("AVM") was used to calculate the value of the underlying property at the time the mortgage

loan was originated.  AVMs are routinely used in the industry as a way of valuing properties

during prequalification, origination, portfolio review and servicing.  AVMs rely upon similar

data as appraisers—primarily county assessor records, tax rolls, and data on comparable

properties.[17]  AVMs produce independent, statistically derived valuation estimates by applying

modeling techniques to this data.

114.    Applying the retroactive AVM to the available data for the properties securing the

sampled loans shows that the appraised value given to such properties at the time of origination

was significantly higher than the actual value of such properties.  The result of this overstatement

of property values is a material understatement of the LTV ratios.  That is, if a property's true

value is significantly less than the value used in the loan underwriting, then the loan represents a

significantly higher percentage of the property's value.  This, of course, increases the risk a

borrower will not repay the loan and the risk of greater losses in the event of a default.  As stated

in the Prospectus Supplement for GSAA 2006-8:  "Mortgage loans with higher original loan-to-

value ratios may present a greater risk of loss than mortgage loans with original loan-to-value

ratios of 80% or below."

115.    For GSAA 2006-2, for example, which was sponsored by Goldman Sachs

Mortgage Company and underwritten by Goldman, Sachs & Co., the Prospectus Supplement

stated that no LTV ratios for the Supporting Loan Group were above 100 percent.  In fact, 20.79

percent of the sample of loans included in the data review had LTV ratios above 100 percent,

meaning that the amount of the underlying mortgage was more than the value of the property.  In

---

[17]   Where no AVM data was available, the appraised value was used.

addition, the GSAA 2006-2 Prospectus Supplement stated that 60.24 percent of the loans had LTV ratios at or below 80 percent. The data review indicated that only 27.80 percent of the loans had LTV ratios at or below 80 percent.

116. The data review revealed that for each Securitization, the Prospectus Supplement misstated several key statistics, including (i) the percentage of loans that had LTV ratios at or below 80 percent, and (ii) the percentage of loans that had LTV ratios above 100 percent. Table 7 reflects (i) the true percentage of mortgages in the Supporting Loan Group with LTV ratios at or below 80 percent, versus the percentage as reported in the Prospectus Supplement; and (ii) the true percentage of mortgages in the Supporting Loan Group with LTV ratios above 100 percent, versus the percentage as reported in the Prospectus Supplement. The percentages listed in Table 7 were calculated by aggregate principal balance.

**Table 7**

| Transaction | Supporting Loan Group | PROSPECTUS Percentage of Loans Reported to Have LTV Ratio At or Less Than 80% | DATA REVIEW True Percentage of Loans With LTV Ratio At or Less Than 80% | PROSPECTUS Percentage of Loans Reported to Have LTV Ratio Over 100 | DATA REVIEW True Percentage of Loans With LTV Ratio Over 100% |
|---|---|---|---|---|---|
| ACCR 2005-4 | Group 1 | 79.52 | 50.71 | 0.00 | 10.14 |
| AHMA 2006-1 | Group 1 | 84.90 | 48.58 | 0.00 | 11.98 |
| FFML 2005-FF11 | Group 1 | 91.49 | 64.75 | 0.00 | 2.97 |
| FFML 2005-FF8 | Group 1 | 56.61 | 45.37 | 0.00 | 11.63 |
| FFML 2006-FF13 | Group 1 | 68.93 | 41.03 | 0.00 | 13.78 |
| FHLT 2006-E | Group 1 | 54.11 | 31.23 | 0.01 | 23.53 |
| GSAA 2005-11 | Group 1 | 88.20 | 56.87 | 0.00 | 6.95 |
| GSAA 2005-14 | Group 1 | 93.87 | 55.30 | 0.00 | 6.23 |
| GSAA 2005-15 | Group 1 | 89.93 | 51.05 | 0.00 | 7.56 |
| GSAA 2006-11 | Group 1 | 91.47 | 53.42 | 0.00 | 4.70 |
| GSAA 2006-2 | Group 1 | 60.24 | 27.80 | 0.00 | 20.79 |
| GSAA 2006-4 | Group 1 | 94.93 | 57.62 | 0.00 | 6.69 |
| GSAA 2006-5 | Group 1 | 94.71 | 54.38 | 0.00 | 6.09 |
| GSAA 2006-8 | Group 1 | 79.43 | 51.84 | 0.00 | 8.97 |
| GSAA 2007-6 | Group 3 | 96.98 | 44.37 | 0.00 | 14.35 |
| GSAMP 2005-AHL2 | Group 1 | 57.58 | 39.60 | 0.00 | 15.35 |
| GSAMP 2005-HE5 | Group 1 | 68.15 | 42.68 | 0.00 | 11.38 |
| GSAMP 2005-HE6 | Group 1 | 51.58 | 37.28 | 0.00 | 15.37 |
| GSAMP 2005-WMC2 | Group 1 | 70.77 | 38.67 | 0.00 | 14.78 |

| Transaction | Supporting Loan Group | PROSPECTUS<br>Percentage of Loans Reported to Have LTV Ratio At or Less Than 80% | DATA REVIEW<br>True Percentage of Loans With LTV Ratio At or Less Than 80% | PROSPECTUS<br>Percentage of Loans Reported to Have LTV Ratio Over 100 | DATA REVIEW<br>True Percentage of Loans With LTV Ratio Over 100% |
|---|---|---|---|---|---|
| GSAMP 2005-WMC3 | Group 1 | 70.06 | 40.17 | 0.00 | 14.63 |
| GSAMP 2006-FM1 | Group 1 | 60.16 | 36.41 | 0.00 | 20.59 |
| GSAMP 2006-FM2 | Group 1 | 66.94 | 43.17 | 0.00 | 15.49 |
| GSAMP 2006-FM3 | Group 1 | 60.86 | 39.06 | 0.00 | 19.51 |
| GSAMP 2006-HE3 | Group 1 | 67.69 | 38.98 | 0.00 | 16.21 |
| GSAMP 2006-HE4 | Group 1 | 57.61 | 36.15 | 0.00 | 13.36 |
| GSAMP 2006-HE5 | Group 1 | 67.62 | 36.03 | 0.00 | 18.14 |
| GSAMP 2006-HE7 | Group 1 | 61.99 | 33.74 | 0.00 | 18.13 |
| GSAMP 2006-HE8 | Group 1 | 61.21 | 32.58 | 0.00 | 21.33 |
| GSAMP 2006-NC2[18] | Group 1 | 56.07 | 37.13 | 0.00 | 19.54 |
| GSAMP 2007-FM1 | Group 1 | 56.47 | 36.70 | 0.00 | 23.44 |
| GSAMP 2007-FM2 | Group 1 | 57.71 | 35.48 | 0.00 | 23.20 |
| GSAMP 2007-HE1 | Group 1 | 39.37 | 24.29 | 0.00 | 27.36 |
| GSAMP 2007-HE2 | Group 1 | 46.03 | 29.42 | 0.00 | 23.20 |
| GSAMP 2007-NC1 | Group 1 | 58.37 | 37.35 | 0.00 | 20.65 |
| GSR 2006-OA1 | Group 1 | 93.41 | 52.91 | 0.00 | 8.39 |
| GSR 2007-AR2 | Group 6 | 84.03 | 51.27 | 0.00 | 5.74 |
| GSR 2007-OA1 | Group 1 | 82.23 | 48.89 | 0.00 | 16.45 |
| GSR 2007-OA2 | Group 1 | 83.17 | 40.57 | 0.00 | 22.50 |
| INDX 2005-AR18 | Group 1 | 96.84 | 66.76 | 0.00 | 5.70 |
| INDX 2005-AR27 | Group 2 | 93.95 | 55.40 | 0.00 | 5.87 |

117.    As Table 7 demonstrates, the Prospectus Supplements for all of the Securitizations reported that only one of the mortgage loans in the Supporting Loan Groups had an LTV ratio over 100 percent.[19]  In contrast, the data review revealed that at least 2.97 percent of the mortgage loans for *each* Securitization had an LTV ratio over 100 percent, and for most Securitizations this figure was much larger.  Indeed, for 28 of the 42 GSE Certificates, the data

---

[18]    As described in note 16, *supra*, the GSAMP 2006-NC2 Prospectus Supplement misstated *all* the statistical and tabular information about the Supporting Loan Group.

[19]    As noted above, the only Securitization reporting in its respective Prospectus Supplement any mortgage loans with an LTV ratio over 100 percent was FHLT 2006-E, and in that case, only 0.01 percent of its mortgage loans were *reported* to have an LTV ratio in excess of 100 percent, in comparison to the 23.53 percent that the AVM revealed.

review revealed that at least 10 percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent.  For 10 of the 42 GSE Certificates, the data review revealed that at least 20 percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent.

118.    These inaccuracies with respect to reported LTV ratios also indicate that the statements in the Registration Statements relating to appraisal practices were false, and that the appraisers themselves, in many instances, furnished appraisals that they understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties.  Indeed, independent appraisers following proper practices, and providing genuine estimates as to valuation, would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.  This conclusion is further confirmed by the findings of the Financial Crisis Inquiry Commission, which identified "inflated appraisals" as a pervasive problem during the period of the Securitizations, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to produce inflated results.  *See* Financial Crisis Inquiry Commission, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2011).

### B.    The Originators of the Underlying Mortgage Loans Systematically Disregarded Their Underwriting Guidelines

119.    The Registration Statements contained material misstatements and omissions regarding compliance with applicable underwriting guidelines.  Indeed, the originators for the loans underlying the Securitizations systematically disregarded their respective underwriting guidelines in order to increase production and profits derived from their mortgage-lending businesses.  This is confirmed by the systematically misreported owner occupancy and LTV

statistics, discussed above, and by (1) government investigations into originators' underwriting practices, which have revealed widespread abandonment of originators' reported underwriting guidelines during the relevant period; (2) the collapse of the GSE Certificates' credit ratings; and (3) the surge in delinquency and default in the mortgages in the Securitizations.

        **1.**       **Government Investigations Have Confirmed That the Originators of the Loans in the Securitizations Systematically Failed to Adhere to Their Underwriting Guidelines**

120.    The abandonment of underwriting guidelines is further confirmed by several government reports and investigations that have described rampant underwriting failures throughout the period of the Securitizations, and, more specifically, have described underwriting failures by the very originators whose loans were included by the Defendants in the Securitizations.

121.    For instance, in November 2008, the Office of the Comptroller of the Currency, an office within the United States Department of the Treasury, issued a report identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas.  The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005–2007 originations.  Countrywide, Fremont, IndyMac, WMC, and GreenPoint, which originated many of the loans for the Securitizations at issue here, were on that list.  *See* "Worst Ten in the Worst Ten," Office of the Comptroller of the Currency Press Release (Nov. 13, 2008), *available at* http://www.occ.treas.gov/news-issuances/news-releases/2009/nr-occ-2009-112b.pdf.

122.    Countrywide originated loans for at least 10 of the Securitizations.  In January 2011, the FCIC issued its final report, which detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.  *See* Financial Crisis Inquiry Commission, Final Report of the National Commission

of the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report").

The FCIC Report singled out Countrywide for its role:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences."  Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm.  But they did not stop.

*See* FCIC Report, at xxii.

123.    Countrywide has also been the subject of several investigations and actions concerning its lax and deficient underwriting practices.  In June 2009, for instance, the SEC initiated a civil action against Countrywide executives Angelo Mozilo (founder and Chief Executive Officer), David Sambol (Chief Operating Officer), and Eric Sieracki (Chief Financial Officer) for securities fraud and insider trading.  In a September 16, 2010 opinion denying these defendants' motions for summary judgment, the United States District Court for the Central District of California found that the SEC raised genuine issues of fact as to, among other things, whether the defendants had misrepresented the quality of Countrywide's underwriting processes. The court noted that the SEC presented evidence that Countrywide "routinely ignored its official underwriting to such an extent that Countrywide would underwrite any loan it could sell into the secondary mortgage market," and that "a significant portion (typically in excess of 20%) of Countrywide's loans were issued as exceptions to its official underwriting guidelines …."  The court concluded that "a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines …."  *SEC v. Mozilo*, No. CV 09-3994, 2010 WL 3656068, at *10 (C.D. Cal. Sept. 16, 2010).  Mozilo, Sambol, and Sieracki subsequently settled with the SEC.

124.    The testimony and documents only recently made available to the GSEs by way of the SEC's investigation confirm that Countrywide was systematically abusing "exceptions" and low-documentation processes in order to circumvent its own underwriting standards.  For example, in an April 13, 2006 e-mail, Mozilo wrote to Sieracki and others that he was concerned that certain subprime loans had been originated "with serious disregard for process [and] compliance with guidelines," resulting in the delivery of loans "with deficient documentation." Mozilo further stated that "I have personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."

125.    On October 4, 2007, the Commonwealth of Massachusetts, through its Attorney General, brought an enforcement action against Fremont, which originated loans for at least eight of the Securitizations, for an array of "unfair and deceptive business conduct," "on a broad scale."  *See* Complaint, *Commonwealth v. Fremont Inv. & Loan & Fremont Gen. Corp.*, No. 07-4373 (Mass. Super. Ct.) ("Fremont Complaint").  According to the complaint, Fremont (i) "approve[ed] borrowers without considering or verifying the relevant documentation related to the borrower's credit qualifications, including the borrower's income"; (ii) "approv[ed] borrowers for loans with inadequate debt-to-income analyses that do not properly consider the borrowers' ability to meet their overall level of indebtedness and common housing expenses"; (iii) "failed to meaningfully account for [ARM] payment adjustments in approving and selling loans"; (iv) "approved borrowers for these ARM loans based only on the initial fixed 'teaser' rate, without regard for borrowers' ability to pay after the initial two year period"; (v) "consistently failed to monitor or supervise brokers' practices or to independently verify the information provided to Fremont by brokers"; and (vi) "ma[de] loans based on information that

Fremont knew or should have known was inaccurate or false, including, but not limited to, borrowers' income, property appraisals, and credit scores." *See* Fremont Complaint.

126.    On December 9, 2008, the Supreme Judicial Court of Massachusetts affirmed a preliminary injunction that prevented Fremont from foreclosing on thousands of its loans issued to Massachusetts residents.  As a basis for its unanimous ruling, the Supreme Judicial Court found that the record supported the lower court's conclusions that "Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan,'" and that "Fremont knew or should have known that [its lending practices and loan terms] would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow." *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 556 (Mass. 2008).  The terms of the preliminary injunction were made permanent by a settlement reached on June 9, 2009.

127.    IndyMac, which originated the loans for at least two of the Securitizations, was the subject of a February 26, 2009 report issued by the Office of Inspector General ("OIG") of the U.S. Department of Treasury entitled "Safety and Soundness: Material Loss Review of IndyMac Bank, FSB" (the "OIG Report").  The OIG Report found that IndyMac Bank had "embarked on a path of aggressive growth" that was supported by its high risk business strategy of "originating … Alt-A loans on a large scale" and then "packag[ing] them together in securities" and selling "them on the secondary market" to investors.  OIG Report at 2, 6, 7.  The OIG Report further stated that:  "To facilitate this level of [loan] production … IndyMac often did not perform adequate underwriting."  *Id*. at 2.

128.    A June 30, 2008 report issued by the Center for Responsible Lending ("CRL") also found that IndyMac Bank often ignored its stated underwriting and appraisal standards and

encouraged its employees to approve loans regardless of the borrower's ability to repay them. *See* Center for Responsible Lending, *IndyMac: What Went Wrong? How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending* (Jun. 30, 2008) (the "CRL Report").  For example, the CRL Report noted that IndyMac Bank "engaged in unsound and abusive lending practices" and "allowed outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information] … [to] make them look like better credit risks."  *See* CRL Report at 2, 8.

129.    WMC, which originated the loans for at least two of the Securitizations, employed reckless underwriting standards and practices, as described more fully below, that resulted in a huge amount of foreclosures, ranking WMC fourth in the report presented to the FCIC in April 2010 identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas. *See* "Worst Ten in the Worst Ten," Office of the Comptroller of the Currency Press Release, November 13, 2008.  General Electric, which had purchased WMC in 2004, closed down operations at WMC in late 2007 and took a $1.4 billion charge in the third quarter of that year. *See, e.g.*, Diane Brady, Adventures of a Subprime Survivor, Bloomberg Businessweek, Oct. 29, 2007, *available at* http://www.businessweek.com/magazine/content/07_44/b4056074.htm.

