LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

EDWARD J. BENNETT
(202) 434-5083
ebennett@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

The Honorable Denise L. Cote
United States District Judge
United States Courthouse
500 Pearl Street, Room 1610
New York, New York 10007-1312

August 14, 2012

Per DLC Chambers, docket in:
| | |
|---|---|
| 11-cv-5201 | 11-cv-6188 |
| 11-cv-6189 | 11-cv-6190 |
| 11-cv-6192 | 11-cv-6193 |
| 11-cv-6195 | 11-cv-6196 |
| 11-cv-6198 | 11-cv-6200 |
| 11-cv-6201 | 11-cv-6202 |
| 11-cv-6203 | 11-cv-6739 |
| 11-cv-7010 | 11-cv-7048 |

Re:   *FHFA v. Merrill Lynch & Co., Inc., et al.*, No. 11 CIV 6202

Dear Judge Cote:

We write on behalf of the Merrill Lynch corporate defendants in the above-captioned case to request a conference at which Merrill Lynch will seek leave to file a motion for reconsideration of the Court's July 31, 2012 ruling excluding from discovery documents held on the "whole loan" side of the GSEs' businesses that evidence the GSEs' familiarity with the lending practices of originators at issue in the cases ("Originators") and Originators' adherence (or not) to their underwriting guidelines.  Tr. of July 31, 2012 hrng. at 102.[1]  A proposed Memorandum of Law is attached.

FHFA has put the GSEs' knowledge and sophistication at issue by alleging fraud claims, *inter alia,* against Merrill Lynch.  FHFA's fraud and DC Blue Sky claims require it to prove that the GSEs justifiably relied on defendants' alleged misstatements, and defendants' statute of limitations defenses turn on what the GSEs knew, and when.[2]  Documents found solely within the GSEs' whole loan businesses are directly relevant to these claims and defenses.[3]

FHFA's burden of proving justifiable reliance depends on, among other things, evidence regarding the GSEs' institutional knowledge and institutional resources.  FHFA must prove, for example, that the GSEs, as sophisticated parties, "used the means of verification available to [them]" before relying on the alleged misstatements.  *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185 (2012) ("'[a]s a matter of law, a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it'") (quoting *Venture*

---

[1] The Merrill Lynch corporate defendants submit this letter out of an abundance of caution, in the event that the Court's statements at page 102:8–11 of the transcript of the of the July 31, 2012 conference were intended to be a final order regarding the scope of document discovery.  If they were not so intended, the attached motion is not ripe and is respectfully withdrawn.

[2] FHFA claims that the GSEs were unaware of the Originators' "systematic disregard" of their underwriting guidelines, Tr. at 16, despite extensive interactions with the Originators.  *See, e.g.*, Tr. at 73–75.

[3] *See* Fed. R. Evid. 401; Fed. R. Civ. P. 26(b)(1).  Plaintiff has not established the documents would be unduly burdensome to produce.  Plaintiff is seeking tens of billions of dollars in damages in this case (plus punitive damages).  Its preliminary estimate is that it will produce "upwards of 1.7 million documents," but aside from that number, it makes no claims about expense or burden.  Under the balancing test in Rule 26(b)(2)(C)(iii), the value of FHFA's claims and the importance of this evidence easily tip the scales in favor of production.

*Group, LLC v. Finnerty*, 68 A.D.3d 638, 639 (2009)); *Tanzman v. La Pietra*, 8 A.D.3d 706, 707 (2004); *see also Davidson Pipe Co.* v. *Laventhol & Horwath*, 120 F.R.D. 455, 460 (S.D.N.Y. 1988) (allowing discovery into a plaintiff's transaction history because evidence related to the "degree of sophistication of a plaintiff in a securities case is both admissible at trial . . . and an apt subject for discovery . . . ."). Discovery of the GSEs' familiarity with Originators' practices—even where such documents reside only on the whole loan side of the businesses— therefore will be important evidence of both the GSEs' sophistication with respect to these transactions and the "means of verification" that were available to them at the time they entered into the transactions, as well as direct and circumstantial evidence of their actual knowledge.

As a matter of law, the GSEs are charged with every relevant fact known to their employees within the scope of their employment by the GSEs. *N.J. Carpenters Health Fund* v. *RALI Series 2006-QO1 Trust*, 2012 WL 1481519, at *2 (2d Cir. Apr. 30, 2012) (summary order). The information possessed by all of the GSEs' employees is imputed to the GSEs unless the employees are "subject to a duty to another not to disclose the fact[s] to the [GSE]." RESTATEMENT (THIRD) OF AGENCY § 5.03 (2006); *see also id.* § 5.03 illus. 9 (where employee in a bank's credit department learns of a restrictive covenant applicable to a borrower but "does not communicate" that information to the lending department, which makes a loan to the borrower in violation of the covenant, "knowledge [of the covenant] will be imputed" to the bank); *George* v. *Equifax Mortg. Servs.*, 375 F. App'x 76, 78 (2d Cir. 2010) (information acquired by employee and imputed to corporation is imputed "*to all of its departments*").[4]

The law compels the discovery the Merrill Lynch corporate defendants seek. But even under the too-narrow reading of relevance urged by FHFA,[5] excluding from discovery the Originator evidence held within the whole loan business prejudices defendants' right to a fair trial. Evidence of what was known within the whole loan business, combined with the GSEs' information-sharing policies, would provide at least circumstantial proof that information about Originators was communicated to the PLS side (direct evidence of actual communication of the relevant facts to PLS may be proven by testimony, but such direct evidence would be available only if the documents were first provided to defendants in discovery). Moreover, given the passage of time, document retention issues, and employee turnover within the GSEs, allowing discovery to reach the whole loan business is the best way to ensure that defendants are able to discover relevant information regarding the Originators that was communicated to PLS personnel. Barring discovery of the whole loan business limits defendants to relying on the fortuity that a PLS-side employee preserved the relevant documents, and even then defendants might be privy to only fragments of each relevant communication.

---

[4] The Restatement also cautions against the perverse incentive for willful blindness that would ensue from the rule FHFA advocates: "Imputation thus reduces the risk that a principal may deploy agents as a shield against the legal consequences of facts the principal would prefer not to know." REST. 3D AGENCY, Comment b.

[5] "[D]efendants are going to get the documents that were considered in connection with the PLS purchases, the purchases at issue in this litigation. Those will be the documents in the possession of the [PLS] traders but it will also be the documents that people who were required to give those traders information had in their possession. And so if a [PLS] supervisor of the traders had in his possession a document which showed hypothetically that Option One was not an approved originator, that document will also be produced." Tr. at 88.

Very respectfully submitted,

/s/ Edward J. Bennett

Edward J. Bennett

Encl.: Proposed Memorandum of Law

cc: Counsel of Record

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

              Plaintiff,

       – v –

MERRILL LYNCH & CO., INC.; MERRILL
LYNCH, PIERCE, FENNER & SMITH INC.;
MERRILL LYNCH MORTGAGE LENDING,
INC.; MERRILL LYNCH MORTGAGE
CAPITAL INC.; FIRST FRANKLIN
FINANCIAL CORP.; MERRILL LYNCH
MORTGAGE INVESTORS, INC.; MERRILL
LYNCH GOVERNMENT SECURITIES,
INC.; MATTHEW WHALEN; BRIAN T.
SULLIVAN; MICHAEL M. MCGOVERN;
DONALD J. PUGLISI; PAUL PARK.; and
DONALD C. HAN,

              Defendants.

**Case No. 11-cv-6202 (DLC)**

ECF Case

**Electronically Filed**

<u>**Oral Argument Requested**</u>

---

**[PROPOSED] MEMORANDUM OF LAW IN SUPPORT OF THE MERRILL**
**LYNCH CORPORATE DEFENDANTS' MOTION FOR RECONSIDERATION**
**OF THE JULY 31, 2012 ORDER REGARDING DISCOVERY OF DOCUMENTS**
**WITHIN THE GSEs' WHOLE LOAN UNITS EVIDENCING THE GSEs'**
<u>**RELATIONSHIPS WITH ORIGINATORS**</u>

# TABLE OF CONTENTS

Contents .................................................................................................................. i

Table of Authorities ................................................................................................ ii

Background ............................................................................................................2

Standard of Review...............................................................................................6

Argument ..............................................................................................................6

I.      The Discovery Sought Is Critical to Establishing or Disproving Plaintiff's Claims ...........6

II.     Plaintiff Bears the Burden of Proving the GSEs Justifiably Relied on the Alleged
        Misrepresentations ...........................................................................................7

        A.      Discovery Is Appropriate Concerning the GSEs' Sophistication ...........................8

        B.      Discovery Is Appropriate Concerning the "Means of Verification"
                Available to the GSEs...........................................................................11

        C.      The GSEs' Whole Loan Employees' Awareness of Originator Practices Is
                Imputed to the GSEs ............................................................................12

III.    Whole Loan Documents Evidence What the PLS Business Knew and Considered
        (or Should Have)................................................................................................14

IV.     The Known Challenges Present in FHFA's Discovery Favor Broader Discovery
        of Whole Loan Custodians....................................................................................16

Conclusion ............................................................................................................17

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abu–Nassar v. Elders Futures Inc.*, 1991 WL 45062 (S.D.N.Y. Mar. 28, 1991)........................11

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*, 2006 WL 1206333 (S.D.N.Y. May 2, 2006)................................................................................................................................12

*AIU Ins. Co. v. TIG Ins. Co.*, 2008 WL 5062030 (S.D.N.Y. Nov. 25, 2008)..............................11

*Anwar v. Fairfield Greenwich Ltd.*, 745 F. Supp. 2d 379 (S.D.N.Y. 2010) ...................................6

*Davidson Pipe Co. v. Laventhol & Horwath*, 120 F.R.D. 455 (S.D.N.Y. 1988)............................8

*Degulis v. LXR Biotechnology, Inc.*, 176 F.R.D. 123 (S.D.N.Y. 1997).........................................9

*Families for Freedom v. U.S. Customs & Border Protection*, 2011 U.S. Dist. LEXIS 113143 (S.D.N.Y. Sept. 30, 2011).......................................................................................6

