# Tab 3

# In The Matter Of:

*FEDERAL HOUSING FINANCE AGENCY v*
*UBS AMERICAS INC*

*July 31, 2012*

*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK, NY 10007*
*212 805-0330*

Original File C7VAAFEDF.txt
**Min-U-Script® with Word Index**

```
C7VAAFEDC1      Conference                    Page 1
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x   11 Civ. 5201 (DLC)
                                       11 Civ. 6188 (DLC)
 3   FEDERAL HOUSING FINANCE AGENCY,   11 Civ. 6189 (DLC)
                                       11 Civ. 6190 (DLC)
 4              Plaintiff,             11 Civ. 6192 (DLC)
                                       11 Civ. 6193 (DLC)
 5        v.                           11 Civ. 6195 (DLC)
                                       11 Civ. 6196 (DLC)
 6   UBS AMERICAS INC., et al.,        11 Civ. 6198 (DLC)
                                       11 Civ. 6200 (DLC)
 7              Defendants,            11 Civ. 6201 (DLC)
                                       11 Civ. 6202 (DLC)
 8   and other FHFA cases.             11 Civ. 6203 (DLC)
                                       11 Civ. 6739 (DLC)
 9   ------------------------------x   11 Civ. 7010 (DLC)
                                       11 Civ. 7048 (DLC)
10
                                       New York, N.Y.
11                                     July 31, 2012
                                         3:00 p.m.
12
     Before:
13
                 HON. DENISE COTE
14
                                       District Judge
15

16
                 APPEARANCES
17

18
     QUINN EMANUEL URQUHART & SULLIVAN LLP
19        Attorneys for Plaintiff
     BY:  PHILIPPE SELENDY
20        RICHARD SCHIRTZER
          JON COREY
21        CHRISTINE H. CHUNG
          JULIA GUARAGNA
22        JORDAN GOLDSTEIN

23
     KASOWITZ BENSON TORRES & FRIEDMAN LLP
24        Attorneys for Plaintiff
     BY:  MARC E. KASOWITZ
25        KANCHANA LEUNG
```

```
C7VAAFEDC1      Conference                    Page 2
 1              APPEARANCES
 2
     STEPHEN HART
 3        Managing Associate General Counsel FHFA
 4
     SKADDEN ARPS SLATE MEAGHER & FLOM LLP
 5        Attorneys for Defendants UBS Americas Inc. and affiliated
          entities and individuals; and SG Americas, Inc. and
 6        affiliated entities and individuals
     BY:  JAY KASNER
 7        SCOTT MUSOFF
          JOSEPH SACCA
 8        ROBERT FUMERTON

 9
     SULLIVAN & CROMWELL LLP
10        Attorneys for Defendant JPMorgan Chase & Co. and
          affiliated entities, and certain individuals
11   BY:  PENNY SHANE
          SHARON NELLES
12        JONATHAN NEDLAK

13
     SULLIVAN & CROMWELL LLP
14        Attorneys for Defendant Goldman Sachs & Co. and affiliated
          entities and individuals
15   BY:  RICHARD KLAPPER
          THEODORE EDELMAN
16        MICHAEL TOMAINO

17
     SULLIVAN & CROMWELL LLP
18        Attorneys for Defendant Barclays Bank PLC and affiliated
          entities and individuals
19   BY:  DAVID BRAFF
          JEFFREY SCOTT
20

