**quinn emanuel** trial lawyers | washington, dc

1299 Pennsylvania Avenue NW, Suite 825, Washington, District of Columbia  20004-2400 | TEL: (202) 538-8000 FAX: (202) 538-8100

November 8, 2012

**VIA ELECTRONIC MAIL**

The Honorable Denise L. Cote
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1610
New York, NY 10007-1312

Re:     FHFA Actions

Dear Judge Cote:

In response to the Court's invitation at the November 5, 2012 hearing, Plaintiff FHFA submits this letter in further opposition to Defendants' request for an order overruling FHFA's claim of privilege over witness interview memoranda prepared by counsel for a Special Litigation Committee ("SLC") of the Board of Directors of Freddie Mac.

**The SLC Report's Brief and General Discussion of Interviewee Information Is Not Disclosure of Privileged Communications Nor Does It Justify Wholesale Waiver of All Memoranda of 46 Witness Interviews.**  Defendants argue that FHFA waived any claim of privilege to any memoranda of the 46 witnesses interviewed because the public filing of the SLC report *disclosed the content of privileged communications* from those interviews.  Contrary to Defendants' assertion, the SLC report does not disclose privileged communications "[in] detail" such that waiver is "clear on its face."  *See* Nov. 5 Hrg. Tr. at 112: 11-16.[1]  Hunton & Williams obtained the factual information in the SLC report primarily from public information, which is cited in three pages of endnotes.  Shane Ex. JJ at 32-36.  The 38-page SLC report contains about one page of text attributed, even generally, to interviewees.  That text consists of generalizations and few quotes.  With one exception, the report attributed no statements to a particular individual.  For the convenience of the Court, the entire interviewee-specific text is reproduced in Appendix 1.  As discussed in FHFA's November 5 letter, these summary, generalized references to interviewee information do not constitute disclosure of privileged communications, much less a waiver of any claim of privilege over all interview memoranda for 46 witnesses.

**FHFA Did Not Place the SLC Report "At Issue" In These Actions.**  At the November 5 hearing, Defendants represented that *In re Kidder Peabody Securities Litigation*, 168 F.R.D. 459 (S.D.N.Y. 1996), compelled a finding of wholesale waiver.  *Kidder* is neither legally nor factually applicable.  In that case, Kidder Peabody retained Davis Polk to conduct an investigation into Joseph Jett's "trades" that ultimately caused Kidder Peabody to restate its reported earnings by $200 million.  Davis Polk prepared an 85-page report "*summarizing in detail* the facts uncovered by the law firm." *Id*. at 462 (emphasis added).  Kidder Peabody produced some of the underlying witness memoranda in discovery, shared a draft of the report and 85 binders of investigation-related information with the SEC, disclosed the contents of the interviews in papers and media interviews and specifically petitioned the court to rely on the

---

[1] At the November 5 hearing, Counsel for First Horizon and Nomura emphasized her perceived importance of the content of the SLC report.  Relevance is not a basis to overrule a claim of privilege.

factual content of the report in the case in which the witness interview memoranda was sought. *Id*. at 467, 472, 474, 468.

*Kidder* is an "at issue" waiver case, not a waiver by disclosure case. The Court relied on a now outdated formulation of the at-issue waiver doctrine to find that Kidder's repeated reliance on the factual statements in the report to justify relief in that case "put in issue statements made by all interviewees." *Id*. at 471-72. Under current Second Circuit law, to trigger an at-issue waiver analysis a "party must *rely* on privileged advice from his counsel *to make his claim or defense*," which requires an affirmative "assertion of fact to influence the decisionmaker." *In re Cnty. of Erie*, 546 F.3d 222, 229 (2d Cir. 2008) (quoting *John Doe Co. v. U.S.*, 350 F.3d 299, 306 (2d Cir. 2003) (emphasis in original); *Gruss v. Zwirn*, 276 F.R.D. 115, 133 (S.D.N.Y. 2011) (rejecting claim of privilege waiver over internal[2] investigation interview memoranda due to disclosure of the investigation report).[3] Unlike Kidder, FHFA has not relied upon nor placed the alleged privileged communications in the SLC report at issue in this case, much less relied upon them to prove its claims. Defendants, not FHFA, injected the SLC report into these actions. FHFA's used the SLC report in a separate case to comply with Virginia's statutory requirement that it to "review and evaluate" shareholder derivative claims and submit to the court a statement of reasons if the company decides not to prosecute them. *See In re Fed. Home Loan Mortg. Corp. Deriv. Litig.*, No. 08 Civ. 773 (E.D. Va.) (Docket No. 138 at ¶¶ 8-9); Va. Code § 13.1-672.4(A).

