UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

                Plaintiff,

       -v-

UBS AMERICAS INC., *et al*.

                Defendants.

---

Other Cases Brought By This Plaintiff:

11 Civ. 6188 (DLC)
11 Civ. 6189 (DLC)
11 Civ. 6190 (DLC)
11 Civ. 6192 (DLC)
11 Civ. 6193 (DLC)
11 Civ. 6195 (DLC)
11 Civ. 6196 (DLC)
11 Civ. 6198 (DLC)
11 Civ. 6200 (DLC)
11 Civ. 6201 (DLC)
11 Civ. 6202 (DLC)
11 Civ. 6203 (DLC)
11 Civ. 6739 (DLC)
11 Civ. 7010 (DLC)
11 Civ. 7048 (DLC)

**Case No. 11 CIV. 5201 (DLC)**

**MEMORANDUM OF LAW IN
SUPPORT OF DEFENDANTS'
MOTION TO COMPEL**

(Counsel on Signature Pages)

November 5, 2012

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................1

PROCEDURAL BACKGROUND ..........................................................................4

      A.     Pleadings and Motions to Dismiss ..........................................................4

      B.     Commencement of Discovery ..................................................................6

      C.     Disclosures to Date about the GSEs' Integrated Activities ....................8

ARGUMENT..........................................................................................................15

I.     FHFA SHOULD BE REQUIRED TO SEARCH FOR AND PRODUCE
      RELEVANT DOCUMENTS FROM ANY BUSINESS UNIT
      SUBSTANTIALLY INVOLVED IN ASSESSING THE ORIGINATORS, THE
      MORTGAGE LOANS, THE SECURITIZATIONS, THE POTENTIAL OR
      ACTUAL COLLATERAL, OR THE RISKS ASSOCIATED WITH ANY OF
      THEM .......................................................................................................15

      A.     The Missing Material Is Relevant to FHFA's Claims and Defendants'
            Defenses ................................................................................................16

      B.     The *AIG* Case FHFA Relies on Does Not Warrant Denial of the Requested
            Discovery ...............................................................................................21

II.    FHFA SHOULD BE REQUIRED TO COOPERATE IN DEVISING A PLAN
      TO COMPLETE ENTITY-WIDE DISCOVERY PROMPTLY AND
      EFFICIENTLY .........................................................................................23

      A.     The Discovery Sought Is Proportional Under Rule 26(b)(2) ................23

      B.     The Discovery Sought May Be Completed Promptly and Efficiently  .................25

CONCLUSION .....................................................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*AIG Global Secs. Lending Corp.* v. *Banc of Am. Secs., LLC*,
   2005 U.S. Dist. LEXIS 21605 (S.D.N.Y. Sept. 26, 2005) ................................................21, 22

*Bank of China* v. *NBM LLC*,
   359 F.3d 171 (2d Cir. 2004) ................................................................................................23

*Boilermakers Nat'l Annuity Trust Fund* v. *Wamu Mortg. Pass Through Certificates,
   Series AR1*, 748 F. Supp. 2d 1246 (W.D. Wa. 2010) ...........................................................16

*Davidson Pipe Co.* v. *Laventhol & Horwath*,
   120 F.R.D. 455, 460 (S.D.N.Y. 1988) ..................................................................................19

*Dongguk Univ.* v. *Yale Univ.*,
   270 F.R.D. 70 (D. Conn. 2010) ............................................................................................23

*Fed. Hous. Fin. Agency v. UBS Ams., Inc.*,
   858 F. Supp 2d 306 (S.D.N.Y. 2012) ................................................................................5, 16

*Feit* v. *Leasco Data Processing Equip. Corp.*,
   332 F. Supp. 544 (E.D.N.Y. 1971) ......................................................................................20

*Ferguson* v. *Lion Holding, Inc.*,
   2005 U.S. Dist. LEXIS 9789 (S.D.N.Y. May 23, 2005) ......................................................24

*Gulf Oil Co.* v. *Bernard*,
   452 U.S. 89 (1981) ...............................................................................................................23

*HSH Nordbank AG* v. *UBS AG*,
   95 A.D.3d 185, 941 N.Y.S.2d 59 (1st Dep't 2012) .............................................................18

*In re AES Corp. Securities Litigation*,
   849 F. Supp. 907 (S.D.N.Y. 1994) ......................................................................................19

*In re WorldCom, Inc. Sec. Litig.*,
   352 F. Supp. 2d 472 (S.D.N.Y. 2005) ..................................................................................20

*Kitchens* v. *U. S. Shelter*,
   1988 U.S. Dist. LEXIS 18546 (D.S.C. June 30, 1988).........................................................20

*Long Island Lighting Co.* v. *Barbash*,
   779 F.2d 793 (2d Cir. 1985)..................................................................................................16

*Maresco* v. *Evans Chemetics*,
   964 F.2d 106 (2d Cir. 1992)..................................................................................................16

# TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

### CASES
### (*continued*)

*N.J. Carpenters Health Fund* v. *Rali Series 2006-QO1 Trust*,
2012 U.S. App. LEXIS 8675 (2d Cir. Apr. 30, 2012) ...........................................................17

*Quinby* v. *WestLB AG*,
245 F.R.D. 94 (S.D.N.Y. 2006) ...........................................................................................24

*Rossini* v. *Ogilvy & Mather, Inc.*,
798 F.2d 590 (2d Cir. 1986).................................................................................................16

*SEC* v. *Collins & Aikman Corp.*,
256 F.R.D. 403 (S.D.N.Y. 2009) .........................................................................................23

*Wheeler* v. *Citigroup*,
2012 U.S. Dist. LEXIS 101296 (S.D.N.Y. July 20, 2012) ...................................................16

*Zubulake* v. *UBS Warburg LLC*,
216 F.R.D. 280 (S.D.N.Y. 2003) .........................................................................................24

### STATUTES AND RULES

FED. R. CIV. P. 26(b) ...............................................................................................................16, 23

FED. R. CIV. P. 30(b)(6) .............................................................................................................6, 7

Section 11 of the Securities Act of 1933 .............................................................................. *passim*

### OTHER AUTHORITIES

RESTATEMENT (THIRD) OF AGENCY § 5.03 (2006) .......................................................................22

## CITATION GLOSSARY

### ENTITIES

**"Defendants"**:  All defendants in the 16 coordinated Actions before this Court.

**"FHFA"**:  Federal Housing Finance Agency.

**"GSEs"**:  Federal National Mortgage Association ("Fannie Mae" or "Fannie") and Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie").

### PLEADINGS AND COURT SUBMISSIONS

**"JPMC AC"**:  FHFA's Amended Complaint, *Federal Housing Finance Agency* v. *JPMorgan Chase & Co.*, 11-cv-6188 (S.D.N.Y.), filed June 13, 2012, Ex. 42.

**("Goldman Sachs AC")**:  FHFA's Amended Complaint, *Federal Housing Finance Agency* v. *Goldman Sachs & Co.*, No. 11-cv-6198, Ex. 59.)

**"Special Litigation Committee Report"**:  Report of the Special Litigation Committee of the Federal Home Loan Mortgage Corporation, February 25, 2011, attached to Freddie Mac's Memorandum In Support of Motion for Voluntary Dismissal Without Prejudice, *In re Federal Home Loan Mortgage Corp. Deriv. Litig.*, No. 1:08-cv-773 (E.D. Va.), Ex. 37.

### TERMS

**"Actions"**:  The sixteen coordinated actions against financial institutions brought by FHFA that are now pending before this Court.

**"Ex."**:  Exhibit (unless otherwise noted, refers to Exhibits to the Declaration of Penny Shane, subscribed to on October 29, 2012).

**"HERA"**:  Housing and Economic Recovery Act of 2008.

**"LTV"**:  Loan-to-value ratio.

**"Non-PLS"**:  Any GSE business other than the PLS business.

**"OFHEO"**:  Office of Federal Housing Enterprise Oversight, the GSEs' former regulator.

**"Originators"**:  The entities that originated the mortgage loans at issue in the Actions.

**"Plaintiff's Objections to Defendants' Fourth Request"**: Plaintiff's Objections and Responses to Defendants' Fourth Request for Production of Documents, Oct. 10, 2012, Ex. 34.

