LAW OFFICES
# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

RYAN T. SCARBOROUGH
(202) 434-5173
rscarborough@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

February 1, 2013

Via Electronic Mail

The Honorable Denise L. Cote
United States District Judge
500 Pearl Street, Room 1610
New York, New York 10007-1312

      Re:    FHFA v. Merrill Lynch, 1:11-cv-06202-DLC

Dear Judge Cote:

      I write to provide the Court with an update on the status of Merrill Lynch's extensive and ongoing efforts to identify and stipulate to documents that comprise the loan origination files for the 7,200 FHFA sample loans, as well as the underwriting guideline applicable to each loan.

      As explained more fully below, in accordance with our commitment at the December 14, 2012 status conference on this topic, beginning immediately after the conference, Merrill Lynch has devoted extensive time, effort and resources to locating and inventorying loan files, locating and matching guidelines, and working with FHFA to achieve meaningful and accurate stipulations, both to actual guideline matches and to processes that would allow both parties to accomplish matches together. Through weekly (and sometimes twice weekly) meetings with FHFA, we believe that much progress was made toward these objectives. We have encountered a fundamental difference, however, in the appropriate method of matching guidelines. Despite this difference, we have suggested a process to deal with this issue and we have proposed to FHFA that we consider a joint submission telling the Court of the status of our efforts and asking for more time to resolve our differences and achieve our objective. Last night, FHFA curtly rejected our proposal and announced that they would not agree to a joint submission. Thus, this letter.

      Merrill Lynch and its vendors have "cracked" over 2,500 of the roughly 4,000 currently available loan files to determine the completeness of those files and extract data necessary to match the correct underwriting guideline. Merrill Lynch is also searching for documents that appear to be missing from those files, as well as trying to obtain other loan files and guidelines from more than 50 third parties. Merrill Lynch has repeatedly invited FHFA to participate in the process of opening loan files, but FHFA has refused. Instead, FHFA proposes to stipulate to the completeness of loan files and match guidelines without actually opening a single loan file.

WILLIAMS & CONNOLLY LLP
The Honorable Denise L. Cote
February 1, 2013
Page 2

FHFA has created a spreadsheet purporting to match guidelines to approximately 4,000 loans. But the spreadsheet suffers from several major deficiencies, which we have pointed out to FHFA on numerous occasions.

First, despite our effort to help FHFA locate nearly 1,700 loan files that they had in their possession but could not find, FHFA's spreadsheet of loan files still does not match our list in several material respects. We are working cooperatively with FHFA to resolve these discrepancies.

Second, FHFA purports to match guidelines to over 800 loans even though those loan files have not been produced.

Third, FHFA has asked us to stipulate to matching guidelines that we still have not received from them and that we have not yet been able to obtain from co-defendants; specifically, despite repeated requests to FHFA for guidelines in its possession, Merrill Lynch still does not have at least 90% of the 12,000 guidelines that FHFA possesses.

Fourth, FHFA has proposed its matching while completely ignoring the guidelines that Merrill Lynch produced four months ago.

Fifth, as we mentioned, FHFA has proposed these matches without opening a loan file, something we told them several times was a mistake. Merrill Lynch has begun opening and inventorying loan files and has completed and shared with FHFA a preliminary review of FHFA's proposed loan file and guideline matches for two securitizations. The results of that review show that FHFA's guideline matches are incorrect approximately 80% of the time. Merrill Lynch is understandably reluctant to stipulate to an FHFA spreadsheet that may be wrong as much as 80% of the time, without some ability to withdraw clearly erroneous stipulations. Merrill Lynch suggested different approaches to this problem by crafting a process-based stipulation that would allow FHFA to not open a file prior to re-underwriting while still allowing Merrill Lynch to withdraw its stipulation if opening the loan file revealed that a different guideline was applicable, but FHFA rejected these proposals.

**Status of Loan Files:**

The parties are attempting to locate and obtain the files for the loans in FHFA's sample. To date, only about 55% of those loan files – roughly 4,000 out of FHFA's 7,200-loan sample – have been located and produced. The parties agree that in virtually all circumstances the remaining loans are in the hands of third-party originators and servicers. Merrill Lynch's counsel has been leading daily calls with FHFA since October to coordinate efforts to obtain these loan files. As part of the meet and confer process related to guideline matching, the parties agreed to share the burden of reviewing loan files and guidelines produced by third parties to determine if they relate to loans in FHFA's sample. If so, the locating party has agreed to identify the relevant loan file, bates stamp each page, and produce them.

As to the loan files that have been located, the parties first focused on verifying that each had identical sets of loan files and guidelines. Initially there were enormous discrepancies as FHFA had identified substantially fewer loan files in its sample (2,250) than Merrill Lynch had produced (roughly 4,000). Merrill Lynch worked diligently to instruct FHFA on how to identify its sample loans from the productions already provided. Despite this effort, the parties still do not agree on the correct bates range for close to four hundred FHFA sample loans.

