# Exhibit 3

LAW OFFICES
# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

EDWARD J. BENNETT
(202) 434-5083
ebennett@wc.com

(202) 434-5000

FAX (202) 434-5029

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

December 10, 2012

<u>Via Electronic Mail</u>

The Honorable Denise L. Cote
United States District Judge
500 Pearl Street, Room 1610
New York, New York 10007-1312

    Re:    <u>FHFA v. Merrill Lynch</u>, 1:11-cv-06202-DLC

Dear Judge Cote:

    In light of the Court's admonition that the parties should endeavor to avoid "creat[ing] problems for three, four, five months down the road," 11/15/12 Tr. at 8:15-16, I write on behalf of the Merrill Lynch Defendants to raise a concern about the Court's Expert Scheduling Order dated November 26, 2012 which, if not addressed now, could delay the completion of Tranche 2 expert discovery.[1]

    The Court's Expert Scheduling Order presumes that the parties can agree to the completeness of 75% of the loan files and 75% of the applicable origination guidelines before the interim disclosure requirements apply, and that these interim disclosures will provide a sufficient head start to enable Defendants to (1) identify an Alternate Set of loans, and (2) complete their rebuttal re-underwriting expert report within two months of receiving FHFA's re-underwriting expert report. In light of this assumption, we consulted with defense counsel in another RMBS case brought by the Quinn Emanuel firm, *MBIA Insurance Corporation v. Countrywide Home Loans, Inc.*, currently pending in the Supreme Court of the State of New York before the Honorable Eileen Bransten (the "*MBIA* case"), to see if it would be feasible to agree that a substantial majority of the loan files for each securitization are complete.

    As explained in the attached Affidavit, the *MBIA* case involved a sample of 6,000 loans from a single originator. Plaintiff's re-underwriting expert identified nearly 50,000 defects within that sample (an average of more than 8 defects per loan) and asserted that 97% of the

---

[1] By raising this particular issue, Defendants do not intend to waive their other objections to the Court's Expert Scheduling Order, as set forth in Defendants' original proposal to provide April 1, 2013 and September 1, 2013 deadlines for FHFA's and the Tranche 2 Defendants' respective re-underwriting expert reports and in their proposed schedule, *see* Dkt. No. 279, which, *inter alia*, proposed limiting the number of loans that Defendants must respond to each month.

The Honorable Denise L. Cote
Page 2

loans were significantly defective. Roughly 10,000 of the asserted defects were due to missing credit documents, affecting more than 80% of the loans (4,785 loans) in the sample. Another 15,000-plus asserted defects were due to missing compliance documents affecting 92% (5,504 loans) of the sample. Although the defendants' re-underwriting expert fully rebutted nearly 90% of the allegedly defective loans, it took her and her team a substantial amount of time *after* receiving the plaintiff's expert re-underwriting report to do so—in that case, four months barely sufficed to rebut 20% fewer loans than are at issue in this case.

The *MBIA* experience raises serious concerns about deadlines in the Expert Scheduling Order that are predicated on robust interim disclosures. To date, 53% of the loans identified in FHFA's proposed samples regarding Merrill Lynch have been produced. For 39 of the 72 securitizations, fewer than 75% of the sampled loans have been produced. Virtually all of the remaining loan files are believed to be in the hands of third parties, and the parties are continuing to work diligently to obtain them. Because the loan files changed hands frequently—from originator to due diligence firm to servicer, and sometimes between servicers—there may be multiple versions of a loan file whose contents can vary substantially. Thus, even if we locate one version of a loan file, that does not guarantee that it is a complete loan file or that another version may not have additional documents. If the *MBIA* case is any indication, FHFA is likely to allege that more than 80% or 90% of the loan files in its sample are missing one or more documents (at least in their current incarnation). The consequences that attach to a stipulation that a loan file is complete[2] strongly suggest that the parties will rarely, if ever, find a securitization where they can agree that 75% of the loan files are complete.

In the absence of a robust interim disclosure process, the two-month window of time (from August 5, 2013 until October 7, 2013) allotted for Defendants' re-underwriting expert to respond to an anticipated 60,000 alleged defects within a 7,200 loan sample is inadequate. No matter how much re-underwriting preparation is done in advance, it is not possible to respond to this magnitude of alleged defects within two months. For that reason, the Merrill Lynch Defendants respectfully request the Court to modify the Expert Scheduling Order to provide that, if interim disclosures are made for fewer than 25% of the securitizations, the deadline for providing rebuttal re-underwriting and loss causation expert reports will be moved back to December 2, 2013. In that circumstance, Defendants suggest that they identify any Alternate Set of loans by August 26, 2013—21 days after receiving FHFA's re-underwriting expert report.

