# EXHIBIT C

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

January 23, 2013

Via E-mail

Richard A. Schirtzer, Esq.,
   Quinn Emanuel Urquhart & Sullivan, LLP,
      865 South Figueroa Street, 10th Floor,
         Los Angeles, California 90017-2543.

      Re:    FHFA Actions

Dear Richard:

      I write on behalf of Defendants to address several outstanding discovery issues, including FHFA's long-delayed production of (a) some GSE due diligence documents, (b) some GSE documents reflecting originator appraisal bias, (c) some GSE reviews of originators and counterparties, (d) documents sufficient to show defect, pull-through and waiver rates, and (e) documents sufficient to show GSE due diligence policies.

      ***GSE Diligence on the Securitizations at Issue.*** — In your January 16 letter, you indicate that FHFA is producing some, but not all, reports of roughly contemporaneous diligence on, or reviews of, the Securitizations at issue. Specifically, your letter limits the promised production to documents from the files of one custodian, ███████, and to documents from "other legal department files" at Fannie Mae. (Jan. 16 Letter at 2.) Your letter states that some of the documents in these files may be privileged, and suggests that FHFA is searching for and producing only "pre-purchase" reports, rather than those created at or about the time of the Securitizations. This will result in an incomplete production of these highly relevant, contemporaneous reviews of the Securitizations, which occurred both before and after the GSEs purchased the Securitizations.

      Defendants ask that you promptly clarify:

- How can these documents be privileged—especially those documents that memorialize reviews conducted by third-party due diligence

Richard A. Schirtzer, Esq. -2-

> providers at the GSEs' direction? If culling privileged from non-privileged is proving difficult because of ▮▮▮▮ or his legal department colleagues' roles, why not look for the reports in other files?

- Is FHFA searching for and producing reports prepared at or about the time of each Securitization?

- How many reports have been located, how many produced (bearing what identification numbers), how many are in the pipeline, and how many cannot be located?

With respect to relevance, your letter takes the position that FHFA will not be searching for or producing loan-level reviews of the Securitizations based on the premise that such documents are either irrelevant or cannot exist because "the GSEs did not have access to loan files."[1] (Jan. 16 Letter, at 1.) This assertion resembles representations FHFA has repeatedly made to the Court, which the Court has repeatedly relied on in denying motions to dismiss or in limiting or considering limits on discovery into GSE diligence:

> Indeed, as the FHFA notes, given that the GSEs did not have access to data such as loan tapes and loan files that would permit them to determine that the representations in the Offering Documents were incorrect, it is difficult to see

---

[1] Your letter inaccurately defines the set of responsive documents as anti-predatory lending reviews conducted by Fannie Mae. Jan. 16 Letter, at 2. FHFA's production, however, suggests that reviews conducted by diligence providers considered broader characteristics, including credit-related characteristics, alongside or as part of anti-predatory or compliance reviews. For example, FHFA has produced an e-mail from Clayton to Fannie Mae and JPMorgan employees attaching both a credit exception report and an anti-predatory lending report regarding a pool of subprime whole loans. *See* ▮▮▮▮ FHFA00015412. ▮▮▮▮ *Id.* at 5413. ▮▮▮▮ FHFA00030324 at 0324 (emphasis added).

Richard A. Schirtzer, Esq.                                                                                              -3-

> how they could help but rely on the representations of
> defendants, who did have access to those materials.

*Fed. Hous. Fin. Agency* v. *JPMorgan Chase & Co.*, 2012 U.S. Dist. LEXIS 158442, at *54 (S.D.N.Y. Nov. 5, 2012); (*see* Dec. 14 Tr. at 23 ("PLS traders and people making purchase decisions" did not have access to "loan level information.").)

Documents in FHFA's production, however, make clear that these representations are incorrect. Indeed, the GSEs conducted reviews and analysis of loan-level data both before and after purchasing the Securitizations. For example, as Fannie Mae's C.J. Zhao wrote in a May 2008 e-mail, "Yes, we are allowed to use loan file in due diligence process." ( ███████████████ FHFA05935810 at 5810.) The e-mail further states that ███████████████

███████████████ (*Id.*) According to the e-mail, ███████████████ (*Id.* at 5811.) ███████████████

███████████████ (*Id.* at 5810; ███████ FHFA01314131 at 4132 ███████████████

███████████████

Moreover, there should be no further dispute that the GSE personnel responsible for purchasing decisions, including PLS traders, were in possession of detailed loan tapes. Indeed, FHFA's production has yielded many documents that attach loan tapes with granular data, including borrower FICO scores and the street addresses of properties. (*See, e.g.*, ███████████████ FHFA-A3-10004112294 ███████████████ E-mail from ███████████████, FHFA00173521 ███████████████ E-mail from ███████████████ FHFA00174094 at 4094 ███████████████

