LAW OFFICES
# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.
WASHINGTON, D. C. 20005-5901
(202) 434-5000
FAX (202) 434-5029

EDWARD BENNETT
(202) 434-5083
ebennett@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

**By ECF**                                                     November 15, 2013

Hon. Denise L. Cote,
   United States District Judge,
     Daniel Patrick Moynihan United States Courthouse,
       500 Pearl Street, Room 1610,
         New York, New York  10007-1312.

     Re:   *FHFA v. Merrill Lynch & Co.*, Inc., 1-11 Civ. 6202 (DLC); *FHFA v. HSBC North America Holdings, Inc.*, 1-11 Civ. 6189 (DLC); *FHFA v. Barclays Bank PLC,* 1-11 Civ. 6190 (DLC); *FHFA v. Deutsche Bank AG*, 1-11 Civ. 6192 (DLC); *FHFA v. First Horizon National Corporation*, 1-11 Civ. 6193 (DLC); *FHFA v. Bank of America Corporation*, 1-11 Civ. 6195 (DLC); *FHFA v. Goldman, Sachs and Co.*, 1-11 Civ. 6198 (DLC); *FHFA v. Credit Suisse Holdings (USA), Inc.*, 1-11 Civ. 6200 (DLC); *FHFA v. Nomura Holding America, Inc.*, 1-11 Civ. 6201 (DLC); *FHFA v. SG Americas, Inc.*, 1-11 Civ. 6203 (DLC); *FHFA v. Morgan Stanley,* 1-11 Civ. 6739 (DLC); *FHFA v. Ally Financial, Inc.*, 1-11 Civ. 7010 (DLC)

Dear Judge Cote:

     On behalf of all Defendants in the above-referenced Actions, we write regarding FHFA's objections to Clayton's production of documents showing the pre-purchase due diligence the GSEs performed on their own purchases of pools of Alt-A and subprime loans to determine whether those loans complied with originators' underwriting guidelines.  FHFA's objection is based solely on the grounds that "these documents related to work that Clayton did for [the GSEs] in . . . their single family business." (Oct. 31 Tr. 18:17-19.)  Although Clayton has agreed to produce the requested materials, the Court has ordered Clayton to withhold any Single Family production pending resolution of FHFA's objection.  (Oct. 31 Tr. 29:9-12.)

     The limited and incomplete set of Clayton reports produced by FHFA for GSE Single Family Alt-A and subprime purchases directly refutes FHFA's re-underwriting, undermines FHFA's allegation that the offering materials here contained material misstatements, supports Defendants' due diligence and loss causation defenses, shows that the GSEs were aware in 2005–2007 of conditions in subprime and Alt-A loans that FHFA now claims are "material defects," and demonstrates that the GSEs were familiar with the processes by which subprime and Alt-A loans were originated as well as their associated risks.  The Court has not considered this issue before on an accurate factual record.  The record now before the Court shows, contrary to FHFA's prior representations, that the GSEs purchased Alt-A and subprime loans:  (i) similar in credit quality to the loans backing the PLS; (ii) underwritten in whole or in part to originators' guidelines; and (iii) subject to the same due diligence sampling and reviews as the loans backing

PLS. (*See* 11/15/2013 Harsch Declaration, submitted in support of Klapper's Nov. 15, 2013 letters to the Court ("Harsch Decl."), Sec. I.A., III, Case No. 11-cv-6198.) Defendants respectfully submit the discovery Clayton has agreed to produce is highly relevant, and FHFA's objection should be overruled.

**I.    The GSEs' Subprime and Alt-A Bulk Purchases, and Clayton's Due Diligence.**

**REDACTED**

**REDACTED**

RE

Many of the non-traditional Alt-A and subprime loans the GSEs purchased in bulk and securitized were underwritten in whole or in part to originators' guidelines. (*Id.* Sec. III.A.) Offering circulars for Freddie Mac's T-Deals make that very representation. (*See id.* ¶ 38.) The loans Fannie Mae purchased as part of its Subprime Initiative also were underwritten to lenders' guidelines. (*Id.* ¶¶ 36, 37.) Fannie Mae applied a "credit box" specifying certain basic eligibility criteria, just as Defendants applied similar credit boxes. (*Id.* ¶¶ 41-42.)

