UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

FEDERAL HOUSING FINANCE AGENCY, etc.,

                     Plaintiff,

         v.

HSBC NORTH AMERICA HOLDINGS, INC., *et al.*,

                Defendants.

:
:  11 Civ. 6189 (DLC)
:
:
:  **PLAINTIFF'S**
:  **MEMORANDUM OF LAW**
:  **IN SUPPORT OF ITS**
:  **MOTION FOR PARTIAL**
:  **SUMMARY JUDGMENT ON**
:  **THE GSES' KNOWLEDGE**
:
:

-------------------------------------------------------------------- x

FEDERAL HOUSING FINANCE AGENCY, etc.,

                     Plaintiff,

         v.

BARCLAYS BANK PLC, *et al.*,

                Defendants.

:
:  11 Civ. 6190 (DLC)
:
:
:
:
:
:
:
:

-------------------------------------------------------------------- x

FEDERAL HOUSING FINANCE AGENCY, etc.,

                     Plaintiff,

         v.

FIRST HORIZON NATIONAL CORP., *et al.*,

                Defendants.

:
:  11 Civ. 6193 (DLC)
:
:
:
:
:
:
:
:

```
-------------------------------------------------------------- x
                                                               :
                                                               :  11 Civ. 6198 (DLC)
FEDERAL HOUSING FINANCE AGENCY, etc.,                          :
                                                               :
                    Plaintiff,                                 :
              v.                                               :
                                                               :
GOLDMAN, SACHS & CO., et al.,                                  :
                    Defendants.                                :
                                                               :
-------------------------------------------------------------- x
                                                               :
                                                               :  11 Civ. 6201 (DLC)
FEDERAL HOUSING FINANCE AGENCY, etc.,                          :
                                                               :
                    Plaintiff,                                 :
              v.                                               :
                                                               :
NOMURA HOLDING AMERICA, INC., et al.,                          :
                    Defendants.                                :
                                                               :
-------------------------------------------------------------- x
                                                               :
                                                               :  11 Civ. 7010 (DLC)
FEDERAL HOUSING FINANCE AGENCY, etc.,                          :
                                                               :
                    Plaintiff,                                 :
              v.                                               :
                                                               :
ALLY FINANCIAL INC., et al.,                                   :
                    Defendants.                                :
                                                               :
-------------------------------------------------------------- x
```

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP

Philippe Z. Selendy
Manisha M. Sheth
Andrew R. Dunlap
David B. Schwartz

51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000

KASOWITZ, BENSON, TORRES &
   FRIEDMAN LLP

Marc E. Kasowitz
Christopher P. Johnson
Michael A. Hanin
Kanchana Wangkeo Leung

1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Plaintiff Federal Housing Finance Agency,*
*as Conservator for Fannie Mae and Freddie Mac*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND .........................................................................................4

     A.    Defendants' Misrepresentations.........................................................................4

     B.    The GSEs' Lack Of Knowledge Concerning The Falsity Of Defendants' Misrepresentations About The Mortgage Loans, SLGs, And Certificates .............6

     C.    Procedural History ........................................................................................10

ARGUMENT ...........................................................................................................11

I.     TO AVOID SUMMARY JUDGMENT, DEFENDANTS MUST PRESENT ADMISSIBLE EVIDENCE THE GSES ACTUALLY KNEW DEFENDANTS' SPECIFIC REPRESENTATIONS ABOUT THE MORTGAGE LOANS WERE NOT TRUE.......................................................................................................13

II.    THERE IS NO EVIDENCE TO PERMIT A FINDING THAT THE GSES HAD ACTUAL KNOWLEDGE OF DEFENDANTS' SPECIFIC MISREPRESENTATIONS ............................................................................17

CONCLUSION........................................................................................................20

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................................11, 12

*Aronson v. TPO Inc.*,
410 F. Supp. 1375 (S.D.N.Y. 1976)....................................................................15

*Casella v. Webb*,
883 F.2d 805 (9th Cir. 1989) ..............................................................15, 19, 20

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..................................................................................................11, 12

*Cordiano v. Metacon Gun Club, Inc.*,
575 F.3d 199 (2d Cir. 2009)..........................................................................12, 18

*Crawford-El v. Britton*,
523 U.S. 574 (1998)..................................................................................................20

*Dale v. Rosenfeld*,
229 F.2d 855 (2d Cir. 1956)..........................................................................3, 15

*DeMaria v. Andersen*,
318 F.3d 170 (2d Cir. 2003)..........................................................................14

*Dunn v. Borta*,
369 F.3d 421 (4th Cir. 2004) ..........................................................15, 19, 20

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976).........................................................................................1, 4, 13

*Fabrikant v. French*,
691 F.3d 193 (2d Cir. 2012)..........................................................................12

*FHFA v. Ally Fin., Inc.*,
2012 WL 6616061 (S.D.N.Y. Dec. 19, 2012) ......................................10

*FHFA v. Bank of Am. Corp.*,
2012 WL 6592251 (S.D.N.Y. Dec. 18, 2012) ......................................16

*FHFA v. Barclays Bank PLC*,
2012 WL 5844189 (S.D.N.Y. Nov. 19, 2012) ......................................10

*FHFA v. First Horizon National Corp.*,
No. 11-CV-6193 (DLC) (S.D.N.Y. Nov. 27, 2012) ......................................1, 10

*FHFA v. Goldman, Sachs & Co.*,
2012 WL 5494923 (S.D.N.Y. Nov. 12, 2012) ......................................10

*FHFA v. HSBC N. Am. Holdings Inc.*,
   No. 11-CV-06189 (DLC) (S.D.N.Y. Nov. 28, 2012) ...........................................10

*FHFA v. HSBC N. Am. Holdings Inc.*,
   --- F. Supp. 2d ----, 2013 WL 6588249 (S.D.N.Y. Dec. 16, 2013)..........................16

*FHFA v. JPMorgan Chase & Co.*,
   2013 WL 5354212 (S.D.N.Y. Sept. 25, 2013)................................................2, 11

*FHFA v. JPMorgan Chase & Co.*,
   902 F. Supp. 2d 476 (S.D.N.Y. 2012).............................................................6

*FHFA v. Nomura Holding Am., Inc.*,
   No. 11-CV-06201 (DLC) (S.D.N.Y. Nov. 27, 2012) ...........................................10