130.    WMC's reckless loan originating practices were noticed by regulatory authorities. In June 2008, the Washington State Department of Financial Institutions, Division of Consumer Services filed a Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect Investigation Fees (the "Statement of Charges") against WMC Mortgage and its principal owners individually.  *See* Statement of Charges, No. C-07-557-08-SC01, Jun. 4, 2008.  The Statement of Charges included 86 loan files, which revealed that at least 76 loans were defective or otherwise in violation of

Washington state law.  *Id*.  Among other things, the investigation uncovered that WMC had originated loans with unlicensed or unregistered mortgage brokers, understated amounts of finance charges on loans, understated amounts of payments made to escrow companies, understated annual percentage rates to borrowers and committed many other violations of Washington State deceptive and unfair practices laws.  *Id*.

131.     GreenPoint, which originated the underlying mortgage loans for at least seven of the Securitizations, systematically disregarded its underwriting standards, granted exceptions in the absence of compensating factors, required less documentation, and granted no-documentation or limited-documentation loans to individuals without sound credit histories.  In November 2008, Businessweek Magazine reported that GreenPoint's employees and independent mortgage brokers targeted borrowers who were less able to afford the loan payments they were required to make, and many had no realistic ability to pay back the loans.  GreenPoint Mortgage Funding, Inc.'s parent corporation, Capital One Financial Corp., eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business.

132.     GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report. GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada.  In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California, 4th worst in Stockton, Merced, and Vallejo-Fairfield-Napa, California, 6th worst in Las Vegas, Nevada; and 9th in Reno, Nevada.

133.     GreenPoint is now a defendant in numerous lawsuits alleging misrepresentations regarding the quality of the loans GreenPoint underwrote and originated. For example, in *U.S.*

*Bank Nat'l Ass'n v. GreenPoint Mortgage Funding, Inc.,* No. 09-600352 (N.Y. Sup. Ct. filed Apr. 22, 2009), a consultant's investigation concluded that 93 percent of the loans that GreenPoint sold contained errors, omissions, misrepresentations, and negligence related to origination and underwriting. The investigation found that GreenPoint loans suffered from serious defects including:

- Pervasive misrepresentations and/or negligence with respect to the statement of the income, assets or employment of the borrower.

- Violations of GreenPoint's own underwriting guidelines and prudent mortgage lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social security numbers, (iii) with credit scores below the required minimum, (iv) with debt-to-income and/or loan-to-value ratios above the allowed maximum or (v) with relationships to GreenPoint or other non-arm's-length relationships.

- Misrepresentations of the borrower's intent to occupy the property as the borrower's residence and subsequent failure to so occupy the property.

- Inflated appraisal values.

On March 3, 2010, the court denied GreenPoint's motion to dismiss this claim, holding that discovery would be required to determine whether GreenPoint would be required under the parties' contract to repurchase all 30,000 loans based on the deficiencies in individual loans identified by U.S. Bank.

134.    New Century and its subsidiary, Home123, originated loans for at least one of the Securitizations.  As stated in the GSAMP 2006-NC2 Prospectus Supplement, "[f]or the year ending December 31, 2005, New Century Financial Corporation originated $56.1 billion in mortgage loans."  And before its collapse in the first half of 2007, New Century was one of the largest subprime lenders in the country.

135.    In 2010, the OCC identified New Century as *the worst* subprime lender in the country based on the delinquency rates of the mortgages it originated in the ten metropolitan

areas between 2005 and 2007 with the highest rates of delinquency.  *See* "Worst Ten in the

Worst Ten," Office of the Comptroller of the Currency Press Release (Nov. 13, 2008), *available*

*at* http://www.occ.treas.gov/news-issuances/news-releases/2009/nr-occ-2009-112b.pdf.  Further,

in January 2011, the FCIC issued its final report, which detailed, among other things, the

collapse of mortgage underwriting standards and subsequent collapse of the mortgage market

and wider economy.  *See* FCIC Report.  The FCIC Report singled out New Century for its role:

> New Century—once the nation's second-largest subprime lender—ignored
> early warnings that its own loan quality was deteriorating and stripped
> power from two risk-control departments that had noted the evidence. In a
> June 2004 presentation, the Quality Assurance staff reported they had
> found severe underwriting errors, including evidence of predatory lending,
> federal and state violations, and credit issues, in 25% of the loans they
> audited in November and December 2003. In 2004,  Chief Operating
> Officer and later CEO Brad Morrice recommended these results be
> removed from the statistical tools used to track loan performance, and in
> 2005, the department was dissolved and its personnel terminated. The
> same year, the Internal Audit department identified numerous deficiencies
> in loan files; out of nine reviews it conducted in 2005, it gave the
> company's loan production department "unsatisfactory" ratings seven
> times. Patrick Flanagan, president of New Century's mortgage-originating
> subsidiary, cut the department's budget, saying in a memo that the "group
> was out of control and tries to dictate business practices instead of audit."

136.    On February 29, 2008, after an extensive document review and conducting over

100 interviews, Michael J. Missal, the Bankruptcy Court Examiner for New Century, issued a

detailed report on the various deficiencies at New Century, including lax mortgage standards and

a failure to follow its own underwriting guidelines.  Among his findings, the Examiner reported:

- "New Century had a brazen obsession with increasing loan
  originations, without due regard to the risks associated with that
  business strategy ….  Although a primary goal of any mortgage
  banking company is to make more loans, New Century did so in an
  aggressive manner that elevated the risks to dangerous and ultimately
  fatal levels."

- New Century also made frequent exceptions to its underwriting
  guidelines for borrowers who might not otherwise qualify for a

particular loan.  A senior officer of New Century warned in 2004 that the "number one issue is exceptions to the guidelines."  Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies.

- "New Century … layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers."

Final Report of Michael J. Missal, Bankruptcy Examiner, *In re New Century TRS Holdings, Inc.*, No. 07-10416 (KJC) (Bankr. Del. Feb. 29, 2008), *available at* http://graphics8.nytimes.com/ packages/pdf/business/Final_Report_New_Century.pdf.

137.    On December 9, 2009, the SEC charged three of New Century's top officers with violations of federal securities laws.  The SEC's complaint details how New Century's representations regarding its underwriting guidelines, e.g., that New Century was committed to "adher[ing] to high origination standards in order to sell [its] loan products in the secondary market" and "only approv[ing] subprime loan applications that evidence a borrower's ability to repay the loan," were blatantly false.

138.    Patricia Lindsay, a former Vice President of Corporate Risk at New Century, testified before the FCIC in April 2010 that, beginning in 2004, underwriting guidelines had been all but abandoned at New Century.  Ms. Lindsay further testified that New Century systematically approved loans with 100 percent financing to borrowers with extremely low credit scores and no supporting proof of income.  *See* Written Testimony of Patricia Lindsay for the FCIC Hearing, April 7, 2010, http://fcic-static.law.stanford.edu/cdn-media/fcic.testimony/2010-0407-Lindsay.pdf, at 3.

139.    The originators of the mortgage loans underlying the Securitizations went beyond the systematic disregard of their own underwriting guidelines.  Indeed, as the FCIC has confirmed, mortgage loan originators throughout the industry pressured appraisers, during the

period of the Securitizations, to issue inflated appraisals that met or exceeded the amount needed

for the subject loans to be approved, regardless of the accuracy of such appraisals, and especially

when the originators aimed at putting the mortgages into a package of mortgages that would be

sold for securitization.  This resulted in lower LTV ratios, discussed above, which in turn made

the loans appear to the investors less risky than they were.

140.    As described by New Century's Patricia Lindsay, appraisers "fear[ed]" for their

"livelihoods," and therefore cherry-picked data "that would help support the needed value rather

than finding the best comparables to come up with the most accurate value."  *See* Written

Testimony of Patricia Lindsay to the FCIC, at 5 (Apr. 7, 2010).  Likewise, Jim Amorin, President

of the Appraisal Institute, confirmed in his testimony that "[i]n many cases, appraisers are

ordered or severely pressured to doctor their reports and to convey a particular, higher value for a

property, or else never see work from those parties again …. [T]oo often state licensed and

certified appraisers are forced into making a 'Hobson's Choice.'"  *See* Testimony of Jim Amorin

to the FCIC, *available at* www.appraisalinstitute.org/newsadvocacy/downloads/ltrs_tstmny/

2009/AI-ASA-ASFMRA-NAIFATestimonyonMortgageReform042309final.pdf.  Faced with this

choice, appraisers systematically abandoned applicable guidelines and over-valued properties in

order to facilitate the issuance of mortgages that could then be collateralized into mortgage-

backed securities.

### 2.    The Collapse of the GSE Certificates' Credit Ratings Further Indicates that the Mortgage Loans Were not Originated in Adherence to the Stated Underwriting Guidelines

141.    The total collapse in the credit ratings of the GSE Certificates, typically from

AAA or its equivalent to non-investment speculative grade, is further evidence of the originators'

systematic disregard of underwriting guidelines, indicating that the GSE Certificates were

impaired from the start.

142.    The GSE Certificates that Fannie Mae and Freddie Mac purchased were originally assigned credit ratings of AAA or its equivalent, which purportedly reflected the description of the mortgage loan collateral and underwriting practices set forth in the Registration Statements. These ratings were artificially inflated, however, as a result of the very same misrepresentations that the Defendants made to investors in the Prospectus Supplements.

143.    Goldman provided or caused to be provided loan-level information to the rating agencies that they relied upon in order to calculate the Certificates' assigned ratings, including the borrower's LTV ratio, debt-to-income ratio, owner-occupancy status, and other loan-level information described in aggregation reports in the Prospectus Supplements.  Because the information that Goldman provided or caused to be provided was false, the ratings were inflated and the level of subordination that the rating agencies required for the sale of AAA or its equivalent certificates was inadequate to provide investors with the level of protection that those ratings signified.  As a result, the GSEs paid Defendants inflated prices for purported AAA (or its equivalent) Certificates, unaware that those Certificates actually carried a severe risk of loss and inadequate credit enhancement.

144.    Since the issuance of the GSE Certificates, the ratings agencies have dramatically downgraded their ratings to reflect the revelations regarding the true underwriting practices used to originate the mortgage loans, and the true value and credit quality of the mortgage loans. Table 8 details the extent of the downgrades.[20]

---

[20]    Applicable ratings are shown in sequential order separated by forward slashes: Moody's/S&P/Fitch.  A hyphen after a forward-slash indicates that the relevant agency did not provide a rating at issuance.

Table 8

| Transaction | Tranche | Ratings at Issuance (Moody's/S&P/Fitch) | Ratings as of July 31, 2011 (Moody's/S&P/Fitch) |
|---|---|---|---|
| ACCR 2005-4 | A1 | Aaa/AAA/-- | A3/AAA/-- |
| AHMA 2006-1 | 1A1 | Aaa/AAA/-- | Ca/D/-- |
| AHMA 2006-1 | 1A2 | Aaa/AAA/-- | Caa2/CCC/-- |
| FFML 2005-FF11 | A1 | Aaa/AAA/-- | Baa1/AAA/-- |
| FFML 2005-FF8 | A1 | Aaa/AAA/-- | A1/AAA/-- |
| FFML 2005-FF13 | A1 | Aaa/AAA/-- | Caa2/ CCC/-- |
| FHLT 2006-E | 1A1 | Aaa/AAA/AAA | Ca/CCC/C |
| GSAA 2005-11 | 1A1 | Aaa/AAA/-- | B3/A+/-- |
| GSAA 2005-14 | 1A1 | Aaa/AAA/-- | Caa3/B-/-- |
| GSAA 2005-14 | 1A2 | Aaa/AAA/-- | C/CCC/-- |
| GSAA 2005-15 | 1A1 | Aaa/AAA/-- | Caa2/CCC/-- |
| GSAA 2006-11 | 1A1 | Aaa/AAA/-- | Ca/CCC/-- |
| GSAA 2006-2 | 1A1 | Aaa/AAA/-- | Caa2/B/-- |
| GSAA 2006-4 | 1A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| GSAA 2006-5 | 1A1 | Aaa/AAA/-- | Ca/CCC/-- |
| GSAA 2006-8 | 1A1 | Aaa/AAA/-- | Ca/CCC/-- |
| GSAA 2007-6 | 3A1A | Aaa/AAA/-- | Caa2/CCC/-- |
| GSAMP 2005-AHL2 | A1A | Aaa/AAA/-- | Ba1/A/-- |
| GSAMP 2005-HE5 | A1 | Aaa/AAA/-- | Aa2/AAA/-- |
| GSAMP 2005-HE6 | A1 | Aaa/AAA/-- | A2/AA-/-- |
| GSAMP 2005-WMC2 | A1A | Aaa/AAA/-- | Aaa/AAA/-- |
| GSAMP 2005-WMC3 | A1A | Aaa/AAA/-- | Caa1/A-/-- |
| GSAMP 2006-FM1 | A1 | Aaa/AAA/-- | Ca/CCC/-- |
| GSAMP 2006-FM2 | A1 | Aaa/AAA/-- | Ca/CCC/-- |
| GSAMP 2006-FM3 | A1 | Aaa/AAA/-- | Ca/CCC/-- |
| GSAMP 2006-HE3 | A1 | Aaa/AAA/-- | Caa1/A-/-- |
| GSAMP 2006-HE4 | A1 | Aaa/AAA/-- | Caa2/BB+/-- |
| GSAMP 2006-HE5 | A1 | Aaa/AAA/-- | Caa1/BBB/-- |
| GSAMP 2006-HE7 | A1 | Aaa/AAA/-- | Caa2/CCC/-- |
| GSAMP 2006-HE8 | A1 | Aaa/AAA/-- | Caa3/B-/-- |
| GSAMP 2006-NC2 | A1 | Aaa/AAA/-- | Ca/CCC/-- |
| GSAMP 2007-FM1 | A1 | Aaa/AAA/-- | Ca/CCC/-- |
| GSAMP 2007-FM2 | A1 | Aaa/AAA/-- | Ca/CCC/-- |
| GSAMP 2007-HE1 | A1 | Aaa/AAA/-- | Caa3/BBB+/-- |
| GSAMP 2007-HE2 | A1 | Aaa/AAA/-- | Caa3/B-/-- |
| GSAMP 2007-NC1 | A1 | Aaa/AAA/-- | Ca/CCC/-- |
| GSR 2006-OA1 | 1A1 | Aaa/AAA/-- | Ca/CCC/-- |
| GSR 2007-AR2 | 6A1 | --/AAA/AAA | --/CCC/C |
| GSR 2007-OA1 | 1A1 | Aaa/AAA/-- | Caa3/CCC/-- |
| GSR 2007-OA2 | 1A1 | Aaa/AAA/-- | Ca/CCC/-- |
| INDX 2005-AR18 | 1A1 | Aaa/AAA/-- | Caa2/BB+/-- |
| INDX 2005-AR27 | 2A1 | Aaa/AAA/-- | Ca/D/-- |

**3.   The Surge in Mortgage Delinquencies and Defaults Further Demonstrates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines**

145.     Even though the Certificates purchased by Fannie Mae and Freddie Mac were supposed to represent long-term, stable investments, a significant percentage of the mortgage loans backing the Certificates have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificateholders.  The overall poor performance of the

mortgage loans is a direct consequence of the fact that they were not underwritten in accordance with the applicable underwriting guidelines as represented in the Registration Statements.

146.    Loan groups that were properly underwritten and contained loans with the characteristics represented in the Registration Statements would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies than occurred here.  Table 9 reflects the percentage of loans in the Supporting Loan Groups that are in default, have been foreclosed on, or are delinquent as of July 2011.