*In Re The AES Corp. Sec. Litig.*, 849 F. Supp 907 (S.D.N.Y. 1994)..............................................8

*In re Harcourt Brace Jovanovich, Inc. Sec. Litig.*, 838 F. Supp. 109 (S.D.N.Y. 1993)................9

*Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*, 574 F.3d 129 (2d Cir. 2009) .....................15

*Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616 (S.D.N.Y. 2011).......................................................................................................................7

*SEC v. Mudd et al.*, Case No. 11-Civ-9202 (S.D.N.Y. Mar. 30, 2012)..................................9, 10

*SEC v. Scott*, 565 F. Supp. 1513 (S.D.N.Y. 1983).......................................................................15

*Whitback v. Vital Signs, Inc.*, 163 F.R.D. 398 (D.D.C. 1995) ......................................................15

## STATE CASES

*Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553 (2009) .....................................7

*HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185 (2012)............................................................7, 11

*Price v. Griffin*, 359 A.2d 582 (D.C. 1976) ...................................................................................7

*Stuart Silver Assoc. v. Baco Dev. Corp.*, 245 A.D.2d 96 (1st Dep't 1997) ....................................7

*Tanzman v. La Pietra*, 8 A.D.3d 706 (3d Dep't 2004) ....................................................................7

*Venture Group, LLC v. Finnerty*, 68 A.D.3d 638 (1st Dep't 2009)................................................7

This case arises from the purchase of $24 billion in residential mortgage-backed securities ("RMBS") by the world's two most prolific and sophisticated RMBS investors, Fannie Mae and Freddie Mac (collectively, the "GSEs"). Plaintiff FHFA alleges, *inter alia*, that defendant Merrill Lynch defrauded the GSEs into purchasing RMBS without disclosing the underwriting practices by which the supporting mortgage loans were originated by third-party lenders (the "Originators"). By this Motion, the Merrill Lynch corporate defendants (hereinafter, "defendants" or "Merrill Lynch defendants") respectfully ask the Court to reconsider its ruling denying discovery of the true extent of the GSEs' awareness of the loan origination practices about which they claim to have been misled.[1]

At the July 31, 2012 status conference, FHFA promised to produce to defendants all documents considered by or relevant to the GSEs' evaluation or purchase of the securities at issue in this case (the "Securities"), *but only to the extent* that such documents are in the files of those specific GSE personnel who (according to FHFA alone) had a role in purchasing the Securities—that is, personnel who worked in or reported to the GSEs' private label securities ("PLS") groups.[2] FHFA refused to search for, let alone produce, documents relating to the Securities or the Originators in the files of employees who (again, according to FHFA alone) were employed only within the GSEs' business units that purchased *whole loans* from the

---

[1] The Merrill Lynch corporate defendants bring this Motion on their own behalf, and not on behalf of any other defendants.

[2] "[D]efendants are going to get the documents that were considered in connection with the PLS purchases, the purchases at issue in this litigation. Those will be the documents in the possession of the [PLS] traders but it will also be the documents that people who were required to give those traders information had in their possession. And so if a [PLS] supervisor of the traders had in his possession a document which showed hypothetically that Option One was not an approved originator, that document will also be produced." Tr. at 88. FHFA also promised to produce the minutes and other documents of Fannie Mae's Private Label Advisory Team and Freddie Mac's equivalent. *See, e.g.,* Tr. at 87.

Originators. Defendants requested production of such documents; the Court ruled that it would not order FHFA to produce them. Tr. at 102. Merrill Lynch respectfully submits that that ruling should be withdrawn, and that discovery for the GSEs' whole loan businesses regarding the Originators' practices should be allowed.

## Background

During the time period relevant to this matter, the GSEs were intimately familiar with the Originators' underwriting practices. Among other things, the GSEs audited the Originators; they visited the Originators' facilities for days at a time; they reviewed the Originators' underwriting policies; they observed, evaluated, and tested the Originators' applications of their underwriting policies; they learned of errors in the Originators' processes and discussed remediation efforts; they reviewed and approved automated underwriting programs used by the Originators; and they kept "scorecards" that rated the Originators based on various factors, including the level of credit risk associated with each Originator. The GSEs also issued more than 5,000 of their own RMBS consisting entirely of loans originated by a single Originator.

By no means was the GSEs' information about the Originators limited to its employees who worked on the PLS side of the business, nor could it have been: the GSEs purchased not only hundreds of billions of dollars in securities that included loans from the Originators, but *trillions* of dollars of whole loans that came out of the Originators.

The GSEs' audits of Originators are described in the Declaration of Cindy Simantel, which was submitted to the Court in connection with the July 31, 2012 hearing.[3] Ms. Simantel was an Executive Vice President in Countrywide's Quality Control and Investor Audit Departments during the relevant period. She attested that the GSEs' annual audits

---

[3] Ms. Simantel's Declaration ("Decl.") and other documents cited in this Motion were provided to the Court and FHFA prior to or at the July 31, 2012 hearing.

looked at all of Countrywide's processes, including origination and underwriting, quality control, secondary marketing, and capital markets. . . . As part of these audits the GSEs would review and re-underwrite a sample of loan files. . . . The sample of loans the GSEs audited included performing and defaulted loans. Numerous Fannie Mae and Freddie Mac employees made regular on-site visits to Countrywide as part of these audits.

Simantel Decl. ¶ 2. Ms. Simantel further stated that she "met regularly with representatives from Fannie Mae and Freddie Mac sometimes as frequently as weekly, to discuss repurchase demands," and that during these meetings she

regularly discussed with the GSEs' representatives a range of issues regarding Countrywide's origination practices, including changes being made to Countrywide's underwriting guidelines, the increased origination of reduced documentation loans, the process for determining income reasonability and the risks associated with origination of stated income loans where the income was not verified and the borrower's statement was relied upon solely to determine loan eligibility from an income standpoint, the underwriting exception process and Countrywide's approval of loans that were exceptions to the guidelines, including loans which allowed for underwriters to make the exceptions and loans which were referred to the Exception Approval Department.

*Id.* ¶ 3.

Ms. Simantel also discussed with Fannie Mae "loans where [Fannie Mae] confirmed the borrower did not occupy the subject property after origination and agreed to review the loans in accordance with prudent underwriting, whereby an underwriter would not be expected to verify occupancy after the fact but rather were there any red flags that should have alerted the underwriter to question the borrower's occupancy at the time of loan origination." *Id.* She testified that one Fannie Mae employee "most familiar with Countrywide's origination practices during the 2004 to or through 2007 period was Mike Sobczak," *id.*, an employee in Fannie Mae's whole loan business whom FHFA refuses to add as a custodian. Ms. Simantel further testified that she "frequently spoke with Mr. Sobczak about Countrywide's practices regarding loans that were sold to the GSEs both as whole loans and as part of private label securities." *Id.*

Ms. Simantel described how the GSEs' PLS and whole loan personnel *together* audited

the Originators:

> Although the annual audits conducted by the GSEs were typically in connection with their purchase of whole loans from Countrywide, I can recall at least one instance where Fannie Mae sought to audit Countrywide's loan origination and underwriting processes specifically in connection with purchase of private label securities. I viewed this audit as related to the annual audit, and I tried to coordinate them, as reflected in the attached email chain. Fannie Mae had requested to conduct a Private Label Issuer audit within a week of the planned annual audit. In my e-mail dated October 11, 2005 at 6:28 p.m., I wrote to Fannie Mae to ask if these two reviews were tied together. Fannie Mae responded that the reviews were related and should be tied together.

*Id.* ¶ 4.

The GSEs' public statements confirm Ms. Simantel's statements. The GSEs touted to

investors their close supervision and analysis of the Originators and their peers:

- "We conduct periodic operational reviews of our single-family mortgage seller/servicers to help us better understand their control environment and its impact on the quality of loans sold to us. We use this information to determine the terms of business we conduct with a particular seller/servicer." (Freddie Mac 2005 Annual Report at 75)

- "We manage institutional credit risk on non-Freddie Mac mortgage-related securities by only purchasing securities that meet our investment guidelines and performing ongoing analysis to evaluate the creditworthiness of the issuers and servicers of these securities and the bond insurers that guarantee them. To assess the creditworthiness of these entities, we may perform additional analysis, including on-site visits, verification of loan documentation, review of underwriting or servicing processes and similar due diligence measures." (Freddie Mac 2005 Annual Report at 76)

The GSEs also described to investors the close coordination between the PLS and whole loan

businesses, corroborating Ms. Simantel's observation:

- *"[A]lthough the Single−Family and [Housing & Community Development] businesses principally manage the relationships with our lender customers, our Capital Markets group works closely with Single−Family and HCD in making mortgage acquisition decisions.*" (Fannie Mae Form 10-K for December 31, 2005, filed May 2, 2007, p. 6) (emphasis added)

- "We operate an integrated business that contributes to providing liquidity to the mortgage market and increasing the availability and affordability of housing in the United States. We are organized in three complementary business segments." (Fannie Mae Form 10-K for December 31, 2005, filed May 2, 2007, p. 5)

- "We made significant organizational changes in 2005 and 2006 to enhance our risk governance structure and strengthen our internal controls due to identified material weaknesses. During 2005, we adopted an enhanced corporate risk framework to address weaknesses in our risk governance structure. This new framework is intended to ensure that people and processes are organized in a way that promotes a cross−functional approach to risk management and controls are in place to better manage our risks. Basic tenets of our corporate risk framework include establishing corporate−wide policies for risk management, delegating to business units primary responsibility for the management of the day−to−day risks inherent in the activities of the business unit, and monitoring aggregate risks and compliance with risk policies at a corporate level." (Fannie Mae Form 10-K for December 31, 2005, filed May 2, 2007, p. 109)

- "We purchase mortgage loans and mortgage-related securities and hold them in our Retained portfolio for investment purposes. We invest in mortgage-related securities issued by GSEs or government agencies, referred to as agency securities. We also invest in non-agency mortgage-related securities. Our portfolio purchases replenish the capital available for mortgage lending. We face competition from other Financial institutions that are aggressively buying mortgage-related securities backed by both GSE and non-agency issuers." (Freddie Mac 2005 Annual Report at 4)

- "We participate in the subprime market segment primarily in two ways. First, our Retained portfolio makes investments in non-Freddie Mac mortgage-related securities that were originated in this market segment. . . . In addition to the non-Freddie Mac mortgage-related securities discussed above, we make investments through our Retained portfolio in some of the Structured Securities we issue with underlying collateral that is subprime." (Freddie Mac 2005 Annual Report at 66)

Despite these pervasive, intimate, long-running, and well-documented interactions, FHFA now claims as a fundamental premise of its lawsuit that the GSEs were unaware of the procedures the Originators used to underwrite the loans at issue in this case, alleging:

> The Registration Statements contained statements about . . . *the origination and underwriting practices used to make and approve the loans*. . . . *Unbeknownst to Fannie Mae and Freddie Mac,* these statements were materially false, as significant percentages of the underlying mortgage loans were not originated in accordance with the represented underwriting standards and origination practices . . . .