21   SULLIVAN & CROMWELL LLP
          Attorneys for Defendants First Horizon National
22        Corporation and affiliated entities and individuals; and
          Nomura Holding America, Inc. and affiliated entities and
23        individuals
     BY:  BRUCE CLARK
24        AMANDA DAVIDOFF

25
```

```
C7VAAFEDC1      Conference                    Page 3
 1              APPEARANCES
 2
     PAUL WEISS RIFKIND WHARTON GARRISON LLP
 3        Attorneys for Defendants CitiGroup Global Markets, Inc.;
          CitiGroup, Inc. and affiliated entities and individuals
 4   BY:  CAITLIN GRUSAUSKAS
          BRUCE BIRENBOIM
 5        SUSANNA BUERGEL

 6
     CRAVATH SWAINE & MOORE LLP
 7        Attorneys for Defendant Credit Suisse Securities (USA) LLC
          and affiliated entities and individuals
 8   BY:  RICHARD CLARY
          MICHAEL REYNOLDS
 9

10   SIMPSON THACHER & BARTLETT LLP
          Attorneys for Defendants RBS Securities Inc.; and Deutsche
11        Bank AG and affiliated entities
     BY:  THOMAS RICE
12        DAVID WOLL

13
     BOIES SCHILLER & FLEXNER LLP
14        Attorneys for Defendant HSBC North America Holdings and
          affiliated entities and individuals
15   BY:  ANDREW MICHAELSON

16
     MAYER BROWN LLP
17        Attorneys for Defendant HSBC North America Holdings and
          affiliated entities and individuals
18   BY:  MICHAEL WARE
          JOHN CONLON
19

20   MAYER BROWN LLP
          Attorneys for Defendants Ally Financial Inc. and GMAC
21        Mortgage Group, Inc.
     BY:  CATHERINE BERNARD
22        REGINALD GOEKE
          MICHAEL O. WARE
23

24   KIRKLAND & ELLIS LLP
          Attorneys for Defendant Ally Securities, LLC
25   BY:  ROBERT J. KOPECKY
```

```
C7VAAFEDC1      Conference                    Page 4
 1              APPEARANCES
 2
     CARPENTER LIPPS & LELAND LLP
 3        Attorneys for Defendant Ally Securities, LLC
     BY:  JEFFREY A. LIPPS
 4        JENNIFER A.L. BATTLE

 5
     WILLIAMS & CONNOLLY LLP
 6        Attorneys for Defendants Bank of America Corporation and
          affiliated entities; and Merrill Lynch and affiliated
 7        entities
     BY:  EDWARD J. BENNETT
 8        PHIL SECHLER
          BETH A. STEWART
 9

10   DAVIS POLK & WARDWELL LLP
          Attorneys for Defendant Morgan Stanley and affiliated
11        entities and individuals
     BY:  JAMES ROUHANDEH
12        BRIAN WEINSTEIN
          DANIEL SCHWARTZ
13        NICHOLAS GEORGE

14
     WEIL GOTSHAL & MANGES LLP
15        Attorneys for Defendant General Electric Company and
          affiliated entities
16   BY:  VERNON BRODERICK
          SETH GOODCHILD
17

18   RICHARDS KIBBE & ORBE LLP
          Attorneys for Individual Defendants Carp, Caruso, Ellison
19        Goodsin, Johnson, Kula, Maxwell, Ryan, Schetritt,
          Glassner, Whalen, Publisi and Park
20   BY:  NEIL BINDER
          DANIEL ZINMAN
21

22   ALLEN & OVERY LLP
          Attorneys for Individual Defendant Molinaro
23   BY:  PAMELA CHEPIGA
          JOSEPHINE A. CHEATHAM
24

25
```