Independently, even if FHFA introduced the alleged "selective disclosures" into this case (it did not), fairness does not require the disclosure of the memoranda and withholding them does not prejudice to defendants. *John Doe Co.*, 350 F.3d at 306 (holding that fairness requires disclosure when "a party uses an assertion of fact to influence the decision maker while denying its adversary access to privileged material potentially capable of rebutting the assertion"). FHFA made no assertion of a privileged communication from the SLC report to influence the Court. Nor do Defendants seek evidence to *rebut* the SLC report. To the contrary, they embrace the SLC report, they find it "exciting" and seek additional, *consistent* evidence, which requires no waiver on fairness grounds to ensure access to evidence. The SLC interviewees were current and former senior officers, directors and management of Freddie Mac. *See* Appendix 1. Because discovery is ongoing herein and defendants can seek to depose them, no waiver of privileged information is required to prevent prejudice to defendants. S*ee Gruss*, 276 F.R.D. at 132-35, 140 (disclosure does not constitute waiver unless it creates a risk of legal prejudice).

FHFA respectfully requests that the Court sustain its claim of privilege over the Special Litigation Committee's witness interview memoranda and deny Defendants' motion for an order compelling their production.

---

[2] Independently, the court in *Kidder* found witness interview memoranda not to be work product because they were not prepared "*principally* to assist in contemplated or ongoing litigation." *Id*. at 466. The Second Circuit rejected that standard in *United States v. Adlman*, holding that work product doctrine protects materials "prepared in anticipation of litigation." 68 F.3d 1495, 1500-02 (2d Cir. 1995) (citing Fed. R. Civ. P. 26(b)(3)). Here, Hunton & Williams prepared the SLC report specifically to address threatened and pending shareholder lawsuits. The underlying interview memoranda are work product, which affords them greater protection. *See Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 478 (S.D.N.Y. 1993) ("The standards for waiver of the attorney-client privilege and of work-product immunity differ to a degree, with greater protection afforded to work-product.").

[3] Further distinguishing Kidder, no draft or investigation-specific materials were provided to the SEC. Even if FHFA did so, that would not be a waiver of any privilege. 12 U.S.C. § 1821(t). In addition, FHFA neither produced witness interview memoranda nor distributed the content of interviews to the media

Respectfully submitted,

/s/   Jon Corey
Jon Corey
(joncorey@quinnemanuel.com)
QUINN EMANUEL URQUHART &
 SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

*Attorney for Plaintiff Federal Housing Finance  Agency in FHFA v. Bank of America Corp.*

cc:  All Defendants (via email)

**Appendix 1**

Page 17, ¶ 4, sent. 1-2: "Although recent history has demonstrated that AAA-rated securities are not as secure as the market once thought, no one interviewed believed they presented a material credit risk when purchased. In the words of one officer, such securities were believed to be 'nuclear-proof.'"

Page 22, ¶ 2, sent. 1: "Every officer the Committee interviewed, including David Andrukonis and others who had concerns about the SISA and NINA markets, believed that the Company's decision to continue participating in the SISA and NINA mortgage markets was the result of an appropriate decision-making process in which opposing viewpoints were discussed and considered."

Page 22, ¶ 3, sent. 2-4: "In the words of one former officer, the discussion was not a 'Polyanna' or 'one-sided' discussion. Rather, costs and benefits were weighed and the more aggressive credit risk strategy generally – but not always – was selected. The Company's senior management 'wrestled' with the appropriate standards for mortgage underwriting given competing pressures on the Company."

Page 22, ¶ 4: "Several current and former officers have told the Committee that they disagreed, sometimes strongly, with the Company's ultimate decisions concerning whether to begin or maintain involvement in certain corners of the non-traditional mortgage market. None of those officers, however, has opined that the Company's decisions were anything other than good faith business judgments. One officer did opine that Mr. Syron and Ms. Cook did not have an adequate understanding of the Company's credit risks, stated further that, as a general matter, senior management weighed all of the facts before making decisions, including decisions pertaining to credit risk."

Page 22, ¶ 1, sents. 1-2: "Nevertheless, various members of senior management told the Committee that senior management and the Board had determined that remediation of the controls weaknesses was a key priority of the Company. Moreover, several witnesses stated that, with various workarounds, these weaknesses did not cause the Company to issue inaccurate financial statements."

Page 31, ¶ 4, sent. 1: "The consensus among the current and former officers and directors of Freddie Mac interviewed by the Committee was that the primary cause of the Company's recent losses was an 'exogenous macro-economic event[ ]'; namely, the unprecedented decline in the housing market."

Page 31, ¶¶ 5-7: "These individuals generally have stated that while Freddie Mac's credit stance had an impact on the margins, there is nothing that Freddie Mac could have done to avoid material losses other than: (i) closing its doors; or (ii) violating GAAP by reserving for hypothetical scenarios that nobody thought were plausible at the time."
    "Other than the collapse in the housing market, these individuals identified several other factors that contributed to Freddie Mac's losses. These factors included the Company's Alt-A portfolio, which has delivered a large component of the Company's losses. At the same time, however, one senior officer stated that 'it is not clear that Freddie Mac would have been better off had it made different credit decisions.' A narrower credit box could have affected adversely

the price of Freddie Mac's security, which also could have driven the Company out of business. It could have driven the Company's market share down to five percent. Each of these outcomes could have ended up causing greater losses."

"With regard to the Company's portfolio of subprime-backed securities, several officers identified mark-to-market accounting as a significant component of the Company's losses. One senior officer explained that Freddie Mac was still receiving cash flows on these securities but was required by GAAP to mark them down beyond what the Company ultimately expected to lose."