## CITATION GLOSSARY
*(continued)*

### TERMS
*(continued)*

**"PLAT"**:  Fannie Mae's Private Label Advisory Team.

**"PLS"**:  The GSEs' businesses responsible for investing in private label securities, including Fannie's Capital Markets group and Freddie's Non-Agency Portfolio Management group.

**"RMBS"**:  Residential Mortgage Backed Securities.

**"Rule 30(b)(6) Objections"**:  Second Amended Objections and Responses to Defendants' Rule 30(b)(6) Deposition, July 27, 2012, Ex. 12.

**"Securitizations"**:  The securitizations at issue in the Actions.

**"Simantel Decl."**:  Declaration of Cynthia Simantel, July 26, 2012, Ex. 53.

**"Single Family"**:  The GSEs' businesses responsible for purchasing or guaranteeing whole loans from mortgage lenders, including but not limited to Fannie's Single-Family Mortgage Business and Freddie's Single Family Sourcing group.

### INTRODUCTION

The GSEs, because of their varied and dominant roles in the mortgage market, not only understood but drove the underwriting practices of loan originators and the diligence practices of loan securitizers, including the alleged industry-wide abandonment of underwriting guidelines, or industry-wide misstatement of loan-to-value ratios or owner-occupancy rates. *Town of Babylon* v. *Fed. Hous. Fin. Agency*, 2012 U.S. App. LEXIS 22140, at *5-6 (2d Cir. Oct. 24, 2012). FHFA is attempting to shield that information from discovery by refusing to search for relevant documents held by the GSEs' several business units, even though those units evaluated some of the very same loans that were later included within the Securitizations at issue in these cases. In earlier proceedings concerning this issue, FHFA promised the Court full production of documents about the "tying together" and "substantial information sharing" between (a) the GSEs' multi-trillion dollar businesses as "packagers" or sellers of RMBS, run through Single Family, and (b) the GSEs' multi-billion dollar businesses as purchasers of RMBS, run through PLS. The Court previously allowed FHFA not to produce information from the GSEs' Single Family files based on FHFA's representation that its production would capture the "tying together" or "substantial information sharing" within each GSE; however, the Court invited Defendants to "come on back to me" if FHFA's production fell short of its promises. (July 31 Tr. at 100:20-101:1, Ex. 16.)

Each GSE indisputably ran its Single Family and PLS businesses on an "integrated" basis, or as "one business segment" with a "cross-functional approach to risk management." This "cross-functional" risk management approach included regular meetings among senior executives from Single Family, PLS, and other segments to "discuss issues of risk."[1] At each GSE, for example, "cross-functional" risk management involved "periodic operational reviews of [] single-

---

[1]  Special Litigation Committee Report at 21, Ex. 37; Fannie Mae 2005 10-K at 109, 146, Ex. 39.

family mortgage seller/servicers to help [] better understand their control environment and its impact on the quality of loans sold to us." (Freddie Mac 2005 Annual Report at 75, Ex. 38; *see* Fannie Mae 2005 10-K at 115, Ex. 39.) With respect to "issuers and servicers" of PLS, each GSE also managed risk through "additional analysis, including on-site visits, verification of loan documentation, review of underwriting or servicing processes and similar due diligence measures." (Freddie Mac 2005 Annual Report at 76, Ex. 38.)

Discovery thus far has confirmed extensive "tying together" and "substantial information sharing" between Single Family and PLS. (July 31 Tr. at 100:20-22, Ex. 16.) Indeed, FHFA's current segmentation effort notwithstanding, there is no doubt that, in the words of Fannie Mae employees, ████████████████████████████████████████████████████████

████████████████[2] Single Family and PLS businesses within each GSE acted in tandem or in aid of their shared objectives when they:

(i)      accessed, analyzed, and used loan-level data to select loans to be included in the Securitizations;

(ii)     chose the Originators for the Securitizations, audited the Originators, approved or disapproved the Originators and tracked information about Originator underwriting practices and tendencies, including borrower misstatements and appraiser bias;

(iii)    decided which RMBS to purchase from private issuers at what prices;

(iv)     commissioned and received their own due diligence reports and other data reflecting the rates of Originators' exceptions to underwriting guidelines applicable to loans in the Securitizations (and more generally);

(v)      led the industry in accepting those exceptions to underwriting guidelines, reducing loan documentation, and loosening credit standards;

(vi)     set or contributed to other industry standards, including for the conduct of reasonable due diligence, and for representations about, or reliance on, owner occupancy, appraisal, or other underwriting guidelines; and

---

[2] ████████████████████████████████████████████ (emphasis added), Ex. 44; *see* pp. 9-11, *infra*.

(vii)  made a calculated decision to increase their risks through PLS that the GSEs knew fell below the GSEs' underwriting standards, because (among other things) the offering documents said so, and the GSEs' housing policy goals drove all aspects of their "integrated" businesses.

This type of information bears on nearly every element of FHFA's claims or Defendants' defenses (including but not limited to falsity, materiality, GSE knowledge and reliance, GSE inquiry notice, reasonableness of diligence, and loss causation).  Accordingly, the Federal Rules and basic fairness require complete discovery.

So far, FHFA has not delivered on its promise to produce documents that capture Single Family's substantial role in the GSEs' PLS investments.  Instead, FHFA has refused to produce any documents that did not happen to be captured in the files of FHFA's selected GSE employees who had either direct involvement in the PLS trades at issue or a duty to report to those PLS traders.  Sporadically produced, for example, are reports to the GSEs about loan-level diligence, including third-party diligence reports, which were *mandatory for each subprime PLS purchase* such as those among the Securitizations.  Missing, for example, are many of the regular, detailed Originator audits that informed the GSEs' decisions whether to approve or disapprove each of the Originators as a source of loans for the Securitizations (as well as any other GSE transaction).  Produced haphazardly and only as snippets—stripped of all context—are internal emails about Single Family's active role in reviewing and selecting loans for inclusion in the Securitizations.  Never produced, for example, are documents reflecting the GSEs' standards on loans securitized, the GSEs' industry-leading rates of underwriting standard exceptions in their own securitizations—rates higher than those FHFA criticizes Defendants for accepting—and the GSEs' prior attributions of losses, like those about which FHFA now sues, to macroeconomic forces, not to any failure of diligence or underwriting.

The business-segment limitation erected by FHFA incorrectly treats these materials as bearing only on GSE knowledge, and only to the extent that knowledge crossed over to PLS.

However, the GSEs' conduct as integrated businesses and industry leaders also bears on whether offering statements were materially misleading, what diligence was reasonable, the justifiability of GSE reliance, the date of GSE notice, and how the GSEs viewed the causes of their losses. Segment-specific discovery perpetuates the fiction that the meaning, accuracy, and materiality of offering document statements about owner-occupancy rates, LTV ratios, or generalized adherence to (or systemic abandonment of) underwriting guidelines can be determined without regard to industry standards and expectations that the GSEs themselves set. It perpetuates the fiction that the GSEs lacked access to loan files, diligence reports and other tools to assess for themselves the quality of the Originators, Mortgage Loans and Securitizations. It perpetuates the fiction that the GSEs viewed certain deviations from underwriting standards as material, when the GSEs themselves bought loans originated under the same standards and led the industry in waiving compliance with them. This is fiction like Captain Renault's shock that there was gambling at Rick's Café. *See* CASABLANCA (Warner Bros. 1942). These fictions should be set aside so that discovery in these Actions may proceed fairly and efficiently toward the truth.

## PROCEDURAL BACKGROUND

### A.    Pleadings and Motions to Dismiss

FHFA filed its complaint in *Federal Housing Finance Agency* v. *UBS Americas Inc.*, 11 Civ. 5201 (S.D.N.Y.) on July 27, 2011. Another 15 cases were filed on September 2, 2011, and these 16 Actions were transferred for coordinated treatment by order dated November 16, 2011. (Order of Nov. 16, 2011, Ex. 1.) Across the Actions, FHFA sues 17 corporate groups and more than 100 individuals on more than $100 billion in mortgage-backed securities from 449 Securitizations.