Merrill Lynch has been performing inventories of the loan files that it does have in order to identify whether there are any missing documents and, if so, is searching for them. In order to make that process more efficient and streamlined, Merrill Lynch has repeatedly asked FHFA to identify the specific loan file documents it contends are essential to the re-underwriting process. Unfortunately, FHFA has refused to provide this information. Without this, Merrill Lynch believes it prudent to search all potential sources for any documents the absence of which FHFA might allege constitutes evidence of failure to adhere to underwriting guidelines. Sometimes these documents are in the possession of third parties. In other cases, they may be located in a system maintained by a Bank of America affiliate.[1]

### Underwriting Guidelines:

A significant reason that Merrill Lynch could not agree to stipulations is that it still does not have all of the potentially relevant guidelines. Merrill Lynch has access to approximately 1,400 sets of guidelines but, due to productions made by other defendants and third parties but not served on Merrill Lynch, FHFA has more than 12,000 sets of guidelines. In mid-December, Merrill Lynch provided FHFA with an index of the guidelines it had already produced. In early January, FHFA provided an index of guidelines in its possession. Merrill Lynch immediately requested that FHFA provide copies of those guidelines, as Merrill Lynch did not have access to them. Inexplicably, FHFA refused and, despite the press of the January 31 deadline, directed Merrill Lynch to obtain them directly from the defendants who had produced them to FHFA. Merrill Lynch immediately began efforts to obtain the relevant guidelines from the other defendants but that process has moved very slowly. Last week FHFA finally agreed to authorize

---

[1] As Merrill Lynch informed the Court in its August 29, 2012 Status Report, the Bank maintains numerous systems that house loan file documentation. Dkt. No. 92. As part of the loan file production process, the Bank undertook a number of searches to identify and produce the at-issue loan documentation in its possession. However, given the diverse systems involved, the fact that any given loan could have multiple loan numbers (i.e. bank identification number, application number, trustee number, and servicing number), the time period in which the initial production needed to be made, as well as the reality that certain documents can be misplaced and misfiled, some documents associated with any given loan file may not have been identified as part of this initial process. The inventory process described above identifies these potential missing documents (and the key identifying information of loans files with which they are associated), so that Merrill Lynch may perform targeted searches of the Bank systems to attempt to locate the missing documents.

WILLIAMS & CONNOLLY LLP
The Honorable Denise L. Cote
February 1, 2013
Page 4

its vendor to produce copies of those guidelines to Merrill Lynch (at Merrill Lynch's expense). Merrill Lynch is still awaiting this production. In the meantime, Merrill Lynch has been working cooperatively with all other defendants to share defendants' guideline productions.

### Status of Stipulating to Loan Files and Potential Guideline Matches:

As noted above, the stipulation process has been substantially stalled because FHFA refuses to assist in the process of opening and inventorying the loan files. Since shortly after the Court finalized the Expert Scheduling Order, Merrill Lynch has devoted enormous time and resources to building a database of FHFA sample loan files, opening each loan file to inventory its contents, ascertaining whether missing documents can be located through targeted searches, and harvesting key data points from the loan file that are necessary to ensure that each loan file is matched to the correct guideline.

Merrill has asked FHFA to cooperate with this time-consuming but necessary process on numerous occasions. Indeed, during the very first meet-and-confer in mid-December, Merrill Lynch proposed that the parties agree on a loan file checklist and share the burden of "cracking" the loan files to inventory their contents and identify key data points for matching guidelines. FHFA refused. Instead it took the position that it would stipulate that any loan file containing more than 100 pages was the "best representation" that the parties could re-create. It took this position without knowing what those pages were. Likewise, FHFA took the position that it could find a "close enough" guideline match without opening the loan file simply by using data from loan tapes, even though loan tapes do not indicate what guideline was used, when the loan was underwritten, or the channel through which the loan was originated (among other things). FHFA then began to roll out its proposed guideline "matches" based on the origination date of the loan (which always post-dates when the loan was underwritten), including loans matched to numerous guidelines that Merrill Lynch cannot review because FHFA has still not produced them.[2]

As noted above, Merrill Lynch's preliminary review of FHFA's proposed guideline matches based on loan tape data reveals that the vast majority of the proposed matches are wrong. Of the first 185 FHFA proposed matches that Merrill has been able to review, 149 are matched to an incorrect guideline. In light of this, Merrill Lynch cannot accede to FHFA's insistence that it stipulate to the contents of loan files and matching guidelines sight-unseen.[3]

---

[2] FHFA purports to match over 4,000 loan files to about 200 guidelines. Of the guidelines FHFA has used to match with loans to date, Merrill Lynch has only received 14 of them from FHFA.

[3] In an effort to salvage something from the meet-and-confer process, the parties explored the possibility of entering into certain process-based stipulations. Merrill Lynch offered to stipulate to the contents of the loan files and a preliminary guideline match without first opening each loan file, as well as an extension of time for FHFA to obtain missing loan files from third parties before having to elect whether to substitute loan files. In exchange, Merrill Lynch requested that either party be permitted to supplement loan documents without regard to Paragraph 7 of the

WILLIAMS & CONNOLLY LLP
The Honorable Denise L. Cote
February 1, 2013
Page 5

In short, Merrill Lynch has made substantial efforts to comply with the Court's Order and stands ready to continue to work with the FHFA toward resolving the remaining areas of disagreement. To that end, we suggest that the Court consider an extension of the January 31st deadline, perhaps for 4 to 6 weeks, to allow the parties to continue their efforts.[4]

Respectfully submitted,

Ryan Scarborough

cc:     Counsel of Record

---

Court's Expert Scheduling Order until four months before the expert report was due or until FHFA made its interim disclosure, and that if either party determined that the guideline identified as a preliminary match was a "mismatch," then the correct guideline would be substituted (if available) or the stipulation would be null and void (if not available). FHFA has not agreed to this process and instead insists that Merrill Lynch stipulate to a process that would identify a guideline – any guideline – which FHFA would use to re-underwrite, even where the guidelines was demonstrably incorrect.

[4] Wednesday evening, FHFA proposed a different protocol for loan files and guidelines in which – without first reaching stipulations – FHFA voluntarily would make interim re-underwriting disclosures so long as Merrill Lynch would agree to rebut them within 28 days. Merrill Lynch responded that it was willing to accept such an arrangement so long as the interim disclosures are made in an orderly and measured fashion, but FHFA has rejected those conditions and that proposal seems to be off the table as to Merrill Lynch.