Respectfully submitted,

Edward Bennett

cc:   Counsel of Record

---

[2] Once such a stipulation is made for a securitization, the Court has stated its presumption that it will not permit more than 10% of the loan files to be supplemented with later-discovered documents. Court's Expert Scheduling Order, ¶ 7. The Court also has held that further re-underwriting associated with an allowed exception will be made at Defendants' expense. *Id.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>Plaintiff,<br><br>– against –<br><br>MERRILL LYNCH & CO., INC.; MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; MERRILL LYNCH MORTGAGE LENDING, INC.; MERRILL LYNCH MORTGAGE CAPITAL INC.; FIRST FRANKLIN FINANCIAL CORP.; MERRILL LYNCH MORTGAGE INVESTORS, INC.; MERRILL LYNCH GOVERNMENT SECURITIES, INC.; MATTHEW WHALEN; BRIAN T. SULLIVAN; MICHAEL M. MCGOVERN; DONALD J. PUGLISI; PAUL PARK.; and DONALD C. HAN,<br><br>Defendants. | Case No. 11-cv-6202 (DLC)<br><br>ECF Case |

**Affidavit of David J. Apfel**

I, David J. Apfel, do state under oath:

1. I am a litigation partner at Goodwin Procter LLP and serve as counsel of record for the Countrywide defendants in the case captioned *MBIA Insurance Corporation v. Countrywide Home Loans, Inc., Countrywide Securities Corp., Countrywide Home Loans Servicing, L.P., and Bank of America Corp.*, Index No. 602825/2008 IAS Part 3, currently pending in the Supreme Court of the State of New York before the Honorable Eileen Bransten (the "*MBIA* Litigation").

2. The *MBIA* Litigation is a mortgage backed securities case involving 15 securitizations of loans originated and/or purchased by Countrywide. There are approximately 390,000 loans underlying the 15 securitizations at issue. Plaintiff in the *MBIA* Litigation is represented by attorneys at Quinn Emanuel Urquhart & Sullivan LLP. MBIA alleges, among other things, that in sponsoring the securitizations, Countrywide breached

1

representations and warranties regarding the quality of the underlying loans. MBIA alleges that a high percentage of the loans were "defective," meaning that they were written outside of applicable underwriting guidelines, without appropriate compensating factors.

3. To attempt to prove its allegations regarding "defective" loans, MBIA has selected what purports to be a representative sample of 400 loans from each of the 15 securitizations, *i.e.*, a total sample of 6,000 loans (the "Sample"). MBIA provided notice of the specific loans in the Sample to the Countrywide defendants on or about May 16, 2011.

4. After receiving MBIA's notice, the Countrywide defendants retained its own independent underwriting expert, Karen Godfrey, who worked with a team of independent underwriters under her supervision to review the Sample loans in advance of receiving an expert report from MBIA's underwriting expert regarding purported "defects" in the loans.

5. On February 28, 2012, MBIA served the Countrywide defendants with a report from Steven Butler, MBIA's underwriting expert, who had supervised a team of underwriters who purported to have "re-underwritten" the 6,000 loans in the Sample. Mr. Butler and his team identified 49,103 alleged underwriting defects within the 6,000-loan sample. In his report, Mr. Butler concluded that virtually 100% of the Sample loans included one or more "defects," and that approximately 97% of the loans in the Sample (5,798) were "significantly defective," meaning that in Mr. Butler's view the "defects" meaningfully and substantially affected the risk associated with the loans. In particular, among the 49,103 alleged defects, Mr. Butler claimed that there were approximately 9,970 defects affecting 4,785 loans due to missing credit documents in the loan files, and another approximately 15,770 defects affecting 5,504 loans due to missing compliance documents.

6. The Court's expert discovery schedule afforded the Countrywide defendants a little over four months (until July 3, 2012) to rebut Mr. Butler's findings and submit an expert report. Notwithstanding the fact that the Countrywide defendants had MBIA's Sample for nearly nine and one-half months before receiving Mr. Butler's report on February 28, 2012, and notwithstanding the fact that Ms. Godfrey and her team of independent underwriters had worked with the Sample loans for many months prior to February 28, 2012, the four months that Ms. Godfrey had to analyze Mr. Butler's findings and prepare her report were barely sufficient.

7. The Countrywide defendants took certain measures to meet this deadline. First, Ms. Godfrey increased the size of her re-underwriting team to the maximum size that would permit rigorous controls for quality and consistency. At a certain point, scalability becomes limited by the need to perform quality control and maintain consistency among underwriters. Second, Ms. Godfrey's team of independent underwriters worked seven days a week until the rebuttal report was due. Third, the Countrywide defendants retained additional experts and support teams in the areas of compliance and appraisals to supplement the work of Ms. Godfrey and her team of independent credit underwriters.

Working on their own, without the support of these additional expert teams, it would have been impossible for Ms. Godfrey and her team to complete their analysis of Mr. Butler's findings in the allotted four months.

8. Of the 5,798 loans that were allegedly significantly defective, Ms. Godfrey was able to fully rebut the defects for 5,128 of these loans (88.4%). Ms. Godfrey was unable to fully rebut the alleged defects for the remaining 670 loans based on the information currently available in the loan files.

Sworn under the pains and penalties of perjury this 5th day of December 2012.

*David J. Apfel*

MICHAEL C.W. WONG
Notary Public, State of New York
No. 02WO6208794
Qualified in Queens County
Commission Expires May 26, 2013

3