Further, as discussed below, FHFA has acknowledged (belatedly) that "fairly late in the game in 2007, Fannie did start looking at proposed transactions for

Richard A. Schirtzer, Esq.                                                                                          -4-

appraisal bias." (Dec. 14 Tr. at 21:3-4.) FHFA's production shows that Fannie performed this analysis of appraisal bias by using, at least, the information contained on detailed loan tapes, including the street address for particular loans. (*See* E-mail from ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, FHFA00285369 at 5369 ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓)[2]

In light of the above, please let us know promptly what FHFA will do to gather, inventory and complete the production of roughly contemporaneous diligence or reviews of the Securitizations.

*Valuation or Appraisal Bias.* — In the January 10 Letter to Judge Cote, FHFA states that it will produce "quarterly reports assessing valuation bias for approximately 25 large lenders based on refinance loans acquired by the single-family business," but only to the extent such reports "were distributed to certain FHFA custodians (specifically, Fannie Mae senior risk officers) during the relevant time period." (Jan. 10 Letter, at 1.) This custodian-based limitation ignores the Court's unqualified order to search for such materials. (Dec. 14, 2012 Tr. at 33:6-9 ("But in any event to the extent, however, that there is a kind of document produced from the whole loan side of the business that reflects any appraisal bias associated with particular originators during the relevant period of time, I want FHFA to look for that.").)[3] The quarterly reports FHFA has produced summarize data gathered from the analysis of loans from 25 lenders, but do not reflect underlying method, analysis or inputs. Indeed, both documents FHFA cites as examples of these quarterly reports refer to a "separate document" containing information regarding Fannie Mae's "Retrospective Value System (RPS)" and refer the reader to other individuals, such as ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (none of whom are FHFA custodians) for "further information." *See, e.g.*, FHFA00015009; FHFA01248133. Please state whether and when FHFA will

---

[2]   Because the Court's assumption that the GSEs lacked access to loan-level information plays an ongoing role in these actions, Defendants urge FHFA to correct the record. *See* N.Y. RULES OF PROF'L CONDUCT R. 3.3(a)(3) (2009).

[3]   The suggestion that these documents were not sent to GSE personnel with input into the purchase of the Securitizations is wrong. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See, e.g.*, E-mail from ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ FHFA02394388 at 4388 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ FHFA02394389 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Richard A. Schirtzer, Esq.                                                                      -5-

produce the model, along with documents sufficient to show the assumptions, and analysis underlying these reports, and whether and when FHFA will complete the search and production of these reports, regardless of whether they were sent to PLS traders or high-level risk personnel at Fannie Mae.

With respect to Freddie Mac, you represented that no "reports or studies assessing appraisal bias *associated with individual originators* between 2005 and 2007" were created. (Jan. 10 Letter at 1-2 (emphasis added).) Your letter does not, however, state whether Freddie Mac created or maintained reports or studies reflecting originator appraisal bias across originators or appraisal firms at issue. (*See* Dec. 14, 2012 Tr. at 33.) Freddie Mac documents produced so far show that there were such reports or studies. For example, one document says Freddie had concluded that ████████████████ ████████████████████████████████████████████████████████████████ ████████████████ *See, e.g.*, ████████████████████████████ FHFA03531100 at 1102. This suggests that FHFA is neither searching for nor producing responsive documents; please let us know how and when FHFA will remedy this problem.

***Originator/Counterparty Reviews.*** — We have reviewed your January 10, 2013 letter to the Court regarding originator/counterparty reviews but continue to have questions regarding the scope of your production. For example, your email states regarding Fannie Mae originator reviews that you are producing all reports to the extent they "informed the decision-making of the PLS traders, their supervisors, and senior risk officers[.]" (Jan. 10 Letter at 2.) Judge Cote asked that FHFA determine whether such reports could be located and produced without imposing an unreasonable burden on FHFA and without any limitation to reports or repositories that "informed the decision-making of the PLS traders, their supervisors, and senior risk officers." Searching shared drives or other readily accessible files—and producing reports contained in the files of FHFA's designated custodians—are all examples of searches that would impose minimal burden on FHFA. Have you undertaken (or will you undertake) those searches?