**REDACTED**

**REDACTED**

**REDACTED**

II.  **The Discovery Sought by Defendants is Highly Relevant to the Claims and Defenses in These Actions.**

*FHFA's Re-underwriting.* Discovery from Clayton will refute FHFA's allegations that the offering materials contained material misrepresentations. As this Court has acknowledged, the "core" issues in these Actions are the "re-underwriting process," the "focus on materiality," and whether "plaintiff can prove misrepresentations" in the PLS. (Nov. 6, 2012 Tr. at 63:2-6.)

**REDACTED**

FHFA's extremely limited production of GSE diligence reports confirms that the GSEs did not apply many of the "industry standards" FHFA now claims should have governed the origination of Alt-A and subprime loans in 2005–2007. (*Id*. ¶ 74-76.)  **REDACTED**
**REDACTED**

**REDACTED**

**REDACTED**

Under the Securities Act, the truth of a statement must be judged "by the facts as they existed at the time of the statement" and a "backward-looking assessment of the infirmities or mortgage-related securities . . . cannot help plaintiffs' case." *In re Royal Bank of Scot. Grp. PLC Sec. Litig.*, 2012 U.S. Dist. LEXIS 126220, at *26 (S.D.N.Y. Sept. 4, 2012) (internal quotation marks omitted). The Second Circuit has found that an investor cannot hold a Securities Act defendant "to a stricter [materiality] standard than [the plaintiff] itself followed." *GAF Corp.* v. *Heyman,* 724 F.2d 727, 742 (2d Cir. 1983).

Clayton's reports will not only show which conditions in loans the GSEs considered "material defects," but also will reflect the GSEs' view of what was material to investors, as well as their own investing decisions. The offering documents for Freddie Mac's T-Deals contain disclosures concerning the originators' adherence to underwriting guidelines, many of which are virtually identical to the disclosures in the offering materials for Defendants' Securitizations. (Harsch Decl. ¶ 38, 92.) An offering circular for Freddie Mac's T-079 deal states, "All of the Mortgage Loans to be acquired by the Issuing Entity from the Depositor were originated generally in accordance with First Franklin Financial's Underwriting Guidelines." (*Id*. ¶ 38) The offering circular for Freddie Mac's T-072 Deal states, "On a case-by-case basis, the originator may determine that, based upon compensating factors, a loan applicant, not strictly qualifying under one of the Risk Categories described below, warrants an exception to the requirements set forth in the Underwriting Guidelines . . . . It is expected that a substantial number of the Mortgage Loans to be included in the mortgage pool will represent such underwriting exceptions." (*Id*. ¶ 92.) **REDACTED**

Even where the GSEs applied some of their own guidelines to Alt-A and subprime purchases, discovery from Clayton would show that the originators' guidelines contained many of the same criteria for evaluating credit, reasonableness of income, or reasonableness of appraisal as the GSEs' guidelines. (Harsch Decl. ¶ 123, 125, 126.) The GSEs' treatment of those criteria is relevant regardless of which guidelines apply.

***Defendants' Due Diligence Defense.*** Discovery from Clayton also will undermine FHFA's argument that Defendants' PLS due diligence was inadequate. **REDACTED** **REDACTED** the diligence they performed reflects their views on the standard that should have been used by "a prudent man in the management of his own property"—the standard Defendants' due diligence defense must satisfy. 15 U.S.C. § 77k(c). Discovery from Clayton will show that the GSE's Alt-A and subprime due diligence standards and processes were similar to those employed by Defendants in the PLS securitization process. (Harsch Decl. Sec. III.E.) **REDACTED**
**REDACTED**

The discovery Clayton has agreed to produce will prove that Plaintiff's arguments impugning Defendants' diligence are driven by a hindsight-based litigation strategy, and do not reflect the GSEs' contemporaneous views of prudent Alt-A and subprime due diligence standards.