*FHFA v. UBS Americas, Inc.*,
   858 F. Supp. 2d 306 (S.D.N.Y. 2012).............................................................13

*FHFA v. UBS Americas Inc.*,
   712 F.3d 136 (2d Cir. 2013)......................................................................13

*FHFA v. UBS Americas Inc.*,
   2013 WL 3284118 (S.D.N.Y. June 28, 2013) ...................................... *passim*

*Globus v. Law Research Serv., Inc.*,
   418 F.2d 1276 (2d Cir. 1969) (Section 11)...................................................13

*Gustafson v. Alloyd Co., Inc.*,
   513 U.S. 561 (1995)................................................................................16

*Healey v. Chelsea Resources, Ltd.*,
   947 F.2d 611 (2d Cir. 1991)......................................................................12

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)..............................................................................1, 13

*Hill York Corp. v. Am. Int'l Franchises, Inc.*,
   448 F.2d 680 (5th Cir. 1971)....................................................................15

*Island Software & Computer Serv., Inc. v. Microsoft Corp.*,
   413 F.3d 257 (2d Cir. 2005)......................................................................19

*J.B. Haralson v. E.F. Hutton Grp., Inc.*,
   919 F.2d 1014 (5th Cir. 1990) ..................................................................16

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ..........................................................3, 14, 15

*Montefiore Med. Ctr. v. Teamsters Local 272*,
   642 F.3d 321 (2d Cir. 2011)......................................................................16

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010)................................................................13, 14

*N.J. Carpenters Health Fund v. Rali Series 2006-Q01 Trust,*
    477 F. App'x 809 (2d Cir. 2012) ....................................................................2, 14, 16

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC,*
    709 F.3d 109 (2d Cir. 2013) .............................................................................12, 15

*Pinter v. Dahl,*
    486 U.S. 622 (1988) ...........................................................................................13, 15

*S.E.C. v. World Info. Tech., Inc.,*
    590 F. Supp. 2d 574 (S.D.N.Y. 2008) ......................................................................12

*Samuels v. Mockry,*
    77 F.3d 34 (2d Cir. 1996) .........................................................................................12

*Sanders v. John Nuveen & Co., Inc.,*
    619 F.2d 1222 (7th Cir. 1980) .............................................................................3, 14

*In re WorldCom, Inc. Sec. Litig.,*
    346 F. Supp. 2d 628 (S.D.N.Y. 2004) .....................................................11, 12, 19

*Wright v. Nat'l Warranty Co.,*
    953 F.2d 256 (6th Cir. 1992) ................................................................................2, 14

### Statutes & Rules

15 U.S.C. § 77k(a) .................................................................................... *passim*

15 U.S.C. § 77*l*(a)(2) ............................................................................... *passim*

D.C. Code § 31-5606.05(a)(1)(B) .................................................................1, 16

Va. Code Ann. § 13.1-522(A) .......................................................................1, 16

Fed. R. Civ. P. 56(c)(4) ....................................................................................12

Fed. R. Civ. P. 56(e) .........................................................................................11

### Other Authorities

31A C.J.S. Evidence § 200 (2012) ...................................................................16

Joseph C. Long, 12A Blue Sky Law § 9:24 (2003) .........................................16

Plaintiff Federal Housing Finance Agency ("FHFA"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" and, together with Fannie Mae, the "GSEs"), respectfully submits this memorandum of law in support of its Motion for Partial Summary Judgment of Defendants'[1] knowledge defense under 15 U.S.C. § 77k(a) ("Section 11"), and of the absence-of-knowledge element of FHFA's claims under 15 U.S.C. § 77*l*(a)(2) ("Section 12"),  D.C. Code § 31-5606.05(a)(1)(B) (the "D.C. Blue Sky law"), and Va. Code Ann. § 13.1-522(A)(ii) (the "Virginia Blue Sky law").[2]  Summary judgment for FHFA is appropriate on these points, as there is no genuine issue of material fact as to whether the GSEs had actual knowledge of any of the specific misrepresentations prior to the purchase of the securities at issue.

## PRELIMINARY STATEMENT

Under Sections 11 and 12 of the Securities Act of 1933 and the Virginia and D.C. Blue Sky laws, a defendant cannot avoid liability for its wrongful misrepresentations by pointing to the security purchaser's knowledge except in exceedingly narrow circumstances.  This was Congress's intent:  The Securities Act "was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976) (citation omitted); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983) (The Securities Act "impos[es] a stringent standard of liability on the parties who play a direct role in a registered offering." (footnote omitted)).  Congress therefore drafted the Securities Act

---

[1]  As used herein, "Defendants" means all defendants named in these six actions ("Actions").

[2]  FHFA has asserted claims under both the Virginia and D.C. Blue Sky laws in all the Actions, with the exception of *FHFA v. First Horizon National Corp.*, No. 11-CV-6193 (DLC), where it has sued under only the D.C. law, and *FHFA v. Ally Financial Inc.*, No. 11-CV-7010 (DLC), where it has sued under only the Virginia law.

with precision, leaving "no ambiguity: For the knowledge affirmative defense to succeed on the merits, the defendant must show the purchaser's actual knowledge of the specific untruth or omission." *N.J. Carpenters Health Fund v. Rali Series 2006-Q01 Trust*, 477 F. App'x 809, 813 (2d Cir. 2012) (emphasis and citations omitted) (Section 11); *see also Wright v. Nat'l Warranty Co.*, 953 F.2d 256, 262 (6th Cir. 1992) (same for Section 12).  This Court's June 28, 2013 ruling followed from this controlling authority.  In that decision, the Court held that to prevail on their knowledge defense, Defendants must prove that the GSEs had "actual knowledge" of the falsity of the "specific representations" at issue.  *FHFA v. UBS Americas Inc.* ("*UBS III*"), 2013 WL 3284118, at *18 (S.D.N.Y. June 28, 2013), *reconsideration denied sub nom. FHFA v. JPMorgan Chase & Co.*, 2013 WL 5354212 (S.D.N.Y. Sept. 25, 2013).