**Table 9**

| Transaction | Supporting Loan Group | Percentage of Delinquent/Defaulted/Foreclosed Loans (60 or more days delinquent) |
|---|---|---|
| ACCR 2005-4 | Group 1 | 31.20 |
| AHMA 2006-1 | Group 1 | 31.90 |
| FFML 2005-FF11 | Group 1 | 50.20 |
| FFML 2005-FF8 | Group 1 | 46.30 |
| FFML 2006-FF13 | Group 1 | 50.20 |
| FHLT 2006-E | Group 1 | 55.70 |
| GSAA 2005-11 | Group 1 | 27.30 |
| GSAA 2005-14 | Group 1 | 22.80 |
| GSAA 2005-15 | Group 1 | 40.70 |
| GSAA 2006-11 | Group 1 | 47.50 |
| GSAA 2006-2 | Group 1 | 53.40 |
| GSAA 2006-4 | Group 1 | 40.80 |
| GSAA 2006-5 | Group 1 | 40.40 |
| GSAA 2006-8 | Group 1 | 43.70 |
| GSAA 2007-6 | Group 3 | 40.20 |
| GSAMP 2005-AHL2 | Group 1 | 37.70 |
| GSAMP 2005-HE5 | Group 1 | 49.90 |
| GSAMP 2005-HE6 | Group 1 | 38.50 |
| GSAMP 2005-WMC2 | Group 1 | 47.00 |
| GSAMP 2005-WMC3 | Group 1 | 53.20 |
| GSAMP 2006-FM1 | Group 1 | 53.40 |
| GSAMP 2006-FM2 | Group 1 | 55.50 |
| GSAMP 2006-FM3 | Group 1 | 53.60 |
| GSAMP 2006-HE3 | Group 1 | 50.50 |
| GSAMP 2006-HE4 | Group 1 | 43.90 |
| GSAMP 2006-HE5 | Group 1 | 45.90 |
| GSAMP 2006-HE7 | Group 1 | 47.60 |
| GSAMP 2006-HE8 | Group 1 | 48.50 |
| GSAMP 2006-NC2 | Group 1 | 36.20 |
| GSAMP 2007-FM1 | Group 1 | 54.50 |
| GSAMP 2007-FM2 | Group 1 | 50.90 |
| GSAMP 2007-HE1 | Group 1 | 51.50 |
| GSAMP 2007-HE2 | Group 1 | 46.00 |
| GSAMP 2007-NC1 | Group 1 | 49.30 |
| GSR 2006-OA1 | Group 1 | 47.60 |
| GSR 2007-AR2 | Group 6 | 14.50 |
| GSR 2007-OA1 | Group 1 | 45.30 |
| GSR 2007-OA2 | Group 1 | 51.50 |
| INDX 2005-AR18 | Group 1 | 34.30 |
| INDX 2005-AR27 | Group 2 | 24.70 |

147.     The confirmed misstatements concerning owner occupancy and LTV ratios, the

confirmed systematic underwriting failures by the originators responsible for the mortgage loans

across the Securitizations, and the extraordinary drop in credit ratings and rise in delinquencies

across those Securitizations, all confirm that the mortgage loans in the Supporting Loan Groups,

contrary to the representations in the Registration Statements, were not originated in accordance

with the stated underwriting guidelines.

### V.     Goldman Sachs Knew Its Representations Were False

148.     The allegations in this Section V are made in support of Plaintiff's common law

fraud and aiding and abetting fraud claims, and *not* in support of Plaintiff's claims under (i)

Sections 11, 12(a)(2) and 15 of the Securities Act, (ii) Sections 13.1-522(A)(ii) and 13.1-522(C)

of the Virginia Code, (iii) Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of

Columbia Code, or (iv) negligent misrepresentation, which are based solely on strict liability and

negligence.

149.     The same evidence discussed above not only shows that the representations were

untrue, but also that Goldman Sachs *knew*, or was reckless in not knowing, that it was falsely

representing the underlying process and riskiness of the mortgage loans that collateralized the

GSE Certificates.  As discussed above, such evidence includes:

- The startling discrepancies in basic information about the underlying mortgage loans, such as owner occupancy and LTV statistics, demonstrates a systemic underwriting failure about which Goldman knew or was reckless in not knowing.

- Clayton, who acted as credit risk manager in many of the Securitizations, admitted that in the period from the first quarter of 2006 to the second quarter of 2007, 23 percent of the mortgage loans Goldman submitted to Clayton to review in RMBS loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines.

- Of the 23 percent of mortgage loans that Clayton found defective, 29 percent of the loans were subsequently waived in by Goldman without

proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here.  Goldman's waiver of nearly a third of the defective loans shows that Goldman knew, or was reckless in not knowing, of the systemic failure in underwriting and misstatements in the offering materials received by the GSEs.

**A.      Evidence Regarding Goldman's Due Diligence**

**1.      Goldman's Due Diligence Benefitted From a Direct Window Into the Originators' Practices**

150.     Goldman benefited from a direct window into the lax origination practices that led to the creation of the mortgage loans underlying the GSE Certificates.  In connection with its purchase from the loan originators of the underlying mortgage loans in the 36 Securitizations it sponsored, Goldman performed due diligence to determine the quality of the loans it was purchasing.  Goldman conducted due diligence on the originators it was purchasing loans from, and on the loans included in each offering to review compliance with the approved underwriting guidelines.

151.     Goldman acquired the securitized loans through two primary channels:  its conduit program (pursuant to which it acquired mortgage loans from various banks, savings and loan associations, mortgage bankers and others) or bulk acquisitions in the secondary market. Goldman's offering materials represented that, in both channels, Goldman conducted due diligence on the lenders who originated the loans, and carefully inspected their underwriting standards: "Prior to acquiring any residential mortgage loans, GSMC [Goldman Sachs Mortgage Company] will conduct a review of the related mortgage loan seller.  GSMC's review process consists of reviewing select financial information for credit and risk assessment and underwriting guideline review, senior level management discussion and background checks.  The scope of the mortgage loan due diligence will depend on the credit quality of the mortgage loans."  GSAMP 2006-2 Prospectus Supplement, at S-62 (filed Jan. 26, 2006).  The Prospectus Supplements

further provided that "[t]he underwriting guideline review considers mortgage loan origination

processes and systems.  In addition, such review considers corporate policy and procedures

relating to HOEPA [i.e., high-rate, high-fee loans] and state and federal predatory lending,

origination practices by jurisdiction, historical loan level loss experience, quality control

practices, significant litigation and material investors."  *Id.*  Similar representations were made in

the Prospectus Supplements for the other GSE Certificates.

     152.    Goldman also stated that it re-underwrote sample pools of the loans it purchased

to determine whether they were originated in compliance with applicable underwriting

guidelines.  For example, in the GSAMP 2006-HE7 Prospectus Supplement, Goldman explained

that it had the option to re-underwrite a sample of the RMBS loan pool:

> We may, in connection with the acquisition of mortgage loans, re-
> underwrite the mortgage loans based upon criteria we believe are
> appropriate depending to some extent on our or our affiliates' prior
> experience with the lender and the servicer, as well as our prior experience
> with a particular type of loan or with loans relating to mortgaged
> properties in a particular geographical region.  A standard approach to re-
> underwriting will be to compare loan file information and information that
> is represented to us on a tape with respect to a percentage of the mortgage
> loans we deem appropriate in the circumstances.

GSAMP 2006-HE7 Prospectus Supplement, at S-29 (filed Oct. 31, 2006).  Similar

representations were made in the Prospectus Supplements relating to the other Goldman-

sponsored Securitizations.  *See also* U.S. Senate Permanent Subcommittee on Investigations,

*Wall Street & The Financial Crisis:  Anatomy of a Financial Collapse*, at 483 (Apr. 13, 2011)

(the "Senate PSI Report") ("Goldman, either directly or through a third party due diligence firm,

routinely conducted due diligence review of the mortgage loan pools it bought from lenders or

third party brokers for use in its securitizations ….").  Thus, Goldman had access to the true

quality of the loans collateralizing the Securitizations it sponsored.

153.    The initial step, in many of the Securitizations, was often done with Goldman's funds, as Goldman provided "warehouse" lines of credit to originators.   In other words, Goldman provided money to originators to fund the mortgages they were granting; Goldman's warehouse loan was then repaid when the originator's loan pool was sold to Goldman for securitization.  As the FCIC found:

> Under Paulson's leadership, Goldman Sachs had played a central role in the creation and sale of mortgage securities.  From 2004 through 2006, the company provided billions of dollars in loans to mortgage lenders; most went to the subprime lenders Ameriquest, Long Beach, Fremont, New Century, and Countrywide through warehouse lines of credit, often in the form of repos.  During the same period, Goldman acquired $53 billion of loans from these and other subprime loan originators, which it securitized and sold to investors.  From 2004 to 2006, Goldman issued 318 mortgage securitizations totaling $184 billion (about a quarter were subprime) ….

FCIC Report, at 142.  Consequently, Goldman's longstanding relationships with the problematic originators, and its numerous roles in the securitization chain, made it uniquely positioned to know the originators had abandoned their underwriting guidelines.

154.    Goldman's privileged position as a source of "warehouse" lines of credit gave it unique knowledge of the conditions under which mortgage loans were originated.  The lines of credit allowed Goldman to control the origination practices of these lenders and gave Goldman an inside look into the true quality of the loans they originated.  As one industry publication explained, warehouse lenders like Goldman have "detailed knowledge of the lender's operations."  Kevin Connor, *Wall Street and the Making of the Subprime Disaster*, at 11 (Nov. 2007).

155.    These warehouse lines gave Goldman the inside track on acquiring the loans that were generated using Goldman funds.  Because of its financial arrangements with warehouse lenders, Goldman was essentially committed to buying the loans that secured its warehouse lines regardless of their quality and the results of Goldman's due diligence.  Indeed, Goldman needed

to purchase the loans with little or no objection to keep the lenders supplied with capital to pay fees and interest owed on the lines of credit.  It was also important to Goldman that it protect its business relationships with warehouse lenders in order to ensure a steady flow of loans for securitization.  Therefore, Goldman was incentivized to allow defective mortgages to remain in the securitizations because: (i) mortgage originators would not maintain a relationship with a bank that consistently kicked out large numbers of loans; and (ii) the securitization became smaller as loans were kicked out, thus decreasing the underwriting fees and other fees.

> ## 2.    Goldman Had Actual Knowledge, on a Daily Basis, of the Number of Non-Performing Loans

156.    Documents recently released by Goldman's third-party due diligence firm, Clayton, confirm that Goldman was aware—on a daily basis—of the weakness in the loan pool and in the underwriting standards of the originators it used in its RMBS transactions.  As discussed above, according to an internal Clayton "Trending Report" made public by the Government in conjunction with testimony given in September 2010, Goldman Sachs was informed that 23 percent of the loans Clayton reviewed for Goldman "failed to meet guidelines." These loans were not subject to any proper "exceptions," as they did not have any "compensating factors."  Rather, these loans were plainly defective.

157.    Confronted with such a high failure rate, Goldman should have either rejected the pool outright, or investigated whether that originator could be considered a trusted source of loans in the future.  Even assuming Goldman incredibly believed a 23 percent failure rate could be chalked up to "sampling error" (e.g., due to the fact that Clayton Holdings did not review every loan in a pool), the proper response would have been to increase the sample size to test that hypothesis.

158.    Goldman not only continued to work with problematic originators, but, rather than expanding the sample size to truly investigate the problems, Goldman simply ignored and did not disclose the red flags revealed by Clayton's review.  According to Clayton's "Trending Report," Goldman "waived in" to its pools 29 percent of those toxic loans that Clayton had identified as being outside the guidelines.

159.    Clayton's "Trending Report" provides compelling evidence that Goldman *knew* it was securitizing defective loans and selling the resulting securities to investors like Fannie Mae and Freddie Mac.  According to the September 23, 2010 testimony of Clayton's Vice President Vicki Beal, through its numerous roles of underwriter, sponsor, and depositor, Goldman was made fully aware on a regular basis that a significant percentage of its loans failed to meet stated underwriting guidelines, but were being included anyway in the pools underlying securities sold to investors, such as those collateralizing the GSE Certificates.

160.    Goldman was not content simply to let poor loans pass into its securitizations in exchange for its fees and repayment of its warehouse loans.  Goldman took the fraud further, affirmatively seeking to profit from this knowledge.  According to the September 2010 FCIC testimony of Clayton's former president, D. Keith Johnson, the investment banks would use the exception reports to force a lower price for itself, and not to benefit investors at all:

> I don't think that we added any value to the investor, the end investor, to get down to your point.  I think only our value was done in negotiating the purchase between the seller and securitizer.  Perhaps the securitizer was able to negotiate a lower price, and could maximize the line.  We added no value to the investor, to the rating agencies.

FCIC Staff Int'v with D. Keith Johnson, Clayton Holdings, LLC (Sept. 2, 2010), *available at* http://fcic.law.stanford.edu/resource/interviews.  In other words, rather than reject defective loans from collateral pools, or cease doing business with consistently failing originators,

investment banks like Goldman would instead use the Clayton data simply to insist on a lower price from the loan originators, leaving more room for its own profits while the defective loans were hidden from investors such as Fannie Mae and Freddie Mac in securitization pools.

161.    Goldman further sought to leverage this information in its warehouse lending business.  Goldman used the discovery of poor lending practices to increase its profits—by charging higher warehouse fees to those originators identified as being problematic.  *See* FCIC Report, at 484 n.2038 (citing Goldman email dated Feb. 2, 2007 which discussed proposal to charge higher warehouse fees to mortgage originators with higher EPD [early payment default] and "drop out" rates, including Fremont and New Century).

162.    In light of the fact that Clayton was operating under extreme pressure from its clients to allow as many loans as possible to remain in the securitization pools and to conduct increasingly cursory reviews, the high rejection and waiver rates are even more damning for Goldman.  Based upon such pressure on Clayton, Goldman knew the true rates of defects were actually much higher than Clayton reported, and that it was allowing in even more defective loans than Clayton's Trending Reports have since revealed.

163.    For example, Melissa Toy and Irma Aninger, two contract risk analysts who reviewed loan files for Bohan from 2004 to 2006—a company that performed similar work to Clayton—have stated that their supervisors overrode the majority of their challenges to shaky loans on behalf of Goldman and other firms:

- "They couldn't recall specific examples involving loans bought by Goldman, but they said their supervisors cleared half-million-dollar loans to a gardener, a housekeeper and a hairdresser."

- "Aninger, whose job was to review the work of other contract analysts, said that she objected to numerous applications for loans that required no income verification, her supervisor would typically tell her, "You can't call him a liar ... You have to take (his) word for it."  (Alterations in original.)

- "I don't even know why I was there," she said, "because the stuff was gonna get pushed through anyway."

- "Toy said she concluded that the reviews were mostly 'for appearances', because the Wall Street firms planned to repackage 'bogus' loans swiftly and sell them as bonds, passing any future liabilities to the buyers. The investment banks and mortgage lenders each seemed to be playing 'hot potato', trying to pass the risks 'before they got burned', she said.

- "There was nobody involved in this who didn't know what was going on, no matter what they say," she said. "We all knew."

Greg Gordon, *Why Did Goldman Stop Scrutinizing Loans It Bought?*, McClatchy Newspapers, Nov. 1, 2009, *available at* http://www.mcclatchydc.com/2009/11/01/77788/why-did-goldman-stop-scrutinizing.html.

### B. Other Evidence Of Goldman's Willingness to Capitalize on Its Unique Knowledge at the Expense Of Investors

164.    That Goldman knew of the originators' abandonment of applicable underwriting guidelines and of the true nature of the mortgage loans it was securitizing is further evidenced by how Goldman handled its own investments.  Goldman internally characterized its offerings as "junk," "dogs," "big old lemons," and "monstrosities."  FCIC Report at 235–36.  Nevertheless, it congratulated itself for successfully offloading such "junk" onto others.  As the public learned in the FCIC's Report, by January 2007, "Daniel Sparks, the head of Goldman's mortgage department, extolled Goldman's success in reducing its subprime inventory, writing that the team had 'structured like mad and traveled the world, and worked their tails off to make some lemonade from some big old lemons."  *Id.* at 236.

165.    Even more damning than Goldman's decision to use securitization as a tool to move declining loans off of Goldman's own books are the huge bets Goldman placed against the very mortgage-backed investments it sold to the GSEs and that are at issue in this Complaint. Goldman coupled those sales with an aggressive campaign to force lenders (the very same ones

who originated loans in the Certificates) to repurchase defective loans which, due to the slowing

securitization market, had been stuck on Goldman's own books.