First Am. Compl. ("FAC") ¶ 5 (emphasis added); *see also* FAC ¶ 77 ("there were pervasive and systematic violations of those [underwriting] guidelines with respect to the securitized loans").

The GSEs' awareness of the Originators' practices and procedures is thus a crucial component of this case.

<center>**Standard of Review**</center>

Whether to grant a motion for reconsideration rests within the Court's sound discretion. *Anwar v. Fairfield Greenwich Ltd.*, 745 F. Supp. 2d 379, 382 (S.D.N.Y. 2010). A party seeking reconsideration should not reargue matters already fairly presented to the Court and fully considered. *Id.*[4]

<center>**Argument**</center>

**I.    The Discovery Sought Is Critical to Establishing or Disproving Plaintiff's Claims**

The Merrill Lynch corporate defendants bring this Motion because the discovery sought is critical to determining the true facts underlying the parties' claims and defenses. Plaintiff's claims are based on allegations that, *inter alia*, defendants misled the GSEs regarding the Originators' adherence to their underwriting guidelines when they made the loans that formed the collateral for the Certificates purchased. *See, e.g.,* FAC ¶ 1 ("Defendants falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the ability of the borrowers to repay their mortgage loans."). The GSEs' access to and information about the Originators' practices is central to, among other things, the viability of its fraud claims. Accepting *arguendo* FHFA's allegations, if the GSEs were aware "that the underlying mortgage loans [did not comply] with certain underwriting guidelines and standards," *id.,* FHFA is not entitled to relief. Simply put, the viability of FHFA's case turns on what the GSEs knew and when they knew it. The discovery precluded by the Court's July 31, 2012 order is essential to determining that issue.

---

[4] Defendants respectfully submit that this standard is met. *See Families for Freedom v. U.S. Customs & Border Protection*, No. 10 Civ. 2705 (SAS), 2011 U.S. Dist. LEXIS 113143, at *9–11 (S.D.N.Y. Sept. 30, 2011). The Court denied defendants' request for full briefing of these matters, July 19, 2012 Tr. at 34, directing that defendants submit a joint, two-page letter. At the July 31, 2012 hearing, defendants were not permitted to fully present the factual and legal bases for their request for this discovery. Tr. at 76–77, 102.

## II. Plaintiff Bears the Burden of Proving the GSEs Justifiably Relied on the Alleged Misrepresentations

"Under New York law, fraud requires a showing of '(1) a material misrepresentation of fact, (2) knowledge of its falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages.'" *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 621 (S.D.N.Y. 2011) (quoting *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 979, 12 N.Y.3d 553, 559 (N.Y. 2009)). "'[A]s a matter of law, a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it.'" *HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 66, 95 A.D.3d 185, 194–95 (1st Dep't 2012) (quoting *Venture Grp., LLC v. Finnerty*, 892 N.Y.S.2d 69, 71, 68 A.D.3d 638, 639 (1st Dep't 2009)). "As to the element of reliance, '[w]here a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means, he [or she] cannot claim justifiable reliance on [the] defendant's misrepresentations . . . .'" *Tanzman v. La Pietra*, 778 N.Y.S.2d 199, 8 A.D.3d 706, 707 (3d Dep't 2004) (alterations in original) (quoting *Stuart Silver Assocs. v. Baco Dev. Corp.*, 665 N.Y.S.2d 415, 417, 245 A.D.2d 96, 98–99 (1st Dep't 1997)).

FHFA's D.C. securities claims also require FHFA to prove that the GSEs justifiably relied on the alleged misstatements. Under D.C. law, where, as here, "the complaint alleges certain misstatements . . . some element of reliance must be shown to demonstrate that such statements caused the injury complained of." *Price v. Griffin*, 359 A.2d 582, 588 (D.C. 1976). A plaintiff must show that its reliance was justifiable in light of the circumstances surrounding the transaction, which "take[s] into account the relative business background and knowledge of the parties." *Id.* at 588 & n.11.

With regard to its fraud and D.C. securities claims, whether any reliance was "justifiable" turns on proof of the GSEs' sophistication and of the means available to the GSEs to verify the accuracy of defendants' alleged misrepresentations. Discovery of the GSEs' whole loan businesses is directly relevant to both issues and will produce evidence that the GSEs were highly sophisticated and had extensive means to verify defendants' statements regarding the Originators' underwriting.

### A.   Discovery Is Appropriate Concerning the GSEs' Sophistication

To address the "sophistication" prong of New York's justifiable reliance requirement, courts routinely allow discovery into transactions beyond those at issue in the litigation. For example, in *Davidson Pipe Co. v. Laventhol & Horwath*, 120 F.R.D. 455, 459 (S.D.N.Y. 1988), the plaintiffs brought securities and fraud claims relating to tax shelters in which they participated. The defendants sought discovery concerning other tax shelters in which the plaintiffs had participated. The court observed that evidence related to the "degree of sophistication of a plaintiff in a securities case is both admissible at trial and an apt subject for discovery." *Id.* at 460. The court noted that "the probative value of evidence on prior dealings will depend on their relation to the litigated transactions with respect to such factors as *similarity of subject matter, degree of complexity,* and the extent of reliance on the advice of others in each case. . . . [W]here there is an *adequate nexus* with the investments at issue in the litigation, prior transactions will be pertinent to the question of sophistication." *Id.* (emphases added). The court allowed discovery into the prior tax shelters, noting that "the *transactions need not be identical in order to be pertinent to the plaintiffs' degree of sophistication*." *Id.* at 461 (emphasis added). Similarly, in *In re the AES Corp. Securities Litigation*, 849 F. Supp. 907 (S.D.N.Y. 1994), the Court granted defendant's motion to compel plaintiffs in a securities class action to produce records of prior investment activity, holding that "[b]ecause the discovery of prior investments is

reasonably calculated to lead to evidence concerning plaintiffs' sophistication in the marketplace, such documents are discoverable." *Id.* at 910; *see also Degulis v. LXR Biotechnology, Inc.*, 176 F.R.D. 123, 126 (S.D.N.Y. 1997) ("sophistication as an investor, and the possible impact this would have on his reliance on supposed misrepresentations or omissions by the Defendants, is a properly discoverable subject"); *In re Harcourt Brace Jovanovich, Inc. Sec. Litig.*, 838 F. Supp. 109, 114 (S.D.N.Y. 1993) ("[D]iscovery relating to investment history is proper where direct reliance is alleged.").

Here, the GSEs were the most sophisticated participants in the RMBS market, and the whole loan business was critical to their sophistication. For example, one witness whose testimony and documents would be excluded from discovery by the Court's July 31, 2012 ruling is Thomas Lund, the former head of Fannie Mae's Single Family Guarantee business (i.e., Fannie's whole loan business).[5] According to the Financial Crisis Inquiry Commission, Mr. Lund presented to Fannie management a June 2005 PowerPoint titled, "Facing Strategic Crossroads." FCIC Report at 178.[6] In the PowerPoint, which the Merrill Lynch defendants possess only because it was a public exhibit of the FCIC,[7] Mr. Lund dedicated more than a dozen slides to a detailed analysis of "Private Label [PLS] Trends" and "Risk Appetite," noting for example that

- Growth in PL has been driven by increase in:
  - Subprime
  - Alt-A
  - ARM production

---

[5] Mr. Lund is a defendant in *SEC v. Mudd*, No. 11-Civ-9202 (S.D.N.Y. filed Dec. 16, 2011), pending before Judge Carter.

[6] *Available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf.

[7] *See* Fannie Mae, Single Family Business: Facing Strategic Crossroads (June 27, 2005) (Ex. 1).

- Common themes across these products: housing affordability and ***flexible guidelines***.

Ex. 1, at 24 (emphasis added). Mr. Lund also noted that the "Key Drivers of Growth in Subprime" included "greater flexibility results in borrower ability to qualify for later loan: Appraisal values (*subprime typically exhibits higher appraisal bias*)." *Id.* at 37 (emphasis added). The 2005 PowerPoint is replete with statistics, charts, and analyses regarding some of the very risks about which FHFA now claims the GSEs were ignorant.[8]

The Lund PowerPoint constitutes direct evidence of Fannie's sophistication in the relevant areas. It is but one document from one witness—and defendants have it only because the FCIC made it public. The July 31, 2012 ruling will shield the documents of Mr. Lund and his colleagues from production, however, affording the Merrill Lynch defendants no access to similar documents or the fact-gathering and analyses that underlie them.[9] All of these documents are critical to the issue of Fannie's sophistication.[10]

---

[8] Counsel for Mr. Lund recently stated to the Court that "FNMA [Fannie Mae] management believed that the unique processes by which subprime loans were originated resulted in additional material risk beyond that which could be measured by the credit characteristics disclosed in the detailed tables. . . . For these reasons, in addition to the tables depicting the credit characteristics of all of its loans, FNMA began in 2007 to disclose separately the percentages in its portfolio of those loans it classified as subprime and Alt-A." Defs.' Mem. of Law in Supp. of the Mot. of Defs. to Dismiss Pl.'s Compl., *SEC v. Mudd*, Case No. 11-Civ-9202 (S.D.N.Y. Mar. 30, 2012).