C7VAAFEDC1    Conference    Page 5

APPEARANCES

KRAMER LEVIN NAFTALIS & FRANKEL LLP
    Attorneys for Individual Defendant Verschleiser
BY: DANI R. JAMES

MORRISON & FOERSTER LLP
    Attorneys for Individual Defendants Marano and Nierenberg
BY: JOEL HAIMS

GREENBERG TRAURIG LLP
    Attorneys for Individual Defendant Mayer
BY: RONALD D. LEFTON

SNR DENTON US LLP
    Attorneys for Individual Defendant Perkins
BY: SANDRA HAUSER

---

C7VAAFEDC1    Conference    Page 6

    (Case called)
    THE COURT: Thank you, everyone. Appreciate your appearance here today. We have a number of matters to address. So let me list the issues that I am aware of. We're going to talk about a schedule for expert discovery, what I'll refer to at this stage for expert discovery. We're going to talk about discovery of the plaintiff and its constituent entities beyond the PLS divisions or branches within those agencies.
    I am going to ask Ms. Shane for a status report on how we're doing with predictive codeine. I am hoping that a meet and confer process has resolved any disputes concerning discovery related to ResCap, but we'll see.
    I know I have been given two documents. I haven't had a chance to look at them. I want to say my two page letter limit had a good impact on attorney's time but has failed adequately to address the paralegal time issues but I made a good stab at getting through materials. I am not sure I've focused on precisely the passages you wanted me to but I've looked at a lot of material you've submitted. And counsel, of course, may have other issues they want to address today as well.
    I have good news and bad news for everybody. So depending on the issue, you will be happy or disappointed. So maybe I'll just start with some preliminary rulings on an issue and then give a chance to the disappointed parties to be heard

---

C7VAAFEDC1    Conference    Page 7

and, if necessary, we'll have a more extensive discussion.
    Why don't I start by disappointing FHFA and I'll move on to the defendants.
    So let's talk about the staging of expert discovery. At our June 13 conference at page 14 I briefly outlined how I thought disclosures might proceed. Based on the materials that had been presented to me in advance of that conference which I noted at the time were very helpful to me, I came to the conclusions that the defendants would not agree to restricting discovery in this case to a sample of loan files. And that, indeed, the plaintiff wanted to reserve its rights as well potentially as affirmative defenses were played out to look beyond any initially designated sample of loan files.
    So as much as I was disappointed by that conclusion I shared that with you all on June 13th and outlined how I thought we might proceed with respect to expert discovery. And I know that the plaintiff is already on its way to making disclosures of samples and individual cases and it began that in the UBS case because that's our first tranche trial.
    And I think the defendants are right that the next thing that has to happen is for the plaintiff to make a disclosure of how it feels the misrepresentations and one, two or all three categories are playing out when you look at that sample.
    And then the next stage would be for the defendants to

---

C7VAAFEDC1    Conference    Page 8

respond and it's possible that defendants will respond with a disagreement about the content of the plaintiff's sample and it's analysis of the extent to which misrepresentations appear in that sample or they may do their own sample of a larger or I suppose potentially smaller or just an intersecting group, different sample all together or they might not do any sample and that may change from case to case.
    It may change from misrepresentation to misrepresentation. And I don't think that's something I could control or would seek to control even if I could. And I feel as if the plaintiff wants to use this request to require the defendants to disclose a sample before they know what the plaintiff's position is with respect to the misrepresentations and the extent to which misrepresentations appear in the plaintiff sample.
    It's sort of way of managing discovery and of managing the litigation and that had been my hope but as I explained on June 13th I don't think that is going to fly for all the reasons I described then. So I think what we're left with is setting out a schedule, hopefully, one that we could agree to in the UBS case and that could be used as a model for the other tranches. So I am not saying that -- it would just be a model. The parties would have an opportunity to agree or disagree in a particular case that the model worked. But so I think what should happen is what has already begun in the UBS case and

### Page 93

THE COURT: So we're about to move into August. Will the defendants get some of this production in August?

MS. CHUNG: I think so, your Honor. I don't want to represent that it's going to be a significant amount but I think that everyone is finding it a challenge. So most of it will be through September. But there is material now in the pipeline being used and being sent out so, yes, we will make some production. I don't want to overstate the situation because I think that there is -- we have a considerable number of documents to review. We are undertaking to do it the old fashioned way on our side and so we need to get through those and produce them and I do think very much of it will be in September, not in August.

THE COURT: I have one more question for you, Mr. --oh, I'm sorry.

MR. SCHIRTZER: Your Honor, I was just standing to address the question.

THE COURT: No. It was for Mr. Sacca.

MR. SCHIRTZER: Did I do it again?

THE COURT: Yes. I wanted to know if the defendants or at least UBS has decided at this point that it would like to brief the substantive law with respect to knowledge with respect to Section 11. And I ask that question because of Footnote Two on the defendants' submission for the July 31st hearing and an undated letter that I think I got on the 30th.