FHFA asserts claims under the Securities Act of 1933, the D.C. and Virginia Blue Sky laws, and, in six cases, common law fraud and aiding and abetting fraud. (*E.g.*, JPMC AC ¶ 1,

Ex. 42.)  In each Action, FHFA alleges that Defendants made misrepresentations concerning

compliance with underwriting guidelines, owner occupancy rates, and LTVs, and credit ratings.

(*E.g.*, *id.* ¶¶ 6-7, 22.)  The complaints broadly allege that "the originators for the loans underlying

the Securitizations systematically disregarded their respective underwriting guidelines."  (*Id.*

¶ 358.)  The complaints assert that the GSEs "had no basis to suspect . . .  widespread

misrepresentations . . . in the Registration Statements," or had "a reasonable belief that the

originators complied with applicable underwriting guidelines and standards."  (*Id.* ¶¶ 437, 536.)

FHFA alleges that the GSEs suffered from some unspecified "asymmetry of information

concerning the mortgage loans underlying the securitizations."  (*Id.* ¶ 538.)  By decision dated

May 4, 2012, the Court dismissed FHFA's negligent misrepresentation claim in the *UBS* case, but

declined to dismiss the Securities Act and state blue sky claims.  *Fed. Hous. Fin. Agency v. UBS

Ams., Inc.*, 858 F. Supp. 2d 306, 336 (S.D.N.Y. 2012).  The Court held that the GSEs could not

plead a "special relationship" with Defendants as required by New York law because "the GSEs

were highly sophisticated players in the mortgage-backed securities market, which they

participated in not only as purchasers but also as packagers and marketers of securities."  *Id.* at

335.  Because FHFA did not assert fraud claims in *UBS* and, thus, the Court did not address the

potential impact of the GSEs' "systematic abandonment" allegations, non-PLS activities, and

command of information on the elements of fraud, such as justifiable reliance.  The Court

subsequently certified for expedited appeal potentially controlling questions concerning the scope

and effect of the Housing and Economic Recovery Act of 2008; the Second Circuit will hear

argument on the certified questions on November 26, 2012.

**B.     Commencement of Discovery**

Coordinated discovery across all Actions commenced on June 14, 2012.  (Order, June 14, 2012, Ex. 2.)  Document discovery was scheduled for substantial completion by October 22, 2012.  (Order of Oct. 5, 2012, Ex. 3.)

Defendants requested that FHFA produce (among other things) documents concerning the GSEs' audits or reviews of the Originators, their underwriting guidelines, and their deviations from or abandonment of those guidelines.  (*See*, *e.g.*, Defendants' Joint Second Requests for Production, June 8, 2012, Ex. 9, Request Nos. 18, 21, 22.)  Defendants also requested documents sufficient to show the diligence the GSEs performed, or that was performed on their behalf, relating to the Securitizations, or any securitization the GSEs sponsored, securitized, underwrote, or sold that included in the collateral pool any loan made by one of the Originators at issue.  (*Id.* Request No. 42.)  FHFA objected to each request, always on the asserted ground that "documents regarding the GSEs' Single Family or Multi Family business operations" are not relevant.  (*See*, *e.g.*, Plaintiff's Objections and Responses to Defendants' Joint Second Requests for Production at 14, 16, 28, July 9, 2012, Ex. 10.)  Defendants also served but were met with blanket objections to interrogatories asking FHFA simply to identify the GSE personnel primarily responsible for relationships with Originators.  (Defendants' First Set of Interrogatories to Plaintiff FHFA at 5, *Fed. Hous. Fin. Agency* v. *JPMorgan Chase & Co.*, 11 Civ. 6188  (S.D.N.Y.), May 17, 2012, Interrogatory No. 3, Ex. 7; Plaintiffs' Responses to Defendants' First Set of Interrogatories at 8, *Fed. Hous. Fin. Agency* v. *JPMorgan Chase & Co.*, 11 Civ. 6188  (S.D.N.Y.), May 31, 2012, Ex. 8.)  On June 28, 2012, in a further attempt to target readily accessible documents, Defendants sought testimony about the GSEs' organizational structures and business segments through a Rule 30(b)(6) deposition.  FHFA refused to testify on most topics, objecting that relevant information was possessed only by "the specific individuals at the GSEs who were involved in the

Securitizations" or "any employees who had an obligation to provide information to those individuals concerning the transactions in issue." (*See* Rule 30(b)(6) Objections at 9, Ex. 12.)

By letter dated July 18, 2012, the parties asked the Court for a briefing schedule for FHFA's anticipated motion for a protective order. (Letter to Judge Denise L. Cote from Richard Schirtzer and Jay Kasner, Ex. 14.) The Court instead ordered a hearing on July 31 to address this and other outstanding discovery issues. (Order, July 24, 2012, Ex. 15.) During that hearing, FHFA reiterated that it would not produce "documents that were considered only on the Single Family side and related only [to] the Single Family business" or "custodians who were cabined on the Single Family side," even if related to the Originators at issue and their adherence to the underwriting guidelines at issue. (July 31 Tr. at 88:22-88:25, Ex. 16.) FHFA pledged production of extensive information, however, from custodians and other repositories for documents transmitted to the PLS personnel involved in purchasing the Securitizations or with a duty to report to those PLS personnel. (*Id.* at 83:6-84:13, 87:5-88:18.) FHFA asserted that the burden of broader collection or production would outweigh the benefits. (Plaintiff's July 30, 2012 Submission to the Court Regarding Defendants' Custodian Requests at 1, Ex. 13.)

Based on these and other of FHFA's representations, the Court denied Defendants' request for a Rule 30(b)(6) deposition on these issues. (July 31 Tr. at 99:23-102:1.) The Court also stated, however:

> If there was, as the defendants argue, a ***tying together*** of the single-family and PLS function within these organizations and ***substantial information sharing between the two sides of the businesses*** within these organizations, and I think I'm capturing the precise terms used this afternoon, ***those documents are going to be captured in this document production***. ***If they aren't, come on back to me***.

(*Id.* at 100:20-101:1 (emphasis supplied).)[3]

Since the hearing, the documents the Court called for have not been captured, apparently because FHFA deems them off limits unless found in certain PLS files.  (*See*, *e.g.*, Plaintiff's Objections to Defendants' Fourth Request, Ex. 34.)  FHFA's blockade has not been limited to its own production.  It even has sought to prevent *third parties* from producing documents about their dealings with the GSEs' Single Family businesses, telling hundreds of third-party subpoena recipients, including Originators, that "the Court overseeing the S.D.N.Y. Actions ruled that such documents are not relevant to the cases."  (Letter from Philippe Z. Selendy, September 14, 2012, Ex. 19; *see* Plaintiff's Objections to Subpoenas of Non-Parties at 7,  *Fed. Hous. Fin. Agency* v. *HSBC North America Holdings, Inc.*, 11 Civ. 6189 (S.D.N.Y.), Oct. 3, 2012, Ex. 20.)  At a conference on October 15, 2012, the Court observed that it had neither ruled the material irrelevant nor foreclosed its production.  (Oct. 15 Tr. at 37:6-9, Ex. 22.)  FHFA's refusals to produce relevant, responsive documents from Single Family files persist.  (*See* Shane Decl. Ex. 34.)

## C.    Disclosures to Date about the GSEs' Integrated Activities

The limited discovery provided by FHFA to date confirms not only that there was functional "tying together" and "substantial information sharing between" the Single Family and PLS or Capital Markets businesses at the GSEs, but that critical evidence concerning the Mortgage Loans, Securitizations, the Originators and GSE practices bearing on them resides outside PLS

---

[3]        On August 14, 2012, certain Defendants moved for reconsideration of the Court's July 31, 2012 decision. Letter of August 14, 2012, at 2, Ex. 17.  On August 28, 2012, the Court denied the motion.  Order of August 28, 2012, Ex. 18.

files.  Because FHFA has blocked discovery from non-PLS sources, only snippets, stray

documents, and incomplete references to crucial evidence are being produced.[4]

**Single Family's Role in Reviewing and Selecting Loans for the Securitizations.**

The limited discovery provided thus far confirms that the GSEs' respective Single Family

businesses scrutinized the purchases of mortgage loans that would become collateral for the

Securitizations at issue.  Freddie Mac recognized the connection between its whole loan and PLS

businesses and sought to evaluate mortgages consistently across both. ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ (████████████████████

████████████████████████████████████████████

████████████ Ex. 50.)