Nor should this unilateral limitation apply to your review or production of Freddie Mac documents. For example, did you identify the 400 EORM operational reviews in the files of custodians pursuant to search terms, or based on searches of shared drives or other likely repositories? Similarly, what files did you review to identify and collect the AMO reports you say you are producing?

Finally, we take issue with your refusal to produce the 335 operational reviews prepared by Freddie's EORM. Your January 10 letter makes clear that production of these reviews "is not incrementally burdensome" and, indeed, that they have already been collected for production. Operational reviews of originators are relevant to your allegation that there was an industry-wide abandonment of underwriting

Richard A. Schirtzer, Esq.                                                      -6-

guidelines, and your allegations that Defendants were "uniquely positioned" to know that originators had abandoned their underwriting guidelines. *See, e.g.,* Amended Complaint, *FHFA v. Merrill Lynch,* 11-cv-6202, ECF No. 61 ¶¶ 117, 192 (S.D.N.Y. filed June 13, 2012). Such information is also relevant to the questions whether the alleged misstatements were material, and whether the GSEs justifiably relied on them or used the "means available" to them. *Abrahami v. UPC Constr. Co.,* 224 A.D.2d 231, 234 (1st Dep't 1996); *Landesbank Baden-Wurttemberg v. Goldman Sachs & Co.,* 478 F. App'x 679, 682 (2d Cir. 2012). We would ask that you produce these documents, as your January 10 letter stated you would.

      ***Defect, Pull-Through and Waiver Rates.*** — During the meet and confer session on January 16, 2013, FHFA represented that the GSEs did not maintain databases that track the GSEs' defect, pull-through and waiver rates for pools of loans they purchased from Originators. FHFA further represented that the GSEs possessed no "summary reports" that are "laid out at the level of generality that the Court is asking for." In a subsequent email from Lauren Misztal to Brad Harsch on January 18, 2013, FHFA stated that it had not questioned GSE employees who maintained business relationships with the Originators to determine whether they maintained information about defect, pull-through and waiver rates. We do not see any basis for refusing to interview the GSE employees responsible for relationships with Originators, who presumably would have the most knowledge at the GSEs of the business practices of the Originators they covered, to determine whether any of them were aware of readily accessible files that would contain information on defect, pull-through and waiver rates on the Originators they covered.

      FHFA further stated in its January 18 email that it has interviewed individuals who were involved in pre-purchase due diligence during the relevant time period, and determined that the GSEs "did not maintain information about defect, pull through and waiver rates on whole loan purchases on an originator-basis in a centralized database or repository." We request clarification of the statement that the GSEs did not maintain such information "on an originator basis." Did the GSEs maintain data on defect, waiver and pull-through rates on some basis other than an "originator basis"? Also, does this statement mean only that the GSEs did not aggregate data on defect, waiver and pull-through rates on their whole loan purchases, or does it also mean that the GSEs did not maintain information concerning defect, waiver and pull-through rates for any Originator or loan pool purchase for any portion of the time period at issue in this case? We would expect, for instance, that in the course of purchasing pools of whole loans, the GSEs or its third-party due diligence providers generated summary reports or spreadsheets that reported the results of due diligence, or that indicated how many loans in a pool were deemed defective, how many were dropped, or how many were accepted for purchase. In this connection, please note the document marked FHFA00060518 to FHFA00060541, which is a ▬▬▬▬▬▬▬▬▬▬▬▬▬ showing that, between December 2005 and November 2007, Fannie Mae purchased billions of dollars of

subprime loans, in multiple transactions, from several Originators that originated loans backing the Securitizations at issue in these cases, including New Century, First Franklin, Chase, Wells Fargo and Countrywide. We would expect that Fannie Mae maintained files associated with each of these transactions that would reflect the results of due diligence performed on these loans, and that Freddie Mac maintained such files for its own purchases of comparable loans. Such documents likely would contain information concerning defect rates, waiver rates and pull-through rates for these whole loan purchases. We request that FHFA inform us whether such documents exist and, if so, how they are stored.

FHFA agreed during the meet and confer session to consider a document that appears to indicate that Freddie Mac tracked "defect rates" of some kind for at least some of the originators at issue in these cases. That document is marked FHFA08095013 to FHFA08095072. Please note, in particular, pages FHFA08095026, 5049-5053 and 5072. We request that FHFA explain whether the "defect rates" referred to in this document indicate the rate at which loans in loan pools identified for purchase by the GSEs failed to comply with originators' underwriting guidelines and, if so, what was the source of data for this report.