4

***Defendants' Knowledge Defense and Inquiry Notice.*** Through their purchases of subprime and Alt-A loans in 2005–2007, the GSEs became aware of conditions in loans that FHFA now claims constitute "defects" in substantially similar loans from the same originators, and were well aware of the processes by which these loans were originated as well as their attendant risks. The GSEs' awareness of such "defects" is relevant to the Defendants' knowledge and inquiry notice defenses.

### III. FHFA's Prior Misstatements Concerning the GSEs' Alt-A and Subprime Purchases and the Court's Reliance on Those Statements.

When the Court previously considered whether to require production of bulk purchase due diligence materials from the GSEs, FHFA's counsel made numerous representations to argue that the due diligence performed on the GSEs' bulk purchases and the diligence performed in connection with the PLS would not be a comparison of "apples to apples." (Feb. 14, 2013 Tr. at 65:11–18; *see* Harsch Decl. Sec. III.) For example, FHFA's counsel stated that the Single Family loans "[had] different characteristics, [were] made to different borrowers, and ***underwritten to different guidelines***." (Dec. 12, 2012 Ltr. from R. Schirtzer to J. Cote at 1.) Regarding diligence processes, FHFA's counsel stated that "the scope of the PLS loan file reviews referenced in the Complaints is very different from the single-family reviews conducted contemporaneously . . . . The contemporaneous Clayton-type diligence of a sample of single-family loans was confined to a comparison of the data in the loan files to loan tapes." (Feb. 6, 2013 Ltr. from P. Selendy to J. Cote at 1.) These statements by FHFA's counsel were not supported by any documents or sworn testimony. The Court incorporated these and other statements into its oral and written opinions. (*See* Harsch Decl. Sec. III.F.)

The statements FHFA's counsel made in connection with Defendants' earlier requests were not correct. As discussed above, the GSEs purchased substantial volumes of Alt-A and subprime loans underwritten in whole or in part to originators' guidelines. (*Id.* Sec. III.A.) Clayton did not merely compare loan files to loan tapes. (*Id.* Sec. III.C.) Rather, Clayton reviewed loan files to determine whether the loans met the originators' guidelines, among other criteria the GSEs may have required. (*Id.*) The type of due diligence the GSEs performed did not differ markedly from that of the Defendants. (*Id.* Sec. III.E.) FHFA's counsel also argued that the low defect rates found by Clayton in the single-family context "simply are not analogous" to the PLS defect rates alleged in the Complaints because Clayton performed a limited review for the GSEs, whereas FHFA is now "going beyond the loan file" to find "the truth." (*Id.* ¶ 60.) This does not explain the discrepancy in defect rates. Clayton consulted sources outside the loan files in performing due diligence for the GSEs. (*Id.* Sec. III.D.) As shown above, the defect rate discrepancy is attributable to FHFA's litigation-driven and hindsight-based re-underwriting: FHFA has identified defects for litigation purposes that the GSEs did not consider defects at all, or that the GSEs considered not to be material in the then-current market environment for non-traditional loans.

The documents Defendants seek from Clayton are highly relevant to the core claims and defenses in these Actions, and are not privileged. Clayton has not objected to their production or cited any burden associated with production. Any burden to FHFA is not properly considered but, in any event, would pale in comparison to the amount in controversy and the parties' resources. Fed. R. Civ. P. 26(b)(2)(C)(iii). FHFA's objection should be overruled and the production allowed to proceed.

                Respectfully Submitted,

                /s/ Edward J. Bennett
                Edward J. Bennett


cc: Counsel for All Parties