Under these governing standards, there is no genuine issue of material fact as to whether the GSEs had actual knowledge of the untruth of Defendants' specific misrepresentations. Defendants' Offering Materials misrepresented the quality of the specific loans in the Supporting Loan Groups ("SLGs") that back the particular Certificates purchased by the GSEs (the "Mortgage Loans").  The misrepresentations relate to four characteristics: (1) the originator's adherence to applicable underwriting guidelines in originating the Mortgage Loans; (2) the loan-to-value ("LTV") ratio and the combined loan-to-value ratio ("CLTV") of the Mortgage Loans; (3) the owner-occupancy rates of the properties underlying the Mortgage Loans; and (4) the credit ratings for each tranche based on information furnished by Defendants to the credit ratings agencies.  Because Defendants made precise representations addressed to these specific criteria, to create a genuine issue of material fact they must present admissible evidence that the GSEs actually knew that, for each Certificate they purchased, each of these particular representations was materially false for the Mortgage Loans underlying that Certificate.

2

There is no evidence that would permit such a finding.  Nothing in the thousands of pages of deposition testimony or in the more than 240 million pages of party and third-party documents supports a finding that the GSEs had actual knowledge that Defendants' four representations were materially false with respect to any Certificate or SLG.  No witness testified that the GSEs had actual knowledge that the specific Mortgage Loans supporting the Certificates were underwritten in a manner contrary to Defendants' representations, had materially different LTV or CLTV ratios from those Defendants reported, had owner occupancy rates that were materially divergent from those Defendants included in the Offering Materials, or were otherwise undeserving of investment grade credit ratings that Defendants obtained.  To the contrary, the only Certificate-specific loan information that the GSEs had available to them prior to their purchase of the Certificates was the information in the Offering Materials that Defendants conveyed to the GSEs—information that was entirely consistent with the loan descriptions Defendants included in the Prospectus Supplements used to market and sell the Certificates.

Defendants cannot create a disputed issue of material fact by relying on stale arguments concerning the GSEs' general market knowledge.  Likewise, Defendants cannot point to what the GSEs "should have known" or rely on the GSEs' alleged sophistication in the mortgage market.  *See Dale v. Rosenfeld*, 229 F.2d 855, 858 (2d Cir. 1956) ("Availability elsewhere of truthful information cannot excuse untruths or misleading omissions in the prospectus." (footnote omitted)); *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008) (The Securities Act "does not establish a graduated scale of duty depending upon the sophistication and access to information of the [buyer]." (quotation marks omitted) (quoting *Sanders v. John Nuveen & Co., Inc.*, 619 F.2d 1222, 1229 (7th Cir. 1980))).  These arguments, which do not relate to the specific Mortgage Loans, SLGs, or Certificates at issue, are irrelevant as a matter of law.  Adopting them

as a basis for a defendant to avoid liability for its misrepresentations would contravene Congress' requirement that those who sell securities do not misrepresent material information. *See Ernst & Ernst*, 425 U.S. at 195.

Because there is no evidence that creates a genuine issue of material fact that the GSEs lacked actual knowledge of Defendants' specific material misrepresentations, FHFA respectfully requests that the Court grant it summary judgment on (1) Defendants' knowledge defense under Section 11; and (2) the absence-of-knowledge element of FHFA's Section 12 claims and its claims under the analogous sections of the Virginia and D.C. Blue Sky laws.

## FACTUAL BACKGROUND

Fannie Mae and Freddie Mac bought 92 Certificates, associated with 87 Securitizations and issued pursuant to 87 Prospectus Supplements, from Defendants. Plaintiff's Statement of Undisputed Material Facts ("SUF") ¶¶ 1, 9, 25, 31, 40, 46, 52. Defendants offered and sold each of the Certificates using a Shelf Registration Statement, a Prospectus, a Prospectus Supplement, and one or more of the following: a term sheet, a preliminary prospectus supplement, and a free writing prospectus (the "Offering Materials"). SUF ¶¶ 2, 5. Defendants distributed these Offering Materials to potential purchasers, like the GSEs, either directly or by making them available for download and review electronically. SUF ¶ 4.

### A. Defendants' Misrepresentations

In the Offering Materials, Defendants' specific representations included that the Mortgage Loans making up the SLGs were generally underwritten in accordance with applicable underwriting guidelines (SUF ¶¶ 2, 3, 11, 14, 20, 26, 33, 35, 41, 47, 53), as well as particular representations regarding the LTV and CLTV ratios of the Mortgage Loans (SUF ¶¶ 2, 3, 12, 15, 16, 17, 18, 19, 21, 27, 34, 36, 42, 48, 54), the number or percentage of those loans secured by owner-occupied residences (SUF ¶¶ 2, 3, 12, 15, 16, 17, 18, 19, 22, 28, 34, 37, 39, 43, 49, 51,

4

55), and the credit ratings of the GSE Certificates (SUF ¶¶ 2, 3, 12, 15, 23, 24, 29, 30, 34, 38, 39, 44, 45, 50, 51, 56, 57).

As an example of the particularity of these four representations, in the Prospectus Supplement for the GSAMP 2005-AHL2 Securitization, from which Fannie Mae purchased a Certificate on December 28, 2005 (SUF ¶ 10), the Defendants in the *Goldman Sachs* Action (the "Goldman Sachs Defendants") specifically represented that:

1. "Each mortgage loan originated or acquired by Accredited is underwritten prior to loan closing, or re-underwritten after loan closing but prior to purchase by Accredited, in accordance with Accredited's underwriting guidelines." SUF ¶ 11.

2. Of the 978 Mortgage Loans in the Group 1 SLG, 887 Mortgage Loans, or 90.70 percent of the SLG, were owner-occupied. SUF ¶ 12.

3. Of the 978 Mortgage Loans in the Group 1 SLG, 559 Mortgage Loans, or 57.58 percent of the SLG, had LTV ratios at or below 80 percent, and that 0 Mortgage Loans had LTV ratios above 100 percent. SUF ¶ 12.

4. Certificates purchased from the A-1A tranche of the GSAMP 2005-AHL2 Securitization deserved credit ratings of AAA from S&P and Aaa from Moody's.  SUF ¶ 12.

Similarly, in the Prospectus Supplement for the GSR 2007-OA2 Securitization, from which Freddie Mac purchased a Certificate on October 29, 2007 (SUF ¶ 13), the Goldman Sachs Defendants specifically represented that:

1. "[A]ll of the mortgage loans that GSMC may acquire through its conduit program will be acquired generally in accordance with the underwriting criteria described in this section," and that loans purchased from the other primary originator, Residential Funding Company, LLC "will have been originated generally in accordance with Residential Funding Company, LLC's underwriting standards or alternative underwriting criteria as described below."  SUF ¶ 14.