### 1. Goldman Began Shorting Its Own Offerings Beginning in 2006

166.    Beginning in 2005 and into 2006, Goldman began to take an increasingly

pessimistic view of the subprime mortgage market.  Goldman's sophisticated and powerful

proprietary models analyzed trends in the performance of the hundreds of thousands of

mortgages that collateralized its RMBS, and those models and superior access to data regarding

the underlying mortgage positions on its books gave Goldman unique knowledge that those

securities were not as safe as their offering materials and ratings represented to investors.  In fact,

Goldman's models and data showed that the RMBS had declined up to 70 percent from their face

amounts.  In his book, *Money and Power:  How Goldman Sachs Came to Rule the World* 494–95

(2011) William D. Cohan explained:

> Goldman's RMBS model could analyze all the underlying mortgages and value
> the cash flows, as well as what would happen if interest rates changed, if
> prepayments were made, or if the mortgages were refinanced.  The model could
> also spit out a valuation if defaults suddenly spiked upward ….  [Goldman's]
> proprietary model was telling [Goldman] that it would not take much to wipe out
> the value of tranches of a mortgage-backed security that had previously looked
> very safe, at least in the estimation of the credit-rating agencies that had been paid
> (by Wall Street) to rate them investment grade.  By tweaking the various
> assumptions based on events that seemed increasingly likely, [Goldman's] models
> were showing a marked decrease in the value of mortgage-related securities.
> Goldman's models said even if you don't believe housing prices are going to go
> down, even if we apply low-probability scenarios about it going negative …
> there's no way this stuff can be worth anywhere near one hundred [cents on the
> dollar]….  [Goldman's] models had them pegged anywhere between 30 cents and
> 70 cents ….

According to a former Goldman employee, these models as well as other information in

Goldman's exclusive possession showed it "the writing on the wall in this market as early as

2005," Gretchen Morgenson & Louise Story, *Banks Bundled Bad Debt, Bet Against It and Won*,

N.Y. Times, Dec. 24, 2009, and into the "the early summer of 2006," Senate PSI Report at 398.

76

Goldman exploited its asymmetric access to, and possession of, information about the weakness

in the mortgage loans collateralizing the Certificates it marketed and sold.

167.     To reduce its massive financial exposure to the subprime mortgage market,

Goldman began looking for ways to short the market (i.e., to make investments which would rise

in value and/or make payments to Goldman as the subprime mortgage market declined).  Its

shorting strategies included the purchase of credit default swap protection on the very RMBS

positions it sold into the market.  Goldman bet that the RMBS would decline in value and/or

default; if so, its swap counterparty would be required to pay Goldman.

168.     Goldman entered into swaps worth hundreds of millions of dollars during this

time period, where it stood of the "short" side of the transaction, while its counterparty went

"long."  For example, according to the Senate PSI Report, Goldman underwrote GSAMP 2007-

FM2, *a securitization it sold to Freddie Mac*, and then turned around and bet *against* that same

securitization through use of credit default swaps.  As the Senate PSI Report explained:

> Goldman marketed and sold the Fremont securities to its customers, while at the
> same time purchasing $15 million in CDS contracts referencing some of the
> Fremont securities it underwrote.  Seven months later, by October 2007, the
> ratings downgrades had begun; by August 2009, every tranche in the GSAMP
> securitization had been downgraded to junk status.

Senate PSI Report at 516 (footnotes omitted).  Goldman's shorting of GSAMP 2007-FM2 was

emblematic of its approach to the Securitizations it marketed and sold to the GSEs.  As a recent

magazine article explained, "Goldman was like a car dealership that realized it had a whole lot

full of cars with faulty brakes.  Instead of announcing a recall, it surged ahead with a two-fold

plan to make a fortune: first, by dumping the dangerous products on other people, and second, by

taking out life insurance against the fools who bought the deadly cars."  Matt Taibbi, *The People*

*vs. Goldman Sachs*, Rolling Stone, May 26, 2011, *available at* http://www.rollingstone.com/ politics/news/the-people-vs-goldman-sachs-20110511.

169.     Continuing from 2006 and 2007, Goldman used its shorting strategy as a way to reduce its own mortgage risk while continuing to create and sell mortgage-related products to its clients.  In 2006, Goldman made a massive $9 billion bet that the same type of assets it was selling to investors like Fannie Mae and Freddie Mac would collapse.  *See id.* at 419.  The $9 billion short bet was placed in 2006 by Goldman's mortgage department, the same department that oversaw the sale of the Certificates to the GSEs.  Goldman's net short position in 2007 rose as high as $13.9 billion.  *Id.* at 430.  As the Senate PSI Report explained, Goldman "sold RMBS and CDO securities to its clients without disclosing its own net short position against the subprime market or its purchase of CDS contracts to gain from the loss in value of some of the very securities it was selling to its client."  *Id.* at 9.

170.     On March 9, 2007, Goldman's Daniel Sparks wrote: "Our current largest needs are to execute and sell our new issues—CDO's and RMBS—and to sell our other cash trading positions ….  I can't overstate the importance to the business of selling these positions and new issues."  A leading structured finance expert reportedly called Goldman's practice "the most cynical use of credit information that I have ever seen," and compared it to "buying fire insurance on someone else's house and then committing arson."  Senate PSI Hearing Ex. 4/27-76.  As the Senate PSI found, Goldman "sold RMBS securities to customers at the same time it was shorting the securities and essentially betting that they would lose value."  Senate PSI Report at 513.

2.     **Goldman's Targeted Campaign to "Put Back" Defective Loans to Originators Demonstrates That It Knew the Targeted Originators' Loans Breached Underwriting Guidelines**

171.     Another tactic that Goldman used to reduce its subprime exposure in 2006 was to force originators from which it bought mortgages to buy them back.  Goldman's repurchase rights arose from mortgage purchase agreements that it entered into with originators.  These agreements typically required originators to warrant that their loans were underwritten according to standard guidelines and conformed to certain characteristics, including the accuracy of the mortgage loan schedule, the absence of fraud by the originator or borrower, and compliance with federal and state laws.  If a representation was breached, Goldman (as sponsor) could demand that the originator repurchase the defective loans as required by the mortgage purchase agreement.  Goldman hired third party re-underwriting firms to assist in this "put back" process and to find defects in the loans which would then be used as a basis to require their repurchase.

172.     Goldman targeted its "put back" campaign at the originators whose loans Goldman knew were most likely to yield underwriting breaches upon examination.  Goldman had unique insight into the quality of the loans purchased from originators, arising from diligence on the originators themselves as well as their loans. Goldman knew based on its many years of dealing with originators such as New Century and Fremont that their loans were the worst on its books and thus the most likely to yield put back claims.

173.     For example, the Senate PSI Report published a December 14, 2006 email from Goldman's Daniel Sparks which told colleagues, "stay focused and aggressive on MLN [Mortgage Lenders Network] …."  See Senate PSI Report at 405.   On January 8, 2007, Daniel Sparks wrote to a colleague, "I just can't see how any originator in the industry is worth a premium.  I'm also a bit scared of [A]ccredited [Aames' parent company] and [N]ew [C]entury, and I'm not sure about taking a bunch of new exposures."  *Id.* at 484 n.2036.

174.   On February 2, 2007, Sparks identified other prime targets of Goldman's repurchase campaign.  He said that his "team is working on putting loans in the deals back to the originators (New Century, WAMU [Long Beach's parent], and Fremont – all real counterparties) as there seem to be issues potentially including some fraud at origination, but resolution will take months and be contentious."  *Id.* at 484.

175.   On March 7, 2007, Sparks continued emphasizing Goldman's priority in ridding itself of loans issued by certain originators.  He described Goldman's exposure as follows:

> As for the big 3 originators – Accredited, New Century and Fremont, our real exposure is in the form of put-back claims. Basically, if we get nothing back we would lose around $60mm vs loans on our books (we have a reserve of $30mm) and the loans in the [CDO and RMBS] trusts could lose around $60mm (we probably suffer about 1/3 of this in ongoing exposures) ….

*Id.* at 485.

176.   In March 2007, following an analysis of a pool of loans originated by Fremont, Goldman concluded that about 50 percent of the 200 files reviewed "look to be repurchase obligations."  *Id.* at 486.  Goldman made it a "priority" to re-underwrite and put back loans purchased from originators it considered weak.  *Id.* at 485.

177.   In total, between 2006 and 2007, Goldman made approximately $475 million in repurchase claims to the originators and others for loans in its inventory. All told, Goldman recovered approximately $82 million from this process.  *Id.* at 483.  Among the securitizations for which Goldman put back (or tried to put back) loans out of its inventory was GSAMP 2006-NC2, a deal Goldman sold to Fannie Mae.  After reviewing the loan files in one New Century deal, Goldman's analysts recommended to Goldman putting back 26 percent of the loan pool. *See* Senate PSI Report at 485–86.

178.    Goldman's actions in 2006 and 2007 present compelling evidence of Goldman's complete abandonment of its customers' interests in its drive to rid itself of declining and defective mortgage assets.

179.    Many of the Individual Defendants, who were officers and directors of Defendant GS Mortgage Securities Corp. and therefore together with its parent company Goldman Sachs Mortgage Company controlled it, had extensive knowledge of the underlying collateral and therefore of Goldman's fraudulent scheme based on other positions they held at Goldman Sachs. For example, Daniel Sparks, was both head of Goldman Sachs Group's Inc.'s Mortgage Department and also the CEO and Director of GS Mortgage Securities Corp.  Kevin Gasvoda, the head of the Mortgage Department's Residential Whole Loan Trading Desk, which oversaw the purchase of mortgages and constructed and sold RMBS securitizations, was also director of GS Mortgage Securities Corp. Similarly, Michelle Gill, who worked on Goldman's "put back" campaign, was a vice president of GS Mortgage Securities Corp. and also a managing director of Goldman Sachs Group, Inc.

180.    Each of these executives played critical roles in establishing and implementing Goldman's de-risking strategies in 2006 and 2007.  For example, in February 2007, Mr. Gasvoda issued a directive or "axe" to the Goldman sales force to sell the remaining RMBS securities from Goldman-originated RMBS securitizations. On February 9, 2007, the sales force reported a substantial number of sales, and Mr. Gasvoda replied: "Great job syndicate and sales, appreciate the focus."  Senate PSI Report at 408.  Ms. Gill was responsible, in part, for Goldman's "put back" campaign in 2006, including the review of faulty Fremont loans.  *Id.* at 484.  Each worked under Sparks, who managed and coordinated Goldman's put back and other de-risking efforts. The Individual Defendants' overlapping personnel and intertwined business strategies meant that

the entities they controlled and were affiliated with had the means and incentives to defraud the GSEs with respect to the Certificates.

### C.   Numerous Government Investigations Have Confirmed Goldman Acted With Scienter

181.   Goldman is the subject of numerous criminal and regulatory probes related to its mortgage underwriting practices.  *See Wall Street Probe Widens*, The Wall Street Journal, May 12, 2010 (reporting on federal criminal and regulatory investigations of whether Goldman and others "misled investors about their roles in mortgage-bond deals").  These investigations further confirm that Goldman's misrepresentations were not mere isolated, innocent mistakes, but the result of the company's reckless or intentional misconduct.

182.   For example, Goldman's misconduct prompted the Attorney General of Massachusetts to examine whether Goldman:

- failed to ascertain whether loans purchased from originators complied with the originators' stated underwriting guidelines;

- failed to take sufficient steps to avoid placing problem loans into securitization pools;

- failed to correct inaccurate information in securitization trustee reports concerning repurchases of loans; and

- failed to make available to potential investors certain information concerning allegedly unfair or problem loans, including information obtained during loan due diligence and the pre-securitization process, as well as information concerning Goldman Sachs' practices in making repurchase claims relating to loans in and out of securitizations.

183.   Goldman settled with the Commonwealth of Massachusetts, paying it $60 million.  FCIC Report at 226.  In announcing the settlement, the Massachusetts Attorney General stated that Goldman did not take "sufficient steps to avoid placing problem loans in securitization pools."  Goldman was also required to forgive all or portions of the balances on many loans it

had bought and securitized, which resulted in tens of millions of dollars in additional expenses to Goldman.

184.    Similarly, the Senate PSI Report concluded that Goldman "knowingly sold high risk, poor quality mortgage products to clients around the world, saturating financial markets with complex, financially engineered instruments that magnified risk and losses when their underlying assets began to fail." Senate PSI Report at 476; *see also id.* at 513 ("Goldman originated and sold RMBS securities that it *knew* had poor quality loans that were likely to incur abnormally high rates of default.") (emphasis added).

185.    In addition, the Senate investigation revealed that Goldman had to disclose that the GSE Certificates' credit ratings were false and misleading because Defendants fed the same misinformation found in the term sheets and Prospectus Supplements to the credit rating agencies in an attempt to manufacture predetermined ratings.  In testimony before the Senate Permanent Subcommittee on Investigations, Susan Barnes, the North American Practice Leader for RMBS at S&P from 2005 to 2008, confirmed that the rating agencies relied upon investment banks to provide accurate information about the loan pools:

> The securitization process relies on the quality of the data generated about the loans going into the securitizations.  *S&P relies on the data produced by others and reported to both S&P and investors about those loans …. S&P does not receive the original loan files for the loans in the pool.*  Those files are reviewed by the arranger or sponsor of the transaction, who is also responsible for reporting accurate information about the loans in the deal documents and offering documents to potential investors.

Senate Homeland Security and Governmental Affairs Subcommittee on Investigations, Hearing on Wall Street and the Financial Crisis: The Role of Credit Rating Agencies, Apr. 23, 2010 (emphasis added).  As a result, the ratings themselves failed to reflect accurately the actual risk

underlying the GSE Certificates because the ratings agencies were in fact analyzing a mortgage pool that had no relation to the pool that actually backed the Certificates purchased by the GSEs.

186.     Even more recently, on September 1, 2011, the Federal Reserve Board sanctioned Goldman Sachs for "a pattern of misconduct and negligence relating to deficient practices" in its former mortgage unit, Litton Loan Servicing LP., including those involving "robo-signing"—a practice that often results in defective foreclosures.  As a result of this sanction, Goldman must retain an independent consultant to review certain foreclosure proceedings initiated by Litton. The Federal Reserve has also announced that it believes monetary sanctions are appropriate against Goldman and plans to announce monetary penalties.  Goldman's "pattern of misconduct" is further evidence that Goldman Sachs knew of the weakness in the mortgage loans collateralizing the Securitizations and had both an ability and willingness to exploit it.

### D.      Further Evidence that Goldman Knew the Appraisals Were Inflated

187.     The appraised value of a mortgaged property is a key component in the stated LTV ratios.  Goldman knew at the time the appraisals were false and baseless, and thus did not genuinely believe at the time the disclosed statistics were accurate.  This is supported by the extent of the wide disparities between reported and actual LTV information for the GSE Certificates, discovered through the use of loan-level, contemporaneous information.  It is also supported by evidence of the other systemic problems at issue here, testimony and investigations into the originators at issue here, and other testimony that has been provided by industry insiders.

188.     For instance, Richard Bitner, a former executive of a subprime lender for fifteen years, testified in April 2010 before the FCIC that "the appraisal process [was] highly susceptible to manipulation," and that the rise in property values was in part due to "the subprime industry's acceptance of overvalued appraisals." Similarly, New Century's Patricia Lindsay, a former wholesale lender, stated in her testimony to the FCIC that appraisers "fear[ed]" for their

"livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value." *See* Written Testimony of Patricia Lindsay to the FCIC, at 5 (Apr. 7, 2010). Likewise, Jim Amorin, President of the Appraisal Institute, confirmed in his testimony that "[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again …. [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice.'" *See* Testimony of Jim Amorin to the FCIC, *available at* www.appraisalinstitute.org/newsadvocacy/downloads/ltrs_tstmny/2009/AI-ASA-ASFMRA-NAIFATestimonyonMortgageReform042309final.pdf.

189.     The FCIC's January 2011 report recounts the similar testimony of Dennis J. Black, an appraiser with 24 years of experience who held continuing education services across the country. "He heard complaints from appraisers that they had been pressured to ignore missing kitchens, damaged walls, and inoperable mechanical systems. Black told the FCIC, 'The story I have heard most often is the client saying he could not use the appraisal because the value was [not] what they needed.' The client would hire somebody else."