[9] On June 8, 2012, defendants requested that FHFA produce documents underlying Mr. Lund's *Crossroads* PowerPoint. FHFA refused, stating *in toto*: "FHFA objects to Request No. 49 on the ground and to the extent that it seeks documents that are not relevant to the claims or defenses of any party and is not reasonably calculated to lead to the discovery of admissible evidence." FHFA's Objection and Responses to Defendants' Joint Second Set of Requests for Documents (July 9, 2012).

[10] Plaintiff has not argued, let alone established, that producing the documents would be unduly burdensome. Plaintiff is seeking billions of dollars in damages in this case (plus punitive damages). Its preliminary estimate is that it will produce "upwards of 1.7 million documents;" aside from that number, it makes no claims about expense or burden. *AIU Ins. Co. v. TIG Ins. Co.*, No. 07 Civ. 7052 (SHS) (HBP), 2008 WL 5062030, at *9 (S.D.N.Y. Nov. 25, 2008) (party's

Evidence from whole loan employees lower down the GSEs' corporate ladders than Mr. Lund also will be important to the question of the GSEs' sophistication. As Ms. Simantel described, GSE employees such as Michael Sobczak had day-to-day relationships with the Originators. *See* Simantel Decl. ¶ 3 ("I frequently spoke with Mr. Sobczak about Countrywide's practices regarding loans that were sold to the GSEs both as whole loans and as part of private label securities."). The GSEs frequently and extensively examined the Originators, including the practices about which they now claim to have been unaware. Their documents will provide the detail behind the GSEs' ratings of loan originators, including Originators that the GSEs deemed sufficiently untrustworthy to continue to sell loans to the GSEs. Their documents also will show the depth of the GSEs' mortgage experts' awareness of the Originators' practices. *See* Simantel Decl. ¶ 2 ("As part of these audits, the GSEs would review and re-underwrite a sample of loan files. I do not recall any distinction in the sample between whole loans they purchased and loans that were collateral for securities they purchased.").

**B.      Discovery Is Appropriate Concerning the "Means of Verification" Available to the GSEs**

To prevail on its fraud and D.C. securities claims, FHFA also must prove that the GSEs "used . . . the means of verification . . . available to [them]." *HSH Nordbank AG*, 941 N.Y.S.2d at 66, 95 A.D.3d at 195. It is apparent that the GSEs had many "means of verification" available to them regarding documents on the whole loan side, including at least:

---

burden in opposing discovery "'requires an evidentiary showing by competent evidence and cannot be discharged by mere conclusory or *ipse dixit* assertions'" (quoting *Abu–Nassar v. Elders Futures Inc*., No. 88 Civ. 7906 (PKL), 1991 WL 45062, at *15 (S.D.N.Y. Mar. 28, 1991)). Under the balancing test in Rule 26(b)(2)(C)(iii), the value of FHFA's claims and the importance of this evidence easily tip the scales in favor of production. Moreover, plaintiff has produced several million documents to the SEC in the investigations of the GSEs and their management, including presumably the custodial files of the six executives currently being sued by the SEC in the Southern District. There is no colorable claim that it is unduly burdensome to simply re-produce those files.

- GSE audits of Originators' policies and practices;

- GSE site visits to Originators;

- GSE reviews of sampled loan files; and

- GSE reviews of Originators' internal audits and Quality Control reports.

Of course, there could be others means of verification available to the GSEs, and one would expect such means of verification to be described in or evident from documents in the possession of the GSEs' whole loan personnel who had frequent interactions with the Originators. The Merrill Lynch defendants simply will not know—and nor will they know whether the GSEs appropriately employed such means to check the accuracy of the alleged misstatements—unless discovery is allowed to extend into the whole loan businesses.

C.    **The GSEs' Whole Loan Employees' Awareness of Originator Practices Is Imputed to the GSEs**

FHFA argues that the GSEs should not be held accountable for their whole loan employees' awareness of the Originator's practices. *See* FHFA's Letter to the Court of July 30, 2012. In support of this proposition, FHFA relies entirely on one case: *AIG Global Securities Lending Corp. v. Banc of America Securities, LLC*, No. 01 CIV 11448 (JGK) (HBP), 2006 WL 1206333 (S.D.N.Y. May 2, 2006). In *AIG*, Magistrate Judge Pitman relied on the Restatement (Second) of Agency. *Id.* at *1 (noting the lack of other authorities). In the intervening years, however, the Restatement (Second) has been replaced by the Restatement (Third). Under current law, a GSE employee's awareness of a particular fact is imputed to the GSEs unless the employee is "subject to a duty to another not to disclose the fact to the [GSE]." Restatement (Third) of Agency § 5.03(b) (2006). As Comment c to the Restatement explains, "the fact that an organization has structured itself internally into separate departments or divisions" does not defeat imputation. *Id.* § 5.03 cmt. c; *see also id.* § 5.03 illus. 9 (where employee in a bank's

credit department learns of a restrictive covenant applicable to a borrower but "does not communicate" that information to the lending department, which makes a loan to the borrower in violation of the covenant, "knowledge [of the covenant] will be imputed" to the bank); *George* v. *Equifax Mortg. Servs.*, 375 F. App'x 76, 78 (2d Cir. 2010) (information acquired by employee and imputed to corporation is imputed "*to all of its departments*") (emphasis added).[11] This imputation alone warrants discovery of the whole loan businesses.

The need for discovery is all the more acute here, where

- The GSEs' whole loan employees were assigned to monitor the Originators and their practices and report back to the GSEs;

- The GSEs encouraged their whole loan and PLS employees to share information regarding Originators and established structures to facilitate such sharing; and

- The GSEs publicly touted the business and risk management benefits of their "cross-functional approach to risk management."

The evidence available to date[12] is that the GSEs' whole loan personnel reviewed and re-underwrote samples of loans initially underwritten by the Originators. Simantel Decl. ¶ 2. The GSEs included in those samples loans that were purchased as whole loans and loans that formed the collateral for securitizations. *Id.* The Originators discussed the underwriting practices that had been used in creating these loans. *Id.* ¶ 4. If the loans reviewed by the GSEs whole loan personnel in fact became part of the collateral pools for the Certificates purchased by the GSEs,

---

[11] The Restatement also cautions against the perverse incentive for willful blindness that would ensue from the rule FHFA advocates: "Imputation thus reduces the risk that a principal may deploy agents as a shield against the legal consequences of facts the principal would prefer not to know." Restatement (Third) of Agency § 5.03 cmt. 6.

[12] The parties currently are in the midst of document production. We will provide further information relevant to this Motion from FHFA's production as warranted.

then the GSEs' information concerning those loans is critically relevant to—and perhaps dispositive of—at least FHFA's fraud claims and the statutes of limitations governing FHFA's securities claims.

### III. Whole Loan Documents Evidence What the PLS Business Knew and Considered (or Should Have)

FHFA argues that the only Originator information in its possession that is relevant is the information relating to Originators that was communicated to the GSEs' PLS buyers and those who reported to them.[13]  As explained above, that is incorrect.  But even if it were not, information found only within the GSEs' whole loan businesses is nonetheless relevant and properly subject to discovery, and excluding this evidence from discovery seriously prejudices the Merrill Lynch defendants' right to a fair trial.

As an initial matter, in its Amended Complaint, plaintiff based its claims in part on information regarding whole loans.  *See* FAC ¶ 156, 171–172.  Plaintiff invoked whole loan repurchase demands as evidence that the Originators abandoned their underwriting guidelines. *Id.*  Having alleged facts relating to whole loans to support its claims, FHFA cannot credibly seek to shield from discovery evidence on the ground that it comes from that side of the GSEs' business.  That is particularly true given the allegations by the former head of the FHFA that the GSEs resisted their regulator's directive in 2006–07 that they use their whole-loan repurchase authority to address allegedly defective underwriting.[14]

---

[13] *See* n.2, above.

[14] *See, e.g.,* Jody Shenn, *Fannie Refused to Punish Countrywide for Bad Debt, Lockhart Says,* Bloomberg.com (May 7, 2012), http://www.bloomberg.com/news/2012-05-07/fannie-refused-to-punish-countrywide-for-bad-debt-lockhart-says.html (according to head of OFHEO, in 2006-2007 the Office "'spent a lot of time' pushing Fannie Mae executives to seek more so-called putbacks on Countrywide loans that failed to match their promised quality"); *id.* ("'If people had known how bad the repurchases were going to get, we'd certainly have had a lot more disciplined underwriting,' Lockhart said in an interview.").

Moreover, evidence of information possessed by the whole loan business, combined with the GSEs' information-sharing policies, would provide at least circumstantial proof that information about Originators was communicated to the PLS side. For example, if discovery of a whole loan employee assigned to audit Originators were to uncover in her files a document stating a certain Originator had abandoned its underwriting guidelines and was engaging in pervasive and systematic underwriting fraud, the document would be at least circumstantial evidence that such information made its way to the PLS side of the business. *See SEC v. Scott*, 565 F. Supp. 1513, 1533 (S.D.N.Y. 1983) ("[I]t is well-recognized that evidence of knowledge and intent is often circumstantial rather than direct."), *aff'd sub nom. SEC v. Cayman Is. Reinsurance Corp.*, 734 F.2d 118 (2d Cir. 1984).[15] Such circumstantial evidence would be particularly compelling where, as here, the GSEs touted their "unified" structures and "cross-functional" information sharing. In addition, direct evidence that the document actually was communicated to PLS may be proved by the testimony of whole loan or PLS witnesses, but such direct evidence would be available only if the documents were first produced to defendants in discovery. Given what is known about the GSEs' auditing of Originators and the review of specific loan files by the GSEs, *see* Simantel Decl., loans underlying the specific Securities purchased by the GSEs may have been reviewed and critiqued by the GSEs prior to purchase.