### Page 94

And this was a topic that we talked about at the May 14th conference and at pages 25 to 26 in which I offered to have early motion practice on the standard for knowledge for Section 11 claim. And at that time the thinking, as I understood it, on the defense side was, no, it'd be too fact intensive a question and would not be meaningful, helpful in the way that I'd anticipated to have that legal discussion now.

Have the defendants changed their mind?

MR. SACCA: Your Honor, we have not. I think we still would welcome the opportunity to brief that after we have had the chance to develop a more full record for your Honor, part of which would be the 30(B)(6) deposition, part of which would probably be documents we get in production after that.

Your Honor, to respond very briefly to what Mr. Schirtzer said, we saw the 30(B)(6) depositions. The partys are agreed on that. We did for a reason, your Honor. A narrative is all well and good for whatever limited purposes but I can't cross-examine a narrative. I can't ask the follow-up questions of a narrative and I can't ask clarifying questions of a narrative. And we've seen plenty today to tell us that we shouldn't take everything that's in this narrative at face value. Mr. Schirtzer just said that where there were counter-party reviews done by Single Family and done by PLS they made an effort to strip out information. We've seen an e-mail though that said that they did this review together at

### Page 95

Freddie's choice to put the Single Family and the PLS review of Countrywide together where, obviously, both sides were going to hear whatever Countrywide had to say.

Now, your Honor, I also will note that many of the Fannie people on that very e-mail about the Countrywide operational review are not on the custodian. Also missing from the custodian's list, your Honor, Freddie's CEO, Mr. Syron. Freddie Exhibit 4 in the binder in front of you which I made reference to before the Special Litigation Committee's report says on pages 16 to 17, although Freddie Mac had been involved in the subprime market prior to Mr. Syron's joining the company and even prior to 2000, the senior management under Mr. Syron increased the company's involvement in that market. The person responsible for Freddie's decision to take on more subprime securities largely through PLS isn't on the custodian list.

So, your Honor, again, we're not after more, per se. We're after the right ones. And we have been deprived up till now of the opportunity to ask questions that we think are necessary to decide who the right ones are. Your Honor has raised some very good questions that we would like answers to about if certain information reached the Private Label advisory team. Do they consider to have been passed on or not? We think this they have the amputation standard on its head. We think under the third restatement of agency information is imputed unless there's a duty to share it.

### Page 96

But, your Honor --

THE COURT: Let me ask you, on this ten page list of the document custodians, are there people who you think should not be on that list?

MR. SACCA: We don't know yet entirely, your Honor. I am not -- it is possible that there are people that we after we learn a little more would think are not necessary. Like I said, judge, I can't stress this enough, we're not out simply to increase the number of custodians. We want to make sure we have the right ones.

THE COURT: Okay. Thanks.

MR. SCHIRTZER: Actually, your Honor, the example that was just offered is almost too telling. They want Dick Syron, the former CEO and chairman of Freddie Mac. And their basis for wanting him is a couple of SEC complaints that claim that he essentially led Freddie Mac into an overconcentration of subprime and didn't disclose it was the gist of the SEC complaint.

What they don't say is that Don Bisenius and Patty Cook, the operational executive vice presidents or whatever titles were immediately below him, were also defendants in that same case and they're both custodians on our list which proves the point I am trying to make, that we have gone to the top levels of the company, the people who had access to directories that will encompass all sorts of information. And we've put

C7VAAFEDC3         Conference         Page 97

1  those people on custodian lists.  To say that we need a
2  30(B)(6) deposition to identify an apexed opponent that's -- it
3  is what it is, your Honor.
4       THE COURT: Okay.  Thank you.  We're going to take a
5  brief recess.  I want counsel to talk about the late August
6  date and whether an order in connection with that would be
7  helpful and whether or not reports, status reports on document
8  production late August before such a conference would be
9  helpful.  I need the parties' guidance and if you could discuss
10 that together.  We'll take a ten minute recess.
11      (Recess)
12      (Continued on next page)