The GSEs evaluated whole loan pools specifically to determine if it was more

advantageous to purchase them for inclusion in agency securitizations or to invest in them through

the AAA tranche of private label securitizations.  For example, a ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

---

[4]        This motion reflects Defendants' review of FHFA's production to date, along with FHFA's stated positions
on further production.  FHFA recently stated that it has substantially completed its production of documents from
custodian files for the period up to 2008.  Because review and production continue, however, some of the materials
Defendants perceive as missing may be on their way.  Still, mindful of the Court's extremely compressed schedule
and with depositions less than three months away, Defendants seek an order overruling FHFA's objections based on a
business segment limitation and clarifying instead that FHFA must search for responsive documents where they are
reasonably likely to be found, and produce them as soon as practicable.  As detailed in Point II.B., below, Defendants
remain willing to work with FHFA to target likely repositories of the missing information so as to promote efficiency
and conclude document discovery promptly, within the time already needed for FHFA to complete its production, and
to receive belatedly requested production, for the post-2008 period.

██████████████. (████████████████████████████████ Ex. 51.)

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ (████████████████████████

████████████ Ex. 51.)  Because FHFA refuses to search ████████████ or other Single

Family employees' files, however, this ████████ ██████ has thus far remained hidden.

Similar glimpses of Single Family's role in reviewing and selecting loans for

Securitizations emerge from internal Fannie Mae emails.  For example, a ████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ (████████████████

██████████████████, Ex. 44.)  ██████████████████████

████████████████████████████████████████

████████████████████████████████ (████████████████

████████████ Ex. 45.)  ██████████████████████

████████████████████████████████████. (████████████

████████████████████████████, Ex. 45.)  Before

another transaction, ████████████████████████████████████

████████████████████████████ (████████████████

████████████████████████, Ex. 49.)[5]

---

[5]      Indeed, based on FHFA's partial production (and on Defendants' internal analysis), the record reveals that
████████████████████████████████████████████████████
████ (████████████████████████████ Ex. 52;
████████ Shane Decl. ¶ 48.)

As these e-mails show, the GSEs' Single Family employees were involved in critical steps toward selecting the loans to be included in the Securitizations.  Numerous Single Family employees appear on e-mails about selecting loans for the Securitizations.  FHFA nonetheless refuses to search these or other Single Family employees' files for information about how Single Family decided which loans to pass along to PLS for inclusion in Securitizations.[6] Because FHFA generally refuses to search Single Family custodians, there is no reason to believe that discovery will reveal more than snippets like these, with allusions to loan selections, but not the basis, findings, or results.

**Single Family's Role in Reviewing Originators.**  The GSEs regularly reviewed Originators and other counterparties, and generated reports that memorialized their findings, assessed risks, and made recommendations that both business groups relied on.  FHFA, however, has selectively produced only a subset of these reports based on the purported business segment in which they reside.  (*See* Plaintiff's Objections to Defendants' Fourth Request at 29 (response to Request No. 30), Ex. 34.)  The distinction FHFA draws between business segments for litigation purposes conflicts with the business practices and perspectives offered by GSE personnel and others who participated in those reviews.  ( ▮▮▮▮

▮▮▮▮ Ex. 36 (" ▮▮▮▮

▮▮▮▮ .) As set forth in the July 26, 2012 Declaration of Cynthia Simantel, an employee in the Quality Control and Investor Audit Departments at one of the Originators (Countrywide), yearly GSE reviews delved into origination practices, with non-PLS employees conducting PLS reviews at the Originator that were coordinated with and related to non-PLS reviews.  (Simantel Decl. at ¶¶ 2, 4, Ex. 53; *see also* Freddie Mac 2005 Annual Report,

---

[6]      Defendants intend to separately move this Court to compel FHFA to add certain custodians and search terms to its search protocol.

June 28, 2006, at 76, Ex. 38 (Freddie conducted "on-site visits, verification of loan documentation, review of underwriting or servicing processes and similar due diligence" at Originators).) Originators communicated with the GSEs' Single Family and PLS employees simultaneously concerning underwriting standards, including the "underwriting exception process and [] approval of loans that were exceptions to the guidelines." (Simantel Decl. ¶ 3, Ex. 53.) Some counterparty review reports prepared for Single Family may have trickled out in discovery; that trickle contains

███████████████████████████████████████████████████████████████████

██████████████████████████. (███████████████████████████████████████

███████████████████████████ Ex. 32 █████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ (emphasis added); ██████

████████████████████████████████████████████, Ex. 33 (████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████ )

**The GSEs' Knowledge of Allegedly Inflated LTV Ratios.** The offering materials for the Securitizations disclosed average loan-to-value (LTV) ratios for the mortgages backing the Securitizations. FHFA now alleges that these stated LTV ratios were misstated.

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████ For example, in an █████████████

████████████████████████████ one of the Securitizations at issue in the *UBS* Action ████████

-12-



████████████████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████ (████████████

██████████████████████ Ex. 47; *see also* ████████████████████

████████████████ Ex 48.)

**The GSEs' Loan Level Due Diligence Reports**.  Fannie Mae policy ████████████

████████████████████████████████████████████████████████

██████ (██████████████████████████████████████████████

███████████████████████, Ex. 29.) ████████████████████████

████████████████████████████████████

████████████████████████████████ (*Id.* at ██████████.) ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

██████ (*Id.*) ████████████████████████████████

████████████████████ (*Id.* at ██████████.) ████████████████████

████████████████████████████████████████████████████████

██████████ (██████████████████████████████████████

Ex. 31.) ████████████████████████████████ (*Id.*) ████████████

████████████████████████████████████████████████████████

████████████████ (██████████████████████████████ Ex.

30.) ████████████████████████████ Defendants have not found reports in

FHFA's production for most of the Certificates that were backed by subprime mortgages

purchased by Fannie.

**The GSEs' Own Due Diligence and Underwriting Standards and Practices.** ▮



(*Id.* at ▮▮▮▮▮) That is precisely the kind of diligence that FHFA now claims was not "adequate and sufficient due diligence" on the part of Defendants. (*E.g.*, Goldman Sachs AC ¶¶ 77-90, Ex. 59.) Further, a 2007 "Clayton Trending Report" on which FHFA relies in its complaints shows that Freddie Mac waived 60 percent of non-conforming loans when purchasing loans for securitizations. (All Clayton Trending Reports at 5, Ex. 41.) Indeed, Freddie had the third highest waiver rate of the 23 entities that Clayton reviewed. (*Id.*) When accusing Defendants, FHFA says waiver rates like these reflect flawed diligence, and notice of deviations from guidelines.[7] FHFA, however, has refused to produce any GSE internal documents concerning these topics.

Likewise, FHFA refuses to produce from the GSEs the very type of documents it seeks from Defendants concerning notice of systemic mortgage fraud. Publicly available documents show that OFHEO required the GSEs to "have a system in place reasonably designed to detect, investigate, and report mortgage fraud or possible mortgage fraud," including every type

---

[7]    *See*, *e.g.*, JPMC AC ¶ 205, Ex. 42 (alleging that JP Morgan Acquisition waived in 51 percent of the 27 percent of loans that Clayton identified as non-conforming). Defendants disagree with FHFA's assertion because, as Clayton representatives have testified, high waiver rates can result from more stringent guidelines, without indicating any wrongdoing. *The Financial Crisis at the Community Level—Sacramento, CA*, Hearing Before the Financial Crisis Inquiry Commission, at 172:20-24 (Sept. 23, 2010), Ex. 57.

of misrepresentation alleged here.  (Policy Guidance:  Examination for Mortgage Fraud Reporting, OFHEO, July 25, 2005, Ex. 55.)  A presentation by Fannie Mae to the Mortgage Bankers Association amassed, for mortgages originated in 2004 or 2005, various "[m]isrep [f]indings," including, among others, "[i]nflated appraised value," "[f]alsified intent to occupy," "[f]alsified employment" and "[i]nflated income."  (Mortgage Fraud Detection & Prevention:  An Investor Perspective at 10, Fannie Mae, May 2006, Ex. 56.)  FHFA, however, has refused all discovery requests for "Reports of mortgage fraud, including any reports to OFHEO" and for identification of GSE personnel responsible for investigating mortgage fraud, because, according to FHFA, the requests "seek[] documents regarding the GSEs' Single Family or Multi Family business operations" (*see* Plaintiff's Objections to Defendants' Fourth Request at 28-29, Ex. 34), or because "reports to OFHEO regarding mortgage fraud were routinely created by employees in the GSEs' single-family or multi-family business operations" and "neither employees nor supervisors in the GSEs' PLS business operations received these reports or the underlying data"  (Letter from Jon Corey to Edward Bennett, October 25, 2012, Ex. 66).  In other words, based on nothing but which files contain them, FHFA is refusing to produce the GSEs' mandatory, real-time reports concerning the same underwriting irregularities, or alleged "frauds," that form the basis for FHFA's claims on behalf of the GSEs now.