Based on FHFA's January 18 email, FHFA apparently restricted its inquiry concerning these documents to GSE employees that performed pre-purchase due diligence. As we explained during the January 16 meet and confer, post-purchase due diligence may be just as relevant as any pre-purchase due diligence. FHFA should conduct a search for relevant documents with any business unit or employee that performed due diligence that could reasonably be expected to generate data regarding Originators' defect, waiver and pull-through rates.

FHFA did not address its production of reviews and assessments of third-party firms, such as Clayton Holdings, Inc., that performed due diligence on pools of loans purchased by the GSEs. This was the subject of the December 3, 2012 letter from Brad Harsch to Adam Abensohn, which was submitted to the Court on December 10. We request that FHFA inform us promptly whether such reviews exist and, if so, whether FHFA intends to produce them.

***Due Diligence Policies.*** — During the meet and confer session on January 16, 2013, FHFA requested that Defendants identify the kinds of due diligence that Defendants would consider to be the most "apples-to-apples" comparison. Defendants explained that such an identification would not be possible without an understanding of the kinds of due diligence the GSEs performed in the course of purchasing pools of loans. Defendants confirmed that they are seeking documents sufficient to show the due diligence policies that the GSEs employed during the relevant time periods for purchases of whole loans most comparable to those at issue in these cases, and in the contexts that are most analogous to the Defendants' purchases of similar whole loans. FHFA

Richard A. Schirtzer, Esq. -8-

explained that the GSEs acquired whole loans through several different channels, some of which involved pre-purchase due diligence and others of which involved post-purchase due diligence. FHFA further stated that due diligence focused primarily on anti-predatory lending, but did not say that the GSEs performed no credit or valuation due diligence in the course of purchasing whole loans. FHFA further suggested that post-purchase due diligence would not be relevant, and stated that it had made no inquiries concerning the GSEs' post-purchase due diligence. FHFA further suggested that the Court had excluded prime loans from the scope of this request, even though the Securitizations include a number backed by prime loans.

Defendants pointed out that they had submitted to the Court a memorandum concerning a purchase of loans by Fannie Mae from New Century in December 2005 indicating that Fannie Mae employed similar due diligence procedures as those employed by Defendants. (*See* Letter from Richard H. Klapper to Court, dated Dec. 12, 2012, Exhibit B.) Defendants also submitted to the Court a Clayton Trending Report that shows that Clayton performed extensive credit and compliance due diligence for Freddie Mac in connection with whole loan purchases. (*See id.*, Exhibit C.) Defendants also explained that they viewed post-purchase due diligence to be as relevant as pre-purchase diligence, and that policies applicable to the purchase of prime loans are relevant under the same theory by which due diligence policies applicable to the GSEs' purchase of subprime and Alt A loans are relevant. In the email of January 18, FHFA states that it will provide information concerning "whether the post-purchase due diligence conducted by the GSEs' single-family businesses in relation to loan acquisitions based on Master Agreements that seller-servicers had with the GSEs included credit review or was solely for purposes of ensuring that the loans delivered complied with the GSEs' anti-predatory lending requirements."

While Defendants did ask whether the GSEs' post-purchase due diligence involved a credit review, FHFA's email reflects an inappropriately narrow view of FHFA's obligations to produce relevant due diligence policies. In order to identify the policies that FHFA should produce in response to the Court's directives of December 17, 2012, FHFA will need to explain in more detail what kinds of due diligence the GSEs performed, for what purposes, and in what contexts. This should include an explanation of whether and to what extent the GSEs performed credit or valuation due diligence in connection with their purchases of whole loans. Defendants had expected that FHFA would be prepared to discuss specific types of policies that it would be able produce during the January 16 meet and confer. Given that these policies were the subject of document requests that Defendants served in June 2012, we request that, by early next week, FHFA be fully prepared to discuss its production of due diligence policies.

Richard A. Schirtzer, Esq.                                                                                                  -9-

*     *     *

       We are now on the eve of depositions and long past the deadline for production of initially requested and priority documents. It has been several months since we requested production on a priority basis. Please let us know whether and when you plan to (a) identify by bates number the complete set of documents, reports and reviews mentioned above that FHFA has purportedly already produced; (b) identify responsive documents that are in the pipeline for production, with what projected production dates; (c) identify any additional searches you are conducting (and files in which you are looking) for these documents responsive to Defendants' requests; and (d) produce privilege logs and redaction logs for previously withheld or redacted materials. Please also let us know whether you intend to correct the record regarding the GSEs' access to loan-level data.

Sincerely,

Penny Shane

cc:     All counsel