2.     Of the 1,116 Mortgage Loans in the Group 1 SLG, 739 Mortgage Loans, or 66.22 percent of the SLG, were owner-occupied.  SUF ¶ 15.

3.     Of the 1,116 Mortgage Loans in the Group 1 SLG, 919 Mortgage Loans, or 82.35 percent of the SLG, had LTV ratios at or below 80 percent, and that 0 Mortgage Loans had LTV ratios above 100 percent. SUF ¶ 15.[3]

4.     Certificates purchased from the 1A-1 tranche of the GSR 2007-OA2 Securitization deserved credit ratings of AAA from S&P and Aaa from Moody's.  SUF ¶ 15.

As demonstrated in further detail in FHFA's SUF, Defendants made comparable representations in each of these four categories with respect to the Mortgage Loans in the SLGs supporting each of the 92 Certificates they sold to the GSEs.  SUF ¶¶ 11, 12, 13-24, 26-30, 33-39, 41-45, 47-51, 53-57.[4]  As FHFA will show at trial, these representations were materially false.

### B.     The GSEs' Lack Of Knowledge Concerning The Falsity Of Defendants' Misrepresentations About The Mortgage Loans, SLGs, And Certificates

The GSEs had no information that established that Defendants' Certificate-specific representations were false.  FHFA and the GSEs have produced approximately 19.1 million pages of documents in discovery; defendants in these 16 coordinated actions have produced approximately 212.7 million pages of documents; and third parties have produced approximately 14.3 million pages of documents.  SUF ¶ 7.  None of these documents permit a reasonable inference that the GSEs actually knew that Defendants' four particular representations were false as to any specific Certificate.

The only Certificate-specific information the GSEs had prior to their purchases was the data in the Offering Materials that Defendants supplied to the GSEs, which were consistent with

---

[3]   Due to the Goldman Sachs Defendants' rounding in the Prospectus Supplement, the LTV percentage for this Securitization in FHFA's amended complaint was slightly different.  *See* SUF ¶ 3 ("Due to rounding, percentages may not add up to 100%.").

[4]   The credit ratings also accounted for the overall structure of the Securitization.  *See FHFA v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 500 (S.D.N.Y. 2012).

Defendants' representations in the Prospectus Supplements.  For instance, in the April 18, 2006

term sheet that the Goldman Sachs Defendants provided to Freddie Mac in connection with the

sale of GSAA 2006-8 1A1, the Goldman Sachs Defendants represented that 76.7% of the loans

in the supporting loan group had an LTV of 80% or lower, that none had an LTV greater than

100%, and that 52.8% of the loans were on properties that were owner-occupied.  SUF ¶ 16.  The

Goldman Sachs Defendants made the same representations in the April 25, 2006 Prospectus

Supplement governing the GSAA 2006-8 Securitization.  SUF ¶ 17.[5]  Defendants have identified

no document demonstrating that they disclosed to the GSEs that the information provided in the

Offering Materials, with respect to any particular Mortgage Loan or SLG, was materially false.

Nor can Defendants point to any GSE witness testifying that he or she had actual

knowledge that a Defendant's specific representation was false.  To the contrary, the GSEs'

witnesses testified that they accepted Defendants' representations as true.  For example, Paul

Norris, the head trader in Fannie Mae's PLS group, testified that he "relied on the reps and

warrants that were given to us and the due diligence done by the dealers" and that Fannie Mae

"had no reason to doubt that [Defendants] weren't doing what they said they were doing."  SUF

¶ 68.  Ashley Dyson, another PLS trader at Fannie Mae, testified that "in regard to loans that I

purchased, I relied on the data that was sent to me by the Wall Street firms, which I engaged in

---

[5]   Occasionally some of the SLGs would change slightly in the weeks before Defendants would issue the Prospectus Supplements, as small numbers of loans would drop out of or come into the SLGs, in part because Defendants were required to populate the pools with only conforming loans.  For example, in the October 11, 2007 free writing prospectus for the GSR 2007-OA2 Securitization, which contained data on the SLG as of September 1, 2007, the Goldman Sachs Defendants represented that the relevant Supporting Loan Group would contain 1,142 loans, with a weighted original LTV ratio of 78.01%, and that 762 of the loans were for property that was owner-occupied.  SUF ¶ 18.  In the preliminary prospectus the Goldman Sachs Defendants issued on October 17, 2007, however, the Goldman Sachs Defendants slightly altered the composition of the Supporting Loan Group, which now contained 1,116 loans, with a weighted original LTV ratio of 78.25%, and with 739 of the loans were for property that was owner-occupied.  SUF ¶ 19.  That latter set of numbers is identical to the representations the Goldman Sachs Defendants made in the GSR 2007-OA2 Prospectus Supplement.  SUF ¶¶ 15.  Even on the occasions where certain preliminary Offering Materials reflected slight variations in the SLGs, Defendants can provide no evidence that any such materials provided the GSEs with actual knowledge that Defendants were misrepresenting the collateral characteristics of the Mortgage Loans.

with trades, and I assumed that the information that I received was accurate and correct." SUF

¶ 67.  Similarly, when asked whether he questioned the accuracy of the information regarding the

loans being provided by the dealers, Shayan Salahuddin, a PLS trader at Fannie Mae, testified:

> The only information that I was given in regards to the … PLS bonds that we
> purchased was supposed to have been, in my understanding at the time, have been
> subject to the due diligence process that the dealers or the sellers might have
> enacted on it prior to its getting to me.  So that there was some verification that
> had gone on and the extent to which it was possible or even practical that people
> lied on it, I don't think I would have that information, would have had that
> information at the time ….   The dealers were the one [sic] doing the due
> diligence, not Fannie Mae.