190.     Such testimony provides further evidence that Goldman—as an industry insider with a unique window into the quality of the underlying mortgage loans by virtue of its role as sponsor and depositor in many of the Securitizations—knew at the time it made representations to the GSEs regarding the strength of the Certificates and the underlying mortgage loans, that such representations were false when made.

**VI.     The GSEs Justifiably Relied on Goldman Sachs's Representations**

191.     Fannie Mae and Freddie Mac purchased the GSE Certificates based upon the representations by Goldman Sachs as the sponsor, depositor, and lead and selling underwriter in all 36 of the Goldman-sponsored Securitizations. Goldman Sachs provided term sheets to the

85

GSEs that contained critical data as to the Securitizations, including with respect to anticipated credit ratings by the credit rating agencies, loan-to-value ratios for the underlying collateral, and owner-occupancy statistics.  This data was subsequently incorporated into Prospectus Supplements that were received by the GSEs upon the close of each Securitization.

192.    The GSEs relied upon the accuracy of the data transmitted to them and subsequently reflected in the Prospectus Supplements.  In particular, the GSEs relied upon the credit ratings that the credit rating agencies indicated they would bestow on the Certificates based on the information provided by Goldman Sachs Mortgage Company and Goldman, Sachs & Co. relating to the collateral quality of the underlying loans and the structure of the Securitization.  These credit ratings represented a determination by the credit rating agencies that the GSE Certificates were "AAA" quality (or its equivalent)—meaning the Certificates had an extremely strong capacity to meet the payment obligations described in the respective PSAs and Prospectus Supplements.

193.    Goldman Sachs, as sponsor, depositor, and lead and selling underwriter in all 36 of the Goldman-sponsored Securitizations, provided detailed information about the underlying collateral and structure of each Securitization it sponsored to the credit rating agencies.  The credit rating agencies based their ratings on the information provided to them by Goldman Sachs, and the agencies' anticipated ratings of the Certificates were dependent on the accuracy of that information.  The GSEs relied on the accuracy of the anticipated credit ratings and the actual credit ratings assigned to the Certificates by the credit rating agencies, and upon the accuracy of Goldman's representations in the term sheets and Prospectus Supplements.

194.    The GSEs relied on the fact that the originators of the mortgage loans in the Securitizations had acted in conformity with their underwriting guidelines, which were described

86

in the Prospectus Supplements.  Compliance with underwriting guidelines was a precondition to the GSE's purchase of the GSE Certificates in that the GSEs' decision to purchase the Certificates was directly premised on their reasonable belief that the originators complied with applicable underwriting guidelines and standards.

195.    In purchasing the GSE Certificates, the GSEs justifiably relied on Goldman's false representations and omissions of material fact detailed above, including the misstatements and omissions in the term sheets about the underlying collateral, which were reflected in the Prospectus Supplements.

196.    But for the above misrepresentations and omissions, the GSEs would not have purchased or acquired the Certificates as they ultimately did, because those representations and omissions were material to their decision to acquire the GSE Certificates, as described above.

### VII.    Fannie Mae's and Freddie Mac's Purchases of the GSE Certificates and the Resulting Damages

197.    In total, between September 7, 2005 and October 29, 2007, Fannie Mae and Freddie Mac purchased from Goldman Sachs over $11.1 billion in residential mortgage-backed securities issued in connection with the Securitizations.  Table 10 reflects Freddie Mac's purchases of the Certificates.[21]

**Table 10**

| Transaction | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|
| ACCR 2005-4 | 004375EE7 | November 23, 2005 | $354,752,000 | 100.0000 | Goldman, Sachs & Co. |
| AHMA 2006-1 | 02660WAA4 | May 25, 2006 | $165,000,000 | 100.0000 | Goldman, Sachs & Co. |
| FFML 2005-FF11 | 362341YA1 | November 22, 2005 | $240,920,000 | 100.0000 | Goldman, Sachs & Co. |
| FFML 2005-FF8 | 362341QL6 | September 29, 2005 | $304,713,000 | 100.0000 | Goldman, Sachs & Co. |
| FHLT 2006-E | 35729NAA3 | December 6, 2006 | $468,289,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAA 2005-14 | 362341ZS1 | November 22, 2005 | $168,059,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAA 2005-14 | 362341B32 | November 22, 2005 | $18,674,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAA 2006-8 | 362348AA2 | April 28, 2006 | $199,053,000 | 100.0000 | Goldman, Sachs & Co. |

---

[21]   Purchased securities in Tables 10 and 11 are stated in terms of unpaid principal balance of the relevant Certificates.  Purchase prices are stated in terms of percentage of par.

| Transaction | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|
| GSAA 2007-6 | 36245RAD1 | May 30, 2007 | $78,936,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2005-HE5 | 362341YW3 | November 22, 2005 | $405,564,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2005-HE6 | 362341F87 | December 29, 2005 | $341,242,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2006-FM2 | 36245DAA8 | September 29, 2006 | $351,611,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2006-FM3 | 36245TAA3 | December 21, 2006 | $257,050,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2006-HE3 | 36244KAA3 | May 26, 2006 | $304,472,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2006-HE4 | 362439AA9 | June 29, 2006 | $352,415,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2006-HE5 | 362437AA3 | August 25, 2006 | $241,582,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2007-FM1 | 3622MAAA9 | January 30, 2007 | $315,873,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2007-FM2 | 3622MHAA4 | February 21, 2007 | $351,823,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2007-HE1 | 3622MDAA3 | February 23, 2007 | $205,454,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2007-HE2 | 362440AA7 | April 20, 2007 | $370,801,000 | 100.0000 | Goldman, Sachs & Co. |
| GSR 2006-OA1 | 362631AA1 | August 25, 2006 | $744,970,000 | 100.0000 | Goldman, Sachs & Co. |
| GSR 2007-OA1 | 3622NAAA8 | May 8, 2007 | $374,616,000 | 100.0000 | Goldman, Sachs & Co. |
| GSR 2007-OA2 | 3622NCAA4 | October 29, 2007 | $186,326,000 | 101.0625 | Goldman, Sachs & Co. |
| INDX 2005-AR18 | 45660LVZ9 | September 7, 2005 | $314,827,000 | 100.0000 | Goldman, Sachs & Co. |

198.    Table 11 reflects Fannie Mae's purchases of the Certificates:

**Table 11**

| Transaction | CUSIP | Settlement Date of Purchase by Fannie Mae | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Fannie Mae |
|---|---|---|---|---|---|
| AHMA 2006-1 | 02660WAB2 | May 25, 2006 | $101,477,000 | 100.0000 | Goldman, Sachs & Co. |
| FFML 2006-FF13 | 30247DAA9 | September 28, 2006 | $244,303,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAA 2005-11 | 362341NV7 | September 29, 2005 | $103,804,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAA 2005-15 | 362341D48 | December 29, 2005 | $241,820,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAA 2006-11 | 362367AA2 | June 30, 2006 | $242,367,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAA 2006-2 | 3623415N5 | February 6, 2006 | $148,331,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAA 2006-4 | 362334FD1 | March 2, 2006 | $223,080,000 | 100.4648 | Goldman, Sachs & Co. |
| GSAA 2006-5 | 362334GQ1 | March 30, 2006 | $186,376,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2005-AHL2 | 362341B81 | December 28, 2005 | $108,759,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2005-WMC2 | 362341UV9 | November 23, 2005 | $266,290,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2005-WMC3 | 362341K99 | December 28, 2005 | $238,899,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2006-FM1 | 362334PF5 | April 27, 2006 | $241,822,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2006-HE7 | 36245EAA6 | November 22, 2006 | $333,098,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2006-HE8 | 3622M8AA4 | December 27, 2006 | $353,741,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2006-NC2 | 362463AA9 | June 29, 2006 | $239,618,000 | 100.0000 | Goldman, Sachs & Co. |
| GSAMP 2007-NC1 | 3622MGAA6 | February 20, 2007 | $479,787,000 | 100.0000 | Goldman, Sachs & Co. |
| GSR 2007-AR2 | 3622N6AL3 | May 24, 2007 | $89,703,000 | 100.0586 | Goldman, Sachs & Co. |
| INDX 2005-AR27 | 45660LN96 | October 28, 2005 | $136,304,000 | 100.5352 | Goldman, Sachs & Co. |

199.    The statements and assurances in the Registration Statements regarding the credit

quality and characteristics of the mortgage loans underlying the GSE Certificates, and the

underwriting practices pursuant to which the mortgage loans were originated, which were

summarized in such documents, were material to a reasonable investor's decision to purchase the

Certificates.

200.    The false statements of material facts and omissions of material facts in the Registration Statements, including the Prospectuses and Prospectus Supplements, directly caused Fannie Mae and Freddie Mac to suffer hundreds of millions of dollars in damages, including without limitation depreciation in the value of the Certificates.  The mortgage loans underlying the GSE Certificates experienced defaults and delinquencies at a much higher rate than they would have had the loan originators adhered to the underwriting guidelines set forth in the Registration Statements, and the payments to the trusts were therefore much lower than they would have been had the loans been underwritten as described in the Registration Statements.

201.    Fannie Mae's and Freddie Mac's losses have been much greater than they would have been if the mortgage loans had the credit quality stated in the Registration Statements.

202.    Goldman Sachs' misstatements and omissions in the Registration Statements regarding the true characteristics of the loans were the proximate cause of Fannie Mae's and Freddie Mac's losses relating to their purchases of the GSE Certificates.  Based upon sales of the Certificates or similar certificates in the secondary market, Goldman proximately caused hundreds of millions of dollars in damages to Fannie Mae and Freddie Mac in an amount to be determined at trial.[22]

## FIRST CAUSE OF ACTION

**Violation of Section 11 of the Securities Act of 1933**
**(Against Defendants GS Mortgage Securities Corp., Goldman, Sachs & Co., Kevin Gasvoda, Michelle Gill, David J. Rosenblum, Jonathan S. Sobel, Daniel L. Sparks, and Mark Weiss)**

203.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes from this cause of action any allegation that could be

---

[22]  Plaintiff does not bring claims in this Complaint against GS Mortgage Securities Corp. arising from GSAMP 2006-FM1, GSAMP 2006-FM2, GSAMP 2006-FM3, GSAMP 2007-FM1, and GSAMP 2007-FM2.

construed as alleging fraudulent or intentional or reckless conduct.  This cause of action specifically excludes the allegations as to Defendants' scienter, including those set forth in Section V.

204.    This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statements.  This claim is brought against Defendant Goldman, Sachs & Co. with respect to each of the Registration Statements.  This claim is also brought against (i) Defendant GS Mortgage Securities Corp. and (ii) Defendants Kevin Gasvoda, Michelle Gill, David J. Rosenblum, Jonathan S. Sobel Daniel L. Sparks, and Mark Weiss (the foregoing Individual Defendants collectively referred to as the "Section 11 Individual Defendants"), each with respect to the Registration Statements filed by GS Mortgage Securities Corp. that registered securities that were bona fide offered to the public on or after September 6, 2005.

205.    Defendant Goldman, Sachs & Co. is strictly liable for making false and materially misleading statements in each of the Registration Statements, and for omitting facts necessary to make the facts stated therein not misleading.  Defendant GS Mortgage Securities Corp. and the Section 11 Individual Defendants are strictly liable for making false and materially misleading statements in the GS Mortgage Shelf Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005, which are applicable to 31 of the 40 Securitizations (as specified in Tables 1 and 2 above), including the related Prospectus Supplements, and for omitting facts necessary to make the facts stated therein not misleading.

206.    Goldman, Sachs & Co. served as the lead underwriter in each Securitization.  As an underwriter in each Securitization, Goldman, Sachs & Co. is strictly liable under Section 11 of the Securities Act for the misstatements and omissions in each Registration Statement.

207.    GS Mortgage Securities Corp. filed four Registration Statements under which 35 of the 40 Securitizations were carried out.  As depositor, GS Mortgage Securities Corp. is an issuer of the GSE Certificates issued pursuant to the Registration Statements it filed within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a).  As such, it is liable under Section 11 of the Securities Act for the misstatements and omissions in the GS Mortgage Shelf Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

208.    At the time GS Mortgage Securities Corp. filed four Registration Statements applicable to 35 of the Securitizations, the Section 11 Individual Defendants were officers and/or directors of GS Mortgage Securities Corp.  In addition, the Section 11 Individual Defendants signed those Registration Statements and either signed or authorized another to sign on their behalf the amendments to those Registration Statements.  As such, the Section 11 Individual Defendants are liable under Section 11 of the Securities Act for the misstatements and omissions in those Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

209.    At the time that they became effective, each Registration Statement contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above.  The facts misstated or omitted were material to a reasonable investor reviewing the Registration Statement, including to Fannie Mae and Freddie Mac.

210.     The untrue statements of material facts and omissions of material facts in the

Registration Statements are set forth above in Section IV and pertain to, among other things,

compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate

credit ratings.

211.     Fannie Mae and Freddie Mac purchased or otherwise acquired the GSE

Certificates in the primary market pursuant to the materially false, misleading, and incomplete

Registration Statements.  At the time they purchased the GSE Certificates, Fannie Mae and

Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of

the facts concerning the false and misleading statements and omissions alleged herein, and if the

GSEs had known those facts, they would not have purchased the GSE Certificates.

212.     Goldman, Sachs & Co. owed to Fannie Mae, Freddie Mac, and other investors a

duty to make a reasonable and diligent investigation of the statements contained in the applicable

Registration Statements at the time they became effective to ensure that such statements were

true and correct and that there were no omissions of material facts required to be stated in order

to make the statements contained therein not misleading.  The Section 11 Individual Defendants

owed the same duty with respect to the GS Mortgage Shelf Registration Statements that they

signed that registered securities that were bona fide offered to the public on or after September 6,

2005, which are applicable to 31 of the Securitizations.

213.     Goldman, Sachs & Co. and the Section 11 Individual Defendants did not exercise

such due diligence and failed to conduct a reasonable investigation.  In the exercise of reasonable

care, these Defendants should have known of the false statements and omissions contained in or

omitted from such Registration Statements, as set forth herein.  In addition, GS Mortgage

Securities Corp., though subject to strict liability without regard to whether it performed diligence, also failed to take reasonable steps to ensure the accuracy of the representations.

214.    Fannie Mae and Freddie Mac sustained substantial damages as a result of the misstatements and omissions in the Registration Statements, for which they are entitled to compensation.

215.    The time period from June 5, 2009 through August 30, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and The Goldman Sachs Group, Inc. (on its own behalf and on behalf of its affiliated entities). The time period from July 15, 2011 through August 30, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and The Goldman Sachs Group, Inc. (on its own behalf and on behalf of its affiliated entities).  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

216.    By reason of the conduct herein alleged, Goldman, Sachs & Co., GS Mortgage Securities Corp., and the Section 11 Individual Defendants are jointly and severally liable for their wrongdoing.

## SECOND CAUSE OF ACTION

### Violation of Section 12(a)(2) of the Securities Act of 1933
### (Against GS Mortgage Securities Corp. and Goldman, Sachs & Co.)

217.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraudulent or intentional or reckless conduct.  This cause of action

specifically excludes the allegations as to Defendants' scienter, including those set forth in Section V.

218.     This claim is brought by Plaintiff pursuant to Section 12(a)(2) of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statements.

219.     Defendant Goldman, Sachs & Co. negligently made false and materially misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for each Securitization.  Defendant GS Mortgage Securities Corp. negligently made false and materially misleading statements in the Prospectuses for the Securitizations effected under the GS Mortgage Shelf Registration Statements, which are applicable to 35 of the Securitizations.

220.     Goldman, Sachs & Co. is prominently identified in the Prospectuses, the primary documents it used to sell the GSE Certificates.  Goldman, Sachs & Co. offered the Certificates publicly, including selling to Fannie Mae and Freddie Mac the GSE Certificates, as set forth in the "Method of Distribution" or equivalent underwriting section of each Prospectus.

221.     Goldman, Sachs & Co. offered and sold the GSE Certificates to Fannie Mae and Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  Goldman, Sachs & Co. reviewed and participated in drafting the Prospectuses.

222.     Goldman, Sachs & Co. successfully solicited Fannie Mae's and Freddie Mac's purchases of the GSE Certificates.  As underwriter, Goldman, Sachs & Co. was paid a

substantial commission based on the amount it received from the sale of the Certificates to the public.