---

[15] *Jasco Tools, Inc. v. Dana Corp.* (*In re Dana Corp.*), 574 F.3d 129, 153 (2d Cir. 2009) ("Circumstantial evidence may permit a factfinder to infer that a witness had knowledge of a particular fact despite his testimonial denial of knowledge."); *Whitbeck v. Vital Signs, Inc.*, 163 F.R.D. 398, 400 (D.D.C. 1995) ("Fed. R. Civ. P. 26 is to be liberally construed to allow discovery into any factual matter that is germane to any of the remaining legal issues in this case, and that may lead to the discovery of admissible evidence or may relate to circumstantial evidence." (internal quotation marks omitted)).

**IV.  The Known Challenges Present in FHFA's Discovery Favor Broader Discovery of Whole Loan Custodians**

This case largely turns on events that occurred from 2004 through 2007, five or more years ago.  During this time, and for some time thereafter, Freddie Mac's information technology systems automatically deleted e-mails.[16]  While the auto-delete function could be overridden, it required affirmative steps by a user to do so.  In the intervening years since 2007, the bursting of the housing bubble and ensuing world economic crisis threw the GSEs into economic disarray and, ultimately, conservatorship.  Both GSEs suffered high rates of employee turnover.[17]  The combination of these factors make it highly likely that relevant documents have been lost or destroyed and will be unavailable in discovery.  In addition, many of the Originators have gone out of business during the ensuing period, and defendants' attempts to subpoena them for documents relating to their origination practices and communications with the GSEs about the Securities have not yielded documents.  As a result, allowing discovery of the GSEs' whole loan businesses is the most efficient way to ensure that defendants are able to discover relevant information regarding the Originators that was possessed by the GSEs and communicated to PLS personnel.  Barring discovery of the whole loan business limits the Merrill Lynch defendants to relying on the fortuity that a PLS-side employee preserved the relevant documents, and even then defendants might be privy to only fragments of each relevant communication.

---

[16] *See, e.g.,* July 3, 2012 Letter from Ms. Chung to Judge Cote.

[17] *See, e.g*., Nick Timiraos, *Freddie, Fannie Departures* Escalate, The Wall Street Journal, Apr. 30, 2012, http://online.wsj.com/article/SB100014240527023048680045773763408225015 10.html.

**Conclusion**

The discovery excluded by the Court's July 31, 2012 ruling is not just relevant; it goes to the heart of the claims and defenses in this case. The Merrill Lynch corporate defendants respectfully request that the Court order FHFA to produce discovery from the whole loan side of the GSEs' business in the same manner as from the other relevant parts of the GSEs' businesses: through the cooperative identification of proposed custodians and search terms and the production of identifiable repositories.

Dated: August 14, 2012

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By:    s/ Edward J. Bennett
      Brendan V. Sullivan, Jr.
      (bsullivan@wc.com)
      David S. Blatt (dblatt@wc.com)
      Edward J. Bennett (ebennett@wc.com)
      725 Twelfth Street, N.W.
      Washington, DC 20005
      Telephone: (202) 434-5000
      Facsimile: (202) 434-5029

*Attorneys for Defendants Merrill Lynch & Co., Inc.; Merrill Lynch, Pierce, Fenner & Smith Inc.; Merrill Lynch Mortgage Lending, Inc.; Merrill Lynch Mortgage Capital Inc.; First Franklin Financial Corp.; Merrill Lynch Mortgage Investors, Inc.; and Merrill Lynch Government Securities, Inc.*

TO:    Manisha M. Sheth (manishasheth@quinnemanuel.com)
      Andrew Kutscher (andrewkutscher@quinnemanuel.com)
      Joshua Ellis (joshuaellis@quinnemanuel.com)
      Quinn Emanuel Urquhart & Sullivan LLP
      51 Madison Avenue
      New York, NY 10010
      *Attorneys for Plaintiff Federal Housing Finance Agency*

Daniel C. Zinman (dzinman@rkollp.com)
Richards Kibbe & Orbe LLP
One World Financial Center
New York, NY 10281
Telephone: (212) 530-1800
Facsimile: (212) 530-1801

*Attorneys for Defendants Matthew Whalen, Brian T. Sullivan, Michael M. McGovern, Donald J. Puglisi, Paul Park, and Donald C. Han*

Exhibit 1


Fannie Mae:
Single Family Guaranty Business;
Facing Strategic Crossroads

June 27, 2005

# Single Family Guaranty Business

## Facing Strategic Crossroads
## June 27, 2005

Fannie Mae

Confidential – Highly Restricted
As of 6/22/2005

Confidential Proprietary Business Information
Produced Pursuant to House Rules

FM-COGR_00088741

Confidential Proprietary Business Information
Produced Pursuant to House Rules

1. Is the housing market overheated?

2. Are consumer changes in preference for adjustable rate vs. fixed rate mortgages cyclical or secular?

3. Does Fannie Mae have a role/responsibility to stabilize the housing market?

4. Does Fannie Mae have an obligation to protect consumers?

Fannie Mae

FM-COGR_00088742

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088743

# The risk in the environment has accelerated dramatically.

- Proliferation of higher risk alternative mortgage products

- Growing concern about housing bubbles

- Growing concerns about borrowers taking on increased risks and higher debt

- Aggressive risk layering

Confidential – Highly Restricted
As of 6/22/2005

3



Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_0008744

# Growth in adjustable rate mortgages (ARMs) continues at an aggressive pace.

- Extensive menu of alternatives / options

- Increasing affordability concerns

- Emphasis on lowest possible payment

- Home being utilized more like an ATM

*Our competitive advantages today are in fixed rate mortgages.*

 FannieMae

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_0088745

# We are at a strategic crossroad….

# We face two stark choices:

# 1. Stay the Course
# 2. Meet the Market Where the Market Is



Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088746

## Stay the Course

- Maintain our strong credit discipline

- Protect the quality of our book

- Intensify our public voice on concerns

- Refrain from offering specific guidelines

- Preserve capital

- Test cyclical vs. secular



Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_0008747

# Alternatively, we could seek to ....

# Meet the Market Where the Market Is

- Meet current consumer and customer demands

- Participate in volume and revenue opportunity / current growth areas

- Accept higher risk and higher volatility of earnings

 FannieMae

Confidential Proprietary Business Information
Produced Pursuant to House Rules

# Possible Implications

## Stay the Course

- Lower volumes / revenues
- Slower book growth
- Continued market share decline
- Lower earnings
- Impact on key customer relationship

## Meet the Market

- Higher volume / revenues
- Faster book growth
- Slow down decline in market share
- Higher credit losses
- Increased exposure to unknown risks
- Potential increased earnings volatility



Fannie Mae

FM-COGR 0008748

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_0008749

## Significant obstacles block our ability to pursue a "Meet the Market" strategy.

- Lack of capabilities and infrastructure

- Lack of knowledge of the credit risks

- Lack of willingness to compete with the market on price

- Lack of a value proposition for subprime

- Lack of a conduit capacity and Regulatory concerns



Confidential Proprietary Business Information
Produced Pursuant to House Rules

# Realistically, we are not in a position to "Meet the Market" today.

## Therefore, we recommend that we:

- Pursue a "Stay the Course" strategy and test whether current market changes are cyclical vs. secular:
  - Advocate public position
  - Be selectively opportunistic in pursuing business
  - See if consumer sentiment changes with flatter yield curve

## While we:

- Dedicate resources and funding to "underground" efforts to:
  - Develop a subprime infrastructure
  - Develop modeling capabilities for alternative markets
  - Develop a conduit capability

> *Is there an opportunity to drive the market back to the 30-year FRM?*

Confidential – Highly Restricted
As of 6/22/2005

10



Fannie Mae

FM-COGR_0008750

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088751

**If we do not seriously invest in these "underground" type efforts and the market changes prove to be secular, we risk:**

- Becoming a niche player

- Becoming less of a market leader

- Becoming less relevant to the secondary market

 FannieMae

# Management Team Discussion

🏦 FannieMae

12

Confidential – Highly Restricted
As of 6/22/2005

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088752

# Single Family Facts and Data

## First Half Performance and Observations

**FannieMae**

13

Confidential – Highly Restricted
As of 6/22/2005

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088753

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR (H)888754

# Single Family Performance

**Corporate Objective Goals Scorecard
Monthly Progress Report - May 2005**

| | |
|---|---|
| Maintain leadership and retain or grow our key accounts | ▽ |
| Address key competitive issues and maintain 30% MDO share | ▽ |
| Implement products and exceed target book growth of 1.75% | ⬢ |
| Increase participation in subprime | ⬢ |
| Use technology tools for process improvement and delivery preference | ⬤ |
| Achieve the HUD goals | ⬤ |
| Lead the market in minority lending and achieve targets | ⬢ |

- Satisfactory progress with customer retention. Holding our own against FRE

- Leakage to subprime and private label continues. We lack a value proposition to stem the tide in today's market

- Book growth negative year-to-date. Negative growth is expected for the full year

- Continue to work on value proposition and proposal to enter the subprime flow market

- On track

- On track

- Loss of market share to subprime, interest only, option ARMS, attracting mission borrowers relative to our "core" products

Confidential – Highly Restricted
As of 6/22/2005



Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088755

# Single Family Performance

| 2005 Divisional Goals ($Bil) | |
|---|---|
| Lender Channel | $383.2 |
| Investor Channel | 100.0 |
| Dedicated Channel | 16.0 |
| **Total Business Volume** | **$499.2** |
| Book Growth | 1.75% |
| Gross Charged Fee | 27.3 bps |
| Credit Losses | $198 mil |

*Inclusive of eBusiness.*

| 2005 HOUSING GOALS | | MAY 2005 YTD ACTUAL |
|---|---|---|
| Low Mod (Affordable) | 52.0% | 55.5% |
| Special Affordable | 22.0% | 26.7% |
| Underserved | 37.0% | 41.3% |
| 2005 SF PMM Sub Goal | | |
| Low Mod (Affordable) | 45.0% | 45.48% |
| Special Affordable | 17.0% | 18.92% |
| Underserved | 32.0% | 32.49% |
| 2005 MINORITY LENDING GOALS | | |
| African American | 5.4% | 5.51% |
| Hispanic | 11.6% | 10.99% |
| Total Minority | 24.7% | 23.78% |