C7vrfed4         Page 98

1       THE COURT: Mr. Bennett, I understand I kept calling
2  you Mr. Williams.
3       MR. BENNETT: Yes, your Honor.
4       THE COURT: I apologize.
5       MR. BENNETT: That's quite all right, your Honor.  The
6  "Edward Bennett" gets people confused all the time.
7       THE COURT: Someone earlier today mentioned that I was
8  going backwards.  I'm going to do that again.  I'm going to
9  revisit our first topic.
10      I think we should keep it simple.  We should have the
11 Daubert motion addressed just to the protocol in the UBS case,
12 briefed by FHFA and UBS on roughly the schedule that the
13 plaintiffs proposed -- august 9th, August 31st, September
14 13th -- understanding that counsel will discuss the appropriate
15 schedule with each other that accommodates vacations and other
16 personal needs and get me a letter describing what schedule
17 they would like me to endorse.  Then, any other defendant who
18 wishes to bring a similar Daubert motion based upon the
19 plaintiff's sampling protocol in their case may during the fall
20 talk with Mr. Selendy about a schedule.  Write me and let me
21 know what your desires are.
22      Again UBS gets the great honor and privilege of being
23 the stalking-horse on the issue for everyone.
24      MR. KASNER: I would say thank you, your Honor, but
25 given my vehemence in reaction, I will sit mute.

C7vrfed4         Page 99

1       THE COURT: I appreciate Mr. Sacca helping me focus on
2  precisely what relief is being sought with respect to the most
3  recent issue we have been discussing.  To the extent the
4  request is for a 30(b)(6) deposition on item 3, that request is
5  denied.
6       I think that I can make a couple of observations here
7  beyond simply saying that request is denied that may have
8  broader implications and, hopefully, helpful guidance for the
9  parties.  I think that specific request was just one of a
10 constellation of issues about the adequacy of FHFA's document
11 production and the number of custodians and the identity of the
12 custodians.
13      Let's step back and ask what this discovery of the
14 plaintiff is all about.  To some extent I'm going to share
15 these thoughts because if you think I see things incorrectly, I
16 think it is important that you hear the way I'm thinking so you
17 can correct my thinking.  Mr. Bennett, that even means pointing
18 out some law to me on occasion.
19      I don't think a defendant can proceed to trial here
20 unless a defendant believes they can successfully defend the
21 section 11 claim.  I know there are these other issues in the
22 case, other claims of federal securities law violations and
23 fraud claims, but I think it is hard for a defendant to proceed
24 to trial unless they think they have a good defense on the
25 section 11 case.

C7vrfed4         Page 100

1       The role of knowledge in a section 11 claim is a
2  limited one.  Over and over again the arguments by defense
3  counsel to me this afternoon have talked about how information
4  from the single-family side of the enterprise was necessarily
5  shared with the PLS side and therefore necessarily appropriate
6  for discovery in this case.
7       The theme of the defense arguments has not been that
8  information held solely within the single-family side of the
9  business should be discoverable.  The fear is that the document
10 production that is being undertaken by the plaintiffs will be
11 inadequate to capture information principally about originators
12 that was shared with the PLS side.  I don't find any basis to
13 believe that that is a realistic fear.
14      First of all, the FHFA is making a massive production
15 here.  As its description of the roles of the various
16 custodians that it has already agreed to make shows, they
17 represent many different functions within the GSEs, including
18 on the risk committees that were so much the focus of
19 discussion with me today.
20      If there was, as the defendants argue, a tying
21 together of the single-family and PLS function within these
22 organizations and substantial information sharing between the
23 two sides of the businesses within these organizations, and I
24 think I'm capturing the precise terms used this afternoon,
25 those documents are going to be captured in this document

### Page 101

production. If they aren't, come on back to me.

There is no basis to argue now or to fear now that they won't be produced. And that is before I even get to the level of analysis that rule 1 would require me to undertake and a proportionality analysis, weighing the role that a knowledge defense is going to have in this case with the kind of intensive undertaking that FHFA is making and that the defendants are each going to be burden by.

I think Mr. Sacca had a good point. He said it's not the number, it's the quality. And that's true. Everybody has to spend money looking at whatever is produced.