## ARGUMENT

**I.   FHFA SHOULD BE REQUIRED TO SEARCH FOR AND PRODUCE RELEVANT DOCUMENTS FROM ANY BUSINESS UNIT SUBSTANTIALLY INVOLVED IN ASSESSING THE ORIGINATORS, THE MORTGAGE LOANS, THE SECURITIZATIONS, THE POTENTIAL OR ACTUAL COLLATERAL, OR THE RISKS ASSOCIATED WITH ANY OF THEM.**

A party is entitled to discover "any nonprivileged matter that is relevant to any party's claim or defense."  FED. R. CIV. P. 26(b)(1).  "[T]he scope of discovery under Fed. R. Civ. P. 26(b) is very broad, encompass[ing] any matter that bears on, or that reasonably could lead to

other matter that could bear on, any issue that is or may be in the case." *Wheeler* v. *Citigroup*, 2012 U.S. Dist. LEXIS 101296, at *7-8 (S.D.N.Y. July 20, 2012) (Fox, M.J.) (quoting *Maresco* v. *Evans Chemetics*, 964 F.2d 106, 114 (2d Cir. 1992)).  A court "abuses its discretion when the discovery is so limited as to affect a party's substantial rights," as parties must be given "a meaningful opportunity to establish" the facts necessary to its claims or defenses.  *Long Island Lighting Co.* v. *Barbash*, 779 F.2d 793, 795 (2d Cir. 1985); *see also Rossini* v. *Ogilvy & Mather, Inc.*, 798 F.2d 590, 601 (2d Cir. 1986).

## A.    The Missing Material Is Relevant to FHFA's Claims and Defendants' Defenses.

*Notice*.  To the extent that the GSEs received negative results from their roughly contemporaneous reviews of the Securitizations, or their yearly Originator reviews, or their extensive other activities as industry leaders, the GSEs would have been on notice of their claims prior to September 2007.  *See UBS*, 858 F. Supp. 2d, at 320-22.  To the extent that these and other documents reflect GSE demands for the "repurchase" of loans due to an alleged lack of conformity with guidelines, they may prove that the GSEs were not only on inquiry notice, but actually had discovered potential claims before September 2007.  If so, that notice may have extended to other loans or securitizations.  *See Boilermakers Nat'l Annuity Trust Fund* v. *Wamu Mortg. Pass Through Certificates, Series AR1*, 748 F. Supp. 2d 1246, 1258 (W.D. Wa. 2010) (plaintiffs had notice of claims based on previous complaint's allegations about "substantially identical" statements in the offering documents of another security).  Moreover, as shown above, employees within Single Family evaluated some of the exact same loans that were later included within the Securitizations.  Accordingly, analyses of these loans may have placed the GSEs on notice of the claims asserted here.

*Knowledge*.  Under Section 11 of the Securities Act, "the issuer may 'prove[] that at the time of [] acquisition [the purchaser] knew of [the alleged] untruth or omission.'"  *N.J.*

*Carpenters Health Fund* v. *Rali Series 2006-QO1 Trust*, 2012 U.S. App. LEXIS 8675, at *6 & n.1 (2d Cir. Apr. 30, 2012).  According to FHFA, the alleged untruth or omission here includes the lack of disclosure that there was a "systematic disregard" and "widespread abandonment" of underwriting guidelines by Originators, as well as an alleged failure to conduct due diligence and disclose more particular alleged Originator failings.  (JPMC AC ¶¶ 340-440, Ex. 42.)  In order to prove that the GSEs knew of these alleged untruths or omissions, Defendants are entitled to discover documents showing what the GSEs learned when they audited the Originators, critiqued their underwriting processes, and noted the same types of underwriting questions that FHFA now claims were then unknown.  Defendants are also entitled to discover what employees within Single Family, who evaluated some of the exact same loans later included in the Securitizations, knew about the quality of those loans.  Documents concerning pre-securitization loan selection, as well as post-securitization due diligence reports required by Fannie Mae for every deal backed by subprime mortgages, demonstrate the GSEs' access to loan-level information that FHFA now claims the GSEs lacked.

From their own activities, including their unmatched access to Originators, the GSEs came to believe that certain disclosures in the offering materials were false.  ██████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████—a dispositive piece of evidence in support of the statutory knowledge defense under Section 11 of the Securities Act, and equally dispositive on other key issues such as notice and materiality.  (████████████████████ ██████████████████████████, Ex. 47; *see also* ████████████████████████████████ ██████████████████ Ex 48.)  Such documents reflect that the GSEs had experience, knowledge, tools and judgment sufficient to form their own beliefs about what a collateral pool's LTV ratio was and about other commonly used metrics.  But FHFA has produced no documents reflecting

the analysis and data that went into forming conclusions ███████████████████████.  Those

analyses and data almost certainly reside outside PLS files, but no less certainly influenced all

aspects of the GSEs' businesses.

FHFA's fraud allegations underscore the importance of this evidence.  FHFA has

alleged in the fraud Complaints that Defendants' dealings with Originators in purchasing and

securitizing mortgage loans made them aware of the alleged borrower misstatements, appraisal

bias, underwriting failures and/or credit rating unreliability that underlies FHFA's claims.  It

stands to reason that the GSEs' Single Family business units, which interacted with the same

Originators concerning the same issues, gained the same information, or more, based on those

interactions.

*Justifiable Reliance*.  Fraud claimants like FHFA must prove not only that a

decision-maker relied on an alleged misstatement, but that that reliance was justifiable.  This

analysis depends on, among other things, the GSEs' institutional knowledge and resources.  *See*,

*e.g.*, *HSH Nordbank AG* v. *UBS AG*, 95 A.D.3d 185, 194-95 (N.Y. App. Div. 2012); *MBIA Ins.*

*Corp.* v. *Merrill Lynch*, 81 A.D.3d 419, 419 (N.Y. App. Div. 2011); *see also PPI Enters. (U.S.)* v.

*Del Monte Foods Co.*, 2003 U.S. Dist. LEXIS 16006, at *68 (S.D.N.Y. Sept. 11, 2003) ("[T]he

level of scrutiny applied to a plaintiff in fraud cases is heightened in transactions between

sophisticated business entities.").  An accurate picture of the GSEs' reliance—including whether it

was justifiable—cannot be had if more than half of the GSEs' corporate knowledge, gained

through the purchase, packaging, and sale of trillions of dollars of Single Family transactions, is

withheld.  Evidence that the GSEs had selected and assessed which Mortgage Loans would be

purchased before the Securitizations were even assembled similarly refutes any claim of reliance

on Defendants' representations.  That the GSEs conducted their own reviews of Originators and

their underwriting practices, and approved or disapproved of Originators on that basis, at least

significantly undercuts any claim of reliance if, as FHFA claims, failings were readily detectable.

In analogous circumstances, other courts in this District have granted motions to

compel production of "all documents reflecting" all of a plaintiff's transactions in any security

during the years when plaintiffs allegedly had been misled.  As Judge Conner explained in *In re*

*AES Corp. Securities Litigation*, "when direct reliance is alleged in the Complaint, plaintiffs'

sophistication is relevant to the merits," and "the discovery of prior investments is reasonably

calculated to lead to evidence concerning plaintiffs' sophistication in the marketplace."  849 F.