SUF ¶ 66.  David Gussmann, Fannie Mae's Vice President, Capital Markets Strategy-Credit

Risk, who was responsible for credit analysis of PLS deals considered by Fannie Mae for

purchase, testified that he understood the loan-related information in the Offering Materials was

accurate because Defendants were conducting diligence on the loans:

> "[I]t was my understanding that the aggregators and the dealers and underwriters would
> perform several checks on these loans to ensure the veracity of the information that was
> provided.  The underwriters would take a comprehensive look at the borrower, their
> assets, credit history, other holdings to determine if it was reasonable that the borrower's
> income as stated was correct.  And then I also believe that the dealers that sold us the
> loans conducted due diligence, an additional layer of due diligence on the loans *that then
> matched the materials that they would provide to us*."

SUF ¶ 68 (emphasis added).

Freddie Mac witnesses with PLS responsibilities also testified that they understood

Defendants' descriptions of the loan characteristics to be accurate.  David Hackney, a Freddie

Mac PLS trader testified that he would have stopped doing business with the dealers if he

thought they were providing materially inaccurate information to him regarding potential deals.

SUF ¶ 77 ("Q. And in the course of your work at Freddie Mac, did you believe at any time that

you had been provided with inaccurate information? Not necessarily fraudulent … but

inaccurate? … A. I wouldn't have done business with them.  ….  If I had suspected anyone, that

would have been the last time we would have spoken.").  Michael Aneiro, the head of Freddie

Mac's PLS desk, testified that he was "dependent on various parties involved with the sale of the

deal that they're making representations that alleviate the risk that I am exposed to by the fact

that I'm a AAA investor and don't have access to actually make those determinations myself."

SUF ¶ 81.  Kevin Palmer, a credit analyst with PLS responsibilities at Freddie Mac, was asked

whether he "expect[ed] that there would be loans within the supporting loan group in which

Freddie Mac was investing that were underwritten in a way where the information provided to

Freddie Mac did not accurately reflect the true character of the collateral."  He testified, "I don't

remember thinking that.  Again, … we relied on the issuer's reps that the information was

accurate."  SUF ¶ 75.

GSE employees, including senior executives, also testified that they did not know that

Defendants' representations in the Prospectus Supplements were materially false.  *See, e.g.*, SUF

¶ 70 (Fannie Mae's former CEO, Daniel Mudd, testifying that his understanding was that the

dealers "had formed a degree of diligence and analysis *and were representing that the underlying*

*loans were as advertised*." (emphasis added)); SUF ¶ 72 (Fannie Mae's Executive Vice President

of Capital Markets, the division that purchased PLS, testifying that Fannie Made "had purchased

[the Certificates] through established underwriters who had assuredly good due diligence

processes on the underlying loans, I would not have had at the time much reason to be

concerned, I think about the incidence of fraud in the issues of securities that we had

purchased"); SUF ¶ 86 (Freddie Mac's former CEO testifying that "We didn't have a concern

about fraud in what Freddie Mac bought in private label securities because it was warranted to us

by the people that supplied it and it was AAA tranches."); SUF ¶ 80 (Freddie Mac's former

Executive VP and Chief Business Officer, testifying that Freddie Mac "would have relied on representations and warranties made [to] Freddie Mac.").

### C.   Procedural History

FHFA filed its amended complaints in the Actions between June 12 and June 28, 2012. SUF ¶ 6.  In each amended complaint, FHFA asserted claims against Defendants for, among other things, violations of Sections 11 and 12 of the Securities Act and related provisions of the Virginia and D.C. Blue Sky laws relating to the four categories of misrepresentations discussed *supra*.  SUF ¶ 6.  Across all of the pending actions, FHFA seeks damages arising out of Defendants' misrepresentations in connection with the sale of 92 Certificates in 87 Securitizations to the GSEs.  SUF ¶ 6.

In a series of written opinions, beginning on November 8, 2012, the Court largely denied Defendants' motions to dismiss, and held that FHFA's claims pertaining to the four categories of alleged misrepresentations are actionable.[6]  In their subsequently filed Answers, each Defendant pled that FHFA's claims were barred because the GSEs knew of, or were willfully blind to, these material misstatements at the time they acquired the Certificates.  SUF ¶¶ 58-63.

In order to address a number of discovery disputes, the Court repeatedly invited briefing over the course of nearly a year addressed to the proper scope of this knowledge defense.  *See UBS III*, 2013 WL 3284118, at *3, 11.  After Defendants "abandoned any meaningful opposition to the Court's longstanding articulation of the knowledge standard (or of any other legal standard that the Court had articulated for the claims and defenses in these actions)," *JPMorgan Chase*,

---

[6]  *See FHFA v. Ally Fin., Inc.*, 2012 WL 6616061, at *5-6 (S.D.N.Y. Dec. 19, 2012); *FHFA v. HSBC N. Am. Holdings Inc.*, No. 11-CV-06189 (DLC), slip op. at 2 (S.D.N.Y. Nov. 28, 2012) (Dkt. No. 171); *FHFA v. Barclays Bank PLC*, 2012 WL 5844189, at *4 (S.D.N.Y. Nov. 19, 2012) (dismissing FHFA's claims under the Virginia Blue Sky Act against non-sellers of the Certificates); *FHFA v. First Horizon Nat'l Corp.*, No. 11-CV-06193 (DLC), slip op. at 2 (S.D.N.Y. Nov. 27, 2012) (Dkt. No. 181); *FHFA v. Nomura Holding Am., Inc.*, No. 11-CV-06201 (DLC), slip op. at 2 (S.D.N.Y. Nov. 27, 2012) (Dkt. No. 165); *FHFA v. Goldman, Sachs & Co.*, 2012 WL 5494923, at *4 (S.D.N.Y. Nov. 12, 2012).

2013 WL 5354212, at *1, the Court issued a written decision on June 28, 2013, holding, among

other things, that Defendants can prevail on a knowledge defense only by demonstrating that the

GSEs possessed "actual knowledge" of the "specific representations" FHFA alleged to be false,

*UBS III*, 2013 WL 3284118, at *18.

Fact discovery between the parties closed across these actions on December 6, 2013.[7]

## ARGUMENT

On a motion for summary judgment, "[t]he moving party bears the burden of

demonstrating the absence of a material factual question," *In re WorldCom, Inc. Sec. Litig.*, 346

F. Supp. 2d 628, 655 (S.D.N.Y. 2004), and, as such, has "the initial responsibility of identifying

those portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue

of material fact," *id.* (ellipsis and quotation marks omitted) (quoting *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986)).  "When the moving party has asserted facts showing that it is entitled

to summary judgment, the opposing party must 'set forth specific facts showing that there is a

genuine issue for trial,' and cannot rest on the 'mere allegations or denials' of the movant's

pleading."  *In re WorldCom*, 346 F. Supp. 2d at 655-56 (quoting Fed. R. Civ. P. 56(e)).