223.    Goldman, Sachs & Co. offered the GSE Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce, including communications between its representatives in New York and representatives of Fannie Mae in the District of Columbia and Freddie Mac in McLean, Virginia.

224.    GS Mortgage Securities Corp. is prominently identified in the Prospectuses for the Securitizations carried out under the GS Mortgage Shelf Registration Statements.  These Prospectuses were the primary documents used to sell Certificates for the 35 Securitizations under the GS Mortgage Shelf Registration Statements.  GS Mortgage Securities Corp. offered the Certificates publicly and actively solicited their sale, including to Fannie Mae and Freddie Mac.  GS Mortgage Securities Corp. was paid a percentage of the total dollar amount of the offering upon completion of the Securitizations effected pursuant to the GS Mortgage Shelf Registration Statements.

225.    With respect to the 35 Securitizations for which it filed the GS Mortgage Shelf Registration Statements, including the related Prospectus Supplements, GS Mortgage Securities Corp. offered the GSE Certificates to Fannie Mae and Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  GS Mortgage Securities Corp. reviewed and participated in drafting the Prospectuses.

226.    GS Mortgage Securities Corp. offered the GSE Certificates for sale by the use of means or instruments of transportation and communication in interstate commerce.

227. Each of Goldman, Sachs & Co. and GS Mortgage Securities Corp. actively participated in the solicitation of the GSEs' purchase of the GSE Certificates, and did so in order to benefit itself. Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

228. Each of the Prospectuses contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses, and specifically to Fannie Mae and Freddie Mac.

229. The untrue statements of material facts and omissions of material facts in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

230. Goldman, Sachs & Co. and GS Mortgage Securities Corp. offered and sold the GSE Certificates directly to Fannie Mae and Freddie Mac pursuant to the materially false, misleading, and incomplete Prospectuses.

231. Goldman, Sachs & Co. owed to Fannie Mae and Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading. GS Mortgage Securities Corp. owed the same duty with respect to the Prospectuses for the Securitizations effected under the four GS Mortgage Shelf Registration Statements.

232.    Goldman, Sachs & Co. and GS Mortgage Securities Corp. failed to exercise such reasonable care.  These defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations, as set forth above.

233.    In contrast, Fannie Mae and Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses at the time they purchased the GSE Certificates.  If the GSEs had known of those untruths and omissions, they would not have purchased the GSE Certificates.

234.    Fannie Mae and Freddie Mac acquired the GSE Certificates in the primary market pursuant to the Prospectuses.

235.    Fannie Mae and Freddie Mac sustained substantial damages in connection with their investments in the GSE Certificates and have the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

236.    The time period from June 5, 2009 through August 30, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and The Goldman Sachs Group, Inc. (on its own behalf and on behalf of its affiliated entities). The time period from July 15, 2011 through August 30, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and The Goldman Sachs Group, Inc. (on its own behalf and on behalf of its affiliated entities).  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## THIRD CAUSE OF ACTION

**Violation of Section 15 of the Securities Act of 1933
(Against Goldman Sachs Mortgage Company, The Goldman Sachs Group, Inc.,
Goldman Sachs Real Estate Funding Corp., and the Individual Defendants)**

237.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraudulent or intentional or reckless conduct.  This cause of action specifically excludes the allegations as to Defendants' scienter, including those set forth in Section V.

238.    This claim is brought under Section 15 of the Securities Act against Goldman Sachs Mortgage Company, The Goldman Sachs Group, Inc., Goldman Sachs Real Estate Funding Corp., and the Individual Defendants for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.

239.    The Individual Defendants at all relevant times participated in the operation and management of GS Mortgage Securities Corp. and its related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of GS Mortgage Securities Corp.'s business affairs.  Defendant Peter C. Aberg was a Director of Defendant GS Mortgage Securities Corp. Defendant Howard S. Altarescu was Vice President, Chief Financial Officer, and Chief Accounting Officer of Defendant GS Mortgage Securities Corp.  Defendant Robert J. Christie was a Director of Defendant GS Mortgage Securities Corp.  Defendant Kevin Gasvoda was a Director of Defendant GS Mortgage Securities Corp. and Managing Director for Goldman's Fixed Income, Currency, and Commodities business line and head of Residential Whole Loan Trading at Goldman Sachs.  Defendant Michelle Gill was Vice President and principal financial officer and principal accounting officer of Defendant GS Mortgage Securities Corp.  Defendant David J. Rosenblum was Vice President and a Director of Defendant GS Mortgage Securities

Corp., and also served as head of Goldman's Collateralized Loan Obligation activities. Defendant Jonathan S. Sobel was a Director of Defendant GS Mortgage Securities Corp. and headed Goldman's mortgage department.  Defendant Daniel L. Sparks was Chief Executive Officer, Vice President and a Director of Defendant GS Mortgage Securities Corp., and also served as the head of Goldman's mortgage department.  Defendant Mark Weiss was Vice President and principal financial officer and principal accounting officer of Defendant GS Mortgage Securities Corp.

240.    Because of their positions of authority and control as senior officers and directors of GS Mortgage Securities Corp., the Individual Defendants were able to, and in fact did, control the contents of the GS Mortgage Shelf Registration Statements, including the related Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

241.    Defendant Goldman Sachs Mortgage Company was the sponsor for 36 of the Securitizations, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of those GSE Certificates by initiating the Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting the depositor (which was Defendant GS Mortgage Securities Corp. in 35 of those Securitizations), and selecting Goldman, Sachs & Co. as the sole or lead underwriter for the Securitizations.  In its role as sponsor, Goldman Sachs Mortgage Company knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.  Goldman Sachs Mortgage Company also acted as the seller of the mortgage loans for 36 of the Securitizations, in that it conveyed such mortgage loans to the

99

depositor, which, in 35 of the Securitizations, was its wholly owned subsidiary Defendant GS Mortgage Securities Corp.

242.     Goldman Sachs Mortgage Company controlled all aspects of the business of GS Mortgage Securities Corp., as that entity was merely a special purpose vehicle created to act as a pass-through for the issuance of the Certificates.  In addition, because of its position as sponsor for 36 of the Securitizations, Goldman Sachs Mortgage Company was able to, and did in fact, control the contents of the Registration Statements filed by GS Mortgage Securities Corp., including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

243.     Defendant The Goldman Sachs Group, Inc. controlled the business operations of each of Defendants Goldman Sachs Mortgage Company, GS Mortgage Securities Corp., Goldman, Sachs & Co., and Goldman Sachs Real Estate Funding Corp.  The Goldman Sachs Group, Inc. is the ultimate corporate parent of its wholly owned subsidiaries Defendants Goldman Sachs Mortgage Company, GS Mortgage Securities Corp., Goldman, Sachs & Co., and Goldman Sachs Real Estate Funding Corp.  As such, The Goldman Sachs Group, Inc. upon information and belief held the voting power and therefore the practical ability to direct and control the actions of GS Mortgage Securities Corp. and Goldman, Sachs & Co. in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of GS Mortgage Securities Corp. and Goldman, Sachs & Co. in connection with the issuance and sale of the Certificates.

244.     The Goldman Sachs Group, Inc. expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material

facts and omissions of material facts in the Registration Statements.  The Goldman Sachs Group, Inc. culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as GS Mortgage Securities Corp. and the issuing trusts to serve as conduits for the mortgage loans.  In addition, there was substantial overlap between the management of the business entities of The Goldman Sachs Group, Inc. and the directors and officers of Defendant GS Mortgage Securities Corp.  For example, Defendant Kevin Gasvoda was a Director of GS Mortgage Securities Corp., in addition to serving as Managing Director for Goldman's Fixed Income, Currency, and Commodities business line and Managing Director and head of Residential Whole Loan Trading at Goldman Sachs.  In addition, Defendant David J. Rosenblum, who was Vice President and a Director of GS Mortgage Securities Corp., also served as head of Goldman's Collateralized Loan Obligation activities.  Similarly, Defendant Jonathan S. Sobel was a Director of Defendant GS Mortgage Securities Corp., and also headed Goldman's mortgage department.  Likewise, Defendant Daniel L. Sparks was Chief Executive Officer, Vice President and a Director of GS Mortgage Securities, while also heading Goldman's mortgage department.  Such overlapping control made The Goldman Sachs Group, Inc. a controlling person of Defendant GS Mortgage Securities Corp. for purposes of Section 15.

245.    Defendant Goldman Sachs Real Estate Funding Corp. is a wholly owned subsidiary of Goldman Sachs Bank USA and is the general partner of Goldman Sachs Mortgage Company, the sponsor of the Securitizations.  The parent company of Goldman Sachs Real Estate Funding Corp.—Goldman Sachs Bank USA—is itself a subsidiary of The Goldman Sachs Group, Inc.  Goldman Sachs Real Estate Funding Corp. provided a further vehicle for the

ultimate controlling entity—The Goldman Sachs Group, Inc.—to further direct the activities of the sponsor of the Securitizations, Goldman Sachs Mortgage Company.  Defendant Goldman Sachs Real Estate Funding Corp., as the general partner of Goldman Sachs Mortgage Company, controlled Goldman Sachs Mortgage Company and was able to, and did in fact, control the contents of the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

246.    Goldman Sachs Mortgage Company, The Goldman Sachs Group, Inc., Goldman Sachs Real Estate Funding Corp., and the Individual Defendants are controlling persons within the meaning of Section 15 of the Securities Act by virtue of their actual power over, control of, ownership of, and/or directorship of GS Mortgage Securities Corp. and Goldman, Sachs & Co. at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

247.    Fannie Mae and Freddie Mac purchased in the primary market the GSE Certificates, which were issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements, and specifically to Fannie Mae and Freddie Mac.

248.    Fannie Mae and Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the misstatements and omissions in the Registration Statements; had the GSEs known of those misstatements and omissions, they would not have purchased the GSE Certificates.

249.   Fannie Mae and Freddie Mac have sustained substantial damages as a result of the misstatements and omissions in the Registration Statements, for which they are entitled to compensation.

250.   The time period from June 5, 2009 through August 30, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and The Goldman Sachs Group, Inc. (on its own behalf and on behalf of its affiliated entities). The time period from July 15, 2011 through August 30, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and The Goldman Sachs Group, Inc. (on its own behalf and on behalf of its affiliated entities).  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## FOURTH CAUSE OF ACTION

### Primary Violations of Section 13.1-522(A)(ii) of the Virginia Code
### (Against Goldman, Sachs & Co. and GS Mortgage Securities Corp.)

251.   Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraudulent or intentional or reckless conduct.  This cause of action specifically excludes the allegations as to Defendants' scienter, including those set forth in Section V.

252.   This claim is brought by Plaintiff pursuant to Section 13.1-522(A)(ii) of the Virginia Code and is asserted on behalf of Freddie Mac.  The allegations set forth in this cause of action pertain only to those GSE Certificates identified in Table 10 above that were purchased by Freddie Mac on or after September 6, 2006.

103

253.    Defendant Goldman, Sachs & Co. negligently made false and materially misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for each Securitization.  Defendant GS Mortgage Securities Corp. negligently made false and materially misleading statements in the Prospectuses for the Securitizations effected under the GS Mortgage Shelf Registration Statements.

254.    Goldman, Sachs & Co. is prominently identified in the Prospectuses, the primary documents it used to sell the GSE Certificates.  Goldman, Sachs & Co. offered the Certificates publicly, including selling to Freddie Mac the GSE Certificates, as set forth in the "Method of Distribution" or equivalent underwriting section of each Prospectus.

255.    Goldman, Sachs & Co. offered and sold the GSE Certificates to Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  Goldman, Sachs & Co. reviewed and participated in drafting the Prospectuses.

256.    Goldman, Sachs & Co. successfully solicited Freddie Mac's purchases of the GSE Certificates.  As underwriter, Goldman, Sachs & Co. was paid a substantial commission based on the amount it received from the sale of the Certificates to the public.

257.    Goldman, Sachs & Co. offered the GSE Certificates for sale, sold them, and distributed them to Freddie Mac in the State of Virginia.

258.    GS Mortgage Securities Corp. is prominently identified in the Prospectuses for the Securitizations carried out under the GS Mortgage Shelf Registration Statements.  These Prospectuses were the primary documents used to sell Certificates for the Securitizations under

the GS Mortgage Shelf Registration Statements.  GS Mortgage Securities Corp. offered the Certificates publicly and actively solicited their sale, including to Freddie Mac.  GS Mortgage Securities Corp. was paid a percentage of the total dollar amount of the offering upon completion of the Securitizations effected pursuant to the GS Mortgage Shelf Registration Statements.

259.    With respect to the Securitizations for which it filed the GS Mortgage Shelf Registration Statements, including the related Prospectus Supplements, GS Mortgage Securities Corp. offered the GSE Certificates to Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  GS Mortgage Securities Corp. reviewed and participated in drafting the Prospectuses.

260.    Each of Goldman, Sachs & Co. and GS Mortgage Securities Corp. actively participated in the solicitation of Freddie Mac's purchase of the GSE Certificates, and did so in order to benefit itself.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

261.    Each of the Prospectuses contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses, and specifically to Freddie Mac.

262.    The untrue statements of material facts and omissions of material facts in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

263.    Goldman, Sachs & Co. and GS Mortgage Securities Corp. offered and sold the GSE Certificates directly to Freddie Mac pursuant to the materially false, misleading, and incomplete Prospectuses.

264.    Goldman, Sachs & Co. owed to Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  GS Mortgage Securities Corp. owed the same duty with respect to the Prospectuses for the Securitizations effected under the four GS Mortgage Shelf Registration Statements.

265.    Goldman, Sachs & Co. and GS Mortgage Securities Corp. failed to exercise such reasonable care.  These Defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations, as set forth above.

266.    In contrast, Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses at the time it purchased the GSE Certificates.  If Freddie Mac had known of those untruths and omissions, it would not have purchased the GSE Certificates.

267.    Freddie Mac sustained substantial damages in connection with its investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

268.    The time period from July 15, 2011 through August 30, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and The Goldman Sachs Group, Inc. (on its

own behalf and on behalf of its affiliated entities).  This action is brought within three years of

the date that FHFA was appointed as Conservator of Freddie Mac, and is thus timely under 12

U.S.C. § 4617(b)(12).

## FIFTH CAUSE OF ACTION

**Controlling Person Liability Under Section 13.1-522(C) of the Virginia Code
(Against Goldman Sachs Mortgage Company, The Goldman Sachs Group, Inc.,
Goldman Sachs Real Estate Funding Corp., and the Individual Defendants)**

269.     Plaintiff realleges each allegation above as if fully set forth herein, except to the

extent that Plaintiff expressly excludes from this cause of action any allegation that could be

construed as alleging fraudulent or intentional or reckless conduct.  This cause of action

specifically excludes the allegations as to Defendants' scienter, including those set forth in

Section V.

270.     This claim is brought under Section 13.1-522(C) of the Virginia Code and is

asserted on behalf of Freddie Mac.  The allegations set forth in this cause of action pertain only

to those GSE Certificates identified in Table 10 above that were purchased by Freddie Mac on or

after September 6, 2006.  This claim is brought against Goldman Sachs Mortgage Company, The

Goldman Sachs Group, Inc., Goldman Sachs Real Estate Funding Corp., and the Individual

Defendants for controlling-person liability with regard to the Fourth Cause of Action set forth

above.

271.     The Individual Defendants at all relevant times participated in the operation and

management of GS Mortgage Securities Corp. and its related subsidiaries, and conducted and

participated, directly and indirectly, in the conduct of GS Mortgage Securities Corp.'s business

affairs.  Defendant Peter C. Aberg was a Director of Defendant GS Mortgage Securities Corp.