- Volume through May totaled $188 billion and was $11 billion (5.5%) behind plan
  - Full year estimate: $491 billion (Q2 forecast)
- YTD book growth (estimated): minus 1.7 percent
  - Full year estimate: minus 0.6 percent
- YTD gross charge fee vs. plan: 26.2 bps vs. 26.8 bps
- YTD credit losses vs. plan: $95.5 million vs. $55.1 million
  - Current full year estimate (6/05): $253 million

- On the housing goals front we remain ahead of targets against all goal categories
- Our minority lending results through May are behind goal for Hispanic (10.99%) and total minority (23.78%)


FannieMae

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_0088756

## We continue to lose goals rich products to private label

- Much of the leakage to the private label market is from products with high minority concentrations

- The two product lines that are driving the majority of leakage to private label are Alt-A and Subprime

- In 2004, these product lines scored high relative to Fannie Mae's core products
  - Alt A: 30% total minority score
  - Subprime: 52% total minority score

- In addition, much of the Option ARM production is securitized in the private label market
  - Option ARMs: 37% estimated total minority score

**Private Label Market Shares of MBS Issuance**



\* Other includes Option Arms

Confidential – Highly Restricted
As of 6/22/2005

**16**



Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088757

Even with tough competition and widening MBS/PC price spreads, Fannie Mae has still maintained share levels versus Freddie Mac in the historical range (55% - 60%)

**Fannie vs. Freddie**



**Entire Securities Market**



**MBS/PC Price Spreads**



- Despite Fannie/Freddie price spreads being at high levels during the past 6 months, the Fannie/Freddie share has remained in the historical range

- However, both GSE's continue to see significant share loss to the private label market

Confidential – Highly Restricted
As of 6/22/2005

**17**



Confidential Proprietary Business Information
Produced Pursuant to House Rules

Our competitive advantages in our core competencies continue to erode

# 1 YEAR AGO....  TODAY....

**Core Competencies**

Credit risk management

Capital advantage

Low cost producer

Customized value approach

Liquidity premium

DU/DO Technology

- Our insular view prevents us from taking credit risks in areas unfamiliar to us.
- Our capital advantage has been lost to collateralized debt obligation issuers and hedge funds. Basel II will further erode our advantage.
- Our pricing is uncompetitive. According to our models, market participants today are not pricing legitimately for risks.
- We don't have a value proposition to compete in today's market (lack of conduit capability).
- Premium still exists with respect to our 30-year TBA security; No liquidity premium for non-fixed rate product.
- DU/DO remain the leading automated underwriting systems in the market. Continued investment is required to ensure we do not lose our competitive advantages in this area.

Confidential – Highly Restricted
As of 6/22/2005

 FannieMae

Fannie Mae

FM-COGR_0000887758

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088759

# Our public position on risk concerns has been gaining momentum

**5/3/05**
Tom Lund
-- MBA Secondary
   Remarks captured
   in numerous articles.

**5/16/05**
OCC & Fed
-- Issue guidance letters
-- Feds warn lenders

**6/1/05**
OFHEO
-- Releases home price data
-- Expresses concerns

**6/9/05**
Greenspan
-- Froth/Bubble

| Articles of Interest<br>*Source: Google* | # of Articles:<br>(Jan – April) | # of Articles:<br>(May – June 22, 2005) |
|---|---|---|
| ■ Housing Bubble | 932 | 1,248 |
| ■ Interest Only | 315 | 1,213 |
| ■ Housing Affordability Concerns | 86 | 746 |
| ■ Greenspan and Housing Concerns | 187 | 598 |
| ■ OFHEO and Housing Concerns | 12 | 28 |
| ■ OCC and Housing Concerns | 18 | 17 |
| ■ Option ARMs | 20 | 10 |

Since early May, we estimate that over 3,500 articles have appeared in various publications on the topics listed above. This compares with an estimated 1,200 articles on these topics in the four months prior.


FannieMae

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088760

Our customer's and other market participant's attitudes towards
layered featured products varies across a broad spectrum

| **Cautious** | **Slower to Move** | **Production Focused** |
|---|---|---|
| **Longer Term View** | **Reluctant Follower** | **Meet the Market** |
| **Constrained** | **Tighter Credit Box** | **Move Fast** |
| Wells | Chase | CHL |
| Citi | PHH | WaMu |
| ABN | First Horizon | World |
| Suntrust | BofA | Greenpoint |
| Wachovia | GMAC | Indy Mac |
| HSBC | Flagstar | Street Aggregators |
| USAA | OSB | Independent Mtg Bankers |
| Irwin | Builder Mtg Corps | Brokers |
| Community Banks | | Realtors |
| Credit Unions | | Subprime Originators |



Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088761

## The market outlook for the year continues to change, driven by lower than expected interest rates and other market dynamics

|  | 2005 Plan | Q2 2005 Forecast |
|---|---|---|
| 30-Year FRM | 6.00% | 5.64% |
| FRM-ARM Spread | 1.35% | 1.22% |
| SF Mortgage Originations ($Bil) | 2,146 | 2,671 |
| Refinance Share (% of volume) | 39.5% | 47.4% |
| ARM Share | 29.2% | 31.4% |
| SF 1st Lien MDO ($Bil) | 7,704 | 7,923 |
| SF 1st Lien MDO Growth | 8.3% | 9.8% |
| FNM HPI (% change from year ago) | 3.4% | 6.5% |

Fannie Mae 2005 Plan and Q2 2005 Forecast



# Single Family Facts and Data

## Private Label and Subprime Market Trends

**FannieMae**

22

Confidential – Highly Restricted
As of 6/22/2005

## Private Label Trends





- Private label market continues to be a significant source of liquidity to lenders. $401 billion of private label securities have been issued in 2005 through May.
- In 2004, Private Label volume surpassed Fannie Mae volume for the first time, with total Private Label issuance of $809 billion versus Fannie Mae issuance of $537 billion.
- Fannie Mae is still the largest single issuer of MBS. Freddie Mac was the second largest issuer with $358 billion, and Countrywide ranked third at $114.5 billion.

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088763



Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088764

## Private Label Trends



Private Label MBS: Product Trends

- Other
- Seconds
- HELOC
- Prime Fixed
- Prime ARM
- Alt-A
- Subprime

*Source: Corporate Development, Inside MBS & ABS*

- Growth in PL has been driven by increases in:
  - Subprime
  - Alt-A
  - ARM production
- Common theme across these products: housing affordability and flexible guidelines

Confidential – Highly Restricted
As of 6/22/2005

**24**

 FannieMae

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_0008765

# Private Label Trends – Wall Street Presence

- Wall Street firms playing an increasingly large role as aggregators of mortgage product.

- Wall Street share of private label issuance has doubled in the past three years (as of 2004 year-end).

- Many Wall Street players are pursuing vertical integration to develop consistent source of product:
  - Lehman originated $43B in Correspondent and Broker originations in 2004.
  - Bear Stearns launched a Broker division in early 2005.
  - Firms making significant front end technology investments, including developing proprietary AU systems.



Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088766

# Wall Street Issuance Trends – Cyclical or Secular?



- 1999-2001 – Wall Street presence in Private Label Issuance declines during (a) the consolidation of many subprime lenders, and (b) the increased presence of the Agencies in the Alt-A market.

- 2002-2005 – Wall Street participation increases measurably; and the street indicates that they are intent on having a lasting presence.

  - "They all want to be like Lehman Brothers... Lehman has a huge pipeline and everyone's coveting it." – Subprime Lender

  - CSFB has ambitious 2005 goals and is positioning itself to continue integrating downstream – exploring acquiring a servicer in 2005. (5/05 - CSFB 9th Private Label Issuers Conference)

  - Morgan Stanley is seeking "to build a brand and a reputation" for their securitization program and to show that they are "not just an opportunistic bond shop." (4/05 – Origination News)

  - On Bear's new broker platform:"Our pitch [is] that the broker's getting capital market execution because he's dealing direct with Wall Street."



Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_0088767

## Private Label Trends – Products and Risk Appetite

■ Primary market originations of products outside Fannie Mae's traditional risk appetite are on the rise.   This means lenders have to turn to aggregators / private label as an outlet.





Source: UBS Mortgage Research: *Market Strategist, May 31, 2005*

• Strong growth of innovative products (Interest Only ARMs, "Pay Option" ARMs)

• Steady growth in share of Private Label market with conforming loan balances

Confidential – Highly Restricted
As of 6/22/2005

**27**

 FannieMae

Confidential Proprietary Business Information
Produced Pursuant to House Rules

## Private Label Trends – Products and Risk Appetite

- Private label securities increasingly include a significant amount of conforming balance product. Reasons include:

  - Our tough anti-predatory lending guidelines preclude us from taking certain loans

  - Our risk appetite is tighter than the market's, especially regarding IO's and Option ARMs

  - Pricing / All-in execution

  - "Spillover" effect – lenders may prefer to sell product all in one place for convenience or execution reasons

  - Difficulty of hedging spread risk on ARMs: Many smaller lenders need best efforts flow execution and servicing released bids, which we don't offer with Alt-A and IO



Confidential Proprietary Business Information
Produced Pursuant to House Rules

# Private Label Trends – Products and Risk Appetite

**Private Label Securities Collateral Characteristics**
Deals Issued April 2004 - Jan 2005

| Prime Fixed & Prime ARM Deals | -> These two categories represented 27% of all private label securitizations in 2004 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $ UPB (BB) | % Total UPB | Avg Loan Size | WA FICO | % FICO < 620 | WA LTV | WA CLTV | % Investor | % Cashout | % CA | % Low/No Doc | % IO | % Option ARM |
| Total Collateral | 116.1 | 100% | 433,987 | 733 | 0.6% | 69.1 | 85.6 | 2% | 22% | 48% | 48% | 48% | 13% |
| Conforming Balance | 22.1 | 19% | 215,269 | 728 | 1.1% | 73.3 | 92.5 | 7% | 22% | 26% | 42% | 73% | 6% |
| Within FM Risk Appetite | 20.0 | 17% | 214,355 | 732 | 0.2% | 73.1 | 92.4 | 7% | 2% | 25% | 40% | 79% | 0% |
| Outside FM Risk Appetite | 2.1 | 2% | 225,742 | 683 | 10% | 75.5 | 94.1 | 12% | 42% | 37% | 55% | 13% | 60% |

| Alt-A Deals | -> This category represented 20% of all private label securitizations in 2004 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $ UPB (BB) | % Total UPB | Avg Loan Size | WA FICO | % FICO < 620 | WA LTV | WA CLTV | % Investor | % Cashout | % CA | % Low/No Doc | % IO | % Option ARM |
| Total Collateral | 109.3 | 100% | 252,548 | 711 | 1.2% | 74.8 | 93.3 | 18% | 30% | 45% | 67% | 51% | 12% |
| Conforming Balance | 63.1 | 58% | 182,392 | 710 | 1.5% | 76.4 | 95.6 | 24% | 28% | 32% | 63% | 48% | 11% |
| Within FM Risk Appetite | 39.6 | 36% | 181,273 | 723 | 0.6% | 75.7 | 95.8 | 24% | 21% | 31% | 56% | 60% | 0% |
| Outside FM Risk Appetite | 23.5 | 22% | 184,307 | 688 | 3.2% | 77.5 | 95.3 | 24% | 40% | 34% | 75% | 28% | 28% |

Notes:

Data Source: Loan Performance database.