I find that FHFA's production of a written response was to be commended. It was a much more reliable presentation of extremely complex matters, more reliable and more detailed than could have been received in any 30(b)(6) deposition under any time frame that could have been considered reasonable.

I don't have a request from the defendants that is pinpointed. There has been only one name mentioned here of a custodian that should have been included and wasn't. I take that as a tribute to both sides here and the meet and confer process, and also in recognition that FHFA is taking its responsibilities seriously, that when it needs to reconsider a particular custodian, it's thinking about that and keeps adding when it finds it's appropriate to do so.

These are layers of reasons which support each other

### Page 102

for my ruling.

MR. BENNETT: Your Honor?

THE COURT: Yes?

MR. BENNETT: I wasn't clear. We certainly are arguing that documents that never went, if there are any, never went from the home loan side to the PLS side are relevant, for a number of reasons.

THE COURT: We have finished argument on that issue. It's late. Thank you so much, but those documents I will not order produced for all the reasons I have just described. Thank you.

MR. BENNETT: Thank you, your Honor.

THE COURT: Counsel, the two exhibits that you gave to me today, I want to make sure that all the materials that we have considered this afternoon in addition to these two handouts -- one, the custodian list, and the other the collection of documents that begins with an excerpt from a Form 10-K -- if you could give me another set so I can make sure that everything is appropriately filed.

MR. KASNER: Your Honor?

THE COURT: Yes, Mr. Kasner?

MR. KASNER: I'm not here to reargue, I assure the Court. I just wish to place on the record so your Honor knows that the issues as to which discovery was being sought that we discussed today do not relate solely to the issues of actual

### Page 103

knowledge.

I understand why your Honor focused on the section 11 claim, which perhaps may impact the component of knowledge a bit differently than the affirmative element in a section 12 claim, for example. However, there are other aspects of the defendants' defenses I wish to advise the Court to which this discovery relates. I assure the Court I'm not here to reargue your Honor's ruling.

Issues of materiality are impacted by what is in the files that we were seeking, in the 30(b)(6) information that we were seeking, information with respect to reliance for those fraud defendants -- I am not one.

THE COURT: Yes.

MR. KASNER: -- and issues related to inquiry notice with respect to the statute of limitations we believe will all be impacted by those issues, your Honor, not simply actual knowledge.

THE COURT: Yes, I understand that. I hope you weren't misled by my frank sharing of an analysis which was just one and not a necessary component to my ruling.

MR. KASNER: I understood, your Honor.

THE COURT: I would have ruled the same way without any reference to the knowledge component of the section 11 claim.

MR. KASNER: I understood that, your Honor. Your

### Page 104

Honor had indicated that that was your Honor's belief about the centrality of that component to our defenses. I just thought it was important to make plain on the record it's not just that issue. I understand what the Court is saying.

THE COURT: The third paragraph in your submission of I believe July 30th lists a number of those other elements or the way knowledge relates to elements of a variety of claims and defenses. I did read that with care and I am well aware of it.

MR. KASNER: Thank you, your Honor.

THE COURT: I have what I thought was the 30(b)(6) issue in a set of letters raised in the first instance I think by FHFA with respect to four separate questions and a request that the 30(b)(6) witness not be redeposed. I believe someone wished to address that for the defendants.

MR. WOLL: Yes, thank you, your Honor. David Woll for the defendants. As you noted, the plaintiff raised with the Court issues we had with the adequacy of two witnesses that were produced to testify with respect to, generally speaking, document retention issues. We submitted something this morning in response to that.

We do have issues with respect to the adequacy of the 30(b)(6) testimony on the document retention issues, but the fundamental issue I want to focus on is the Freddie Mac document destruction issue because I think it impacts really

**C7vrfed4** — Page 105

everything we have been talking about today in terms of custodians and scheduling.

To briefly summarize, and I know it's late, the plaintiffs originally brought to our attention that Freddie Mac employed an automatic deletion protocol originally described to us as having been in place at least from January 2004 to September 2008. They told us during the week of June 29th, when we were talking about document custodians, that as a result of that protocol, basically any email that wasn't affirmatively saved for an employee prior to September 2008 didn't exist anymore and any emails to an employee who left prior to 2008, those emails also wouldn't exist anymore, even if they had been affirmatively saved, because they would have been affirmatively discarded at the time of departure.