Supp. 907, 910 (S.D.N.Y. 1994).  Indeed, "evidence probative of the degree of sophistication of a

plaintiff in a securities case is both admissible at trial and an apt subject for discovery," and

provided "there is an adequate nexus with the investments at issue in the litigation, prior

transactions will be pertinent."  *Davidson Pipe Co.* v. *Laventhol & Horwath*, 120 F.R.D. 455, 460

(S.D.N.Y. 1988) (Francis, M.J.); *see also Kingsway Fin. Servs.* v. *PriceWaterhouse-Coopers LLP*,

2006 U.S. Dist. LEXIS 35615, at *9 (S.D.N.Y. June 1, 2006).

*Falsity and Materiality*.  The GSEs' practices in making or approving exceptions

to underwriting standards in the GSEs' own securitizations would demonstrate the level of

exceptions that the GSEs and other market participants considered material.  In fact, many of the

offering documents on which FHFA bases its claims expressly referred to Fannie Mae's and

Freddie Mac's underwriting standards, with some offering documents prominently warning that

the "Underwriting Standards of the Originator Are Not as Stringent as those of Fannie Mae and

Freddie Mac, Which May Result in Losses."  (*See*, *e.g.*, Prospectus Supplement for JPMAC 2006-

WMC3 at S-11, Ex. 40.)  Interpreting these standards—and determining which factors sufficiently

"compensat[e]" to allow for exceptions to them—requires understanding how such terms were

used in the mortgage industry.  (*Id.* at S-52-53; *see Kitchens* v. *U. S. Shelter*, 1988 U.S. Dist.

LEXIS 18546, at *87-91, *96-98 (D.S.C. June 30, 1988) (where offering document referred to generally accepted valuation procedures, falsity and materiality analysis depends on proof about those generally accepted procedures).)  The GSEs used those terms, and created those understandings, through their trillion dollar Single Family businesses.  *See Town of Babylon* v. *Fed. Hous. Fin. Agency*, 790 F. Supp. 2d 47, 49-50 (E.D.N.Y. 2011) (GSEs' combined assets and market positions made them a "dominant force" that "guided" decisions by other market participants), *aff'd*, 2012 U.S. App. LEXIS 22140 (2d Cir. Oct. 24, 2012).

> *Due Diligence Defenses*.  For underwriter Defendants, documents reflecting how the GSEs performed their due diligence is directly relevant to the presentation of due diligence defenses under Section 11(b)(3).  To assess reasonable diligence, courts examine "that which is required of a prudent man in the management of his own property."  *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 492 (S.D.N.Y. 2005) (Cote, J.) (internal quotation marks omitted); *Feit* v. *Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 576-78 (E.D.N.Y. 1971) (same). In *Escott* v. *BarChris Constr. Corp.*, for example, the court looked to "[g]enerally accepted accounting standards" to assess the reasonableness of the diligence conducted.  283 F. Supp. 643, 703 (S.D.N.Y. 1968).  Here, the GSEs dominated the mortgage securitization industry; they regularly conducted their own diligence, regularly made representations about mortgages from the same Originators, and employed many of the same due diligence processes that the Defendants employed.  Their conduct bears directly on whether the diligence conducted by Defendants was reasonable.  *See Babylon*, 796 F. Supp. 2d at 49-50.

> *Loss Causation*.  Section 11(e) of the 1933 Act provides a "loss causation" defense to defendants who can prove that the alleged damages "represent[] other than the depreciation in value of such security resulting from" the alleged misrepresentation.  *See also In re State Street Bank & Trust Co. Fixed Income Funds Investment Litig.*, 774 F. Supp. 2d 584, 588 (S.D.N.Y.

2011).  Documents from across the GSEs' businesses likely contain admissions that the GSEs

attributed poor performance of all RMBS, including but not limited to those the GSEs issued, to

macro-economic factors such as declining home prices or increased unemployment rates.  Both

GSEs already are on public record attributing their losses to a "once-in-a-lifetime credit tsunami,"

not to any alleged misconduct by Defendants.  (Memorandum of Law in Support of Fannie Mae's

Motion to Dismiss at 1, *In re Fannie Mae 2008 Sec. Litig.*, 08 Civ. 7831 (S.D.N.Y.), Sept. 18,

2009, Ex. 64.)

### B.   The *AIG* Case FHFA Relies on Does Not Warrant Denial of the Requested Discovery.

As discussed above, the missing material bears on nearly every element of FHFA's

claims and Defendants' defenses, not simply the GSEs' knowledge.  Even if GSE "knowledge"

alone were at issue, however, FHFA is incorrect that under *AIG Global Securities Lending Corp.* v.

*Banc of America Securities*, "the knowledge possessed by people other than (1) the specific

individuals at the GSEs who were involved in the Securitizations, or (2) any employees who had

an obligation to provide information to those individuals concerning the transactions in issue, is

irrelevant."  (Rule 30(b)(6) Objections at 9, Ex. 12 (citing *AIG*, 2006 U.S. Dist. LEXIS 25883

(S.D.N.Y. May 2, 2006).)  In *AIG*, the Court considered the potential relevance to plaintiffs' fraud

claim of information in plaintiffs' possession regarding a company that issued consumer

installment contracts that collateralized asset-backed securities that plaintiffs purchased, where the

information remained confined to employees with no connection to the specific transactions at

issue in the litigation.  *Id.* at *2-3; *see also AIG Global Secs. Lending Corp.* v. *Banc of Am. Secs.,*

*LLC*, 2005 U.S. Dist. LEXIS 21605, at *1-2 (S.D.N.Y. Sept. 26, 2005).  Reasoning, under the

since-superseded Second Restatement of Agency, that "the knowledge of one agent derived from a

particular transaction is not imputed to the principal when a different agent participates in a

different transaction," *AIG*, 2006 U.S. Dist. LEXIS 25883, at *4, the Court held that "any

knowledge that those employees acquired in the course of those other transactions, unless actually communicated to the specific employees who made the investment decision that give rise to the this action, is not chargeable to the plaintiffs or the specific employees who made the investment decision at issue here," and denied Defendants' request for discovery.  *Id.* at *5.

Unlike in *AIG*, the discovery sought here focuses on the Originators, Mortgage Loans and Securitizations, where FHFA admits that some information about those topics was shared among the GSEs' Single Family to the PLS traders or those who reported to them, oversaw them, or assisted them.  (*See*, *e.g.*, Rule 30(b)(6) Objections at 14, Ex. 12.)  The issues here need not involve imputation of knowledge, under *AIG* or otherwise, because (i) some Single Family information undoubtedly influenced the PLS trades and is discoverable; (ii) Single Family or other non-PLS personnel played a role in diligencing the Mortgage Loans and in selecting collateral for Securitizations; and (iii) the GSEs set standards in the industry for diligence, underwriting, and offering statement representations.  The only issue, therefore, is how best to locate and produce this responsive material.

Further, *AIG* was decided solely in the context of knowledge and sophistication defenses to securities fraud claims and did not purport to apply to materiality, loss causation, or statute of limitations defenses.  2006 U.S. Dist. LEXIS 25883, at *3 ("The issue underlying the present dispute is how the financial sophistication and knowledge of a corporate plaintiff is determined in this context . . . .").  Thus, for example, with respect to inquiry notice, it does not make sense to "limit[] the inquiry concerning knowledge and sophistication to the particular individuals involved in the transaction," because those individuals may not have had any responsibility for assessing the GSEs' potential claims against their business partners.  *Id.* at *7.  And under the Third Restatement of Agency, never addressed in *AIG*, unless the Single Family division employees are "subject to a duty to another not to disclose the fact[s]" within the GSEs,

the GSEs are "charge[able] with notice" of those facts. RESTATEMENT (THIRD) OF AGENCY § 5.03

(2006); *see also George* v. *Equifax Mortg. Servs.*, 375 Fed. App'x 76, 78 (2d Cir. 2010); *Bank of*

*China* v. *NBM LLC*, 359 F.3d 171, 179 (2d Cir. 2004); *Kirschner* v. *KPMG LLP*, 15 N.Y.3d 446,

466 (2010).[8]

## II.   FHFA SHOULD BE REQUIRED TO COOPERATE IN DEVISING A PLAN TO COMPLETE ENTITY-WIDE DISCOVERY PROMPTLY AND EFFICIENTLY.