Summary judgment is proper "unless 'there is sufficient evidence favoring the nonmoving party

for a jury to return a verdict for that party,'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

(1986), hence "'[t]he mere existence of a scintilla of evidence in support of [the non-moving

party's] position will be insufficient' to defeat a summary judgment motion," *Fabrikant v.*

*French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252).  Furthermore,

---

[7]   Order re Revised Pretrial Schedule, Sept. 25, 2013, *FHFA v. Goldman, Sachs & Co.*, Dkt. No. 493.
Although fact discovery closed on December 6, 2013, certain depositions took place after that date.  The deposition
of one FHFA witness, Peter Niculescu, was completed on December 10, and Defendants' Rule 30(b)(6) deposition
of FHFA occurred on December 17.  Fact and Rule 30(b)(6) depositions of various defendants, including HSBC,
Barclays, Nomura, and Goldman Sachs, continued until February 12, 2014.

any such evidence offered by the opposing party must "set out facts that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(4).

These summary judgment standards operate similarly for the knowledge elements of FHFA's different claims.  With respect to FHFA's Section 11 claims, the Securities Act "creates an affirmative defense " as to the plaintiff's knowledge *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 127 n.12 (2d Cir. 2013) (citations omitted), and as such, it "is sufficient for [FHFA] to point to a lack of evidence to go to the trier of fact on an essential element" of this affirmative defense, *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322-23).  Similarly, for claims under Section 12 and the Blue Sky laws, while FHFA bears the burden of proof, *UBS III*, 2013 WL 3284118, at *13 (citing *Healey v. Chelsea Resources, Ltd.*, 947 F.2d 611, 617 (2d Cir. 1991)), because the knowledge the GSEs lacked is the same as for Section 11, *id.* at *14 & n.14, summary judgment is warranted "if, viewing all facts of record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication," *S.E.C. v. World Info. Tech., Inc.*, 590 F. Supp. 2d 574, 577 (S.D.N.Y. 2008) (quotation marks omitted) (quoting *Samuels v. Mockry*, 77 F.3d 34, 35 (2d Cir. 1996)); *see In re WorldCom*, 346 F. Supp. 2d at 655-56 (same standard for defendants' motion for summary judgment on their affirmative defense); *cf.* 31A C.J.S. Evidence § 200 (2012) ("The court will more promptly discharge a litigant from the burden of evidence where the proposition is a negative one, and the burden of evidence is sustained by proof which renders probable the existence of the negative fact, nothing in the nature of a demonstration being required." (footnotes omitted)).

I.   **TO AVOID SUMMARY JUDGMENT, DEFENDANTS MUST PRESENT ADMISSIBLE EVIDENCE THE GSES ACTUALLY KNEW DEFENDANTS' SPECIFIC REPRESENTATIONS ABOUT THE MORTGAGE LOANS WERE NOT TRUE**

Defendants cannot prevail on a knowledge defense under the Securities Act and Blue Sky laws unless they "establish that the GSEs had actual knowledge that the specific representations in the prospectus supplements issued by the defendants were false." *UBS III*, 2013 WL 3284118, at \*18.  This holding is in keeping with long-standing authority addressed to the purpose and express terms of the Securities Act.  "The Securities Act of 1933 … was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst*, 425 U.S. at 195 (citation omitted).  As the Supreme Court and the Second Circuit recognize, "to assure compliance with the disclosure provisions of the Act," *Herman & MacLean*, 459 U.S. at 381-82, Congress intentionally sought to create "*in terrorem*" civil liability in Sections 11 and 12, *Pinter v. Dahl*, 486 U.S. 622, 646 (1988) (Section 12); *Globus v. Law Research Serv., Inc.*, 418 F.2d 1276, 1288 (2d Cir. 1969) (Section 11); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (both).

Consequently, the Securities Act places "a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean*, 459 U.S. at 382; *see also FHFA v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 329 (S.D.N.Y. 2012) ("[L]iabilty under the Securities Act is strict liability."), *aff'd*, 712 F.3d 136 (2d Cir. 2013).  In Section 11, Congress provided that any signer, director of the issuer, preparing or certifying accountant, or underwriter may be liable if "any part of the registration statement … contained an untrue statement of a material fact or omitted to state a material fact."  15 U.S.C. § 77k(a).  In Section 12(a)(2), which

has "roughly parallel elements," *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359,

Congress provided for the liability of "any person who …. offers or sells a security … by means

of a prospectus or oral communication, which includes an untrue statement of a material fact or

omits to state a material fact," 15 U.S.C. § 77*l*(a)(2).  As such, "[i]ssuers are subject to 'virtually

absolute' liability under section 11, while the remaining potential defendants under sections 11

and 12(a)(2) may be held liable for mere negligence."  *In re Morgan Stanley Info. Fund Sec.*

*Litig.*, 592 F.3d at 359.

Defendants are subject to this stringent liability unless, under Section 11, they show that

the purchaser "knew of such untruth or omission," 15 U.S.C. § 77k(a), or, under Section 12, the

plaintiff fails to show that it did "not know[] of such untruth or omission," *id.* § 77*l*(a)(2).  This

"statutory language leaves no ambiguity:  For [Section 11's] knowledge affirmative defense to

succeed on the merits, the defendant must show the purchaser's *actual* knowledge of the *specific*

untruth or omission."  *N.J. Carpenters Health Fund*, 477 F. App'x at 813 (emphases omitted and

added); *see also UBS III*, 2013 WL 3284118, at *14-15.  Similarly, Section 12 "bars recovery

only when a plaintiff has *actual* knowledge that a representation is false or knows that existing

information has been withheld."  *Wright*, 953 F.2d at 262 (emphasis added).  The Securities

Act's strict liability applies unless "the purchaser knew about *the* false statement at the time of

acquisition."  *DeMaria v. Andersen*, 318 F.3d 170, 175 (2d Cir. 2003) (emphasis added).