Defendant Howard S. Altarescu was Vice President, Chief Financial Officer, and Chief

Accounting Officer of Defendant GS Mortgage Securities Corp.  Defendant Robert J. Christie

107

was a Director of Defendant GS Mortgage Securities Corp.  Defendant Kevin Gasvoda was a Director of Defendant GS Mortgage Securities Corp. and Managing Director for Goldman's Fixed Income, Currency, and Commodities business line and head of Residential Whole Loan Trading at Goldman Sachs.  Defendant Michelle Gill was Vice President and principal financial officer and principal accounting officer of Defendant GS Mortgage Securities Corp.  Defendant David J. Rosenblum was Vice President and a Director of Defendant GS Mortgage Securities Corp., and also served as head of Goldman's Collateralized Loan Obligation activities. Defendant Jonathan S. Sobel was a Director of Defendant GS Mortgage Securities Corp. and headed Goldman's mortgage department.  Defendant Daniel L. Sparks was Chief Executive Officer, Vice President and a Director of Defendant GS Mortgage Securities Corp., and also served as the head of Goldman's mortgage department.  Defendant Mark Weiss was Vice President and principal financial officer and principal accounting officer of Defendant GS Mortgage Securities Corp.

272.    Because of their positions of authority and control as senior officers and directors of GS Mortgage Securities Corp., the Individual Defendants were able to, and in fact did, control the contents of the GS Mortgage Shelf Registration Statements, including the related Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

273.    Defendant Goldman Sachs Mortgage Company culpably participated in the violation of Section 13.1-522(A)(ii) set forth above with respect to the offering of GSE Certificates in transactions it sponsored by initiating the Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting the depositor (GS Mortgage Securities Corp.), and selecting Goldman, Sachs & Co. as the lead underwriter.  In

its role as sponsor, Goldman Sachs Mortgage Company knew and intended that the mortgage

loans it purchased would be sold in connection with the securitization process, and that

certificates representing the ownership interests of investors in the cashflows would be issued by

the relevant trusts.  Goldman Sachs Mortgage Company also acted as the seller of the mortgage

loans for the Securitizations it sponsored, in that it conveyed such mortgage loans to the

depositor, which was generally its wholly owned subsidiary Defendant GS Mortgage Securities

Corp.

274.    Goldman Sachs Mortgage Company controlled all aspects of the business of GS

Mortgage Securities Corp., as that entity was merely a special purpose vehicle created to act as a

pass-through for the issuance of the Certificates.  In addition, because of its position as sponsor,

Goldman Sachs Mortgage Company was able to, and did in fact, control the contents of the

Registration Statements filed by GS Mortgage Securities Corp., including the Prospectuses and

Prospectus Supplements, which contained material misstatements of fact and omitted facts

necessary to make the facts stated therein not misleading.

275.    Defendant The Goldman Sachs Group, Inc. controlled the business operations of

each of Defendants Goldman Sachs Mortgage Company, GS Mortgage Securities Corp.,

Goldman, Sachs & Co., and Goldman Sachs Real Estate Funding Corp.  The Goldman Sachs

Group, Inc. is the ultimate corporate parent of its wholly owned subsidiaries Defendants

Goldman Sachs Mortgage Company, GS Mortgage Securities Corp., Goldman, Sachs & Co., and

Goldman Sachs Real Estate Funding Corp.  As such, The Goldman Sachs Group, Inc. upon

information and belief held the voting power and therefore the practical ability to direct and

control the actions of GS Mortgage Securities Corp. and Goldman, Sachs & Co. in issuing and

selling the Certificates, and in fact exercised such direction and control over the activities of GS

Mortgage Securities Corp. and Goldman, Sachs & Co. in connection with the issuance and sale of the Certificates.

276.   The Goldman Sachs Group, Inc. expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.  The Goldman Sachs Group, Inc. culpably participated in the violation of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as GS Mortgage Securities Corp. and the issuing trusts to serve as conduits for the mortgage loans.

277.   In addition, there was substantial overlap between the management of the business entities of The Goldman Sachs Group, Inc. and the directors and officers of Defendant GS Mortgage Securities Corp.  For example, Defendant Kevin Gasvoda was a Director of GS Mortgage Securities Corp., in addition to serving as Managing Director for Goldman's Fixed Income, Currency, and Commodities business line and Managing Director and head of Residential Whole Loan Trading at Goldman Sachs.  In addition, Defendant David J. Rosenblum, who was Vice President and a Director of GS Mortgage Securities Corp., also served as head of Goldman's Collateralized Loan Obligation activities.  Similarly, Defendant Jonathan S. Sobel was a Director of Defendant GS Mortgage Securities Corp., and also headed Goldman's mortgage department.  Likewise, Defendant Daniel L. Sparks was Chief Executive Officer, Vice President and a Director of GS Mortgage Securities, while also heading Goldman's mortgage department.  Such overlapping control made The Goldman Sachs Group, Inc. a

controlling person of Defendant GS Mortgage Securities Corp. for purposes of Section 13.1-522(C).

278.    Defendant Goldman Sachs Real Estate Funding Corp. is a wholly owned subsidiary of Goldman Sachs Bank USA and is the general partner of Goldman Sachs Mortgage Company, the sponsor of the Securitizations.  The parent company of Goldman Sachs Real Estate Funding Corp.—Goldman Sachs Bank USA—is itself a subsidiary of The Goldman Sachs Group, Inc.  Goldman Sachs Real Estate Funding Corp. provided a further vehicle for the ultimate controlling entity—The Goldman Sachs Group, Inc.—to further direct the activities of the sponsor of the Securitizations, Goldman Sachs Mortgage Company.  Defendant Goldman Sachs Real Estate Funding Corp., as the general partner of Goldman Sachs Mortgage Company, controlled Goldman Sachs Mortgage Company and was able to, and did in fact, control the contents of the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

279.    Goldman Sachs Mortgage Company, The Goldman Sachs Group, Inc., Goldman Sachs Real Estate Funding Corp., and the Individual Defendants are controlling persons within the meaning of Section 13.1-522(C) of the Virginia Code by virtue of their actual power over, control of, ownership of, and/or directorship of GS Mortgage Securities Corp. and Goldman, Sachs & Co. at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

280.    Freddie Mac purchased the GSE Certificates, which were issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated

therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements, and specifically to Freddie Mac.

281.    Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the misstatements and omissions in the Registration Statements; had Freddie Mac known of those misstatements and omissions, it would not have purchased the GSE Certificates.

282.    Freddie Mac has sustained substantial damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation, and for which Goldman Sachs Mortgage Company, The Goldman Sachs Group, Inc., Goldman Sachs Real Estate Funding Corp., and the Individual Defendants are jointly and severally liable.

283.    The time period from July 15, 2011 through August 30, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and The Goldman Sachs Group, Inc. (on its own behalf and on behalf of its affiliated entities).  This action is brought within three years of the date that FHFA was appointed as Conservator of Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## **SIXTH CAUSE OF ACTION**

### **Primary Violations of Section 31-5606.05(a)(1)(B) of the District of Columbia Code (Against GS Mortgage Securities Corp. and Goldman, Sachs & Co.)**

284.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraudulent or intentional or reckless conduct.  This cause of action specifically excludes the allegations as to Defendants' scienter, including those set forth in Section V.

112

285.     This claim is brought by Plaintiff pursuant to Section 31-5606.05(a)(1)(B) of the District of Columbia Code and is asserted on behalf of Fannie Mae.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 11 above that were purchased by Fannie Mae.

286.     Defendant Goldman, Sachs & Co. negligently made false and materially misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for each Securitization.  Defendant GS Mortgage Securities Corp. negligently made false and materially misleading statements in the Prospectuses for the Securitizations effected under the GS Mortgage Shelf Registration Statements.

287.     Goldman, Sachs & Co. is prominently identified in the Prospectuses, the primary documents it used to sell the GSE Certificates.  Goldman, Sachs & Co. offered the Certificates publicly, including selling to Fannie Mae the GSE Certificates, as set forth in the "Method of Distribution" or equivalent underwriting section of each Prospectus.

288.     Goldman, Sachs & Co. offered and sold the GSE Certificates to Fannie Mae by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  Goldman, Sachs & Co. reviewed and participated in drafting the Prospectuses.

289.     Goldman, Sachs & Co. successfully solicited Fannie Mae's purchases of the GSE Certificates.  As underwriter, Goldman, Sachs & Co. was paid a substantial commission based on the amount it received from the sale of the Certificates to the public.

290.     Goldman, Sachs & Co. offered the GSE Certificates for sale, sold them, and distributed them to Fannie Mae in the District of Columbia.

291.     GS Mortgage Securities Corp. is prominently identified in the Prospectuses for the Securitizations carried out under the GS Mortgage Shelf Registration Statements.  These Prospectuses were the primary documents used to sell Certificates for the Securitizations under the GS Mortgage Shelf Registration Statements.  GS Mortgage Securities Corp. offered the Certificates publicly and actively solicited their sale, including to Fannie Mae.  GS Mortgage Securities Corp. was paid a percentage of the total dollar amount of the offering upon completion of the Securitizations effected pursuant to the GS Mortgage Shelf Registration Statements.

292.     With respect to the Securitizations for which it filed the GS Mortgage Shelf Registration Statements, including the related Prospectus Supplements, GS Mortgage Securities Corp. offered the GSE Certificates to Fannie Mae by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  GS Mortgage Securities Corp. reviewed and participated in drafting the Prospectuses.

293.     Each of Goldman, Sachs & Co. and GS Mortgage Securities Corp. actively participated in the solicitation of Fannie Mae's purchase of the GSE Certificates, and did so in order to benefit itself.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

294.     Each of the Prospectuses contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses, and specifically to Fannie Mae.

114

295.     The untrue statements of material facts and omissions of material facts in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

296.     Goldman, Sachs & Co. and GS Mortgage Securities Corp. offered and sold the GSE Certificates directly to Fannie Mae pursuant to the materially false, misleading, and incomplete Prospectuses.

297.     Goldman, Sachs & Co. owed to Fannie Mae, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  GS Mortgage Securities Corp. owed the same duty with respect to the Prospectuses for the Securitizations effected under the four GS Mortgage Shelf Registration Statements.

298.     Goldman, Sachs & Co. and GS Mortgage Securities Corp. failed to exercise such reasonable care.  These Defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations, as set forth above.

299.     In contrast, Fannie Mae did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses at the time it purchased the GSE Certificates.  If Fannie Mae had known of those untruths and omissions, it would not have purchased the GSE Certificates.

300.    Fannie Mae sustained substantial damages in connection with its investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

301.    The time period from June 5, 2009 through August 30, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and The Goldman Sachs Group, Inc. (on its own behalf and on behalf of its affiliated entities). The time period from July 15, 2011 through August 30, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and The Goldman Sachs Group, Inc. (on its own behalf and on behalf of its affiliated entities).  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae, and is thus timely under 12 U.S.C. § 4617(b)(12).

### SEVENTH CAUSE OF ACTION

**Controlling Person Liability Under Section 31-5606.05(c) of the District of Columbia Code (Against Goldman Sachs Mortgage Company, The Goldman Sachs Group, Inc., Goldman Sachs Real Estate Funding Corp., and the Individual Defendants)**

302.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraudulent or intentional or reckless conduct.  This cause of action specifically excludes the allegations as to Defendants' scienter, including those set forth in Section V.

303.    This claim is brought under Section 31-5606.05(c) of the District of Columbia Code and is asserted on behalf of Fannie Mae.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 11 above that were purchased by Fannie Mae.  This claim is brought against Goldman Sachs Mortgage Company, The Goldman

116

Sachs Group, Inc., Goldman Sachs Real Estate Funding Corp., and the Individual Defendants for controlling-person liability with regard to the Sixth Cause of Action set forth above.

304.    The Individual Defendants at all relevant times participated in the operation and management of GS Mortgage Securities Corp. and its related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of GS Mortgage Securities Corp.'s business affairs.  Defendant Peter C. Aberg was a Director of Defendant GS Mortgage Securities Corp.  Defendant Howard S. Altarescu was Vice President, Chief Financial Officer, and Chief Accounting Officer of Defendant GS Mortgage Securities Corp.  Defendant Robert J. Christie was a Director of Defendant GS Mortgage Securities Corp.  Defendant Kevin Gasvoda was a Director of Defendant GS Mortgage Securities Corp. and Managing Director for Goldman's Fixed Income, Currency, and Commodities business line and head of Residential Whole Loan Trading at Goldman Sachs.  Defendant Michelle Gill was Vice President and principal financial officer and principal accounting officer of Defendant GS Mortgage Securities Corp.  Defendant David J. Rosenblum was Vice President and a Director of Defendant GS Mortgage Securities Corp., and also served as head of Goldman's Collateralized Loan Obligation activities.  Defendant Jonathan S. Sobel was a Director of Defendant GS Mortgage Securities Corp. and headed Goldman's mortgage department.  Defendant Daniel L. Sparks was Chief Executive Officer, Vice President and a Director of Defendant GS Mortgage Securities Corp., and also served as the head of Goldman's mortgage department.  Defendant Mark Weiss was Vice President and principal financial officer and principal accounting officer of Defendant GS Mortgage Securities Corp.

305.    Because of their positions of authority and control as senior officers and directors of GS Mortgage Securities Corp., the Individual Defendants were able to, and in fact did, control

the contents of the GS Mortgage Shelf Registration Statements, including the related Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

306.   Defendant Goldman Sachs Mortgage Company culpably participated in the violation of Section 31-5606.05(a)(1)(B) set forth above with respect to the offering of GSE Certificates in transactions it sponsored by initiating the Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting the depositor (GS Mortgage Securities Corp.), and selecting Goldman, Sachs & Co. as the lead underwriter.  In its role as sponsor, Goldman Sachs Mortgage Company knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.  Goldman Sachs Mortgage Company also acted as the seller of the mortgage loans for the Securitizations it sponsored, in that it conveyed such mortgage loans to the depositor, which was generally its wholly owned subsidiary Defendant GS Mortgage Securities Corp.

307.   Goldman Sachs Mortgage Company controlled all aspects of the business of GS Mortgage Securities Corp., as that entity was merely a special purpose vehicle created to act as a pass-through for the issuance of the Certificates.  In addition, because of its position as sponsor, Goldman Sachs Mortgage Company was able to, and did in fact, control the contents of the Registration Statements filed by GS Mortgage Securities Corp., including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

308.     Defendant The Goldman Sachs Group, Inc. controlled the business operations of each of Defendants Goldman Sachs Mortgage Company, GS Mortgage Securities Corp., Goldman, Sachs & Co., and Goldman Sachs Real Estate Funding Corp.  The Goldman Sachs Group, Inc. is the ultimate corporate parent of its wholly owned subsidiaries Defendants Goldman Sachs Mortgage Company, GS Mortgage Securities Corp., Goldman, Sachs & Co., and Goldman Sachs Real Estate Funding Corp.  As such, The Goldman Sachs Group, Inc. upon information and belief held the voting power and therefore the practical ability to direct and control the actions of GS Mortgage Securities Corp. and Goldman, Sachs & Co. in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of GS Mortgage Securities Corp. and Goldman, Sachs & Co. in connection with the issuance and sale of the Certificates.

309.     The Goldman Sachs Group, Inc. expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.  The Goldman Sachs Group, Inc. culpably participated in the violation of Section 31-5606.05(a)(1)(B) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as GS Mortgage Securities Corp. and the issuing trusts to serve as conduits for the mortgage loans.

310.     In addition, there was substantial overlap between the management of the business entities of The Goldman Sachs Group, Inc. and the directors and officers of Defendant GS Mortgage Securities Corp.  For example, Defendant Kevin Gasvoda was a Director of GS

119

Mortgage Securities Corp., in addition to serving as Managing Director for Goldman's Fixed Income, Currency, and Commodities business line and Managing Director and head of Residential Whole Loan Trading at Goldman Sachs.  In addition, Defendant David J. Rosenblum, who was Vice President and a Director of GS Mortgage Securities Corp., also served as head of Goldman's Collateralized Loan Obligation activities.  Similarly, Defendant Jonathan S. Sobel was a Director of Defendant GS Mortgage Securities Corp., and also headed Goldman's mortgage department.  Likewise, Defendant Daniel L. Sparks was Chief Executive Officer, Vice President and a Director of GS Mortgage Securities, while also heading Goldman's mortgage department.  Such overlapping control made The Goldman Sachs Group, Inc. a controlling person of Defendant GS Mortgage Securities Corp. for purposes of Section 31-5606.05(c).