"Prime FRM" "Prime ARM" and "Alt-A" deal classifications are defined by the issuer as reflected in LP database.

"FM Current Risk Appetite" reflects typical FM eligiblity criteria on bulk deal business for an average customer.

Loans without reported FICO scores were excluded from the data set.

All loans are in first lien position; WA CLTV = weighted average combined LTV of first lien plus any subordinate lien(s)

Confidential – Highly Restricted
As of 6/22/2005



FM-COGR_00088769

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088770

# Fannie Mae vs. Market View: IO & Option ARM

**Countrywide Recent Bid Profile**
**Interest Only and Option ARMs**

| Collateral Profile | WAC | WAM | LTV | FICO | ACI | % Low Doc |
|---|---|---|---|---|---|---|
| IO ARM (Std MI) | 6.00 | 359 | 79.5 | 727 | 622 | 79.6 |
| Pay Option ARM (Std MI) | 1.60 | 359 | 75.8 | 721 | 626 | 65.1 |

### Fannie Mae vs. Rating Agencies

|  | IO ARM | | Pay Option ARM | | |
|---|---|---|---|---|---|
|  | FM | S&P | FM | S&P - Old | S&P - New |
| AA Sizing (Fannie Stress) | 7.5 | 3.7 | 8.5 | 5.5 | 6.7 |
| B Sizing (Expected Loss) | 1.8 | 0.4 | 2.2 | 0.6 | 0.8 |

### Fannie Mae vs. MI Companies

|  | IO ARM | Pay Option ARM |
|---|---|---|
| Fannie Mae Value of CE | 31.3 | 44.1 |
| MI Cost for CE | 18.7 | 28.9 |
| MI Execution Benefit | 12.6 | 15.2 |
| Enhancement Levels | 2.35% stop-loss, 0.55% deductible | 3.85% stop-loss, 0.65% deductible |

### Market Pricing

|  | With Credit Enhancement | | No Credit Enhancement | |
|---|---|---|---|---|
|  | IO | Pay Option | IO | Pay Option |
| Competitive Gfee (Charge Fee) | 54.0 | 55.0 | 54.0 | 55.0 |
| Gross Model Fee (includes CE cost) | 54.5 | 63.4 | 105.9 | 110.2 |
| GAP | -0.5 | -8.4 | -51.9 | -55.2 |

Notes:
Average Investor Channel charge fee for IO product is 49 bps
Pay Option charge fees reflect recent Countrywide bids vs. private label market.
Freddie Mac recently offered WAMU a mid-30's gfee for high quality Option ARMs

Confidential – Highly Restricted
As of 6/22/2005

**30**

- Fannie Mae's view of risk is significantly different than other market participants

- S&P recently came out with more punitive criteria for Option ARMs

- MI companies price the expected and stress loss levels differently than Fannie Mae

- We need to obtain credit enhancement on the entire loan pool in order to achieve relatively gap neutral model fees



Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

# Fannie Mae vs. Market View: Subprime

## Countrywide Recent Bid Profile
## Subprime Market

| Collateral Profile | WAC | WAM | LTV | FICO | ACI | DTI |
|---|---|---|---|---|---|---|
| ARM (Charter MI) | 7.1 | 359 | 78.3 | 604 | 561 | 41.1 |

**Fannie Mae v.s. Rating Agencies**

| | Subprime | |
|---|---|---|
| | FM | S&P |
| AA Sizing (Fannie Stress) | 12.0 | 12.6 |
| B Sizing (Expected Loss) | 3.1 | 2.0 |

**Fannie Mae v.s. MI Company**

| | Subprime with Deep CE |
|---|---|
| Fannie Mae Value of CE | 176.0 |
| MI Cost for CE | 101.0 |
| MI Execution Benefit | 75.0 |
| Enhancement Levels | 15.0% stop-loss, 1.50% deductible, Charter Primary |

**Competitive Alternatives**

| | Subprime | |
|---|---|---|
| | With Deep CE | With Charter Min MI Only |
| Competitive Gfee | 130.0 | 130.0 |
| Gross Model Fee (includes CE cost) | 195.0 | 277.0 |
| GAP | -65.0 | -147.0 |

- Our view of risk for subprime product is more in line with Rating Agencies
- MI companies price the expected and stress loss levels differently than Fannie Mae
- Our execution still significantly off current market levels – market competitive g-fees would result in significant negative gap, even with credit enhancement

FM-COGR_00088771

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088772

# Private Label Trends – Products and Risk Appetite

- This trend is increasingly costing us business with our largest customer:



Share of Countrywide's Prime Conventional
Monthly Mortgage Fundings
Acquired by Fannie Mae

'Fannie Mae acquisitions of conventional, first lien mortgages from Countrywide as a share of Countrywide fundings of prime, conventional, first lien mortgages.



Share of Countrywide's Total
Monthly Mortgage Fundings
Acquired by Fannie Mae

'Fannie Mae acquisitions of mortgages from Countrywide as a share of Countrywide mortgage fundings.

FannieMae

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_0008773

# Private Label Trends – Products and Risk Appetite

**Countrywide Loan Production**

**Q1-2005**

$ in millions

| PRODUCT | Total Countrywide Loan Production | % Total Production | $ UPB Sold to Fannie | % Sold to Fannie |
|---|---|---|---|---|
| 30 FRM | $11,218 | 38.9% | $5,354 | 47.7% |
| 15 FRM | 2,985 | 10.3% | 2,379 | 79.7% |
| FRM ALT-A | 4,340 | 15.0% | 646 | 14.9% |
| AMORTIZING ARM ALT-A | 600 | 2.1% | 403 | 67.2% |
| INTEREST ONLY ARM | 2,811 | 9.7% | 1,920 | 68.3% |
| PAY OPTION ARM | 6,889 | 23.9% | - | 0.0% |
| TOTAL PRODUCTION | $28,843 | 100.0% | $10,702 | 37.1% |

**Pay Option ARM Drill Down**

**Potential Eligibility Criteria**

| Pay Option | Tight Eligibility Bucket | Broader Eligibility Bucket | Not Eligible |
|---|---|---|---|
| Total UPB | $2,412 | $5,670 | $1,219 |
| % Investor | 22.1 | 21.6 | 30.3 |
| % Cashout | 38.9 | 41.8 | 44.1 |
| % Single-Family | 79.8 | 79.7 | 69.3 |
| % Full Doc | 46.1 | 36.1 | 33.6 |
| % with Subordinate Liens | 21.2 | 23.3 | 27.6 |
| wa Debt Ratio | 35.4 | 35.6 | 45.0 |
| wa FICO | 744.1 | 721.4 | 669.1 |
| wa MTMLTV | 70.7 | 73.1 | 78.3 |
| CreditWorks Model Fee | 76 | 101 | 219 |
| Gross Model if Credit Enhanced | 52 | 62 | n/a |
| Est Market Price (Charge Fee) | 25 | 50 | 55 |

Notes:

- Does not include subprime, second, or government loans.

- Eligibility buckets reflect potential offering to Countrywide for Option ARM product under a forward commitment.

- Tight eligibility bucket could be extended to other lenders on a bulk basis.

- "Not Eligible" category on Option ARMs reflects loans outside our credit risk appetite and/or borrower appropriateness framework.

- Debt ratio (back ratio) estimated from a one-month sample and only includes Full Doc loans.

- Countrywide data file did not include loans sold to Freddie; figures are grossed up assuming a 20% FR share based on Q1 actuals.

Confidential – Highly Restricted
As of 6/22/2005

**33**


FannieMae

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR 00088774

# Interest Only / Option ARMs Dominate Prime & Alt-A Private Label Deals



**IO/ Option ARM Share of Private Label Deals**

Source: UBS Mortgage Research 6-7-05 Mortgage Strategist

Confidential – Highly Restricted
As of 6/22/2005

34



Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_0088775

Many of the current products in the market today provide for a low payment with increased payment shock over time

| Loan Type | Start Rate | P & I Payment (Initial) | P & I Payment (First Adjustment) | P & I Payment (Maximum Adjustment) | Qualifying Max. Loan Amount |
|---|---|---|---|---|---|
| Option ARM (w/ Neg. Amortization) | 1.00% | $125 | $876 | $1,912 | $285,714 |
| 3/1 IO ARM | 5.00% | $625 | $904 | $1,436 | $300,000 |
| 5/1 IO ARM | 5.13% | $641 | $992 | $1,376 | $292,683 |
| 30-Yr. Fixed Rate (w/ 2/1 buydown) | 4.25% | $738 | $826 | $916 | $254,096 |
| 30-Yr. IO Fixed Rate | 6.00% | $750 | $1,266 | $1,266 | $250,000 |
| 5/30 IO (35-Yr.) | 6.13% | $766 | $911 | $911 | $244,898 |
| 40-Yr. Fixed Rate | 5.75% | $799 | $799 | $799 | $234,571 |
| 5/1 ARM | 5.00% | $805 | $900 | $1,252 | $232,852 |
| 30-Yr. Fixed Rate (Approve) | 5.63% | $863 | $863 | $863 | $217,143 |

Assumptions: a) $150K loan amount. b) Start Rates based on posted lender pricing. Rates at adjustment assume current index value for the loan type. Option ARM teaser rate of 1% on IO fixed for one year, then moves to 5.25% until first rate adjustment. c) Qualifying max loan amount for all loan types assumes the borrower made $60K and utilizes a 25% qualifying ratio. d) Option ARM qualifying rate of 5.25%. All other loan types qualified at starting payment rate.



Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088776

## Subprime Market Trends

- Market is evolving into a product continuum

**(\$ in Millions)**

Prime A

Traditional Alt-A

Expanded Alt-A

Alt B/C

- Trends towards integration of prime and subprime players:

    - New Century/RBC Acquisition in May 2005

    - Countrywide #1 issuer of subprime and Alt A; #3 issuer in Prime ARM securities in 2004

    - Ameriquest making significant marketing efforts aimed at broad customer base

    - To date, we have not seen any players integrate platform and sales process

- Profit margins in subprime shrinking but are still significantly higher than for prime mortgages



Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR 00088777

# Subprime Market Trends

<u>Key Drivers of Growth in Subprime:</u>

- Broker driven sales process:
  - Subprime generates higher margins and more approvals

- Greater flexibility results in borrower ability to qualify for larger loan:
  - Calculation of income (subprime more flexible on income sources)
  - Higher debt ratios
  - Appraisal values (subprime typically exhibits higher appraisal bias)

- Mortgage Insurance Avoidance:
  - Subprime lenders moving up the credit spectrum results in higher LTV's
  - For marginal borrowers, a subprime loan often costs less than a conventional loan once the MI payment is factored in

- Ability of lenders to transfer risk to capital markets / monetize entire cash flow stream:
  - Strong CDO demand for subordinate bonds means lenders have a steady investor source for riskiest credit
  - Ability to sell off residual cash flows in form of Net Interest Margin (NIM) bonds means lenders can realize more proceeds upfront and reduce exposure to future income fluctuations


FannieMae

# Single Family Facts and Data

## Home Price Growth and Credit Concerns

Confidential – Highly Restricted
As of 6/22/2005

38

🏠 FannieMae

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088778

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088779

## Home Price Growth Remains Strong

| Region | Annualized HP Growth from TB-RTI* up to 2005Q1 | | |
|---|---|---|---|
| | Last 1 yr | Last 2 yrs | Last 5 yrs |
| West South Central | 4.7% | 3.7% | 3.4% |
| West North Central | 6.4% | 6.3% | 7.3% |
| East South Central | 6.6% | 5.3% | 3.7% |
| East North Central | 6.8% | 5.9% | 5.4% |
| New England | 10.9% | 10.9% | 12.3% |
| Middle Atlantic | 14.6% | 13.9% | 12.3% |
| Mountain | 22.5% | 16.8% | 9.4% |
| South Atlantic | 22.7% | 17.7% | 11.8% |
| Pacific | 22.8% | 21.3% | 15.5% |
| US | 14.6% | 12.7% | 9.9% |

*TB-RTI: A new home price index estimation methodology
that uses data only from purchase transactions.

**US Housing Market continues with its recent trend:**

- High growth rate and high dispersion across geographic locations

- Some observed slowing of growth rates (Southern CA, Las Vegas), but most remain above long-term trend

**Home price growth has significantly outpaced income growth:**

- Affordability is at historical lows in some markets

### US Income Growth vs. Home Price Growth





Confidential Proprietary Business Information
Produced Pursuant to House Rules

## Local Market Focus – I/O Share

■ Many of the MSAs that experienced a high annual IO share increase (in excess of 13%) were MSAs that also experienced high home price growth (in excess of 19%) in the last year.



**Increase in Interest-Only (IO) Share Vs. HP Growth**
among top 100 MSAs

Source: Private Label Purchase Loan Dataset (Economics and Mortgage Market Analysis) & Credit Finance

Confidential – Highly Restricted
As of 6/22/2005

40



Fannie Mae

FM-COGR_00088780

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_0008781

## Local Market Focus – Investor Share

- During the last year, many of the MSAs that experienced a high annual increase in investor share (in excess of 4%) were MSAs that also experienced high home price growth (in excess of 15%).



**Increase in Investor Share vs. HP Growth among top 100 MSAs**

HP Growth based on TB-RTI (from 2003Q4 to 2004Q4)

Increase in Investor Share based on Purchase-only PCC data (from 2003Q4 to 2004Q4)

Source: Purchase only PCC data (Economics and Mortgage Market Analysis) & Credit Finance



Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088782

# High home price growth tends to reduce credit losses



**Forecasted Credit Losses Under Alternative
National Home Price Growth Scenarios
(without Make-whole Revenues)**

Source: 2005Q2 Loss Forecast Model (LFM) production runs.
All loss figures are as of default date and include charge-off, foreclosed property expense, and foregone interest.

*Fannie Mae*                    *Proprietary and Confidential*

Confidential – Highly Restricted
As of 6/22/2005

**42**



Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR 00087X3

# Credit losses on new ARM products would vary under different economic scenarios

**Losses were forecast on new ARMs in three different economic scenarios:**

1. Corporate Forecast: House prices up 3-4% annually, interest rates up 1% in 1st 5-years
2. Housing Recession in overpriced regions, interest rates increase 1.1% in 1st 5-years
3. Housing Recession in overpriced regions, interest rates increase 5% in 1st 5-years





# Single Family Facts and Data

## Emerging Products and Product Definitions

FannieMae

44

Confidential – Highly Restricted
As of 6/22/2005

Confidential Proprietary Business Information
Produced Pursuant to House Rules

Fannie Mae

FM-COGR_00088785

# Emerging Products: Market View and Fannie Mae Participation

| | 2003 | | | | |
|---|---|---|---|---|---|
| | ARM (Share of $ Volume) | Low & No Doc (Share of $ Volume) | Investor (Share of $ Volume) | 2nd Home (Share of $ Volume) | IO ARMs (Share of $ Volume) |
| Prime Conventional Conforming | 18.2% | 16.7% | 6.5% | 5.1% | NA |
| Subprime | 80.6% | 42.8% | 7.2% | 1.3% | 9.1% |
| Alt-A | 44.0% | 65.0% | 18.1% | 3.9% | 25.1% |
| FNM Participation | 13.9% | 8.5% | 5.5% | 5.5% | **1.1%** |
| % FNM Participation via Inv. Chan | 28.7% | 77.7% | 26.2% | 9.0% | 47.7% |

| | 2004 | | | | |
|---|---|---|---|---|---|
| | ARM (Share of $ Volume) | Low & No Doc (Share of $ Volume) | Investor (Share of $ Volume) | 2nd Home (Share of $ Volume) | IO ARMs (Share of $ Volume) |
| Prime Conventional Conforming | 30.8% | 22.3% | 8.1% | 6.5% | NA |
| Subprime | 88.1% | 44.8% | 7.5% | 1.5% | 23.9% |
| Alt-A | 71.1% | 57.6% | 18.2% | 4.7% | 50.3% |
| FNM Participation | 24.9% | 10.1% | 5.6% | 7.0% | **7.6%** |
| % FNM Participation via Inv. Chan | 33.6% | 80.6% | 40.9% | 14.8% | 71.7% |

> In 2003, IO ARMs accounted for just 1.1% of FNM's purchase money mortgage acquisitions. In 2004, they accounted for 7.6%

Source: Economics and Mortgage Market Analysis using Loan Performance.

- Shares of ARMs, Investor and Low Doc products have increased from 2003 to 2004 as measured by purchase money mortgage originations.
  - FNM product shares of ARM, I/O, Low Doc are trailing behind market share.
  - Investor Channel is driving I/O and Low Doc volume.
- Alt A and Subprime are more concentrated in these products.

Confidential – Highly Restricted
As of 6/22/2005

45



Confidential Proprietary Business Information
Produced Pursuant to House Rules

# Product Definitions

- **Interest Only** - A mortgage in which the borrower makes monthly payments for a specified period that cover only the interest due on the loan. During the Interest Only period, the outstanding principal balance of the loan does not decline. After the initial interest only period, the monthly payment is increased to an amount sufficient to fully amortize the outstanding balance over the remaining term of the loan.

- **Hybrid ARM** - A mortgage loan that has an initial fixed rate period, after which the mortgage loan converts to an adjustable rate. An example of a Hybrid ARM is a 2/28 mortgage loan. This is a 30 year adjustable mortgage program, except that the first interest rate adjustment does not occur until 2 years into the loan. Once the loan converts to an ARM, the interest rate adjusts periodically (typically monthly, semi-annually or annually) based on a particular interest rate index (e.g., LIBOR, 1-Yr Treasury).

- **Negative Amortization Adjustable-Rate Mortgage (Neg Am)** - An adjustable rate mortgage that provides for a fixed monthly payment even if the interest rate on the loan changes. Typically, the interest rate on a neg am loan adjust monthly, while the payment stays fixed for a year. If the interest rate increases in a given month such that the monthly payment is insufficient to cover both principal and interest then due, the interest shortage is added to the unpaid principal balance of the mortgage to create "negative" amortization. Most neg am loans have a cap on the maximum amount that can be added to the loan balance over the life of the loan.

- **Option ARM** - An adjustable rate mortgage that gives the borrower various payment options each month. In a typical Option ARM, borrowers have the option to make a minimum payment, which could result in negative amortization if the minimum payment is not enough to cover interest due (similar to the minimum payment on a credit card). They also have the option to make interest-only payments or fully amortizing payments. The expanded payment options give the borrower more leeway to qualify for a mortgage. The 12 month Treasury Average (MTA) is the most common index used with option ARM loans; however, some lenders also offer LIBOR, the 1-Year Treasury Bill, and the 11th District Cost of Funds (COFI) as indices.

Confidential – Highly Restricted
As of 6/22/2005



Fannie Mae

FM-COGR_00088786