Obviously, it is pretty fruitless to talk about document custodians if they don't have any documents. We thought it important to bring this to the Court's attention right away, which we did in a letter from Mr. Kasner on July 2nd. Counsel for the plaintiff responded, noted that they had brought this to our attention because it was relevant to document custodians and discovery, and said in that letter, quote, "FHFA will continue to work in good faith to resolve any outstanding issues regarding e-discovery and to exchange information with defendants that bears on that effort." That sounded pretty good.

**C7vrfed4** — Page 106

We wrote a letter to the plaintiff on July 5th. I wrote that letter. Other letters followed on July 12th. Suffice it to say there were numerous requests to plaintiff to try and get to the bottom of this issue, which fundamentally is to what extent are there large gaps in the emails available for relevant custodians for the relevant period. We didn't get any answers, unfortunately, to those letters.

We did make it part of our 30(b)(6) notice, which is why it comes up in this context now. One of the topics in our 30(b)(6) notice, topic 1, was about the systematic deletion of potentially relevant documents pursuant to this protocol. The plaintiffs did produce a witness, on July 20th I believe, to testify with respect to topics 1, 2, 10 and 11 in the notice, all of which are document retention topics. His name was Rick Keogh. Mr. Keogh was not able to tell us anything about what custodians proposed either by the plaintiff or by the defendants had electronic documents remaining.

We showed him the list of custodians that were proposed by the plaintiff at that point. We showed him some lists. We asked him, do you know what's available from any of the plaintiffs? He said no. The plaintiffs have taken the position that that is beyond the scope of the notice. It is certainly not beyond the scope of the notice as it was originally framed by us. We also don't think it is beyond the scope of the notice as they agreed to produce the

**C7vrfed4** — Page 107

witness Mr. Keogh to testify about document retention policies and practices, quote, as they applied to the groups and individuals responsible for the securitizations.

It certainly wasn't a surprise to the plaintiff that we were keenly interested in this, because we had written to them, we had written to the Court, and they said they were going to provide this information. But Mr. Keogh couldn't provide that.

The other thing that troubled us, and still troubles us, and why I think we need to get to the bottom of this, is the description of this automatic deletion protocol has changed over time. The plaintiff, through counsel originally, represented what I just described, referring to January 4th of 2008. Mr. Keogh submitted a declaration, which I cited in one of my letters, which was referenced in the letter to the Court, in another federal action where he said that documents prior to October 2007 had been automatically deleted, but then in October 2007 they ceased the recycling of backup tapes.

Then, at his deposition Mr. Keogh said and plaintiff produced some information saying, hold on a second, we have lots of backup tapes for emails prior to October 2007, which was directly contrary to what it said in Mr. Keogh's declaration in this other federal action. We followed up with some more correspondence. We asked some more questions.

In their letter to the Court yesterday, the plaintiff

**C7vrfed4** — Page 108

told you that, quote, "FHFA has advised defendants that each agreed Freddie Mac custodian has significant amounts of electronic information, including email, for the relevant period." They advised us at the same time they sent the letter to your Honor. We got a separate letter that included the same statement.

Respectfully, I don't think that that statement, given what we know or have heard about the Freddie Mac auto deletion policy, really answers the question of whether there are large gaps in the emails that were apparently subject to some type of auto deletion policy.

We don't know what are on the backup tapes that Mr. Keogh identified for the first time at his deposition. If there are substantial emails from custodians, I don't know exactly what that means. For instance, if somebody worked on deals in 2005 and I have emails for 2007, that's not going to help us very much.

They have only identified that there are substantial emails for the initial custodians they agreed to. They had initially agreed to, I think, 38 Freddie Mac custodians. They say they are going to add more. I think it will bring them up to like 51. They say that should ameliorate our concerns. But we don't know if any of those extra custodians have any emails, so it doesn't really ameliorate the concerns.

I don't think we can wait until the end of the