### A.   The Discovery Sought Is Proportional Under Rule 26(b)(2).

Under Rule 26(b)(2)(C)(i)-(iii), a court may limit relevant discovery if "the burden

or expense of the proposed discovery outweighs its likely benefit, considering the needs of the

case, the amount in controversy, the parties' resources, the importance of the issues at stake in the

action, and the importance of the discovery in resolving the issues." It is FHFA's burden,

however, "to show good cause to deny the discovery sought," and FHFA can meet its burden only

with a "particular and specific demonstration of fact." *Dongguk Univ.* v. *Yale Univ.*, 270 F.R.D.

70, 74 (D. Conn. 2010) (citing *Gulf Oil Co.* v. *Bernard*, 452 U.S. 89, 102 (1981)). This rule is no

different where the party resisting discovery is the United States government. *See, e.g., SEC* v.

*Collins & Aikman Corp.*, 256 F.R.D. 403, 414, 418 (S.D.N.Y. 2009).[9]

To assess proportionality, courts look to whether the cost of discovery "is

significantly disproportionate to the value of the case." *Quinby* v. *WestLB AG*, 245 F.R.D. 94, 110

(S.D.N.Y. 2006) (quoting *Zubulake* v. *UBS Warburg LLC*, 216 F.R.D. 280, 288 (S.D.N.Y. 2003)).

---

[8]    FHFA has asserted that "walls" prevented certain information flow from Single Family to PLS personnel. Rule 30(b)(6) Objections at 18, 25, Ex. 12. As more fully described in the accompanying Declaration, the GSEs' produced documents raise substantial doubts about these "walls." Additional questions arise from ███████. *See* Shane Decl. ¶ 56 & ███████████. Ex. 60. The scope or effectiveness of "walls" is irrelevant where, as here, the issues to which non-PLS materials relate transcend what was known by PLS employees.

[9]    Defendants note that FHFA is not a government actor when acting as conservator for the GSEs. FHFA has conceded that point. *See* Memorandum of Points and Authorities in Support of Intervenor Federal Housing Finance Agency's Motion to Dismiss the *Bivens* Claim Under Rule 12(b)(6) at 18-20, *Herron* v. *Fannie Mae*, 10 Civ. 00943 (D.D.C.), June 27, 2011, Ex. 62.

Burden is deemed to be "minimal" where the expenses of discovery "pale in comparison" to the amount "in controversy," "the parties have demonstrated a willingness to devote substantial resources to discovery," and "both sides are well-financed" so "neither gains an economic advantage by making discovery more costly." *Ferguson* v. *Lion Holding, Inc.*, 2005 U.S. Dist. LEXIS 9789, at *10-11 (S.D.N.Y. May 23, 2005) (cost of additional discovery "pale[d] in comparison" to $75 million value of claims).

Here, the amounts in controversy are massive—billions of dollars. They easily dwarf the costs of discovery. All parties have sought substantial discovery and have shown a willingness to devote substantial resources to the task. To date, Defendants have produced at least 350 million pages of documents, including 50 million pages other than loan files, from 641 custodians; FHFA has produced 4.9 million non-loan file pages, from 112 custodians. (*See* Shane Decl. ¶ 21.) In other words, FHFA has produced a small fraction of what it has received. For its part, FHFA seeks production from Defendants of all documents reflecting any dealings with the Originators, and a wide range of materials from business divisions and personnel unconnected to Defendants' PLS business. (Plaintiff's Second Request for the Production of Documents at 9-10, *Fed. Hous. Fin. Agency* v. *JPMorgan Chase & Co.*, 11 Civ. 6188 (S.D.N.Y.), June 4, 2012, Ex. 43.) In recent weeks, FHFA has significantly increased the number of custodians whose files it demands Defendants search, significantly expanded the time frames in which documents are sought, and indicated no intention of completing its own document production, or its demands for documents, by October 22, 2012. (*See* Shane Decl. ¶¶ 23-24.) FHFA also has disclosed a potentially significant document destruction issue, heightening the need for it to search for documents that might have resided in multiple repositories. (*See id.* ¶ 57 & Ex. 61.) Defendants do not seek cumulative or duplicative discovery, nor do they seek to impose undue burden. Rather,

Defendants seek production of the unique documents FHFA has shielded from discovery based on the business-segment limitation that it devised for litigation—not business—purposes.

**B.      The Discovery Sought May Be Completed Promptly and Efficiently.**

For the reasons discussed above, Defendants respectfully request the Court to order FHFA to produce the following materials, from whichever repositories appear reasonably likely to contain them, including repositories located within the Single Family segments of the GSEs:

- Documents reflecting how and on what basis non-PLS personnel helped to select loans for the Securitizations;

- Documents reflecting loan-level reviews that the GSEs performed on the Securitizations or any of the Mortgage Loans contained in them;

- Documents reflecting the GSEs' reviews or analyses of the Originators at issue and the basis for the GSEs' approvals, disapprovals and analyses of the Originators at issue, including any periodic audits, counterparty reviews, and any communications or analyses concerning those audits or reviews;

- Documents reflecting the policies, procedures and practices relating to the GSEs' analysis, review, issuance or purchase of RMBS, including documents sufficient to show the GSEs' diligence practices, and their understanding and uses of models, underwriting guidelines, and exception processes that FHFA says Defendants failed to follow;

- Documents reflecting any analysis of the causes of alleged loss to the GSEs' RMBS purchases; and

- Documents reflecting ways in which analysis of the Mortgage Loans in question affected the GSEs' decision to purchase private label securities, including how such analysis influenced the price the GSEs paid for such securities.

Defendants have sought this discovery through the most cost-efficient, expeditious methods:  Rule 30(b)(6) depositions, interrogatories, and informal exchanges of information about potential custodians.  (*See* Shane Decl. ¶¶ 8-11, Exs. 7, 11.)  Defendants propose that the parties employ these same potentially cost- and time-saving discovery tools to complete this discovery. This discovery could easily be accomplished in parallel with the supplemental document production that already is ongoing, at FHFA's request.  (*See* Shane Decl. ¶ 23.)

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Compel should be granted.

Dated:  New York, New York
        November 5, 2012


Respectfully Submitted,

/s/ Penny Shane
_____

Penny Shane (shanep@sullcrom.com)
Sharon L. Nelles (nelless@sullcrom.com)
Jonathan M. Sedlak (sedlakj@sullcrom.com)
Yavar Bathaee (bathaeey@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004

*Attorneys for Defendants JPMorgan Chase &
Co., JPMorgan Chase Bank, N.A., J.P. Morgan
Mortgage Acquisition Corporation, J.P.
Morgan Securities LLC, J.P. Morgan
Acceptance Corporation I, Bear Stearns & Co.,
Inc., EMC Mortgage LLC, Structured Asset
Mortgage Investments II Inc., Bear Stearns
Asset Backed Securities I LLC, WaMu Asset
Acceptance Corporation, WaMu Capital
Corporation, Washington Mutual Mortgage
Securities Corporation, Long Beach Securities
Corporation and certain of the Individual
Defendants*

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw com)
Alan C. Turner (aturner@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017-3954

*Attorneys for Defendants Deutsche Bank AG,
Taunus Corporation, Deutsche Bank Securities
Inc., DB Structured Products, Inc., Ace
Securities Corp., Mortgage IT Securities Corp.*

David H. Braff (braffd@sullcrom.com)
Brian T. Frawley (frawleyb@sullcrom.com)
Jeffrey T. Scott (scottj@sullcrom.com)
Joshua Fritsch (fritschj@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

*Attorneys for Barclays Capital Inc., Barclays
Bank PLC, Securitized Asset Backed
Receivables LLC, Paul Menefee, John Carroll,
and Michael Wade*

Richard W. Clary (rclary@cravath.com)
Michael T. Reynolds (mreynolds@cravath.com)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