Defendants cannot avoid liability by pointing to the sophistication of the plaintiff.  The

Securities Act "does not establish a graduated scale of duty depending upon the sophistication

and access to information of the [buyer]."  *Miller*, 519 F.3d at 887 (quoting *Sanders*, 619 F.2d at

1229); *see also Hill York Corp. v. Am. Int'l Franchises, Inc.*, 448 F.2d 680, 696 (5th Cir. 1971)

("[W]e again reject the defense based upon the plaintiffs' sophistication.  Neither the

monumental credulity of the victim nor the investor's sophistication or independent knowledge offer a refuge to the defendant." (quotation marks omitted)), *abrogated on other grounds by Pinter*, 486 U.S. 622; *Aronson v. TPO Inc.*, 410 F. Supp. 1375, 1379 (S.D.N.Y. 1976) ("Plaintiffs' sophistication … [is] immaterial to defendants' obligations under" the Securities Act).

Defendants also cannot defeat Section 11 or 12 liability by showing that corrective information was available to the plaintiff.  For Section 11, "[i]f courts held that merely available, as opposed to widely known, public information exposed an untruth or omission, thereby rendering it immaterial, they would effectively shift the burden of proof on § 11's affirmative defense, presuming that the plaintiff *should* have known the relevant information rather than requiring the defendant to prove actual knowledge." *N.J. Carpenters Health Fund*, 709 F.3d at 127 n.12.  For Section 12, such a standard would contradict the bedrock rule that "investors are not generally required to look beyond a given document to discover what is true and what is not," *Miller*, 519 F.3d at 887, because "[a]vailability elsewhere of truthful information cannot excuse untruths or misleading omissions in the prospectus," *Dale*, 229 F.2d at 858.  Thus "[c]onstructive knowledge cannot bar a purchaser's recovery" under Sections 11 or 12, *Casella v. Webb*, 883 F.2d 805, 809 (9th Cir. 1989) (Section 12); *see N.J. Carpenters Health Fund*, 709 F.3d at 127 n.12 (similar for Section 11),[8] and "a purchaser who is actually ignorant that a seller's representation is inaccurate or incomplete may recover even though the full truth is apparent from materials in her possession," *Dunn v. Borta*, 369 F.3d 421, 429 (4th Cir. 2004)

---

[8]  In *UBS III*, the Court also held as a matter of law that Defendants could not prevail on their knowledge defense by proving the GSEs' "willful blindness," because such a standard is inapplicable under the plain language of the Securities Act.  2013 WL 3284118, *16.

(quoting *J.B. Haralson v. E.F. Hutton Grp., Inc.*, 919 F.2d 1014, 1032 n.10 (5th Cir. 1990), *abrogated on other grounds by Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995)).[9]

The same standards apply under the Blue Sky laws.  *See FHFA v. Bank of Am. Corp.*, 2012 WL 6592251, at *7 n.8 (S.D.N.Y. Dec. 18, 2012) (The Court's "holding applies equally to the plaintiff's Blue Sky claims, because the D.C. and Virginia securities laws are generally interpreted in accordance with Section 12(a)(2)." (collecting cases)); *Dunn*, 369 F.3d at 428-29 (reasoning that "judicial constructions of section 12(2) of the federal Securities Act of 1933" are "instructive" because the statute is "substantially identical" to the Virginia Blue Sky law).  The knowledge language of the Virginia Blue Sky Act is identical to that of Section 12 in this respect, *see* Va. Code Ann. § 13.1-522(A)(ii) ("the purchaser not knowing of such untruth or omission"); 15 U.S.C. § 77*l*(a)(2) (same), and the D.C. Blue Sky Act is nearly so, *see* D.C. Code § 31-5606.05(a)(1)(B) ("the buyer does not know of the untruth or omission").[10]  In short, as this Court previously concluded, to avoid liability under the Securities Act or the Virginia or D.C. Blue Sky laws, Defendants must show "that the GSEs had actual knowledge that the specific representations in the prospectus supplements issued by the defendants were false."  *UBS III*, 2013 WL 3284118, at *18.

---

[9]   In light of this settled law, the unsupported, non-precedential dicta in *New Jersey Carpenters Health Fund* that, for purposes of a class certification motion, "public information could constitute circumstantial evidence of individual purchaser knowledge," 477 F. App'x at 814, cannot be read to override the rule that "[f]or the knowledge affirmative defense to succeed *on the merits*, the defendant must show the purchaser's actual knowledge of the specific untruth or omission," *id.* at 813.  *See also Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 329 (2d Cir. 2011) (Dicta from a non-precedential summary order is not controlling because "these stray comments are neither binding precedent nor even the holding of the case in which they appear. But more importantly, they do not accurately reflect the nature of the legal right at issue here.").

[10]   Moreover, both the Virginia and D.C. Blue Sky Acts were modeled on the Uniform Securities Act, *FHFA v. HSBC N. Am. Holdings Inc.*, --- F. Supp. 2d ----, 2013 WL 6588249, at *4 (S.D.N.Y. Dec. 16, 2013), which "was intended to reverse the age-old concept of caveat emptor and replace it with the concept of caveat venditor or seller beware.  Therefore, the investor is not charged with information he might have acquired or with constructive knowledge," *Dunn*, 369 F.3d at 429 (quoting Joseph C. Long, 12A Blue Sky Law § 9:24 (2003)).

## II. THERE IS NO EVIDENCE TO PERMIT A FINDING THAT THE GSES HAD ACTUAL KNOWLEDGE OF DEFENDANTS' SPECIFIC MISREPRESENTATIONS

Because Defendants' misrepresentations were "specific and concrete," to avoid summary judgment on the knowledge element of FHFA's claims Defendants must offer a "correspondingly specific" showing of the GSEs' knowledge. *UBS III*, 2013 WL 3284118, at *17. The Court has already provided guidance, by way of an example, of the particular evidentiary showing required to establish a knowledge defense for the four misrepresentations at issue:

> The prospectus supplement for the MABS 2007-WMC1 securitization, at issue in the UBS case, contained the following statements alleged to be materially misleading. First, the prospectus supplement represented that 70.76% of the loans in the Supporting Loan Group had LTV ratios of 80% or lower, and that none had an LTV ratio of greater than 100%. Second, the prospectus supplement reported that 98.32% of the loans were for owner-occupied properties. And finally, the prospectus supplement explained that the loans had been "originated generally in accordance with the underwriting guidelines." Thus, to show that the GSEs knew these statements were false, defendants would presumably be required to show that, given the particular pool of loans that formed the Supporting Loan Group, the GSEs were aware that it was not in fact true that 70.76% of those loans had 80% or lower LTV ratios, or that 98.32% were for owner-occupied properties, or that the SLG's loans were generally originated in accordance with the originator's underwriting guidelines.