311.    Defendant Goldman Sachs Real Estate Funding Corp. is a wholly owned subsidiary of Goldman Sachs Bank USA and is the general partner of Goldman Sachs Mortgage Company, the sponsor of the Securitizations.  The parent company of Goldman Sachs Real Estate Funding Corp.—Goldman Sachs Bank USA—is itself a subsidiary of The Goldman Sachs Group, Inc.  Goldman Sachs Real Estate Funding Corp. provided a further vehicle for the ultimate controlling entity—The Goldman Sachs Group, Inc.—to further direct the activities of the sponsor of the Securitizations, Goldman Sachs Mortgage Company.  Defendant Goldman Sachs Real Estate Funding Corp., as the general partner of Goldman Sachs Mortgage Company, controlled Goldman Sachs Mortgage Company and was able to, and did in fact, control the contents of the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

120

312.     Goldman Sachs Mortgage Company, The Goldman Sachs Group, Inc., Goldman Sachs Real Estate Funding Corp., and the Individual Defendants are controlling persons within the meaning of Section 31-5606.05(c) of the District of Columbia Code by virtue of their actual power over, control of, ownership of, and/or directorship of GS Mortgage Securities Corp. and Goldman, Sachs & Co. at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

313.     Fannie Mae purchased the GSE Certificates, which were issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements, and specifically to Fannie Mae.

314.     Fannie Mae did not know, and in the exercise of reasonable diligence could not have known, of the misstatements and omissions in the Registration Statements; had Fannie Mae known of those misstatements and omissions, it would not have purchased the GSE Certificates.

315.     Fannie Mae has sustained substantial damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation, and for which Goldman Sachs Mortgage Company, The Goldman Sachs Group, Inc., Goldman Sachs Real Estate Funding Corp., and the Individual Defendants are jointly and severally liable.

316.     The time period from June 5, 2009 through August 30, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and The Goldman Sachs Group, Inc. (on its own behalf and on behalf of its affiliated entities). The time period from July 15, 2011 through August 30, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing

Finance Agency, Fannie Mae, Freddie Mac, and The Goldman Sachs Group, Inc. (on its own

behalf and on behalf of its affiliated entities).  This action is brought within three years of the

date that FHFA was appointed as Conservator of Fannie Mae, and is thus timely under 12 U.S.C.

§ 4617(b)(12).

## EIGHTH CAUSE OF ACTION

### Common Law Negligent Misrepresentation
### (Against GS Mortgage Securities Corp. and Goldman, Sachs & Co.)

317.    Plaintiff realleges each allegation above as if fully set forth herein, except to the

extent that Plaintiff expressly excludes from this cause of action any allegation that could be

construed as alleging fraudulent or intentional or reckless conduct.  This cause of action

specifically excludes the allegations as to Defendants' scienter, including those set forth in

Section V.

318.    This is a claim for common law negligent misrepresentation against Defendants

GS Mortgage Securities Corp. and Goldman, Sachs & Co.

319.    Between September 7, 2005 and October 29, 2007, GS Mortgage Securities Corp.

and Goldman, Sachs & Co. sold the GSE Certificates to the GSEs as described above.  Because

GS Mortgage Securities Corp. owned and then conveyed the underlying mortgage loans that

collateralized the Securitizations for which it served as depositor, GS Mortgage Securities Corp.

had unique, exclusive, and special knowledge about the mortgage loans in the Securitizations

through its possession of the loan files and other documentation.

320.    Likewise, because Goldman, Sachs & Co. acted as underwriter for the

Securitizations it underwrote, under the Securities Act it was obligated—and had the

opportunity—to perform sufficient due diligence to ensure that the Registration Statements,

including without limitation the relevant Prospectus Supplements, for which it served as

122

underwriter did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  As a result of this privileged position as underwriter—which gave it access to loan file information and obligated it to perform adequate due diligence to ensure the accuracy of the Registration Statements—Goldman, Sachs & Co. had unique, exclusive, and special knowledge about the underlying mortgage loans in the Securitizations.

321.    Goldman, Sachs & Co. also had unique, exclusive, and special knowledge of the work of third-party due diligence providers, such as Clayton, who identified significant failures of originators to adhere to the underwriting standards represented in the Registration Statements. The GSEs, like other investors, had no access to borrower loan files prior to the closing of the Securitizations and their purchase of the Certificates.  Accordingly, when determining whether to purchase the GSE Certificates, the GSEs could not evaluate the underwriting quality or the servicing practices of the mortgage loans in the Securitizations on a loan-by-loan basis.  The GSEs therefore reasonably relied on Goldman, Sachs & Co.'s knowledge and its express representations made prior to the closing of the Securitizations regarding the underlying mortgage loans.

322.    GS Mortgage Securities Corp. and Goldman, Sachs & Co. were aware that the GSEs reasonably relied on GS Mortgage Securities Corp.'s and Goldman, Sachs & Co.'s reputations and unique, exclusive, and special expertise and experience, as well as their express representations made prior to the closing of the Securitizations, and depended upon these Defendants for complete, accurate, and timely information.  The standards under which the underlying mortgage loans were actually originated were known to these Defendants and were not known, and could not be determined, by the GSEs prior to the closing of the Securitizations.

In purchasing the GSE Certificates from GS Mortgage Securities Corp. and Goldman, Sachs & Co., the GSEs relied on their special relationship with those Defendants, and the purchases were made, in part, in reliance on that special relationship.

323.    Based upon their unique, exclusive, and special knowledge and expertise about the loans held by the trusts in the Securitizations, GS Mortgage Securities Corp. and Goldman, Sachs & Co. had a duty to provide the GSEs complete, accurate, and timely information regarding the mortgage loans and the Securitizations.  GS Mortgage Securities Corp. and Goldman, Sachs & Co. negligently breached their duty to provide such information to the GSEs by instead making to the GSEs untrue statements of material facts in the Securitizations, or otherwise misrepresenting to the GSEs material facts about the Securitizations.  The misrepresentations are set forth in Section IV above, and include misrepresentations as to the accuracy of the represented credit ratings, compliance with underwriting guidelines for the mortgage loans, and the accuracy of the owner-occupancy statistics and the loan-to-value ratios applicable to the Securitizations, as disclosed in the term sheets and Prospectus Supplements.

324.    In addition, having made actual representations about the underlying collateral in the Securitizations and the facts bearing on the riskiness of the Certificates, GS Mortgage Securities Corp. and Goldman, Sachs & Co. had a duty to correct misimpressions left by their statements, including with respect to any "half truths."  The GSEs were entitled to rely upon GS Mortgage Securities Corp. and Goldman, Sachs & Co.'s' representations about the Securitizations, and these Defendants failed to correct in a timely manner any of their misstatements or half truths, including misrepresentations as to compliance with underwriting guidelines for the mortgage loans.

325.     The GSEs reasonably relied on the information GS Mortgage Securities Corp. and Goldman, Sachs & Co. did provide, and GS Mortgage Securities Corp. and Goldman, Sachs & Co. knew that the GSEs were acting in reliance on such information.

326.     The GSEs were damaged in an amount to be determined at trial as a direct, proximate, and foreseeable result of GS Mortgage Securities Corp.'s and Goldman, Sachs & Co.'s misrepresentations, including any half truths.

327.     The time period from June 5, 2009 through August 30, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and The Goldman Sachs Group, Inc. (on its own behalf and on behalf of its affiliated entities). The time period from July 15, 2011 through August 30, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and The Goldman Sachs Group, Inc. (on its own behalf and on behalf of its affiliated entities).  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## NINTH CAUSE OF ACTION

### Common Law Fraud
**(Against Goldman Sachs Mortgage Company,
GS Mortgage Securities Corp. and Goldman, Sachs & Co.)**

328.     Plaintiff realleges each allegation in paragraphs 1 through 202 above as if fully set forth herein.

329.     This is a claim for common law fraud against Defendants Goldman Sachs Mortgage Company, GS Mortgage Securities Corp. and Goldman, Sachs & Co. with respect to the Securitizations Goldman Sachs Mortgage Company sponsored.

330.    The material representations set forth above were fraudulent, and Goldman, Sachs & Co.'s representations to the GSEs in the term sheets and Prospectus Supplements falsely and misleadingly misrepresented and omitted material statements of fact.  The misrepresentations are set forth in Section IV above, and include misrepresentations as to the accuracy of the represented credit ratings, compliance with underwriting guidelines for the mortgage loans, and the accuracy of the owner-occupancy statistics and the loan-to-value ratios applicable to the Securitizations, as disclosed in the term sheets and Prospectus Supplements.  The representations on which the GSEs relied were directly communicated to them by Goldman, Sachs & Co. Goldman, Sachs & Co. knew, or was reckless in not knowing, that its representations and omissions were false and/or misleading at the time they were made.  Goldman, Sachs & Co. made the misleading statements for the purpose of inducing the GSEs to purchase the GSE Certificates.

331.    The basis for the false representations in the term sheets and Prospectus Supplements that Goldman, Sachs & Co. made to the GSEs was information that Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. provided to Goldman, Sachs & Co. as to the strength of the collateral underlying the GSE Certificates and the structure of the Securitizations.  Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. communicated this information to Goldman, Sachs & Co. with the knowledge and intent that Goldman, Sachs & Co. would communicate this information to purchasers of the GSE Certificates.  Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. each had reason to expect that the GSEs were among the class of persons who would receive and rely on such representations.

332.    Each of Goldman Sachs Mortgage Company, GS Mortgage Securities Corp. and Goldman, Sachs & Co. intended that the above misleading statements were to be made for the purpose of inducing the GSEs to purchase the GSE Certificates.  Goldman Sachs Mortgage Company made misleading statements with reason to expect that Fannie Mae and Freddie Mac would be among the class of persons who would receive and rely upon the statements.

333.    The GSEs justifiably relied on Goldman Sachs Mortgage Company, GS Mortgage Securities Corp. and Goldman, Sachs & Co.'s false representations and misleading omissions.

334.    Had the GSEs known the true facts regarding Goldman's underwriting practices and the quality of the mortgage loans collateralizing the GSE Certificates, they would not have purchased the GSE Certificates.

335.    As a result of the foregoing, the GSEs have suffered damages according to proof. In the alternative, Plaintiff hereby demands rescission and makes any necessary tender of the GSE Certificates.

336.    Goldman Sachs Mortgage Company, GS Mortgage Securities Corp. and Goldman, Sachs & Co.'s misconduct was intentional and wanton.  The immediate victims of Goldman Sachs Mortgage Company, GS Mortgage Securities Corp. and Goldman, Sachs & Co.'s fraud was Fannie Mae and Freddie Mac, two Government-sponsored entities whose primary mission is assuring affordable housing to millions of Americans.  Further, the public nature of Goldman Sachs Mortgage Company, GS Mortgage Securities Corp. and Goldman, Sachs & Co.'s harm is apparent in—and conclusively demonstrated by—the congressional hearings and federal enforcement actions that have been pursued against Goldman as a direct result of the fraudulent conduct at issue in this Complaint.  *See, e.g.*, the Senate PSI Report at 376–636; the FCIC Report, *passim*; *Goldman Sachs to Pay Record $550 Million to Settle SEC*

*Charges Related to Subprime Mortgage CDO*, SEC Litig. Release No. 21592 (July 15, 2010).

Punitive damages are therefore warranted for Goldman Sachs Mortgage Company, GS Mortgage

Securities Corp. and Goldman, Sachs & Co.'s actions in order to punish them, deter them from

future misconduct, and protect the public.

337.    The time period from June 5, 2009 through August 30, 2011 has been tolled for

statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae

and The Goldman Sachs Group, Inc. (on its own behalf and on behalf of its affiliated entities).

The time period from July 15, 2011 through August 30, 2011 has been tolled for statute of

limitations purposes by virtue of a tolling agreement entered into among the Federal Housing

Finance Agency, Fannie Mae, Freddie Mac, and The Goldman Sachs Group, Inc. (on its own

behalf and on behalf of its affiliated entities).  This action is brought within three years of the

date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus

timely under 12 U.S.C. § 4617(b)(12).

## TENTH CAUSE OF ACTION

### Aiding and Abetting Fraud
### (Against Goldman Sachs Mortgage Company and GS Mortgage Securities Corp.)

338.    Plaintiff realleges each allegation in paragraphs 1 through 202 above as if fully set

forth herein.

339.    This is a claim for aiding and abetting fraud against Defendants Goldman Sachs

Mortgage Company and GS Mortgage Securities Corp. with respect to the Securitizations

Goldman Sachs Mortgage Company sponsored.

340.    Goldman Sachs Mortgage Company, as sponsor for 36 of the Securitizations,

substantially assisted Goldman, Sachs & Co.'s fraud by choosing which mortgage loans would

be included in those Securitizations.  It also extended warehouse lines of credit to mortgage

originators that it *knew* had shoddy standards with the intent of later purchasing and securitizing those loans to purchasers, such as the GSEs.  Goldman Sachs Mortgage Company's action in assisting in the origination of, and then purchasing, poorly underwritten loans was an integral part of the Securitizations.

341.    Likewise, GS Mortgage Securities Corp., as depositor for 35 of the Securitizations, substantially assisted Goldman, Sachs & Co.'s fraud by issuing the Registration Statements that were used to offer publicly the Certificates.  As the issuer of the Certificates, GS Mortgage Securities Corp. was an integral part of Goldman, Sachs & Co.'s sale of the Certificates to the GSEs.

342.    As described above, Goldman, Sachs & Co. made fraudulent and untrue statements of material fact and omitted to state material facts regarding the true credit quality of the GSE Certificates, the true rate of owner occupancy, the true LTV ratio of the underlying mortgage loans, and compliance by the originators with applicable underwriting guidelines.

343.    Each of Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. had unique access to the loan files, and therefore was aware of the extreme weakness of the loans.  In fact, Goldman Sachs during the same period it was selling the GSE Certificates to the GSEs was also *shorting* those same Certificates and engaging in put back requests with originators and other parties based upon the weakness of the underlying loans.  Accordingly, Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. were aware that the representations and omissions of Goldman, Sachs & Co. were fraudulent.

344.    The central role of Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. in Goldman, Sachs & Co.'s vertically integrated sales strategy substantially assisted Goldman, Sachs & Co. in its fraud.  Goldman Sachs Mortgage Company, as the

purchaser of the underlying mortgage loans, worked closely with GS Mortgage Securities Corp., as the vehicle for securitizing the mortgage loans, which in turn worked closely with Goldman, Sachs & Co., as the distribution arm for the Certificates that were collateralized by those mortgage loans and then sold to the GSEs. Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. worked hand-in-glove to provide Goldman, Sachs & Co. with Certificates that it could fraudulently sell to the GSEs.

345.    Goldman Sachs Mortgage Company and GS Mortgage Securities Corp.'s substantial assistance in Goldman, Sachs & Co.'s fraud played a significant and material role in inducing the GSEs to purchase the GSE Certificates. As a direct, proximate and foreseeable result of Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. aiding and abetting Goldman, Sachs & Co. in its fraud against the GSEs, the GSEs have been damaged in an amount to be determined at trial.

346.    Because Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. aided and abetted Goldman, Sachs & Co.'s fraud willfully and wantonly, and because, by their acts, Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. knowingly affected the general public, including but not limited to all persons with interests in the Certificates, Plaintiff is entitled to recover punitive damages.

347.    The time period from June 5, 2009 through August 30, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae and The Goldman Sachs Group, Inc. (on its own behalf and on behalf of its affiliated entities). The time period from July 15, 2011 through August 30, 2011 has been tolled for statute of limitations purposes by virtue of a tolling agreement entered into among the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and The Goldman Sachs Group, Inc. (on its own

behalf and on behalf of its affiliated entities).  This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

348.    An award in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including:

a.    Rescission and recovery of the consideration paid for the GSE Certificates, with interest thereon;

b.    Each GSE's monetary losses, including any diminution in value of the GSE Certificates, as well as lost principal and lost interest payments thereon;

c.    Punitive damages;

d.    Attorneys' fees and costs;

e.    Prejudgment interest at the maximum legal rate; and

f.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

349.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues triable by jury.

DATED:    New York, New York
          September 2, 2011

                            QUINN EMANUEL URQUHART &
                            SULLIVAN, LLP

                    By: _____
                            Philippe Z. Selendy
                            Adam Abensohn


                            51 Madison Avenue, 22nd Floor
                            New York, New York  10010-1601
                            (212) 849-7000

                            *Attorneys for Plaintiff Federal Housing*
                                *Finance Agency*

132