*Attorneys for Credit Suisse Securities (USA)
LLC, Credit Suisse Holdings (USA), Inc., Credit
Suisse (USA), Inc., DLJ Mortgage Capital, Inc.,
Credit Suisse First Boston Mortgage Securities
Corporation, Asset Backed Securities
Corporation, Credit Suisse First Boston
Mortgage Acceptance Corporation, Andrew A.
Kimura, Jeffrey A. Altabef, Eveleyn Echevarria,
Michael A. Marriott, Zev Kindler, John P.
Graham, Thomas E. Siegler, Thomas Zingalli,
Carlos Onis, Steven L. Kantor, Joseph M.
Donovan, Juliana Johnson, and Greg Richter*

Richard H. Klapper (klapperr@sullcrom.com)
Theodore Edelman (edelmant@sullcrom.com)
Michael T. Tomaino, Jr.
(tomainom@sullcrom.com)
Tracy Richelle High (hight@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

*Attorneys for Goldman, Sachs & Co., GS
Mortgage Securities Corp., Goldman Sachs
Mortgage Company, The Goldman Sachs
Group, Inc., Goldman Sachs Real Estate
Funding Corp., Peter C. Aberg, Howard S.
Altarescu, Robert J. Christie, Kevin Gasvoda,
Michelle Gill, David J. Rosenblum, Jonathan S.
Sobel, Daniel L. Sparks, Mark Weiss*

John M. Conlon (jconlon@mayerbrown.com)
Mark S. Hanchet
(mhanchet@mayerbrown.com)
Michael O. Ware (mware@mayerbrown.com)
MAYER BROWN LLP
1675 Broadway
New York, NY 10019

*Attorneys for Defendants HSBC North America
Holdings Inc., HSBC USA Inc., HSBC Markets
(USA) Inc., HSBC Bank USA, NA., HSI Asset
Securitization Corporation*

Jay B. Kasner (jay.kasner@skadden.com)
Thomas J. Nolan (thomas.nolan@skadden.com)
Scott Musoff (scott.musoff@skadden.com)
Robert A. Fumerton
(robert.fumerton@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, NY  10036

*Attorneys for Defendants UBS Americas Inc.,
UBS Real Estate Securities Inc., UBS Securities
LLC, Mortgage Asset Securitization
Transactions, Inc., David Martin, Per Dyrvik,
Hugh Corcoran and Peter Slagowitz*

James P. Rouhandeh
Brian S. Weinstein
Daniel J. Schwartz
Nicholas N. George
Jane M. Morril
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017

*Attorneys for Defendants Morgan Stanley,
Morgan Stanley & Co. Incorporated (n/k/a
Morgan Stanley & Co. LLC), Morgan Stanley
Mortgage Capital Holdings LLC (successor-in-
interest to Morgan Stanley Mortgage Capital
Inc.), Morgan Stanley ABS Capital I Inc.,
Morgan Stanley Capital I Inc., Saxon Capital,
Inc., Saxon Funding Management LLC, Saxon
Asset Securities Company, Gail P. McDonnell,
Howard Hubler, David R. Warren, and Steven
S. Stern*

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Alan Turner (aturner@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017

*Attorneys for Defendant RBS Securities Inc.*

Greg A. Danilow (greg.danilow@weil.com)
Vernon Broderick
(vernon.broderick@weil.com)
WEIL, GOTSHAL, & MANGES LLP
767 Fifth Avenue, 25th Fl.
New York, NY  10153

*Attorneys for General Electric Company,
General Electric Capital Services, Inc., GE
Mortgage Holding, LLC, GE-WMC Securities,
LLC*

Brad S. Karp (bkarp@paulweiss.com)
Susanna M. Buergel (sbuergel@paulweiss.com)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064

*Attorneys for Citigroup Inc., Citigroup
Mortgage Loan Trust Inc., Citigroup Global
Markets Realty Corp., Citigroup Global
Markets Inc., Susan Mills, Randall Costa, Scott
Freidenrich, Richard A. Isenberg, Mark I.
Tsesarsky, Peter Patricola, Jeffrey Perlowitz
and Evelyn Echevarria*

Bruce Clark (clarkb@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

Amanda F. Davidoff (davidoffa@sullcrom.com)
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006

*Attorneys for Defendants First Horizon
National Corporation, First Tennessee Bank
National Association, FTN Financial Securities
Corporation, First Horizon Asset Securities,
Inc., Gerald L. Baker, Peter F. Makowiecki,
Charles G. Burkett, and Thomas J. Wageman*

Bruce Clark (clarkb@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

Amanda F. Davidoff (davidoffa@sullcrom.com)
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006

*Attorneys for Defendants Nomura Securities
International, Inc., Nomura Holding America
Inc., Nomura Asset Acceptance Corporation,
Nomura Home Equity Loan, Inc., Nomura
Credit & Capital, Inc., David Findlay, John
McCarthy, John P. Graham, Nathan Gorin, and
N. Dante LaRocca*

Jay B. Kasner (jay.kasner@skadden.com)
Scott Musoff (scott.musoff@skadden.com)
George Zimmerman
(george.zimmerman@skadden.com)
Robert A. Fumerton
(robert.fumerton@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, NY 10036

*Attorneys for SG Americas, Inc., SG Americas
Securities Holdings, LLC, SG Americas
Securities, LLC, SG Mortgage Finance Corp.,
and SG Mortgage Securities, LLC, Arnaud
Denis, Abner Figueroa, Tony Tusi, and Orlando
Figueroa*

Pamela Rogers Chepiga
(pamela.chepiga@allenovery.com)
Josephine A. Cheatham
(allie.cheatham@allenovery.com)
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020

*Attorneys for Samuel L. Molinaro, Jr.*

Matthew Solum
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Robert J. Kopecky
Devon M. Largio
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

Jeffrey S. Powell
Patrick M. Bryan
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
(202) 879-5000

*Attorneys for Ally Securities, LLC*

Reginald R. Goeke (rgoeke@mayerbrown.com)
Catherine M. Bernard
(cbernard@mayerbrown.com)
MAYER BROWN LLP
1999 K St., N.W.
Washington, D.C.  20006

Michael O. Ware (mware@mayerbrown.com)
MAYER BROWN LLP
1675 Broadway
New York, NY 10019

*Attorneys for Ally Financial Inc. and GMAC
Mortgage Group, Inc.*

David Blatt (dblatt@wc.com)
John McNichols (jmcnichols@wc.com)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005

*Attorneys for Bank of America Corporation;
Bank of America, N.A.; Asset Backed Funding
Corp.; Banc of America Funding Corp.; Merrill
Lynch & Co., Inc., Merrill Lynch Mortgage
Lending, Inc., Merrill Lynch Mortgage Capital
Inc., First Franklin Financial Corp., Merrill
Lynch Mortgage Investors, Inc., Merrill Lynch
Government Securities, Inc., Merrill Lynch,
Pierce, Fenner & Smith Inc.*

Sandra D. Hauser
(sandra.hauser@snrdenton.com)
SNR DENTON US LLP
1221 Avenue of the Americas
New York, New York 10020

*Attorney for Matthew Perkins*

Daniel C. Zinman (dzinman@rkollp.com)
Neil S. Binder (nbinder@rkollp.com)
RICHARDS KIBBE & ORBE LLP
One World Financial Center
New York, NY 10281

*Attorneys for George C. Carp, Robert Caruso,
George E. Ellison, Adam D. Glassner, Daniel B.
Goodwin, Juliana Johnson, Michael J. Kula,
William L. Maxwell, Mark I. Ryan, and Antoine
Schetritt; Matthew Whalen; Brian Sullivan;
Michael McGovern; Donald Puglisi; Paul Park,
and Donald Han*

Joel C. Haims (jhaims@mofo.com)
LaShann M. DeArcy (ldearcy@mofo.com)
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104

*Attorneys for Tom Marano and Michael
Nierenberg*

Dani R. James (djames@kramerlevin.com)
Jade A. Burns (jburns@kramerlevin.com)
KRAMER LEVIN NAFTALIS & FRANKEL
LLP
1177 Avenue of the Americas
New York, New York 10036

*Attorneys for Defendant Jeffrey L. Verschleiser*

Richard A. Edlin (edlinr@gtlaw.com)
Ronald D. Lefton (leftonr@gtlaw.com)
Candace Camarata (camaratac@gtlaw.com)
GREENBERG TRAURIG, LLP
200 Park Avenue,
New York, NY 10166
Phone: 212-801-9200

*Attorneys for Defendant Jeffrey Mayer*