*Id.* Nothing in the record that would permit or support such a showing for any of the 92 Certificates in these Actions, much less each of them.

The only information available to the GSEs concerning the specific characteristics of the Mortgage Loans is the false data that Defendants furnished in their Offering Materials. For instance, for a Certificate from the A-1A tranche of the GSAMP 2005-AHL2 Securitization, the Goldman Sachs Defendants represented that each mortgage loan originated or acquired by Accredited had been underwritten or re-underwritten "in accordance with Accredited's

underwriting guidelines," that 559 of the 978 mortgage loans in the supporting loan group had

LTVs at or below 80% and that none had LTVs above 100%, that 887 of the 978 mortgage loans

in the supporting loan group were for properties that were owner-occupied, and that the A-1A

tranche deserved an AAA credit rating (or its equivalent).  SUF ¶ 11, 12.  The GSEs did not have

access to the same information as Defendants—such as the loan files for these or any of the

Mortgage Loans—prior to purchase to determine whether Defendants were misrepresenting the

quality of such loans.  SUF ¶¶ 66-68, 75-77, 81, 89.  Nor is FHFA aware of a representation in

any document produced in this case—which exceeds 240 million pages across all parties and

third parties—that could have provided the GSEs with actual knowledge that any of these four

representations were materially false.

The same pattern follows for every Certificate in these Actions:  Defendants made

specific representations concerning adherence to underwriting guidelines, LTV ratios, owner-

occupancy statistics, and credit ratings.  SUF ¶¶ 11-24, 26-30, 33-39, 41-45, 47-51, 53-57.  The

GSEs possessed no information, such as loan files, showing that the actual loan characteristics

were materially different from the Defendants' representations, and there is likewise no evidence

that the GSEs actually knew that the loan characteristics were materially false.  SUF ¶¶ 64-89.

On this record, Defendants cannot meet their burden to "come forward with admissible

evidence sufficient to raise a genuine issue of fact for trial."  *Cordiano*, 575 F.3d at 204.  As

Defendants have previously acknowledged, "[e]ach certificate is a separate security, generally

collateralized by a unique set of loans and governed by a unique set of disclosures about those

loans."  *FHFA v. Goldman, Sachs & Co.*, Dkt. No. 135, at 11.  Therefore, Defendants must

present evidence sufficient to create a genuine issue of material fact that the GSEs had actual

knowledge of each of the four material misrepresentations at the time of purchase for each of the

92 Certificates.  *See In re WorldCom*, 346 F. Supp. 2d at 680-82 (reasoning that the absence of a genuine issue of material fact as to one misrepresentation had no effect on the presence of a genuine issue on other misrepresentations).  Defendants can present no evidence to support an "actual knowledge" finding for any specific misrepresentation bearing on any particular Certificate.

Even if Defendants could point to some document in the GSEs' possession that revealed the falsity of Defendants' misrepresentations—and FHFA is aware of no such document—that would still be insufficient to create a genuine issue of material fact under decades of Securities Act precedent.  Because "a purchaser who is actually ignorant that a seller's representation is inaccurate or incomplete may recover even though the full truth is apparent from materials in her possession," *Dunn*, 369 F.3d at 429 (quotation marks omitted); *see Casella*, 883 F.2d at 809, Defendants must show that the GSEs actually knew that Defendants' particular misrepresentations were false.  There is again no such evidence; to the contrary, the only loan-level or Certificate-level information available to the GSEs was the false information conveyed by Defendants in their Offering Materials, and there is no testimony by any witness indicating that the GSEs were nevertheless aware of Defendants' specific misrepresentations.

Nor can Defendants defeat summary judgment by attacking the credibility of the GSEs' witnesses, because "'if the [moving party] has made a properly supported summary judgment motion, the [non-moving party] may not respond simply with general attacks upon the [moving party's] credibility, but rather must identify affirmative evidence from which a jury could find that the [non-moving party] has carried [its] burden.'"  *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) (brackets omitted) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998)).  There is no such "affirmative evidence" in the record.

As this Court has previously concluded, "the GSEs were entitled to rely on the representations made in the offering documents."  *UBS III*, 2013 WL 3284118, at *18; *see also Casella*, 883 F.2d at 809 ("Sellers may be liable for misrepresentations they did not know were false if they should have known it; purchasers need only establish they did not know the statements were untrue.").  The GSEs purchased the Certificates pursuant to those misrepresentations, to their extreme detriment, and will recover at trial accordingly.  Because there is no genuine dispute of material fact about the GSEs' actual knowledge, summary judgment for FHFA on the knowledge element of its Section 11, Section 12, and Blue Sky claims is proper.

## CONCLUSION

For the reasons stated above, FHFA respectfully requests that the Court grant its motion for partial summary judgment against Defendants with respect to (1) Defendants' knowledge defense to FHFA's claim under Section 11 of the Securities Act; and (2) the "absence-of-knowledge" element of FHFA's claims under Section 12 of the Securities Act and the Virginia and D.C. Blue Sky laws.

Respectfully submitted,


DATED:   New York, New York
         April 22, 2014

By: /s/ Philippe Z. Selendy                    By: /s/ Kanchana Wangkeo Leung
Philippe Z. Selendy                            Marc E. Kasowitz
Manisha M. Sheth                               Christopher P. Johnson
Andrew R. Dunlap                               Michael A. Hanin
David B. Schwartz                              Kanchana Wangkeo Leung
QUINN EMANUEL URQUHART &                       KASOWITZ, BENSON, TORRES &
   SULLIVAN, LLP                                  FRIEDMAN LLP
51 Madison Avenue, 22nd Floor                  1633 Broadway
New York, New York 10010                       New York, New York 10019
(212) 849-7000                                 (212) 506-1700


*Attorneys for Plaintiff Federal Housing Finance Agency,*
*as Conservator for Fannie Mae and Freddie Mac*